# EXHIBIT T

RC OPPORTUNITY LLC and SCHLACKS
2020 TRANSFER LLC,

                Petitioners,

  -against-

TKF II GP LLC, TKF II L.P., JABBOK
SCHLACKS and WILLIAM SCHLACKS,

             Respondents.

## ARBITRATION DEMAND

Petitioners RC Opportunity LLC ("RC Opportunity") and Schlacks 2020 Transfer LLC ("2020LLC" and, together with RC Opportunity, the "Petitioners"), submit this Arbitration Demand against Respondents Jabbok Schlacks ("Jabbok") and William Schlacks ("William" and, together with Jabbok, the "Schlacks"), TKF II GP LLC ("TKF LLC"), and TKF II L.P. ("TKF LP" and, with all of the foregoing Respondents, the "Respondents") as follows:

## NATURE OF THE ACTION

1.     Petitioners bring this proceeding as a result of the Schlacks' failure to deliver stock in EquipmentShare.com, Inc. ("ES") to 2020LLC under a pair of option agreements and the Schlacks' improper claim, on behalf of TKF LLC and TKF LP, that the stock they refuse to deliver rightfully belongs to TKF LP. The Schlacks are members, managers, and representatives of TKF LP and TKF LLC. The Schlacks own a majority of and control TKF LLC, the general partner of TKF LP.

2.     The Schlacks, who are brothers and officers, directors, and major shareholders of ES, entered into the option agreements in 2020, which the parties amended in 2021 and then again in 2022. Under the option agreements, 2020LLC has the option to purchase shares of ES from the

Schlacks (the "Option Shares"). The Schlacks proposed the original option agreements to induce Neil Chheda, the sole manager of 2020LLC and an experienced venture capitalist, to participate in an effort to identify companies in which ES could invest capital. In 2021 and 2022, Mr. Chheda and his associates helped the Schlacks and ES place nearly $30 million in capital.

3.     In 2022, the Schlacks formed TKF LP, a limited partnership. TKF LP was chartered to source and invest capital in early-stage companies, which was similar to what Mr. Chheda had been assisting the Schlacks and ES to do since 2020. In connection with this new venture, the Schlacks asked Mr. Chheda to become a limited partner in TKF LP and to invest up to $2.5 million in TKF LP. They also asked Mr. Chheda to agree to the Schlacks' substantially favorable profit distribution terms depending on TKF LP's performance. In exchange, the Schlacks agreed to increase the number of options available to 2020LLC under the option agreements in amendments to the option agreements in 2022.

4.     In February 2024, 2020LLC properly exercised its right to purchase its vested option shares under the terms of the option agreements and amendments. The Schlacks, however, have refused to tender the shares and have refused to provide 2020LLC with payment wiring instructions to finalize the exercise of its option to purchase the shares.

5.     Although the option agreements are plain and unambiguous and require the Schlacks to transfer the Option Shares to 2020LLC, the Schlacks have claimed that the Option Shares are somehow the property of TKF LP. As members, managers, and representatives of TKF LP and of its general partner, TKF LLC, the Schlacks have made this claim on their own behalf and ostensibly on behalf of TKF LP and TKF LLC. As noted above, RC Opportunity is a limited partner in TKF LP, and Mr. Chheda is the sole member and manager of RC Opportunity.

6.      The TKF LP limited partnership agreement (the "TKF Agreement") is governed by Delaware law and contains a broad arbitration clause that "[a]ny claim, dispute or controversy of whatever nature arising out of or relating to this [TKF Agreement]," including disputes or controversies "concerning the interpretation, effect, termination, validity, performance and/or breach of this [TKF Agreement]" shall be determined by arbitration pursuant to the JAMS Comprehensive Rules and Procedures ("JAMS Rules") before a single arbitrator. The TKF Agreement further provides that, "the covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, personal or legal representatives, successors and assigns of the respective parties hereto" and "the provisions of this Agreement should be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought."

7.      The Schlacks' claim that the Option Shares are the property of TKF LP is a blatant misreading of the TKF Agreement to skirt their obligations under the option agreements. In reality, the Schlacks are refusing to honor the option agreements because the exercise price of the Option Shares is $4.22 and, based on a recent sale of ES shares, the Option Shares are potentially valued at a price of at least $22.00. By invoking what they ostensibly claim is TKF LP's right under the TKF Agreement and related documents to ownership of the Option Shares, they are using the TKF Agreement as a defense to their refusal to deliver the Option Shares and are estopped from claiming that they are not obligated to arbitrate Petitioners' claims. As members, managers, and representatives of TKF LP and TKF LLC, they are also bound to arbitrate a dispute "arising out of or relating to" the TKF Agreement.

8.      Petitioners seek a declaratory ruling that TKF LP has no right or entitlement to the Option Shares and that the Option Shares must be delivered to 2020LLC. 2020LLC also seeks

damages for breach of contract against the Schlacks of, at a minimum, $59,699,550, which is the difference between the exercise price ($4.22) and the latest price ES paid for redeeming comparable ES shares ($22.00) multiplied by the number of Option Shares, or 3,357,680.

9.     Alternatively, Petitioners seek an order of specific performance requiring the Schlacks to deliver the Option Shares to 2020LLC in exchange for the payment of the contractual price for the Option Shares. ES is a private corporation, and its shares are illiquid. As a result, the true value of the ES shares is difficult to ascertain and thus Petitioners are unlikely to be adequately compensated by an award of damages. Further, without prompt equitable relief, the Option Shares may be transferred or pledged to a bona fide third-party purchaser and thus Petitioners may forever lose the opportunity of owning the shares pursuant to the option agreements and will be irreparably harmed without any adequate remedy at law.

## PARTIES

10.     2020LLC is a Delaware limited liability company with its principal place of business in Boston, Massachusetts. 2020LLC's manager is Neil Chheda, a resident of Boston, Massachusetts. Mr. Chheda is also a director at ES.

11.     RC Opportunity is a Delaware limited liability company with its principal place of business in Boston, Massachusetts. RC Opportunity's sole member and manager is Mr. Chheda.

12.     Jabbok is a resident of Missouri. He is, and was at all relevant times, the Chief Executive Officer and a director of ES. In addition to millions of as-yet unvested options in ES, Jabbok currently holds 23,899,112 common shares of ES. Jabbok is also a member, manager, and representative of TKF LP and TKF LLC.

13.     William is a resident of Missouri. He is, and was at all relevant times, the President and a director of ES. In addition to millions of as-yet unvested options in ES, William currently

holds 23,899,112 common shares of ES. William is also a member, manager, and representative of TKF LP and TKF LLC.

14.     TKF LLC is a Delaware limited liability company with its registered agent, Corporation Trust Corporation, located in Wilmington, Delaware, and its principal place of business is in Columbia, Missouri.

15.     TKF LP is a Delaware limited partnership with its registered agent, Corporation Trust Corporation, located in Wilmington, Delaware, and its principal place of business is in Columbia, Missouri

16.     Non-party ES is a privately held corporation organized under the laws of Delaware, with its principal place of business in Columbia, Missouri. ES's principal business is the sale and rental of construction equipment. Based on recent funding transactions and valuations pursuant to Department of Treasury regulation 409A, ES has a market capitalization approaching $4 billion.

## THE ARBITRATION CLAUSE AND RELATED PROVISIONS

17.     The TKF Agreement (attached as Exhibit 1) provides, at Section 15.4:

> **Section 15.4. Waiver of Jury Trial; Expedited Arbitration**. Any claim, dispute or controversy of whatever nature arising out of or relating to this Agreement, including without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement or any conflict of interest between the General Partner and the Partnership ("***Controversy***") shall be settled by arbitration pursuant to this section. In the event of such a Controversy, the complaining party shall deliver to the other a "***Dispute Notice***," which shall describe the Controversy with particularity. Within 10 days after receipt of such Dispute Notice, the parties thereto shall meet and confer in person with fully authorized and empowered executives and with counsel regarding the matters set forth in the Dispute Notice and shall attempt in good faith to resolve all issues described therein. Unless otherwise agreed in writing by the negotiating parties, the above-described negotiation shall take place at a mutually acceptable time and place, and end at the close of the first meeting

of executives and counsel described above. To the extent the parties either are not able to meet or otherwise not able to resolve the Controversy within the time stated (unless extended by mutual agreement), such Controversy shall be determined by binding arbitration under and pursuant to . . . JAMS's Comprehensive Arbitration Rules and Procedures (where the amount in controversy, not including estimated attorneys' fees or costs, equals or exceeds $250,000). The arbitration shall proceed before one arbitrator, who, to the extent practicable, shall be a retired Article III federal court judge negotiated and agreed on by the parties. If the parties are unable to agree upon such an arbitrator within 30 days after the demand for arbitration is filed, then JAMS shall appoint a sole arbitrator in accordance with its rules ("Rules"). Nothing in this Section 15.[4] precludes any of the parties from seeking injunctive and/or emergency relief (including, among other things, a temporary restraining order) from a court of competent jurisdiction. The prevailing party in any arbitration shall be reimbursed for its attorneys' fees by the non-prevailing party.

18.     Section 15.6 of the TKF Agreement provides that, "to the fullest extent permitted by law, the covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, personal or legal representatives, successors and assigns of the respective parties hereto." Section 15.2(b) of the TKF Agreement further provides that, "[t]he Partners desire, intend and agree that the provisions of this Agreement should be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought."

19.     The JAMS Rules, which are incorporated by express reference into the TKF Agreement's arbitration clause, provide: "Jurisdictional and arbitrability disputes, including the disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are the proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator." JAMS Rules at Rule 11(b).

# FACTUAL ALLEGATIONS

## *The Original Option Agreements*

20.     On December 31, 2020, Jabbok entered into the Jabbok Schlacks Option Agreement with 2020LLC (the "Jabbok Schlacks Option Agreement"). Also on December 31, 2020, William entered into the William Schlacks Option Agreement with 2020LLC (the "William Schlacks Option Agreement," and together with the Jabbok Schlacks Option Agreement, the "Original Option Agreements," attached as Exhibit 2).

21.     One of the reasons for the Original Option Agreements was to induce Mr. Chheda to work with Jabbok and William to engage in venture capital efforts to source early-stage investments on behalf of and for ES using ES capital. Mr. Chheda has substantial experience in venture capital and runs a network of venture capital funds under the d/b/a "Romulus Capital" ("Romulus"). Certain Romulus funds are also themselves investors in ES. Mr. Chheda actively participated in this endeavor, and he and his associates helped ES invest tens of millions of dollars from 2020 to 2022, including in such companies as Branch Technologies, Inc., Cost Certified, Inc., Felux, Inc., Foresight, Inc., Flexbase Technologies, Inc., Reconstruct, Inc., Skillit, Inc., and Soil Connect Services, Inc.

22.     The Original Option Agreements contain identical provisions. As they state, the Schlacks were each receiving from ES a grant of 767,196 shares of ES common stock (the "Grant Shares") and each agreed to grant to 2020LLC options for one-third of that amount, or 255,732 Option Shares. (Mr. Chheda formed 2020LLC to receive the transfer of the Schlacks' shares, hence the LLC's full name: Schlacks 2020 Transfer LLC.) The one-third number was arrived at because Jabbok, William, and Mr. Chheda were each going to be involved in efforts to source early-stage investments on behalf of and for ES. As Section 1(a) of the Original Option Agreements provides:

It is anticipated that following the date hereof, the Seller [each of William and Jabbok] will receive a grant of 767,196 shares of Common Stock (or options to purchase shares of Common Stock) (the "Award Shares") pursuant to an award agreement (the "Grant Agreement") with the Company [ES], which Grant Agreement will provide for vesting conditions on the acquisition or retention of such Award Shares essentially similar to those set forth on Exhibit A hereto (such vesting conditions as set forth in the Grant Agreement, the "Vesting Conditions") and an exercise price to be paid to the Company to acquire such Award Shares (the "Per Share Exercise Price"). Seller shall notify Buyer promptly upon receipt by Seller of the Grant Agreement, providing a copy thereof.

(Ex. 2, § 1(a).)

23.    Exhibit A of the Original Option Agreements, entitled "Vesting Conditions," provided a vesting schedule that began on the first grant of Award Shares under the Grant Agreement and proceeded through three subsequent vesting triggers based on "such time[s]" as ES achieved a particular valuation—from $2 billion, to $3 billion, to $4 billion.

24.    Section 1(b), in turn, provides:

Subject to the terms and conditions of this Agreement, the Seller hereby grants the Buyer the right to acquire (the "Option Right") from time to time up to 255,732 shares (the "Option Shares") of Common Stock of the Company from Seller, subject to the terms and conditions of this Agreement including vesting provisions.

(*Id.* § 1(b).)

25.    The Original Option Agreements further provide that:

The Option Right shall vest and become exercisable for tranches of Option Shares (such shares becoming "Vested Options Shares") at the time as the Vesting Condition for such tranche is satisfied for the corresponding Award Shares. Seller shall notify Buyer promptly each time any Vesting Conditions are so satisfied. The Buyer may purchase from Seller from time to time, pursuant to the terms hereof, the Vested Options Shares by notice to the Seller together with tender of payment in cash (by wire transfer, certified check or official bank check) of the Per Share Exercise Price for each such Vested Option Share (such transaction being referred to as a "Sale Closing"). The Sale Closing shall occur promptly following such notification and tender of payment by Buyer. For avoidance of

doubt, the Option Right may be exercised at any time or from time to time with respect to all or any portions of the Vested Option Shares, and such right shall continue to be exercisable through the term of exercisability under the Grant Agreement (such time or event causing termination, a "Termination Event").

(*Id.* § 2(a).)

***The First Amendments, the Stock Split, and the First Exercise***

26.     A few months after the Original Option Agreements, Jabbok and William offered Mr. Chheda an alternative, partially accelerated vesting schedule in return for decreasing the total number of Option Shares. Mr. Chheda accepted, and Jabbok and William each entered into "Amendment No. 1 to Option Agreement" with 2020LLC, effective as of June 16, 2021 (together, the "First Amendments"), which modified certain terms of the Original Option Agreements. The First Amendments are identical and are both attached as Exhibit 3. The First Amendments "confirm[ed] that the Per Share Option Price is $33.77 per share, which is set to be the fair market value of the shares based on a 409A valuation obtained recently." The First Amendments reduced the number of Option Shares from 255,732 to 210,979 and modified the vesting schedule so that the four vesting events in the Original Option Agreements changed to two vesting events—half of the 210,979 Option Shares, or 105,490 Option Shares, were to vest on June 17, 2021, and the other half, or 105,489 Option Shares, were to vest "at such time as [ES] achieves a Valuation of no less than $4 billion, provided that such Valuation is achieved on or before June 30, 2024."

27.     Soon after the First Amendments, ES underwent a 1:8 stock split. Pursuant to Section 3 of the Original Option Agreements, "[w]henever [ES] shall . . . subdivide its outstanding shares of Common Stock . . . the number of Option Shares and the Per Share Price shall be equitably adjusted . . . as of the effective date of such subdivision." As a result, the 105,490 Option Shares that vested on June 17, 2021 under the First Amendments at $33.77 per share effectively

became 843,920 Option Shares at $4.22 per share. Likewise, the 105,489 Option Shares that were to vest at the $4 billion valuation became 843,912 Option Shares at the same price.

28.     In June 2021, 2020LLC exercised its option to purchase 839,420 Option Shares that vested on June 17, 2021 under the First Amendments from each Jabbok and William, for a total of 1,678,840 shares (the "First Exercise"). 2020LLC paid the option price and Jabbok and William provided the Option Shares pursuant to the First Exercise.

***Jabbok and William Form TKF LP***

29.     In the fall of 2022, Jabbok, William, and Mr. Chheda decided again to change their arrangement. First, Jabbok and William wished to establish a stand-alone venture capital fund. That is, instead of Jabbok, William, and Mr. Chheda sourcing investment companies and funding those investments with cash from ES's balance sheet, Jabbok and William decided to form a limited partnership—TKF LP—to make investments. Second, Jabbok and William requested that Mr. Chheda personally contribute substantial capital to TKF LP and to cede to Jabbok and William management rights over TKF LP. Finally, Jabbok and William requested that they and they alone receive performance fees from TKF LP investments in the form of "carried interest." This time, in return, Jabbok and William would increase the total number Option Shares to Mr. Chheda.

30.     The structure settled upon was that Jabbok and William would become members of TKF LLC, a limited liability company that would serve as the general partner of TKF LP. As the general partners, Jabbok and William (through an affiliated limited partner) would own 12.5 percent of TKF LP. ES would become a limited partner of TKF LP. ES would own 75% of TKF LP and would be responsible for making up to $12 million in capital contributions ($3 million as an initial contribution and up to $9 million in additional contributions). Mr. Chheda, via RC Opportunity, would become a 12.5% limited partner and would be responsible for up to $2.5

million in contributions ($500,000 initially and up to $2 million additionally).  (*See* Ex. 1 at Sch. A-1.)

31.     One major benefit to TKF LLC (and to its members, Jabbok and William) of being the general partner—in addition to having control of TKF LP—is that, according to the TKF Agreement, TKF LLC would receive performance fees in the form of "carried interest." Accordingly, under Section 4.2 of the TKF Agreement, distributions would first be made pro rata according to ownership in TKF LP (12.5%, 12.5%, and 75%) until the limited partners received a 100% return of their capital contributions (the "100% Hurdle"). (Ex. 1, § 4.2(a).) After that, distributions would favor the general partner as follows: (1) if the limited partners achieve the 100% Hurdle but distributions total *less than* 500% of their capital contributions, the general partner would receive 20% of the limited partners' pro rata distribution; (2) if the limited partners receive distributions *equal to or exceeding* 500% of their capital contributions, the general partner would receive 40% of the limited partners' pro rata distributions. (*Id*. § 4.2(b).)

32.     The differences between the arrangement among Jabbok, William, and Mr. Chheda that contributed to the parties entering into the Original Option Agreement on December 31, 2020, and the new TKF LP fund structure, were substantial. First, Mr. Chheda was being asked to contribute through RC Opportunity up to $2.5 million to TKF LP. Before the new structure, Mr. Chheda was not contributing and putting at risk any capital. Also, in the prior structure, while it was contemplated that Mr. Chheda, with his venture capital background, would be able to substantially shape the direction and focus of the endeavor, in the new structure, Mr. Chheda would cede much control to Jabbok and William and become (through RC Opportunity) a limited partner of TKF LP with no legal right to manage or direct TKF LP. Finally, not only was Mr. Chheda now

being expected to contribute up to $2.5 million, but he was also being asked to pay to Jabbok and William carried interest on that $2.5 million investment.

***The Second Amendments***

33.     Mr. Chheda agreed to these new terms and to make the investment in TKF LP in return for an increase in the number Option Shares and a change to the vesting schedule of the unvested options. Given the changed structure—which now had Mr. Chheda committing substantial capital, ceding control to Jabbok and William, and giving them the exclusive right to carried interest at a substantially generous rate—the parties agreed that the amount of Option Shares Mr. Chheda's 2020LLC entity would be entitled to from each of Jabbok and William would increase to a total of 3,357,860 shares. This doubled the number of Option Shares reflected in the Second Amendments (after the 1:8 stock split) and constitutes roughly half (approximately 55%) of the 6,137,568 Grant Shares (whereas previously 2020LLC had the right to approximately one-third of the Grant Shares). The parties also agreed to change certain deadlines related to the Option Shares that would vest when ES achieved a $4 billion valuation.[1]

34.     Accordingly, on or about December 16, 2022, Jabbok and William each entered into "Amendment No. 2 to Option Agreement" with 2020LLC (together, the "Second Amendments"), which are attached as Exhibit 4. Pursuant to the Second Amendments, a total of 3,357,680 Option Shares (1,678,840 Option Shares from each Jabbok and William) vested on June 17, 2021. (Ex. 4.) An additional 3,357,680 Option Shares—again, half that amount from each of

---

[1] As described above, the Original Option Agreements were originally structured so that 2020LLC received in Option Shares one-third of the Grant Shares, or 255,732 Option Shares compared to 767,196 Grant Shares. In the First Amendments, that number was reduced to 210,979 Option Shares, with 105,490 vesting on June 17, 2021 and 105,480 vesting at the $4 billion valuation. When the 1:8 stock split occurred, those amounts were effectively changed by operation of the Original Option Agreements to 843,920 and 843,912, or a total of 1,687,832 out of the split-adjusted 6,137,568 Grant Shares, which was slightly less than but roughly equivalent to the one-third division originally conceived in the Original Option Agreements.

Jabbok and William—shall vest at such time as ES achieves a $4 billion valuation, within the parameters of the updated 2024 deadlines. (*Id.*)

35.     The sum and substance, then, of the transactions involved in the TKF Agreement and the Second Amendments were as follows: the Schlacks directed their new newly formed entities, TFK II LC and TKF LP, to enter into the TKF Agreement with newly formed RC Opportunity, and they also entered into the Second Amendments with 2020LLC. In return, in order for 2020LLC to receive the additional shares under the Second Amendments, 2020LLC (and its manager Mr. Chheda), directed RC Opportunity to enter into the TKF Agreement while 2020LLC entered into the Second Amendments. In this way, the TKF Agreement and the Second Amendments involved substantially interdependent and connected conduct and they also involved a unity of ownership among the Schlacks, TKF LP, and TKF II LLC, on the one hand, and a unity of ownership between 2020LLC and RC Opportunity on the other.

***2020LLC's Second Exercise of Its Right to Option Shares***

36.     As noted above, in June 2021, 2020LLC purchased 843,920 Option Shares that vested on June 17, 2021 under the First Amendments from each Jabbok and William. On February 13, 2024, 2020LLC sought to exercise its right to purchase the remaining Option Shares that had vested on June 17, 2021 under the Second Amendments from both Jabbok and William, and 2020LLC provided notice of its intent in accordance with Section 2(a) of the Original Option Agreements (together, the "Second Exercise Notices," attached as Exhibit 5).

37.     The Second Exercise Notices requested Jabbok's and William's wiring instructions so that 2020LLC could wire the funds necessary to purchase the remaining Option Shares from each of Jabbok and William.

38.     Neither Jabbok nor William provided any wiring instructions in response to the Second Exercise Notices, and they have refused, despite repeated requests, to provide wiring instructions. They have also denied their obligations under the Second Amendments and have refused to proceed with the closing of the acquisition of the Option Shares pursuant to the Second Exercise Notices.

***The Parties Meetings and Respondents' Positions***

39.     Consistent with the requirement in the arbitration provision in the TKF Agreement that the parties attempt to negotiate a resolution, the parties, through their counsel, met on four occasions to discuss an informal resolution of their dispute between March 1 and April 30, 2024. Respondents, through their counsel, have taken the position that they do not have any obligation to proceed with the sale of the Option Shares to 2020LLC because it was their intention that the Option Shares were the property *not* of 2020LLC but of TKF LP. According to Respondents—again, through their counsel—it was either through mistake or some kind of duress they were experiencing in December 2020 when they signed the Original Option Agreements that they agreed that the Option Shares would go to 2020LLC. They also contend that the Second Amendments contain a scrivener's error with respect to the amount of Option Shares.

40.     This attempt to invoke the rights of TKF LP and TKF LLC under the TKF Agreement is without merit. As an initial matter, the Original Option Agreements could not be clearer as to the identity of the holder of the option, or "Buyer." The Buyer is plainly defined as 2020LLC. Jabbok and William also affirmed their knowledge and agreement that the Buyer was 2020LLC in the First Amendments on June 16, 2021 and in the Second Amendments on December 16, 2022. What's more, after and pursuant to the First Exercise in June 2021, in a June 30, 2021 Stock Transfer Agreement, both Jabbok and William confirmed that the Buyer was 2020LLC and

instructed the Secretary of ES to transfer the shares to 2020LLC. The 2021 Stock Transfer Agreements are attached as Exhibit 6. These subsequent affirmations of 2020LLC as the Buyer plainly show that Jabbok and William were not mistaken about what entity was to receive the Option Shares. Further, their repeated affirmations after the Original Option Agreements—and well after any alleged duress in December 2020 had dissipated—confirms that any claim of duress during that period is without merit.

41.     Nor is there any reference to TKF LP or anything remotely resembling TKF LP in the Original Option Agreements, the First Amendments, or the Second Amendments—and for good reason. While the Original Option Agreements were signed on December 31, 2020, TKF LP and the TKF Agreement *did not come into existence until October 28, 2022*, nearly two years later and shortly before the Second Amendments were executed on December 16, 2022. Further, once TKF LP did come into existence shortly before the Second Amendments, there was no mention of Option Shares in the TKF Agreement or in the related subscription documents.

42.     Further, it was clear from the First Exercise that it was 2020LLC (and not any other entity) that was exercising its option for the Option Shares in June 2021. Equally clear was that it was 2020LLC *that paid the Purchase Price for the Option Shares* in the First Exercise. On top of that, the Schlacks, as the members of TKF LLC and the exclusive manager of TKF LP, have the obligation to "manage and control the investments, business and affairs of [TKF LP]" and to keep accurate books and records "reflect[ing] the assets of [TKF LP]." (Ex 1, §§ 5.1, 5.2(f).) Despite contending that they believed the Option Shares—including, presumably, those 2020LLC obtained in the First Exercise in June of 2021—are supposed to be assets of TKF LP, the Schlacks never complained that nearly 2 million shares of ES stock were not, in fact, assets of TKF LP. This is yet another confirmation that the Option Shares were never intended to be assets of TKF LP.

43.     Likewise, there is not a single reference to Option Shares or the Option Agreement in the TKF Agreement or any other documents related to TKF LP. This is despite numerous provisions of the TKF Agreement and related documents that would be expected to mention them. As but a few examples, Schedule A of the TKF Agreement describes the "Capital Commitments" of the general partner and the limited partners. (*Id.* at Sch. A-1.) This section describes all of the property of TKF LP, including "Initial Capital Contributions" and "Total Possible Commitment" in the future. There is no mention of the Option Shares or the Option Agreement. There is also no mention of Option Shares or ES stock in Section 2.4 of the TKF Agreement, which describes the "Purpose" of TKF LP and the types of assets TKF LP is expected to acquire and to hold. The TKF Agreement also contains an "Entire Agreement" clause, which provides that "this Agreement sets forth the entire understanding of all the parties hereto." (*Id.* § 15.5.)

44.     Nor is there any mention of the Option Shares or any ownership of ES stock in the "Statement of Investment Consideration" (the "Investment Statement") related to TKF LP, which was finalized the same day as the TKF Agreement and "relates to the proposed sale of limited partnership interests of" TKF LP. (Ex. 7 at 1.) In fact, the Investment Statement makes clear that there was never any understanding or intent that TKF LP would possess Option Shares or any ES stock for that matter. As one of the "Risk Factors" in the Investment Statements states:

> **Unspecified Investments**.  The capital commitments received from the Limited Partners pursuant to this offering are going into a blind pool.  *The Fund has not identified the particular investments it will make.*

(*Id.* at 4 (emphasis added).) Likewise, under "Portfolio Company Risks," in a section entitled, "Early stage investments," the Investment Statement states that TKF LP

> will pursue a venture capital strategy and will invest primarily in equity and equity-oriented securities of privately held early-stage companies.  The Fund may often be the first source of professional financing for such companies.  These companies typically have

> limited or no revenues, are not profitable and may require
> considerable additional capital to develop products, audiences,
> technologies and markets, acquire customers and achieve or
> maintain a competitive position.

(*Id.* at 9.) Again, there is no mention of ES or Option Shares. What's more, the description of the "early-stage companies" the stock of which TKF LP planned to own is a far cry from ES, which is a mature company with over five thousand employees and has raised billions of dollars of capital. ES is not an "early-stage company."

45.     As well, throughout the Investment Statement there *are* references to ES—although again without any suggestion that TKF LP will hold Option Shares or any ES stock. For example, under the heading, "**Management Risks**" (bold in original) the Investment Statement discloses that "[t]he Managing Members [of the Fund] are the Chief Executive Officer and President, and Members of the Board of Directors, of [ES], a fast-growing technology company in the construction industry." (*Id.* at 14.) At the same time, the Investment Statement states, under the heading, "**Portfolio Company Risks**" and "***Reliance on Portfolio Company management team***" (bold and italics in original) that TKF LP will "generally hold minority equity positions in its Portfolio Companies, with limited control and information rights" and that "[e]ach Portfolio Company's day-to-day operations will be the responsibility of such company's management team." (*Id.* at 9.) This description would certainly not apply to ES, since Jabbok and William are the CEO and President, as well as members of ES's Board of Directors and major ES shareholders.

46.     Finally, as to the Schlacks' attempt to avoid their obligations by claiming that the Second Amendments contain a scrivener's error with respect to the number of Option Shares, the contention is clearly without merit. The Second Amendments are simple, three-page agreements with the alleged scrivener's error on a single half-page of text describing the number of Option Shares and the vesting schedule. (*See* Ex. 4.) These are not 50-page, single-spaced tomes with

easily missed fine print or confusing terminology. Further, the Schlacks had or at least had access to, capable counsel and, on information and belief, had counsel review the Second Amendments before signing them. There was no error.

47.     In a final attempt to avoid arbitration and to resolve the dispute, on May 15, 2024, 2020LLC sent a supplemental notice of exercise to Jabbok and to William (the "Supplemental Notices," attached as Exhibit 8). In the Supplemental Notices, 2020LLC explained why the Schlacks' contentions are without merit. 2020LLC also again tendered the Purchase Price for the Option Shares pursuant to the Supplemental Notices and asked the Schlacks to confirm that they were ready to complete the transfer of the Option Shares. Neither the Schlacks nor their counsel have confirmed that they are prepared to do so.

## COUNT I
### (Declaratory Judgement – All Respondents)

48.     Petitioners re-allege all of the foregoing allegations.

49.     There is an actual dispute among the parties concerning entitlement to the Option Shares pursuant to the Supplemental Notices. Respondents claim that the Option Shares subject to the Supplemental Notices should be the property of TKF LP and that the Second Amendment contains a scrivener's error. Petitioners dispute these contentions.

50.     The Arbitrator should declare the rights of the parties and should issue an award declaring that Option Shares subject to the Supplemental Notices are not the property of TKF LP, that there was no scrivener's error, and that 2020LLC is entitled to prompt receipt of the Option Shares pursuant to the Supplemental Notices.

## COUNT II
### (Equitable Relief/Specific Performance – Jabbok Schlacks)

51.     Petitioners reallege all of the forgoing allegations.

52.     Jabbok has refused to proceed with the completion of 2020LLC's exercise of its option pursuant to the Supplemental Notice.

53.     The Option Shares are not public shares, and their value is difficult to ascertain. Thus, it is unlikely that 2020LLC will be adequately compensated by an award of monetary damages if Jabbok is not ordered to specifically perform and to timely provide the ES shares pursuant to the Jabbok Schlacks Option Agreement, as amended.

54.     The Arbitrator should order Jabbok to specifically perform all of his obligations under the Jabbok Schlacks Option Agreement, as amended, including by, in exchange for the agreed-upon purchase price, delivering the Option Shares due under the Jabbok Schlacks Option Agreement, as amended, and pursuant to the Supplemental Notice.

## COUNT III
### (Equitable Relief/Specific Performance – William Schlacks)

55.     Petitioners reallege all of the forgoing allegations.

56.     William has refused to proceed with the completion of 2020LLC's exercise of its option pursuant to the Supplemental Notices.

57.     The Option Shares are not public shares, and their value is difficult to ascertain. Thus, it is unlikely that 2020LLC will be adequately compensated by an award of monetary damages if William is not ordered to specifically perform and to timely provide the Option Shares due under the William Schlacks Option Agreement, as amended, and pursuant to the Supplemental Notice.

58.     The Arbitrator should order William to specifically perform all of his obligations under the William Schlacks Option Agreement, as amended, including by, in exchange for the agreed-upon purchase price, delivering the Option Shares due under the William Schlacks Option Agreement, as amended, and pursuant to the Supplemental Notice.

19

## COUNT IV
### (Breach of Contract – Jabbok Schlacks)

59.     Petitioner realleges all of the foregoing allegations.

60.     The Jabbok Schlacks Option Agreement, as amended, is a valid and enforceable agreement by and between Jabbok and 2020LLC.

61.     2020LLC performed its obligations under the Jabbok Schlacks Option Agreement, as amended, by properly exercising its option to acquire the Option Shares pursuant to the Second Exercise Notice and the Supplemental Notice and by tendering the purchase price for the Option Shares upon Jabbok's confirmation of bank wiring instructions.

62.     Jabbok breached his contractual obligations when he failed to recognize the Second Exercise Notice and the Supplemental Notice and by failing to provide and/or confirm wiring instructions. In failing to adequately respond to the Second Exercise Notice and the Supplemental Notice, Jabbok has failed to perform under the Jabbok Schlacks Option Agreement, as amended, and has prevented 2020LLC from proceeding with its contractual rights to purchase the Option Shares and refused to tender the Option Shares to 2020LLC.

63.     Jabbok's breach of the Jabbok Schlacks Option Agreement, as amended, has damaged 2020LLC in an amount to be proven in the arbitration but in no event less than $29,849,775.

## COUNT V
### (Breach of Contract – William Schlacks)

64.     Petitioner realleges all of the foregoing allegations.

65.     The William Schlacks Option Agreement, as amended, is a valid and enforceable agreement by and between William and 2020LLC.

66. 2020LLC performed its obligations under the William Schlacks Option Agreement, as amended, by properly exercising its option to acquire the Option Shares pursuant to the Second Exercise Notice and the Supplemental Notice and by tendering the purchase price for the Option Shares upon William's confirmation of bank wiring instructions.

67. William breached his contractual obligations when he failed to recognize the Second Exercise Notice and the Supplemental Notice and by failing to provide and/or confirm wiring instructions. In failing to adequately respond to the Second Exercise Notice and the Supplemental Notice, William has failed to perform under the William Schlacks Option Agreement, as amended, and has prevented 2020LLC from proceeding with its contractual rights to purchase the Option Shares and refused to tender the Option Shares to 2020LLC.

68. William's breach of the William Schlacks Option Agreement, as amended, has damaged 2020LLC in an amount to be proven in the arbitration but in no event less than $29,849,775.

**PRAYER FOR RELIEF**

**WHEREFORE**, Petitioners request that the Arbitrator grant the following:

a.  A declaration that the Option Shares subject to the Supplemental Notices are not the property of TKF LP, that there was no scrivener's error, and that 2020LLC is entitled to prompt receipt of the Option Shares pursuant to the Supplemental Notices;

b.  An order that Jabbok shall specifically perform all of his obligations under the Jabbok Schlacks Option Agreement, as amended, by providing and/or confirming wiring instructions and tendering the Option Shares due under

the Jabbok Schlacks Option Agreement, as amended, and pursuant to the Supplemental Notice;

c.    An order that William shall specifically perform all of his obligations under the William Schlacks Option Agreement, as amended, by providing and/or confirming wiring instructions and tendering the Option Shares due under the William Schlacks Option Agreement, as amended, and pursuant to the Supplemental Notice;

d.    An award that Jabbok has breached the Jabbok Schlacks Option Agreement, as amended, and that 2020LLC is entitled to an award of damages from Jabbok of no less than $29,849,775;

e.    An award that William has breached the William Schlacks Option Agreement, as amended, and that 2020LLC is entitled to an award of damages from William of no less than $29,849,775;

f.    An award of pre-judgment interest under Delaware law; and

g.    An award awarding Petitioners all costs and expenses of the arbitration, including all attorneys' fees, which will be determined in the customary manner after the prevailing party has been determined and on the basis of fee and expense affidavits.

Dated:  May 22, 2024                                   Respectfully submitted,

                                                       By: */s/ Anthony S. Fiotto*
                                                           Anthony S. Fiotto
                                                           Nathaniel R. Mendell
                                                           Julia C. Koch
                                                           Mitchell E. Feldman
                                                           MORRISON FOERSTER LLP
                                                           200 Clarendon Street
                                                           Boston, MA 02116

Telephone: 617-648-4700
Facsimile: 617-830-0142
afiotto@mofo.com
nmendell@mofo.com
jkoch@mofo.com
mfeldman@mofo.com
*Attorneys for Petitioners*

23

# Exhibit 1

# TKF II L.P.

### LIMITED PARTNERSHIP AGREEMENT

### DATED AS OF OCTOBER 28, 2022

THE LIMITED PARTNERSHIP INTERESTS (THE "*INTERESTS*") OF TKF II L.P. (THE "*PARTNERSHIP*") HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), THE SECURITIES LAWS OF ANY U.S. STATE OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (i) THE SECURITIES ACT, ANY APPLICABLE SECURITIES LAWS OF ANY U.S. STATE, AND ANY OTHER APPLICABLE SECURITIES LAWS AND (ii) THE TERMS AND CONDITIONS OF THIS LIMITED PARTNERSHIP AGREEMENT. THEREFORE, PURCHASERS OF THE INTERESTS SHALL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE PARTNERSHIP IS NOT REGISTERED AND WILL NOT REGISTER AS AN INVESTMENT COMPANY UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "*INVESTMENT COMPANY ACT*"), IN RELIANCE ON ONE OR MORE EXCLUSIONS OR EXEMPTIONS THEREFROM.

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS; RULES OF CONSTRUCTION ................................................1

    Section 1.1.   Definitions ................................................................................1

    Section 1.2.   Rules of Construction ................................................................1

ARTICLE II ORGANIZATION ................................................................................2

    Section 2.1.   Organization ................................................................2

    Section 2.2.   Name ................................................................2

    Section 2.3.   Principal Office; Registered Agent ................................................2

    Section 2.4.   Purpose ................................................................3

    Section 2.5.   Certificate of Limited Partnership ................................................3

    Section 2.6.   Term ................................................................3

    Section 2.7.   Qualification in Other Jurisdictions ................................................3

    Section 2.8.   Alternative Investment Vehicles ................................................4

    Section 2.9.   Parallel Investment Vehicles ................................................5

    Section 2.10.   Single Partnership Assumption ................................................7

    Section 2.11.   Co-investments ................................................8

ARTICLE III PARTNERS AND CAPITAL ................................................................9

    Section 3.1.   General Partner ................................................................9

    Section 3.2.   Offering; Partners; Initial Closing ................................................9

    Section 3.3.   Capital Contributions ................................................11

    Section 3.4.   Liability of Partners ................................................12

    Section 3.5.   Default in Payment ................................................12

    Section 3.6.   Admission of Limited Partners ................................................16

    Section 3.7.   Strategic Investors ................................................18

    Section 3.8.   ERISA Matters ................................................18

    Section 3.9.   Limited Exclusion Right ................................................20

    Section 3.10.   Mandatory Withdrawal ................................................21

ARTICLE IV DISTRIBUTIONS; ALLOCATION OF PROFITS AND LOSSES ................22

    Section 4.1.   Distributions ................................................22

    Section 4.2.   Amounts and Priority of Distributions ................................................23

    Section 4.3.   Special Distributions ................................................23

    Section 4.4.   Special Tax Distributions ................................................23

Section 4.5.   Tax Withholding ................................................................24

Section 4.6.   Capital Accounts ...............................................................25

Section 4.7.   Allocations of Profits and Losses .....................................26

Section 4.8.   Special Allocations ...........................................................28

Section 4.9.   Allocation Rules ...............................................................29

Section 4.10.  Tax Allocations ................................................................29

Section 4.11.  UBTI ................................................................................29

**ARTICLE V RIGHTS AND DUTIES OF THE GENERAL PARTNER – EXPENSES**......30

Section 5.1.   Management; Investment Limitations ...............................30

Section 5.2.   Duties and Obligations of the General Partner .................32

Section 5.3.   Determination of Fair Value .............................................33

Section 5.4.   Exclusivity; Other Businesses of the General Partner .......34

Section 5.5.   Expenses and Reimbursements; Organizational Expenses............36

Section 5.6.   Management Fee and Expenses.........................................37

Section 5.7.   Removal of the General Partner .......................................37

**ARTICLE VI INDEMNIFICATION** ................................................................39

Section 6.1.   Indemnification of General Partner and the Manager ...................39

Section 6.2.   Giveback Obligations .......................................................41

Section 6.3.   Advancement of Expenses ................................................42

Section 6.4.   Cure Rights ......................................................................42

**ARTICLE VII ADVISORY COMMITTEE** ....................................................42

Section 7.1.   The Advisory Committee..................................................43

**ARTICLE VIII TRANSFERABILITY OF GENERAL PARTNER'S INTEREST** ............44

Section 8.1.   Assignment of the General Partner's Interest ..................45

Section 8.2.   Transfer of General Partner's Interest ..............................45

**ARTICLE IX TRANSFERABILITY OF A LIMITED PARTNER'S INTEREST** ............45

Section 9.1.   Restrictions on Transfers of Interests ...............................45

Section 9.2.   Assignees .........................................................................48

Section 9.3.   Substituted Limited Partner .............................................50

Section 9.4.   Transfers During a Fiscal Year ........................................50

Section 9.5.   Elections Under the Internal Revenue Code .....................51

**ARTICLE X DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP** ................51

Section 10.1.  Dissolution .......................................................................51

Section 10.2.  Liquidation........................................................................51

Click on a box to open it up

Section 10.3.    Clawback Liability ................................................................53

**ARTICLE XI AMENDMENTS** ...........................................................................53

Section 11.1.    Adoption of Amendments; Limitations Thereon ...........................53

**ARTICLE XII CONSENTS, VOTING AND MEETINGS** .................................55

Section 12.1.    Method of Giving Consent ..........................................................55

Section 12.2.    Meetings ...................................................................................56

Section 12.3.    Record Dates .............................................................................56

Section 12.4.    Submissions to Partner ...............................................................56

**ARTICLE XIII POWER OF ATTORNEY** .........................................................56

Section 13.1.    Power of Attorney .......................................................................56

**ARTICLE XIV RECORDS AND ACCOUNTING; REPORTS; FISCAL AFFAIRS** ..........57

Section 14.1.    Records and Accounting ..............................................................57

Section 14.2.    Annual Reports ..........................................................................58

Section 14.3.    Tax Information; Tax Returns ......................................................58

Section 14.4.    Partnership Funds ......................................................................59

Section 14.5.    Partnership For Income Tax Purposes; Tax Elections, Determinations & Decisions .............................................................................59

Section 14.6.    Other Information ......................................................................59

Section 14.7.    Limited Partner Information .......................................................60

Section 14.8.    Partnership Representative .........................................................60

Section 14.9.    Safe Harbor Election and Forfeiture Allocations ..........................61

**ARTICLE XV MISCELLANEOUS** ....................................................................63

Section 15.1.    Notices .....................................................................................63

Section 15.2.    Governing Law; Separability of Provisions ...................................63

Section 15.3.    [RESERVED] ..............................................................................64

Section 15.4.    Waiver of Jury Trial; Expedited Arbitration .................................64

Section 15.5.    Entire Agreement ......................................................................65

Section 15.6.    Binding Provisions; Third Party Beneficiaries ..............................65

Section 15.7.    No Waiver .................................................................................66

Section 15.8.    Confidentiality ..........................................................................66

Section 15.9.    No Right to Partition ..................................................................68

Section 15.10.   [RESERVED] ..............................................................................68

Section 15.11.   Remedies Cumulative .................................................................68

Section 15.12.   Counterparts; E-Mail Signatures .................................................68

Section 15.13.   Partner Communications .............................................................69

Section 15.14.    Force Majeure ................................................................................... 69

Section 15.15.    UCC Article 8 Election ....................................................................... 69

Section 15.16.    Ownership and Use of Name ............................................................... 69

Section 15.17.    Legal Counsel and Other Professionals ............................................. 70

Section 15.18.    Confidentiality of Investor Identity .................................................... 70

Section 15.19.    Authorized Representatives ................................................................. 70

Section 15.20.    Disqualifying Events ........................................................................... 71


SCHEDULE A        Limited Partners' and General Partner's (and Affiliated Limited Partners')
                  Capital Commitments

EXHIBIT A          Definitions

This LIMITED PARTNERSHIP AGREEMENT (this "*Agreement*") of TKF II L.P., a Delaware limited partnership (the "*Partnership*"), is made as of October 28, 2022, among TKF II GP, LLC, a Delaware limited liability company (together with any successor appointed in accordance with this Agreement, the "*General Partner*"), EquipmentShare.com Inc., a Delaware corporation (the "*Initial Limited Partner*") as the Initial Limited Partner, and such Persons becoming limited partners of the Partnership on the date hereof for so long as they shall be Limited Partners hereunder and such other Persons as may hereafter become limited partners of the Partnership as hereinafter provided for so long as they shall be Limited Partners hereunder (each individually referred to as a "*Limited Partner*" and collectively with the General Partner, the "*Partners*").

W I T N E S S E T H:

WHEREAS, the Partnership was formed as a limited partnership by the filing of a Certificate of Limited Partnership with the Office of the Secretary of State of the State of Delaware on July 29, 2022; and

WHEREAS, the parties hereto wish to form and operate the Partnership on the terms set forth herein.

NOW THEREFORE, in consideration of the mutual promises of the parties hereto hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS; RULES OF CONSTRUCTION

Section 1.1. **Definitions**. For purposes of this Agreement, unless the context otherwise requires capitalized terms shall have the meaning ascribed to such terms in <u>Exhibit A</u> annexed hereto.

Section 1.2. **Rules of Construction**. Accounting terms used that are not otherwise defined herein shall have the meanings given to them under U.S. generally accepted accounting principles. As used in this Agreement, the masculine, feminine or neuter gender and the singular or plural numbers shall be deemed to include the others whenever the context so requires. References to Sections and Articles refer to sections and articles of this Agreement unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder" and words of like import refer to this Agreement as a whole unless the context otherwise requires. Whenever the words "including", "include" or "includes" are used in this Agreement, they should be interpreted in a non-exclusive manner as though the words ", without limitation," immediately followed the same. The headings or captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement. All references herein to funds, dollars or payments means United States dollars. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any party (notwithstanding any rule of law requiring an agreement to be strictly construed against the drafting party), it being understood that the parties

to this Agreement are sophisticated and have had adequate opportunity and means to retain counsel to represent their interests. Whenever the word "or" is used in this Agreement, it shall be interpreted as non-exclusive in the same manner as "and/or." Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement the General Partner or any other Person is authorized or required to make a decision or take or omit to take an action or exercise or refrain from exercising a right (which the Partners hereby agree is generally signified by the use of the word "may" or "shall," respectively, unless the context otherwise requires) (1) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, such Person shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall, to the maximum extent not prohibited by applicable law, have no fiduciary or other duty or obligation to give any consideration to any interest of or factors affecting the Partnership, the Partners or any other Person, or (2) in "Good Faith" or under another express standard, such Person shall act under such express standard and shall not be subject to any other or different standards. The rights and liabilities of the Partners shall be as provided for in the Delaware Act if not otherwise expressly provided for in this Agreement or the Subscription Agreement. To the extent that the rights or obligations of any Partner are different by reason of any provision of this Agreement or the Subscription Agreement than they would be in the absence of such provision, this Agreement or the Subscription Agreement, as the case may be, shall control.

## ARTICLE II

## ORGANIZATION

Section 2.1.    **Organization**. The Partnership was formed pursuant to and in accordance with the Delaware Revised Uniform Limited Partnership Act (6 Del. C. Sections 17-101 *et seq.*), as amended from time to time (the "*Delaware Act*"). The Agreement is effective as of October 28, 2022 (the "*Effective Date*"). The Term of the Partnership commenced upon the filing of the Certificate pursuant to Section 2.5 and shall continue until the dissolution of the Partnership in accordance with the provisions of ARTICLE X.

Section 2.2.    **Name**. The name of the Partnership shall be TKF II L.P. The General Partner is authorized to make any variations in the name of the Partnership and may otherwise conduct the business of the Partnership under any other name, upon compliance with all applicable laws, that the General Partner may deem necessary or advisable. The General Partner shall advise the Limited Partners in writing of any change in the name of the Partnership. In the case of a change of name of the Partnership pursuant to this Section 2.2, specific references herein to the name of the Partnership shall be deemed to have been amended to reflect the name change. The General Partner reserves the right to use one or more names that are similar to or include a material portion of the name of the Partnership, without compensation to the Partnership, in connection with any future business activities of the General Partner or any of its Affiliates not otherwise inconsistent with its obligations hereunder.

Section 2.3.    **Principal Office; Registered Agent**. The Partnership shall maintain its principal office at 8 W 5th Street, Fulton, MO 65251. The General Partner may change the location of the Partnership's principal office and may establish such additional offices of the Partnership as it may from time to time determine. The General Partner shall provide notice to the Limited Partners of any change in the Partnership's principal place of business. The registered office of the

Partnership in the State of Delaware is the Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, county of New Castle, Delaware 19801, and the registered agent for service of process on the Partnership in the State of Delaware at such registered office is Corporation Service Company. The General Partner may change the registered office or registered agent as it may from time to time determine and shall provide notice of any such change to the Limited Partners.

Section 2.4.    **Purpose**. The purpose of the Partnership is (i) to acquire and develop the Investments pursuant to the Investment Parameters, as such term is defined in Exhibit A attached hereto, (ii) to own, manage and dispose of the Investments, sharing profits and losses therefrom, and (iii) to conduct such other business activities as may be incidental to, or in furtherance of, the foregoing purpose, and to engage in any lawful act or activity and to exercise any powers permitted to a limited partnership formed under the Delaware Act in furtherance thereof. Where the General Partner deems it appropriate, the General Partner may use special purpose entities, including corporations, limited liability companies, limited partnerships to make and hold Interests in the Partnership or the Fund. In order to address certain legal, tax, and/or regulatory investment requirements, the General Partner may also cause the Partnership to form one or more parallel investment vehicles, feeder funds, and/or intermediate investment vehicles. The General Partner may also cause the Partnership to invest (or permit an investor to invest in the Partnership, the Fund or in an Investment) through corporations, limited liability companies, limited partnerships, parallel entities, joint ventures or other arrangements in which the Partnership has an economic interest and where such arrangements do not breach this Agreement (each, a "***Subsidiary***").

Section 2.5.    **Certificate of Limited Partnership**. The General Partner has caused the Certificate to be filed and recorded in the Office of the Secretary of State of the State of Delaware in accordance with the Delaware Act and, to the extent required by applicable law, shall cause the Certificate to be filed in the appropriate place in each state in which the Partnership may hereafter establish a place of business. The General Partner shall also cause to be filed, recorded and published, such amendments, notices, certificates, statements or other instruments required by any provision of any applicable law that governs the formation of the Partnership or the conduct of its business from time to time.

Section 2.6.    **Term**. The term of the Partnership (the "***Term***") commenced on the Effective Date and shall continue until the tenth (10) anniversary of the Initial Closing Date, unless the Partnership is sooner dissolved in accordance with Section 10.1, which period, (a) may be extended for an additional period of up to two (2) years following a determination by the General Partner with the approval of the Advisory Committee (as defined below). The existence of the Partnership as a separate legal entity shall continue until cancellation of the Certificate as provided in the Delaware Act.

Section 2.7.    **Qualification in Other Jurisdictions**. The General Partner shall cause the Partnership to be qualified or registered under its name or under assumed or fictitious names under foreign company statutes or similar laws in any jurisdiction in which the Partnership owns property, if any, or transacts business to the extent such qualification or registration is necessary or, in the judgment of the General Partner, advisable in order to preserve the limited liability of the Limited Partners or to permit the Partnership to lawfully own property, if any, or transact business, and shall cause the Partnership not to own property or transact business in any

jurisdiction until it is qualified or registered to do so. The General Partner shall, as required by applicable law, execute, file and publish all such certificates, notices, statements or other instruments necessary to permit the Partnership lawfully to own property, if any, and conduct business as a Partnership in all jurisdictions where the Partnership elects to own property or transact business and to maintain the limited liability of the Limited Partners.

Section 2.8. **Alternative Investment Vehicles**.

(a) If the Partnership or any investor encounters legal, tax or regulatory impediments to the investment in a potential asset or in the Partnership or in the Fund, to the fullest extent permitted by law, the General Partner may hold the asset outside the Partnership in (or permit the investors to hold their Interests in the Partnership or in the Fund through) one or more alternative vehicles (which entities may include a group trust, a blocker entity or an off-shore vehicle) organized by the General Partner or the investor and having investment objectives substantially identical, to the extent practicable, to those of the Partnership, but that would not encounter (or would appear to mitigate) such legal, tax or regulatory impediments (such alternative vehicles, the "*Alternative Investment Vehicles*"); *provided*, that the terms of such Alternative Investment Vehicles do not breach this Agreement. Each Alternative Investment Vehicle will be a limited partnership, limited liability company, or corporation whose general partner, managing member or voting shareholder, as the case may be, will be the General Partner and whose limited partners, non-managing members, or non-voting shareholders, as the case may be, will be investors of a similar class (such as institutional investors or tax-exempt investors). The conditions, concessions and economic terms of each such Alternative Investment Vehicle shall be substantially the same as those set forth in this Agreement. In connection with the investment program of the Fund, the General Partner may cause an Alternative Investment Vehicle to enter into obligations jointly and severally, including with respect to Investments and Indebtedness, with the Partnership, other Alternative Investment Vehicles, Parallel Investment Vehicles, and other Affiliates of the General Partner, including investment vehicles organized by the General Partner or its Affiliates. For the avoidance of doubt, the General Partner may organize other special purpose vehicles for any reason, and this provision shall not limit the General Partner's authority in this respect.

(b) If the General Partner forms any Alternative Investment Vehicles to co-invest with the Partnership, the Partnership may (i) make its Investment through an Aggregator Vehicle (the "*Aggregator Vehicle*") among the Partnership and such Alternative Investment Vehicle with each such vehicle making capital contributions to such Aggregator Vehicle in proportion to the aggregate capital commitments of their respective partners or other equity owners (treating any participant in the Alternative Investment Vehicle as a partner or equity owner of such Alternative Investment Vehicle and not a partner or equity owner of the Partnership), or (ii) may cause the Alternative Investment Vehicle to invest side-by-side with the Partnership in the Investment directly, subject to applicable legal, tax or regulatory considerations. The General Partner (and its Affiliates) may make a portion of any Capital Commitment to, and receive a portion of the Carried Interest through, the Aggregator Vehicle, so long as the intended economic deal among the Limited Partners and the General Partner (and its Affiliates) set forth in this Agreement are not changed in any material way in the aggregate.

(c)     Any Fund expenses that are applicable to the Partnership and any Alternative Investment Vehicle (including the Partnership's and any Alternative Investment Vehicle's *pro rata* share of the expenses of any investment entities) will be equitably allocated by the General Partner. Except as provided in Section 4.3 (with respect to distributions to account for a disproportionate accrual of the Management Fee), distributions from the Aggregator Vehicle or an Investment will be made among the Partnership and any other Alternative Investment Vehicles in accordance with the relative capital contributions made by each of them to the Aggregator Vehicle or such Investment. To the extent that any Alternative Investment Vehicle and the Partnership are jointly liable for any investment expenses, costs or indemnification obligations and the Partnership funds more than its *pro rata* share of any such costs or expenses, the General Partner shall use commercially reasonable efforts to cause such Alternative Investment Vehicle to make the Partnership whole in respect of any such costs or expenses. Other investment vehicles may be designated as Alternative Investment Vehicles by the General Partner under Section 5.1(a)(xii).

Section 2.9.     **Parallel Investment Vehicles**.

(a)     The General Partner may establish one or more additional collective investment vehicles for certain types of investors to invest in Investments (as more fully provided in each such vehicle's partnership agreement) alongside the Partnership (each, a "***Parallel Investment Vehicle***"). The terms, including fees and carried interest, of each Parallel Investment Vehicle may differ from the terms herein. The General Partner or an Affiliate of the General Partner shall serve as general partner or similar manager of each Parallel Investment Vehicle. Subject to legal, tax, regulatory, investment guideline and similar considerations: (i) any Parallel Investment Vehicle shall invest in all Investments alongside the Partnership, (ii) the Partnership and any Parallel Investment Vehicle shall invest and divest on economic terms that are the same, and at the same time, in all material respects and (iii) the respective interests of the Partnership and any Parallel Investment Vehicle in any Investment generally shall be in proportion to the respective aggregate Unused Capital Commitments of their partners. In connection with the investment program of the Fund, the General Partner may cause a Parallel Investment Vehicle to enter into obligations jointly and severally, including with respect to Investments and Indebtedness, with, or guaranty obligations of, the Partnership, Alternative Investment Vehicles, other Parallel Investment Vehicles, subsidiaries of Alternative Investment Vehicles and Parallel Investment Vehicles and other Affiliates of the General Partner, including investment vehicles organized by the General Partner or its Affiliates. For the avoidance of doubt, nothing in this Section 2.9 shall be read to prohibit organization of other investment vehicles to make subsequent investments in any Investment.

(b)     To the fullest extent permitted by law, if Additional Limited Partners are admitted to the Partnership (or additional limited partners or members are admitted to any Parallel Investment Vehicle) after any Partner has made Capital Contributions to the Partnership (or partners or members of any Parallel Investment Vehicle have made capital contributions to such Parallel Investment Vehicle(s)), regardless of whether such contributions have then been made to the Aggregator Vehicle or an Investment, the Capital Contributions of such additional Partners (or partners or members of any Parallel Investment Vehicle) (and other payments by such additional Partners or members, as described in Section 3.6(b) (based on the Single Partnership Assumption)) shall be contributed (or paid, as applicable) by such Partner (or partner or member, as the case may

be) to the Aggregator Vehicle or the Investment (through the applicable Fund Entity) and then distributed (or paid, as applicable) by the Aggregator Vehicle or the Investment (through the applicable Fund Entity) to the entities comprising the Fund and then to such entities' respective Partners (or partners or members, as applicable) as necessary to cause all Partners (and partners and members of Parallel Investment Vehicles, as applicable) of all entities comprising the Aggregator Vehicle or participating in such Investment to satisfy the provisions of Section 3.6(b) of each Fund Agreement (based on the Single Partnership Assumption). Each of the Fund Agreements shall contain provisions that match the provisions of this Section 2.9.

(c)     The General Partner may, at any time with the Consent of the applicable Limited Partner, (i) transfer all or a portion of a Limited Partner's Capital Commitment and Interest to a Parallel Investment Vehicle or (ii) transfer all or a portion of the Parallel Investment Vehicle Commitment and interest of a Parallel Investment Vehicle Partner to the Partnership; *provided*, that, in each case, the relative holdings of the Partnership and such Parallel Investment Vehicle in each Investment shall be rebalanced to ensure a proportionate allocation between the vehicles.

(d)     If the General Partner forms any Parallel Investment Vehicles to co-invest with the Partnership, the Partnership may (i) make its Investment through an Aggregator Vehicle among the Partnership and such Parallel Investment Vehicles with each such vehicle making capital contributions to such Aggregator Vehicle in proportion to the aggregate capital commitments of the Partnership, or (ii) may cause the Parallel Investment Vehicle to invest side-by-side with the Partnership in the Investment directly, subject to applicable legal, tax or regulatory considerations. The General Partner (and its Affiliates) may make a portion of any Capital Commitment to, and receive a portion of the Carried Interest through, the Aggregator Vehicle, so long as the intended economic deal among the Limited Partners and the General Partner (and its Affiliates) set forth in this Agreement are not changed in any material way in the aggregate.

(e)     Any Operating Expenses that are applicable to the Partnership and any Parallel Investment Vehicle (including the Partnership's and any Parallel Investment Vehicle's *pro rata* share of the expenses of any investment entities) will be equitably allocated by the General Partner. Except as provided in Section 4.3 (with respect to distributions to account for a disproportionate accrual of the Management Fee), distributions from the Aggregator Vehicle or an Investment will be made among the Partnership and any other Parallel Investment Vehicles in accordance with the relative capital contributions made by each of them to the Aggregator Vehicle or such Investment. Other investment vehicles may be designated as Parallel Investment Vehicles by the General Partner under Section 5.1(a)(xii). To the extent that any Parallel Investment Vehicle and the Partnership are jointly liable for any investment expenses, costs or indemnification obligations and the Partnership funds more than its *pro rata* share of any such costs or expenses, the General Partner shall use commercially reasonable efforts to cause such Parallel Investment Vehicle to make the Partnership whole in respect of any such costs or expenses.

(f)     The General Partner may use placement agents and may cause the Fund to incur Placement Fees. Any Placement Fees shall be paid by the Fund. To the fullest extent permitted by law, the General Partner in Good Faith shall allocate any Placement Fees and the Management Fee to the Partners of each Parallel Investment Vehicle and among the Partners thereof with respect to whom such Placement Fees and the Management Fee are payable pursuant

to the Fund Agreements. All other Operating Expenses and Organizational Expenses shall be allocated among the Partnership and the other Parallel Investment Vehicles in proportion to the respective aggregate capital contributions of each of the Partnership and the other Parallel Investment Vehicles to the Aggregator Vehicle or the applicable Investment; *provided*, that any such Placement Fees, Operating Expenses or Organizational Expenses that the General Partner determines are specific to the Partnership or one or more of the Partnership or other Parallel Investment Vehicles (including expenses associated with Partnership or Parallel Investment Vehicle level taxes or brokerage commissions) may be allocated to the Partnership or such Parallel Investment Vehicle, as the case may be, on a basis the General Partner determines is fair and reasonable. Notwithstanding anything to the contrary contained in this Agreement, if an investor is not permitted to invest in an entity that pays Placement Fees, a Parallel Investment Vehicle may be formed for such investor and other similarly situated investors so that such investor and the entity in which it invests will not pay Placement Fees.

Section 2.10. **Single Partnership Assumption**.

(a) To the fullest extent permitted by law, but not for federal, state or local income tax purposes, the Partnership and all Alternative Investment Vehicles and Parallel Investment Vehicles comprising the Fund shall be treated as a single entity (using the assumption that all Limited Partners, members and partners of all Fund entities were partners in a single limited partnership comprising the Fund) (the "***Single Partnership Assumption***") when the context requires, for purposes of applying the following provisions of the Fund Agreement:

(i) the Capital Commitment of the General Partner and its Affiliates pursuant to Section 3.1;

(ii) the purchase of a Defaulted Interest pursuant to Sections 3.5(c) and 3.5(d);

(iii) the provisions regarding Subsequent Closings in Section 3.6(b);

(iv) the investment and leverage targets of Sections 5.1(b) and 5.1(c), respectively;

(v) the provisions of Sections 5.5(a) and 5.5(b) (relating to Operating Expenses and Organizational Expenses);

(vi) the indemnification and exculpation provisions of Article VI;

(vii) the selection of Advisory Committee members pursuant to Section 7.1; and

(viii) the voting of the Limited Partners (except with respect to matters that solely apply internally to the Partnership or another Alternative Investment Vehicle or Parallel Investment Vehicle), including any vote that results in the dissolution or liquidation of the Partnership, an Alternative Investment Vehicle or a Parallel Investment Vehicle, with all Alternative Investment Vehicles and Parallel Investment Vehicles comprising the Fund (including the Partnership) being required to liquidate or dissolve simultaneously. The Term

of the Partnership and each Alternative Investment Vehicle and Parallel Investment Vehicle shall end simultaneously. Any amendment made to any Fund Agreement pursuant to Article XI thereof shall be made to each of the Fund Agreements to the extent applicable and/or permitted by the relevant Fund Agreements and Side Letters.

(b)　Investment results in respect of any Alternative Investment Vehicle will generally be (i) aggregated, solely for calculation purposes, with the investment results of the Partnership, (ii) determined in conjunction with and after giving effect to any and all distributions and allocations previously made pursuant to Article IV in connection with investments of the Partnership, (iii) taken into account and treated as a distribution or allocation, as the case may be, under Article IV, with respect to investments of the Partnership; and (iv) taken into account in determining the Clawback Amount (if any) under Section 10.2(g); in each case, unless the General Partner elects otherwise based on its determination that such aggregation would create or increase the risk of any adverse tax consequences, impose legal or regulatory constraints or create contractual or business risks that would be undesirable for the Partnership or for the Partners taken as a whole; *provided* that the General Partner shall provide reasonable written notice to the Advisory Committee prior to making any final determination to disaggregate the Partnership from any Alternative Investment Vehicle. Notwithstanding any provisions to the contrary contained herein, each Alternative Investment Vehicle may enter into agreements with the Partnership and other appropriate parties to allocate investment expenses and other obligations, as well as any applicable fees or items of income or expenses, or any capital contributions, among such Alternative Investment Vehicle, the Partnership and any other Alternative Investment Vehicle, any Parallel Investment Vehicle or any co-investment vehicle formed for the purpose of making such investment, including making joint and several borrowings. In furtherance of the foregoing, and notwithstanding any other provision of this Agreement, in the event that an Alternative Investment Vehicle is used and, as a result, the Alternative Investment Vehicle results in materially differential tax treatment or consequences for any Limited Partner with respect to an investment as compared to the tax treatment or consequences that would have applied for such Limited Partner in respect of such investment had it been made directly by the Partnership, then the General Partner's share of distributions and allocations under Articles IV and X for all purposes will be determined with respect to the affected Limited Partners as if such investment had been made directly by the Partnership.

Section 2.11.　**Co-investments**. The General Partner may seek co-investors to participate in a co-investment opportunity alongside an Investment if the General Partner has determined that it is appropriate and in the best interest of the Partnership to do so. If the General Partner determines to seek such co-investors, the General Partner may offer to one or more of the non-defaulting Limited Partners (to be selected by the General Partner in its sole discretion) the opportunity to co-invest with the Partnership in such Investment. The General Partner may also offer the amounts available for investment in such co-investment opportunity to strategic investors, lenders and/or other investment vehicles or managed accounts managed by the General Partner, the Manager, and/or their Affiliates. Any such co-investments shall be made upon such terms and conditions as the General Partner may determine and may be made available through limited partnerships or other entities formed in connection with any such co-investment opportunity. Each co-investor shall be required to bear a *pro rata* share of the costs and expenses relating to the co-investment in which the co-investor participates. The General Partner may, in its sole discretion, determine that any proposed participants in a co-investment opportunity will not be required to

bear any Broken Deal Expenses which would result in the Fund participating in such proposed investment, if any, bearing such Broken Deal Expenses; *provided*, that if the Partnership pays any Broken Deal Expenses, the General Partner shall use commercially reasonable efforts to provide that the Partnership receive any Break-up Fees paid in connection with the Partnership's pursuit of such co-investment opportunity. Notwithstanding any implication to the contrary and to the fullest extent permitted by law, any participation by any selected Limited Partners in a co-investment vehicle:

(a)     will be entirely the investment decision and responsibility of the selected Limited Partners, and neither the General Partner, the Manager, nor any of its Affiliates, will assume any risk, responsibility or expense, or be deemed to have provided any advice or recommendation in connection with any participation by the selected Limited Partners in an Investment;

(b)     will be consummated and disposed of at substantially the same time, on an arm's length basis, and on terms and conditions that are substantially similar to those obtained by the Partnership; and

(c)     will not entitle any Limited Partner to participate in the management or control of any co-investment vehicle.

**ARTICLE III**

**PARTNERS AND CAPITAL**

Section 3.1.     **General Partner**. The name, address and Capital Commitment of the General Partner and the Affiliated Limited Partners are set forth in Schedule A hereto. The General Partner, the Affiliated Limited Partners and their respective Affiliates shall make a combined Capital Commitment in the amount of at least one percent (1%) of the Aggregate Commitments as of the Effective Date. The Capital Commitment obligation of the General Partner and the Affiliated Limited Partners may be satisfied (a) by causing a co-investment Person that is an Affiliate of the General Partner to invest with the Partnership in all Investments on the same terms as the Partnership's investment, (b) through direct investment as a Limited Partner in the Partnership or indirectly through investment of one or more Affiliates as a Partner in the Partnership, and (c) by investing in Parallel Investment Vehicles or an Aggregator Vehicle. The Capital Commitment obligation of the General Partner and the Affiliated Limited Partners may be increased in the sole discretion of the General Partner at any time, including to reflect its election to forego all or a portion of its Management Fee and deem such amount as a Capital Contribution pursuant to Section 5.6.

Section 3.2.     **Offering; Partners; Initial Closing**.

(a)     The Fund is seeking Aggregate Commitments from qualified individuals and institutional investors who will become limited partners of the Fund up to a maximum aggregate amount of $100,000,000, including the aggregate Capital Commitment of the General Partner and the Affiliated Limited Partners to the Fund; *provided*, that the General Partner, in its sole discretion, reserves the right to accept Capital Commitments of a lesser or greater amount.

The minimum Capital Commitment for a Limited Partner is $250,000; *provided*, that the General Partner, in its sole discretion, reserves the right to accept Capital Commitments of a lesser or greater amount. The name, address and Capital Commitment of any Limited Partner shall be as set forth on such Limited Partner's counterpart of <u>Schedule A</u> hereto that applies to such Limited Partner, as amended from time to time. A Person shall be deemed admitted as a Limited Partner of the Partnership at the time such Person's Subscription Agreement is accepted by the General Partner as evidenced by the General Partner signing such Person's Subscription Agreement and holding a Closing with respect to such Person. The Interests issued to the Limited Partners represent valid limited partnership Interests in the Partnership.

(b)     Unless admitted to the Partnership as a General Partner or Limited Partner, as provided in this Agreement, no Person shall be considered a Partner. The Partnership and the General Partner need deal only with Persons as Partners that have been duly admitted. Neither the Partnership nor the General Partner shall be required to deal with any other Person (other than with respect to Distributions and allocations to assignees pursuant to assignments in compliance with Article IX) merely because of an assignment or Transfer of an Interest to such Person. To the fullest extent permitted by law, neither the Partnership nor the General Partner shall have any liability with respect to any Distribution or allocation made in accordance with this Agreement to the Person shown on the Partnership records as a Partner or to its legal representatives, or to the assignee of the right to receive Distributions and allocations pursuant to an assignment in compliance with Article IX.

(c)     The General Partner may also be a Limited Partner and its Affiliates may also be Limited Partners of the Partnership, by acquiring an Interest on the Closing Date, or upon acquiring the Interest of a Limited Partner or otherwise in accordance with this Agreement.

(d)     Except as expressly provided for herein, the Limited Partners shall not participate in, or take part in the control of, the business of the Partnership, and shall have no right or authority to act for or bind the Partnership. All Limited Partners of the Partnership shall be deemed to constitute a single class or group and, except as may be specifically otherwise provided herein, shall vote or grant written consents as a single class with respect to any matters on which Limited Partners have the right to vote or act by written consent hereunder or under the Delaware Act. If pursuant to the terms of this Agreement any Limited Partner is excluded from voting or granting or withholding written consent on any matter to be acted on by the Limited Partners, then the Interest of that Limited Partner shall not be included (and shall not be deemed outstanding) for purposes of determining whether the required vote or written consent of Limited Partners has been obtained hereunder or under the Delaware Act.

(e)     The General Partner shall have full power and authority, on behalf of the Partnership and so as to bind the Partnership thereby, to take any action that it determines to be necessary or desirable in its reasonable judgement:

(i)     so that the Partnership's assets will not be deemed to include Plan Assets, which may include, without limitations:

(A)     making structural, operating or other changes in the Partnership;

(B)	selling or otherwise disposing of an Investment;

(C)	cancelling the remaining Capital Commitment of any Limited Partner;

(D)	requiring the withdrawal of any Limited Partner or the sale in whole or in part of any Limited Partner's Interest;

(E)	dissolving the Partnership; or

(F)	using its reasonable best efforts to take any action in its sole and absolute discretion to ensure that participation by ERISA Limited Partners is not "significant" within the meaning of the Plan Assets Regulation for purposes of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law; and

(ii)	to avoid the occurrence of a non-exempt "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code.

(f)	If any Limited Partner shall be required to withdraw in accordance with the provisions of Section 3.2(e), there shall be distributed to such Limited Partner or its legal representative within 180 days after the last day of the Fiscal Year of the Partnership in which such withdrawal occurred, an amount equal to the balance of such Limited Partner's Estimated Value Capital Account as of the end of such Fiscal Year of the Partnership or, if withdrawal occurs other than at the end of a Fiscal Year, as of the date of such withdrawal; *provided*, *however*, that for purposes of determining the Estimated Value Capital Account in connection with the payment to be made pursuant to Section 3.2(e) to such withdrawn Limited Partner, the General Partner may deduct from the valuations of the Partnership's assets such costs or expenses in an amount, not to exceed 3.0% % of such valuations, as the General Partner may determine (in its sole discretion) to be necessary to cover the costs of implementing such withdrawal.

Section 3.3.	**Capital Contributions**

(a)	Limited Partners shall make additional capital contributions, in cash, to the Partnership, payable by wire transfer or check, upon at least ten (10) Business Days' prior written notice (which may be by facsimile or electronic mail) from the General Partner (the "***Drawdown Notice***") at such time (the "***Drawdown Date***") and in such amount (the "***Drawdown Amount***") as shall be specified in the Drawdown Notice.

(b)	No Partner shall be paid interest on any Capital Contribution to the Partnership or on such Partner's Capital Account.

(c)	Except upon dissolution of the Partnership pursuant to Article X (and then only to the extent provided in Section 10.2(c)(ii)), no Partner shall have any right to demand the return of its Capital Contributions.

(d)	No Partner shall have the right to demand or receive property other than cash in return for its Capital Contributions.

(e)     To facilitate Investments by the Partnership, the General Partner (or an Affiliate) may purchase or acquire Investments initially without the use of any debt financing, with the intention of obtaining debt financing after the Investment is acquired. The amount of any Distributions to a Partner (made at any time during the period in which Capital Contributions may be called in accordance with this Agreement) representing the amount of Capital Contributions associated with the net proceeds from debt financing of an Investment that was initially acquired without the use of debt financing and constituting a return of such Capital Contributions shall be added to such Partner's Unused Capital Commitments, and the General Partner may recall such Distributions for any purpose for which Capital Contributions may be called under and, in accordance with the terms and conditions of, this Agreement.

Section 3.4.     **Liability of Partners**.

(a)     Except as otherwise provided by the Delaware Act, no Partner (or former Partner) shall be obligated to make any contribution to the Partnership in addition to its Unused Capital Commitment or have any liability for the repayment or discharge of the debts and obligations of the Partnership; *provided*, that (i) such Partner shall be obligated to return any Distribution to the extent required by the Delaware Act or other applicable law and to recontribute (in reverse order of Distribution priority) Distributions in order to pay indemnity and other expenses of the Partnership as set forth in Section 6.2 and at any time to rectify any mistake in Distributions, and (ii) each Partner shall have such other liabilities as are expressly provided for in this Agreement (including Section 3.5).

(b)     Subject to the terms of this Agreement, neither the General Partner nor any of its Affiliates shall have any liability to any Limited Partner in respect of any amounts outstanding in the Capital Account of a Limited Partner, including Capital Contributions.

(c)     If, notwithstanding the terms of this Agreement, any Partner has received a Distribution that the Partner is required to return to or for the account of the Partnership or Partnership creditors under applicable law, then the obligation under applicable law of any Partner to return all or any part of a Distribution made to such Partner shall be the obligation of such Partner and not of any other Partner.

Section 3.5.     **Default in Payment**.

(a)     The Partnership shall be entitled to enforce the obligations of each Partner to make the Capital Contributions set forth in Section 3.3 and to return Distributions as provided in Section 3.4, and the Partnership shall have all remedies available at law or in equity in the event any Capital Contribution or return of Distribution is not so made.

(b)     If a Partner (a "***Defaulting Partner***") fails to pay any amount required to be paid by it under this Agreement within five days after the Due Date therefor, the General Partner may send a notice of default (a "***Default Notice***") to such Partner. If the payment is not received by the Partnership within 10 days after the receipt by the Defaulting Partner of a Default Notice (i) such failure shall constitute a breach of this Agreement and (ii) in the General Partner's sole discretion, such amount shall constitute a demand loan ("***Default Loan***") to such Partner that shall

bear interest payable to the Partnership at a rate of 5.0% plus the Prime Rate *per annum*, compounded monthly, or, if lower, the highest rate of interest permitted under applicable law, from and after the original due date of such installment (the "***Default Date***") until the earliest of either (A) the payment of such installment, including any interest accruing under this Section 3.5(b), (B) the purchase of such Defaulting Partner's Defaulted Interest (as defined below) under Section 3.5(c), or (C) the conclusion of foreclosure proceedings under Section 3.5(e). Any interest paid by a Defaulting Partner pursuant to this Section 3.5(b) shall not be treated as a Capital Contribution but shall be treated as income of the Partnership. Alternatively, the General Partner, in its sole discretion, may allow one or more non-defaulting Partners to make Default Loans to the Defaulting Partner at a rate equal to the lesser of 5.0% plus the Prime Rate *per annum*, compounded monthly, and the maximum interest rate permitted by law, to be repaid from the Distributions otherwise payable to the Defaulting Partner (with such Distributions being deemed to have been first made to the Defaulting Partner and then paid to the lending non-defaulting Partners in repayment of such Default Loan). Notwithstanding any other provision of this Agreement, the Partnership shall have the right to withhold any Distributions due to a Defaulting Partner and apply any such Distributions to the payment of such Defaulting Partner's Default Loan and any interest accrued and unpaid thereon, and any amounts so withheld shall be treated, for all purposes, as if such amounts had first been distributed to the Defaulting Partner in the order of priority set forth in Section 4.2 and thereafter paid by the Defaulting Partner to the Partnership or any Partners who have made such Default Loan as provided above, as applicable, in payment of the principal and any accrued and unpaid interest on such Default Loan.

(c)     In addition to, and not in limitation of, the foregoing, the General Partner may designate (in its sole discretion) in the Default Notice provided to a Defaulting Partner, one or more parties, which parties may be the Partnership, the Limited Partners, the General Partner, Affiliates of the General Partner or third parties, that will be permitted to acquire (by redemption in the case of the Partnership or by purchase in the case of any other Person) all or any portion of the Interest of the Defaulting Partner in the Partnership (the "***Defaulted Interest***"); *provided*, that such default has not been cured by the Defaulting Partner within 10 days after receipt by the Defaulting Partner of the Default Notice. If a Defaulting Partner shall pay any overdue installment of its Capital Commitment, *plus* interest in accordance with Section 3.5(b), prior to the expiration of the above-referenced 10-day period, (i) such Partner shall cease to be a Defaulting Partner, (ii) such Partner shall cease to be in breach of this Agreement and (iii) the remedies provided in this Section 3.5(c) and in Section 3.5(e) shall not be available with respect thereto. If a Defaulting Partner shall fail to cure its default within the above-referenced 10-day period, such failure shall constitute a breach of this Agreement and such Defaulting Partner shall forfeit its Interest and thereby cease to be a Partner for all purposes as of the date of the issuance of the Default Notice.

(d)     With respect to any redemption or purchase made pursuant to Section 3.5(c), the General Partner may determine that no consideration be paid other than the attorneys' fees and costs of enforcing payment and the transfer and removal of the Defaulting Partner as a Partner. The provisions of Section 3.5, including the discount set forth in the immediately preceding sentence shall constitute a penalty for breach of this Agreement as permitted by the Delaware Act that has been fully negotiated and discussed and each Partner completely understands and comprehends the intent, effect and potential ramifications thereof. The Partners agree that the provisions of Section 3.5, including this Section 3.5(d) are a reasonable remedy for the monetary damage that would result from any Partner's failing to make its required

Capital Contributions as and when from time to time required pursuant to the provisions of this Agreement. Each party redeeming or purchasing the Defaulted Interest pursuant to Section 3.5(c) shall be obligated, severally and not jointly, to pay its *pro rata* portion of the aforesaid consideration based on the percentage of the Defaulting Partner's Defaulted Interest acquired by such party. If the General Partner exercises its right to cause the Partnership to redeem all or a portion of a Defaulting Partner's Defaulted Interest pursuant to Section 3.5(c), the General Partner may, in its sole discretion, issue a Drawdown Notice for an amount up to the aggregate Unused Capital Commitment of each Partner and for purposes of determining each Partner's liability under any such Drawdown Notice, the Allocation Percentage of the Partners shall be calculated assuming that the Partnership's proposed redemption of all or a portion of the Defaulted Interest has been completed. Any non-Defaulting Partner or third party that acquires all or a portion of a Defaulting Partner's Defaulted Interest shall also assume the portion of the Defaulting Partner's Capital Commitment corresponding to the acquired portion of the Defaulted Interest and shall pay to the Partnership, concurrently with the payment of the purchase price to the Defaulting Partner, an amount representing the portion of the Defaulting Partner's Capital Contribution that is then due and unpaid (excluding any interest accrued under Section 3.5(b)) that corresponds to the acquired portion of the Defaulted Interest. If the Partnership acquires any portion of a Defaulting Partner's Defaulted Interest, the portion of the Defaulting Partner's Capital Commitment that corresponds to the portion of the Defaulted Interest acquired by the Partnership shall be cancelled. Any interest that accrues under Section 3.5(b) with respect to a Defaulting Partner's Defaulted Interest prior to the acquisition of such Defaulted Interest pursuant to Section 3.5(c) and this Section 3.5(d), shall remain an obligation of the Defaulting Partner and shall not be assumed by any Person acquiring the Defaulted Interest unless otherwise agreed in writing by such Person and the Defaulting Partner.

(e)     In addition to or in lieu of, and not in limitation of, any of the foregoing, upon termination of the 10-day period provided in Section 3.5(c) if a breach of this Agreement by the Defaulting Partner has occurred, the General Partner, in its sole discretion, may (i) commence proceedings to collect any due and unpaid installment of the Defaulting Partner's Capital Commitment (*plus* interest in accordance with Section 3.5(b)) and the expenses of collection, including arbitration or court costs and attorneys' fees and disbursements, and (ii) elect (effective upon giving notice to the Defaulting Partner) that the Defaulting Partner have no further co-investment opportunities to the extent that the Defaulting Partner otherwise would qualify for such opportunities.

(f)     Any actions taken by the General Partner or the Partnership pursuant to this Section 3.5 shall be in addition to and not in limitation of any other rights or remedies that the Partnership may have against the Defaulting Partner, including, but not limited to, the right to hold the Defaulting Partner responsible for any damages or liabilities (including attorneys' fees, arbitration or court costs and other expenses of collection) to which the Partnership may be subjected (in whole or in part) under applicable law as a result of the default by the Defaulting Partner.

(g)     Each Limited Partner hereby agrees that, if such Limited Partner shall fail to pay when due any installment of its Capital Commitment required pursuant to Section 3.3 and the General Partner elects to pursue one or more remedies set forth in Section 3.5(c), such Limited Partner shall sell, assign, transfer and convey to the Partnership, any designee of the General

Partner or any and all Limited Partners making the election contemplated by Section 3.5(c), as applicable, the Defaulted Interest in consideration of the amount determined in accordance with the provisions of Section 3.5(d).

(h)     So long as a Defaulting Partner remains a Defaulting Partner, such Limited Partner shall not, to the fullest extent permitted by law, be entitled to exercise any voting rights or right to purchase any other Defaulting Partner's Interest otherwise granted to such Limited Partner under this Agreement and its representative shall cease to serve on the Advisory Committee upon notice from the General Partner (which may be given or not given in the General Partner's sole discretion). In addition, to the fullest extent permitted by law, a Defaulting Partner shall not be entitled to make any demands upon the Partnership for inspection of the Partnership's books and records, or any lists of Partners of the Partnership. A Limited Partner shall be considered a Defaulting Partner from and after the date of delivery of the Default Notice. Whenever the Consent or decision of a Limited Partner or of the Limited Partners is required or permitted pursuant to this Agreement or under the Delaware Act, a Defaulting Partner shall not, to the fullest extent permitted by law, be entitled to participate in such Consent or to make such decision.

(i)     If a Feeder Fund is a Defaulting Partner because of a default by an investor in such Feeder Fund (a "*Defaulting Investor*") in the payment of amounts that the Defaulting Investor is obligated to pay to the Feeder Fund, then the Feeder Fund's Interest shall be separated into two parts for purposes of exercising all default remedies under this Section 3.5. One part will consist of the Defaulted Interest and will represent an amount of the Feeder Fund's Interest that corresponds to the interest of the Defaulting Investor in the Feeder Fund (the "*Default Portion*"). The second part will consist of the balance of the Feeder Fund's Interest (the "*Non-Default Portion*"). Only the Default Portion of the Feeder Fund's Interest will be treated as a Defaulted Interest for purposes of this Agreement and the Feeder Fund will continue to have the same rights as all other non-defaulting Partners to the extent of the Non-Default Portion of the Feeder Fund's Interest. If the Partnership or any non-defaulting Partner (other than the Feeder Fund) elects to purchase part or all of the Default Portion, such purchase shall occur by the Partnership or the non-defaulting Partner, as the case may be, redeeming or purchasing, as applicable, part or all of the Default Portion and the Feeder Fund using the proceeds received from such purchase to then acquire from the Defaulting Investor the corresponding portion of the Defaulting Investor's interest in the Feeder Fund. If the Feeder Fund is a Defaulting Partner as a result of a default by one of its investors, the General Partner may make such modifications to this Section 3.5 and Article IV as are necessary or appropriate so that an ownership Interest in the Feeder Fund is the economic equivalent (other than with respect to tax attributes) of an Interest of the same subscription amount.

(j)     Notwithstanding any other provision of this Section 3.5, if any underlying investor in a Limited Partner with respect to which a Several Interest Election has been accepted fails to satisfy a drawdown request to such Limited Partner and as a result such Limited Partner fails to make its Capital Contribution to the Partnership, in whole or in part, or fails to make any other payment contemplated by this Agreement, such Limited Partner may be treated as a Defaulting Partner in accordance with this Section 3.5, but solely with respect to that portion of such Limited Partner's Interest attributable to such underlying investor's indirect interest in the Partnership. The General Partner may make any adjustments to the Interest of such Limited Partner to accomplish the overall objectives of this Section 3.5(j); *provided*, that such adjustments shall

not have a material adverse effect on the Interests of any other Partner. In addition, to the extent the General Partner permits the Limited Partners to exercise any of the remedies set forth in this Section 3.5 with respect to a defaulting Limited Partner, it shall permit any Limited Partner that has made a Several Interest Election to participate in any such remedy being exercised solely for the benefit of one or more underlying investors of such Limited Partner as if such underlying investor has invested in the Partnership directly. Nothing in this Section 3.5(j) shall be construed as making any underlying investor in such Limited Partner a Limited Partner for any purpose whatsoever.

(k)     Unless the General Partner otherwise elects to terminate a Defaulting Partner's Unused Capital Commitment, each Defaulting Partner shall remain obligated to make Capital Contributions as required by the General Partner up to the full amount of the Defaulting Partner's Capital Commitment.

(l)     In addition to the other rights provided in this Section 3.5 and to the extent not inconsistent with such other rights, upon termination of the 10-day period provided in Section 3.5(c) if a breach of this Agreement by the Defaulting Partner has occurred, the General Partner may freeze or, in its discretion, permanently reduce to zero, the Capital Account of the Defaulting Partner, by notice to the Defaulting Partner, in which event (i) the Defaulting Partner shall, to the fullest extent permitted by law, no longer have any right to participate in the Profits, Losses and Distributions of profits of the Partnership arising at any time thereafter, (ii) the Partnership may withhold from the Defaulting Partner all Distributions to which it might otherwise be entitled hereunder, including Distributions upon liquidation (which amounts shall be deemed to have been first distributed to such Partner for all purposes and then paid by such Partner with respect to the amounts owed by such Partner), (iii) all Distributions that would otherwise be made to the Defaulting Partner on or after such date shall be subject and subordinate in timing and right of payment to payment in full to all Partners who are not Defaulting Partners of the positive balances in their Capital Accounts upon the liquidation and dissolution of the Partnership, and (iv) the amounts withheld from the Defaulting Partner by the Partnership pursuant to this sentence shall not accrue any interest.

(m)     Notwithstanding anything to the contrary in this Section 3.5, if any of the First Limited Partners becomes a Defaulting Partner, then the Unused Capital Commitment of such First Limited Partner shall be terminated and the General Partner shall not pursue any other remedy set forth in this Section 3.5 with respect to such First Limited Partner.

Section 3.6.     **Admission of Limited Partners**.

(a)     Person(s) executing this Agreement or a counterpart signature page hereto as of the Initial Closing Date are admitted to the Partnership as Limited Partners effective as of the Effective Date. Except as provided in the first sentence of this Section 3.6(a), a Person, including an Additional Limited Partner or substitute limited partner meeting the further requirements of this Agreement, shall be deemed admitted as a Limited Partner at the time such Person and the General Partner have executed this Agreement or a counterpart signature page to this Agreement and the effective date of such admission (as determined by the General Partner in its sole discretion) has occurred.

(b)     Additional Limited Partners may be admitted to the Partnership after the Initial Closing Date at the time and in the manner provided in this Section 3.6(b) as follows:

(i)     After the Initial Closing Date, the General Partner may admit additional Limited Partners (each, an "*Additional Limited Partner*"), or accept additional Capital Commitments from existing Partners, at one or more additional closings (each a "*Subsequent Closing*"); *provided*, *however*, that no Subsequent Closings shall be permitted after the date that is eighteen (18) months after the Initial Closing Date (the last Subsequent Closing occurring under this Section 3.6(b)(i) is referred to as the "*Final Closing*").

(ii)     In connection with any Subsequent Closing, Subsequent Closing Partners shall be deemed to contribute an amount equal to (a) such Partner's pro-rata share of all drawn Capital Commitments less (b) such Partner's pro-rata share of all Distributions (if any) made to Partners admitted in any prior Closing ("*Subsequent Closing Commitments*"). For the avoidance of doubt, Limited Partners admitted in any prior Closing will be deemed to immediately contribute any such amounts so that the General Partner and the Manager may make new Investments. Subsequent Closing Commitments will be drawn immediately and allocated towards new Investments at the General Partner's discretion.

(iii)     Unless waived by the General Partner in its sole discretion, Subsequent Closing Partners shall also contribute an amount equal to interest that would be payable on a debt obligation in the amount of the contribution required pursuant to clause (ii) above, calculated like interest at the Prime Rate plus 3% per annum, compounded annually, for the period from the due date or dates on which the other Partners were required to make their earlier contributions through the date of payment ("**Interest Charge**"). An Interest Charge shall not be treated as a capital contribution by the Subsequent Closing Partner. An Interest Charge in respect of amounts other than the Management Fee shall be allocated and distributed to the Partners pro rata based on all previous capital contributions to the Partnership as adjusted to reflect the date on which such previous capital contributions were made.

(iv)     In connection with each Subsequent Closing, the General Partner shall modify each Limited Partner's Schedule A and the books and records of the Partnership to accurately reflect the Capital Contribution, Capital Commitments subject to call and Capital Account of each Partner, determined as of the time of such Subsequent Closing. The Capital Commitment of each existing Partner shall not be increased or decreased by any Subsequent Closing Commitment received.

(v)     Notwithstanding the other provisions of this Section 3.6(b), in order to prevent certain economic distortions that might otherwise occur, any Additional Limited Partner that is treated as the same taxpayer as an existing Limited Partner for federal income tax purposes shall be treated in the same manner as the existing Limited Partner under this Section 3.6(b), and references to the existing Limited Partner in the other provisions of this Section 3.6(b) shall include any such Additional Limited Partner.

(vi)     For purposes of Article IV, any item of income, gain, loss, or deduction previously allocated pursuant to Article IV hereof with respect to any portion of an

Interest sold for a Subsequent Closing Commitment pursuant to Section 3.6(b)(ii) shall be deemed attributable to such transferred Interests.

(vii)   If one or more Alternative Investment Vehicles are established pursuant to Section 2.8, the above procedures for subsequent admissions will be applied (to the maximum extent reasonably practicable) on an aggregate basis across the Fund entities as described in Section 2.9.

(viii)  If one or more Parallel Investment Vehicles are established pursuant to Section 2.9, the above procedures for subsequent admissions will be applied (to the maximum extent reasonably practicable) on an aggregate basis across the Fund entities as described in Sections 2.9(e) and 2.9(f).

(c)   The admission of a Person to the Partnership that would cause the Partnership to be an "investment company" within the meaning of Section 3 of the Investment Company Act, shall, to the fullest extent permitted by law, be void *ab initio* and shall not bind or be recognized by the Partnership.

(d)   The General Partner shall take such actions as are reasonably appropriate to cause the provisions of this Section 3.6 to be applied among all Partners and Parallel Investment Vehicle Partners without regard for the vehicle through which a particular investor participates in the Fund.

Section 3.7.   **Strategic Investors.** Subject to the provisions of Section 3.5(m), EquipmentShare.com, Inc. ("*ES*") shall make a Capital Commitment of $12,000,000; Arken LLC shall make a Capital Commitment of $2,000,000, and RC Opportunity LLC shall make a Capital Commitment of $2,000,000. The parties agree that, the General Partner will enter into a separate Side Letter with ES, which will have the effect of amending certain terms of this Agreement as they apply to ES including by reducing or eliminating certain fees and expenses that would otherwise be payable by ES associated with its investments in the Fund. Each of these investors will be a First Limited Partner in the Initial Closing and will therefore be entitled to reduce their Capital Commitments in accordance with Section 3.5(m).

Section 3.8.   **ERISA Matters**.

(a)   The General Partner shall use commercially reasonable efforts to ensure that the terms and conditions of the Investments, and the contractual rights obtained and exercised with respect to the Investments, will not (1) cause the Partnership to fail to qualify as a "venture capital operating company" as defined in the Plan Assets Regulation (if such qualification is otherwise being sought) or (2) otherwise cause the assets of the Partnership to be treated as Plan Assets. For the avoidance of doubt, no ERISA Limited Partner shall be admitted to the Partnership without the General Partner's express written consent.

(b)   In connection with the General Partner's efforts set out in Section 3.8(a):

(i)   no transaction affecting the Interests shall be effective if the General Partner determines that such Investments may result in a material risk that the Partnership's assets would be deemed to include Plan Assets;

(ii)    the General Partner may take any action it deems appropriate in connection with assuring that the assets of the Partnership will not include Plan Assets, including, without limitation:

(A)    precluding, limiting or otherwise not giving effect to all or any portion of any purchase, acquisition, assignment or transfer of any Interest or withdrawal of any Limited Partner; and

(B)    effecting *pro rata* withdrawals by Limited Partners who have represented that they are Benefit Plan Investors and by (unless otherwise determined by the General Partner) a Controlling Person to reduce the aggregate holdings of such Benefit Plan Investors so that participation by Benefit Plan Investors should not be deemed "significant" within the meaning of the Plan Assets Regulation.

(c)    If the General Partner determines, including, without limitation, taking into account any relevant information provided by an ERISA Limited Partner, that:

(i)    participation by Benefit Plan Investors in the Partnership is "significant" within the meaning of the Plan Assets Regulation for purposes of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law; and

(ii)    no other exception from the treatment as Plan Assets under the Plan Assets Regulation or any applicable Similar Law applies,

then the General Partner shall promptly notify the ERISA Limited Partner of such determination. The General Partner is hereby authorized and empowered to take actions as it determines in its discretion are appropriate to mitigate, prevent or cure any adverse consequence of such determinations, which may include, without limitation and as appropriate:

(i)    renegotiating the terms of any Investment or otherwise modifying the manner in which the Partnership conducts its business;

(ii)    permitting or requiring the assignment of all or any portion of the Interests of any or all of the ERISA Limited Partners; and

(iii)    requiring each ERISA Limited Partner that is a Benefit Plan Investor (on a *pro rata* basis unless otherwise consented to by the ERISA Limited Partner):

(A)    assign all or any portion of its Interests at a price not less than the fair value of such an Interest or portion thereof, with such a fair value being determined by the General Partner; and/or

(B)    completely or partially withdraw from the Partnership and receive in consideration an amount, as determined under Section 3.2(f), of such an Interest or portion thereof being withdrawn,

and in either case, with such an amount being payable, in the sole and absolute discretion of the General Partner, either in cash or in the form of a promissory note (which may be prepaid by the Partnership at any time).

(d)     Notwithstanding any provision to the contrary contained in this Agreement, no in-kind Distribution shall be made to an ERISA Limited Partner to the extent that such an ERISA Limited Partner provides an opinion of counsel or other evidence reasonably acceptable to the General Partner that receipt of such an in-kind Distribution would result in a non-exempt "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code.

Section 3.9.     **Limited Exclusion Right**.

(a)     Prior to making any Investment, the General Partner shall have the right (a "***Limited Exclusion Right***"), but not an obligation, to exclude any Limited Partner from participating in such Investment and in any item of income, gain, loss, deduction, credit or Distribution with respect thereto if the General Partner determines in Good Faith (*provided*, that acting in Good Faith shall include relying on any oral or written representation or acknowledgement of a Limited Partner) that:

(i)     participation by such Limited Partner in such Investment will (A) result in a violation by the Partnership of the provisions of any law, statute, rule, regulation or order applicable to the Partnership, any Parallel Investment Vehicle, such Investment or any other Limited Partner or (B) subject the Partnership, any Parallel Investment Vehicle, such Investment or any other Limited Partner to any material penalty under any such law, statute, rule, regulation or order;

(ii)     participation by such Limited Partner in such Investment would require the Partnership to register as an investment company under the Investment Company Act; or

(iii)     participation by such Limited Partner in such Investment would cause (or be reasonably likely to cause) a significant delay, extraordinary expense, violation of applicable law or a material adverse effect on the Partnership or its Affiliates, any Investment or future Investment, a Partner or a Parallel Investment Vehicle.

(b)     In exercising its Limited Exclusion Right pursuant to Section 3.9(a), the General Partner's Good Faith determination pursuant to clauses (i) and (ii) of such Section 3.9(a) shall be supported by an opinion of the Partnership's counsel in order for the General Partner to exclude a Limited Partner from an Investment. If the General Partner exercises a Limited Exclusion Right hereunder or if the General Partner exercises an equivalent right with respect to a Parallel Investment Vehicle, the General Partner shall (x) so notify each Limited Partner to be excluded at least five days prior to making any Investment, which notice shall be accompanied by reasonable detail of the basis therefor (including a summary of the facts leading to the exercise of such right) and (y) give at least 10 days' notice to the non-excluded Limited Partners of the amount of any additional Capital Contributions that they are required to make (in an amount that represents their *pro rata* share of the aggregate amount payable by all non-excluded Limited Partners (based upon their Unused Capital Commitments)) in order to consummate the proposed Investment as to

which such right has been exercised. If appropriate, the General Partner may apply this Section 3.9(b) with respect to any Limited Partner that has made a Several Interest Election to the portion of the Interest of such Limited Partner to which such exclusion applies.

Section 3.10. **Mandatory Withdrawal**.

(a) In addition to the right of the General Partner to cause a Limited Partner to withdraw from the Partnership as set forth in Section 3.2(e), the General Partner shall have the right at any time upon written notice to require a Limited Partner to withdraw from the Partnership if (i) the General Partner reasonably determines, in Good Faith, that such Limited Partner has made a material misrepresentation in, or violated any covenant of, this Agreement or such Limited Partner's Subscription Agreement, is a Prohibited Limited Partner or has suffered an Incapacity event, (ii) in the reasonable judgment of the General Partner, a significant delay, extraordinary expense, violation of law or material adverse effect (including a material likelihood that the Partnership's assets would be deemed to include Plan Assets) on the Limited Partners, the Partnership or any of its Affiliates, any Investment or any future Investment is likely to result, or (iii) the General Partner reasonably determines, in Good Faith, that the participation of such Limited Partner in the Partnership is illegal. Upon the giving of such notice, such Limited Partner shall be required to withdraw as a Limited Partner as of the date specified in such notice (the "*Withdrawal Date*").

(b) Effective upon the Withdrawal Date, such Limited Partner shall cease to be a Limited Partner of the Partnership for all purposes and, except for its right to receive payment for its Interest in the Partnership as provided in Section 3.10(c), shall no longer be entitled to the rights of a Limited Partner under this Agreement (including the right to have any allocations made to its Capital Account pursuant to Article IV, the right to receive Distributions pursuant to Article IV and upon dissolution of the Partnership pursuant to Article X and the right to vote on matters as provided in this Agreement).

(c) The Capital Accounts of the Partners shall be adjusted as of any Withdrawal Date to reflect allocations made pursuant to the Allocation Provisions through such date. If, after such adjustments, there is a positive balance in such Partner's Capital Account, then the amount of such balance shall be paid by the Partnership to such Partner in cash as promptly as is reasonably practicable following such withdrawal (taking into account the liquidity needs of the Partnership); *provided*, that the General Partner shall be under no obligation to sell, finance or refinance any Investment to effect such withdrawal. If appropriate, the General Partner may apply this Section 3.10 with respect to any Limited Partner that has made a Several Interest Election to the portion of the Interest of such Limited Partner to which such withdrawal applies.

## ARTICLE IV

## DISTRIBUTIONS; ALLOCATION OF PROFITS AND LOSSES

Section 4.1. **Distributions**.

(a) Distributions from the Partnership will consist of the following categories of items: (i) Current Income; and (ii) Capital Transaction Proceeds. The General Partner shall

periodically review any reserves created for the payment of anticipated Operating Expenses or other legal obligations and release any excess amounts in such reserves for distribution in accordance with this Article IV.

(b)    The Partnership may reinvest Current Income. The Partnership will be permitted to reinvest (and shall not be required to distribute) proceeds realized on the sale or disposition of Investments, provided that the Partnership's cumulative investment in securities other than money market investments, bridge securities and other passive investments over the term of the Partnership will not exceed one hundred twenty percent (120%) of the Partnership's aggregate capital commitments.

(c)    Subject to the ability of the General Partner to reinvest proceeds pursuant to Section 4.1(b), distributions by the General Partner will be distributed as follows: (i) Current Income at such time and in such amounts as determined in the General Partner's sole discretion; and (ii) Capital Transaction Proceeds within 90 days after receipt (or if distribution within such 90-day period is not practicable, as soon as practicable thereafter); (items (i) through (ii) together, less any reserves established in the sole discretion of the General Partner, the "***Distributable Cash Flow***").

(d)    Distributions pursuant to this ARTICLE IV or upon liquidation of the Partnership under Section 10.2 may be made in-kind by distributing all or a portion of the Partnership's share of publicly traded portfolio company securities, upon such terms and conditions, as the General Partner deems appropriate. Cash distributions shall be made, to the extent practicable, in *pro rata* portions of cash as to each Partner receiving such Distributions.

(e)    All Distributions to be made to the Partners pursuant to this Article IV or upon liquidation of the Partnership under Article X, as applicable, shall be adjusted to take into account any Partner who has not contributed its Capital Contributions as called for by the General Partner pursuant to the terms of this Agreement, whether as a result of such Partner's default under Section 3.5, or otherwise.

(f)    Notwithstanding any provision to the contrary contained in this Agreement, the Partnership shall not be required to make a Distribution to a Limited Partner on account of its Interest in the Partnership if such Distribution is likely to violate the Delaware Act or any other applicable law.

Section 4.2.    **Amounts and Priority of Distributions**.

Subject to the provisions of Sections 4.1, Section 4.3 and 4.4, and the Delaware Act, Distributable Cash Flow initially will be apportioned among the Partners *pro rata* in accordance with their respective Allocation Percentage. The amount apportioned to the General Partner and Affiliated Limited Partners will be distributed to the General Partner and such Affiliated Limited Partners, as applicable, in the sole discretion of the General Partner. The amount apportioned to the Limited Partners other than Affiliated Limited Partners will be allocated among them in accordance with their respective Allocation Percentage and, subject to the provisions of Sections 4.1, Section 4.3, 4.4, Section 4.7(d) and the Delaware Act, the amount so allocated to each such Limited Partner will be distributed in the following order of priority:

(a)     *First*, 100% pro rata to such Partner in proportion to such Partner's Unreturned Capital, until such Partner has received an amount equal to such Partner's Unreturned Capital;

(b)     *Second*,

(i)     for any period when cumulative distributions to a Limited Partner are, in the aggregate, less than 500% of such Limited Partner's Capital Contributions received (A) 80% of any excess over the amount allocated to the Partnership in clause (a) to each Partner in proportion to such Partner's Allocation Percentage and (B) 20% of such excess over the amount allocated to the Partnership to the General Partner

(ii)     for any period when cumulative distributions to a Limited Partner are, in the aggregate, equal or exceed 500% of such Limited Partner's Capital Contribution received (A) 60% of any excess over the amount allocated to the Partnership in clauses (a) and (b) to each Partner in proportion to such Partner's Allocation Percentage and (B) 40% of such excess over the amount allocated to the Partnership to the General Partner

*(either such amount in (b)(1) and (b)(2) above allocated to the General Partner, the "**Carried Interest**").*

In lieu of receiving Distributions of Carried Interest from the Partnership, the General Partner may elect to receive such amounts from Subsidiaries of the Partnership (including an Aggregator Vehicle) or a Parallel Investment Vehicle.

Section 4.3.     **Special Distributions**.

(a)     To the extent that the Management Fee paid by the Partnership with respect to a Partner for a particular quarter accrues at a different rate than the rate at which the Management Fee is paid by the Partnership with respect to such calendar quarter, distributions to the Partners from the Partnership pursuant to Section 4.2 shall be adjusted to the extent necessary, as determined by the General Partner in its discretion, to account for such disproportionate accrual of the Management Fee.

Section 4.4.     **Special Tax Distributions**. To the extent that the Distribution priorities set forth in Section 4.2 do not provide cumulative Distributions to any Partner as of the end of any Fiscal Year in an amount at least equal to the aggregate federal, state and local taxes that would (based on the assumptions below) be deemed to be payable by such Partner on the cumulative taxable income of the Partnership allocated to the l Partner and other payments, as of the end of such Fiscal Year (determined by assuming that the Partner is an individual subject to the highest marginal rate of federal, state and local taxation applicable to individuals residing in New York, New York or San Francisco, California, whichever is higher, and taking into account the character of income allocated to the Partner (including income required to be taxed as ordinary income when received by a Partner, self-employment taxes, and tax under Code Section 1411) and the deductibility of state and local taxes for federal tax purposes (to the extent such state and local taxes are deductible) and any loss limitations contained in Code Section 470 restricting the ability to deduct Partnership losses or deductions allocated to the General Partner) (a "**Tax Distribution Amount**", if to a Limited Partner, and the "**Carried Interest Tax Liability**" with respect to the

General Partner), then the General Partner shall cause a Distribution to be made to such Partner for the Fiscal Year equal to such Partner's Tax Distribution Amount (a "***Limited Partner Tax Distribution***") or its Carried Interest Tax Liability (the "***Carried Interest Tax Distribution***"), as applicable. For the avoidance of doubt, Carried Interest Tax Liability shall also include any taxable income to the General Partner resulting from or caused by the Carried Interest, including but not limited to any deemed income or compensation to the General Partner for tax purposes on account of Carried Interest. Carried Interest Tax Distributions will be treated as advance payments of Carried Interest and will reduce future payments thereof (but will not be repayable by the General Partner.)

Section 4.5.     **Tax Withholding**.

(a)     (i) The General Partner shall at all times be entitled to make payments with respect to any Partner in amounts required to discharge any obligation of the Partnership to withhold from a Distribution or make payments to any governmental authority with respect to any foreign, federal, state or local tax liability of such Partner arising as a result of such Partner's interest in the Partnership (a "***Withholding Payment***"). Any Withholding Payment made from funds withheld upon a Distribution to a Partner will be treated as (and deemed to have been) distributed to such Partner for all purposes of this Agreement and then paid by the Partnership as the agent of such Partner. Any other Withholding Payment will be deemed to be a recourse demand loan by the Partnership to the relevant Partner. The amount of any Withholding Payment treated as a loan, *plus* interest thereon, from the date of each such Withholding Payment until such amount is repaid to the Partnership at a rate of Prime Rate + 3.0% per annum, shall be repaid to the Partnership upon demand by the Partnership; *provided*, *however*, that in the General Partner's sole discretion, any such amount may be repaid by deduction from any Distributions payable to such Partner pursuant to this Agreement (with such deduction treated as an amount distributed to the Partner) as determined by the General Partner in its sole discretion. Notwithstanding anything contained herein to the contrary, the Partnership may be required to withhold Distributions and make payments to United States tax authorities, including under Sections 1441, 1442, 1445, 1446 and 1471 through 1474 of the Code, and the General Partner is hereby authorized to do so to the extent the Partnership is subject to such requirements.

(ii)     The General Partner agrees that, with respect to any allocation or distribution from the Fund, before withholding and paying over to any United States federal, state or local taxing authority any amount purportedly representing a tax liability of a Limited Partner by reason of an investment in the Partnership, the General Partner will use commercially reasonable efforts to provide the Limited Partner with written notice of the amount proposed to be withheld from the Limited Partner and an opportunity for the Limited Partner to establish (at the Limited Partner's sole expense, including, without limitation, any costs, expenses, fees or penalties of any nature incurred or payable by or assessed on the General Partner or the Partnership and to the satisfaction of the General Partner in its sole discretion) the basis for an exemption from such withholding requirement applicable to the Limited Partner, as long as the foregoing does not subject the Partnership, the other investors, the General Partner or any of their respective partners, members, shareholders, or owners, as reasonably determined by the General Partner, to any potential liability to such taxing authority or any other governmental authority for any such claimed withholding and payment and would not otherwise, as reasonably determined by the General Partner, result in adverse consequences

to the Fund or its Limited Partners. For the avoidance of doubt, the withholdings referred to in this Section 4.5 shall be made at the maximum applicable statutory rate under applicable law unless the General Partner receives documentation, satisfactory to the General Partner in its discretion, to the effect that a lower rate is applicable, or that no withholding is applicable.

(b)     If the proceeds to the Partnership (or any fiscally transparent entity in which the Partnership holds an interest) from an investment are reduced on account of taxes withheld at the source, and such taxes are attributable to one or more, but not all, of the Partners in the Partnership, the amount of the reduction shall be borne by the relevant Partners to whom such taxes are attributable as determined by the General Partner in its discretion and treated as if it were paid by the Partnership as a Withholding Payment with respect to such Partners pursuant to Section 4.5(a). If the proceeds to the Partnership (or any fiscally transparent entity in which the Partnership holds an interest) from an investment are reduced on account of taxes withheld at the source, and such taxes are attributable to all Partners, the amount of the reduction shall be treated as an expense of the Partnership. This Section 4.5 and the other provisions of this Agreement shall be applied consistently with the requirements of Treasury Regulations Section 1.704-1.

(c)     Promptly upon request, each Partner shall provide the General Partner with any information, representations, certificates, affidavits or forms related to such Partner (or its direct or indirect partners, members, owners or account holders, as the case may be) necessary (i) to establish the Partnership's (or that of any Investment, Parallel Investment Vehicle, Feeder Fund, Aggregator Vehicle, Alternative Investment Vehicle, or Subsidiary) legal entitlement to an exemption from, or reduction of, withholding or other tax under applicable law, and (ii) for the Partnership to comply with any tax reporting, withholding or payment obligations under applicable law. Each Partner represents and warrants that any information, representations, certificates, affidavits or forms furnished by such Partner pursuant to this Section 4.5 shall be true, accurate and complete and agrees to promptly update them if the Partner becomes aware anything previously provided is no longer true, accurate and complete.

Section 4.6.     **Capital Accounts**.

(a)     A separate Capital Account shall be established and maintained for each Partner. Any references in this Agreement to the Capital Account of a Partner shall be deemed to refer to such Capital Account as the same may be credited or debited from time to time as set forth in this Section 4.6.

(b)     The Capital Account of each Partner shall be computed separately with respect to each Partner. The Capital Account of each Partner shall be credited with such Partner's Capital Contributions to the Partnership and shall be credited or debited pursuant to Section 4.6(c).

(c)     The Capital Account of each Partner shall be maintained in accordance with the rules of Code Section 704(b) and the Treasury Regulations (including Section 1.704-1(b)(2)(iv) thereof) thereunder (with no double counting of items taken into account in determining Profits or Losses). In general, a Partner's Capital Account shall be increased by (i) the amount of money and the Gross Asset Value of any property (net of liabilities secured by such contributed property that the Partnership is considered to assume or to take subject to) contributed to the Partnership by the Partner, and (ii) allocations to the Partner of Profits and any items of income or gain that are

specially allocated pursuant to Section 4.8, and decreased by (x) the amount of money distributed to the Partner by the Partnership, (y) the Gross Asset Value of any property distributed to the Partner by the Partnership (net of liabilities secured by such distributed property that such Partner is considered to assume or take subject to) and (z) allocations to the Partner of Losses and any items of expense or loss that are specially allocated pursuant to Section 4.8. The foregoing provisions relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1 and 1.704-2 and shall be applied in a manner consistent with such Treasury Regulations.

(d)     Whenever the Partnership would be permitted to adjust the Capital Accounts of the Partners pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) to reflect revaluations of Partnership property, if any, the Partnership may so adjust the Capital Accounts of the Partners. In the event that the Capital Accounts of the Partners are adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) to reflect revaluations of Partnership property, if any, (i) the Capital Accounts of the Partners shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property, (ii) the Partners' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and book value of such property in the same manner as under Code Section 704(c), and (iii) the amount of upward and/or downward adjustments to the book value of the Partnership property shall be treated as income, gain, deduction and/or loss for purposes of applying the allocation provisions of this Article IV.

Section 4.7.     **Allocations of Profits and Losses**.

(a)     After application of Section 4.7(d) and Section 14.9(c), and subject to the other provisions of this Article IV, any remaining Profits or Losses for the taxable year (or items thereof) shall be allocated among the Partners in such ratio or ratios as may be required to cause the balances of the Partners' respective Economic Capital Accounts to be as nearly equal to their respective Target Balances as possible, consistent with compliance with Code Section 704(b).

(b)     The Partners intend that the provisions of Section 4.7 through Section 4.10 and Section 14.9(c) (the "*Allocation Provisions*") shall produce final Capital Account balances of the Partners that are identical to the Distributions that the Partners would receive in accordance with Section 10.2(c)(ii) upon the liquidation of the Partnership. To the extent that the Allocation Provisions would fail to produce such final Capital Account balances as of the close of any taxable year of the Partnership (based on the assumptions that (i) all assets still owned by the Partnership and its Subsidiaries at the close of such year, other than interests in each other, are sold at such time for their Gross Asset Values, (ii) all Partners have contributed any Unused Capital Commitments as needed to satisfy any credit facility secured by the Capital Commitments and the General Partner has contributed any amounts needed to satisfy any remaining Partnership liabilities for which the General Partner would be liable, to the extent such obligations would apply after the deemed sale described in preceding clause (i), and (iii) all proceeds were distributed in liquidation of the Partnership), Profits and Losses of the Partnership for the current taxable year and future taxable years (or items of gross income and deduction of the Partnership for such years) shall be reallocated by the General Partner among the Partners as necessary to produce such result

(or, to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years, for prior open taxable years) as determined by the General Partner in Good Faith. Notwithstanding the foregoing, the General Partner may make such allocations as it deems necessary to give economic effect to the provisions of this Agreement, taking into account facts and circumstances as the General Partner deems reasonably necessary for this purpose, including the timing and amounts of distributions pursuant to Section 4.3 of the Agreement, if any. The General Partner shall have the power to amend this Agreement, as it considers advisable in Good Faith after consulting with counsel, to produce the results described above.

(c)     Notwithstanding the foregoing, the General Partner shall be entitled to defer Distributions and the allocation of Profits and Losses to the General Partner in respect of its Carried Interest in a manner intended to minimize the allocation of Profits to the General Partner that would cause the General Partner to recognize short-term capital gain as a result of the application of Code Section 1061.

(d)     Profits and Losses shall be allocated to the Partners, at such times, and in the amounts necessary, as determined by the General Partner, to account for any adjustment to distributions of Distributable Cash Flow pursuant to Section 4.3 of this Agreement. Allocations of Profits and Losses under this Section 4.7(d) shall take precedence over, and be made prior to, allocations under Section 4.7(b) and (c).

(e)     If for any Fiscal Year after the Partnership's net Profit or Loss has been allocated pursuant to Section 4.7 the closing adjusted Capital Account balance of the General Partner for such Fiscal Year has been reduced to less than the Target Amount by more than the amount of the General Partner's obligation to recontribute amounts to the Partnership pursuant to Section 10.2(g) upon dissolution of the Partnership (with such obligation determined for this purpose by assuming that all Partnership assets and liabilities are sold or satisfied for an amount equal to their respective book values and by disregarding any limitations on such contribution obligations that are based on the Capital Account balances of the Limited Partners), then an amount of net Loss (collectively, the "**Contingent Loss**") for such Fiscal Year shall be reallocated from the General Partner's Capital Account to the Capital Accounts of the Limited Partners as a group so that the closing adjusted Capital Account balance of the General Partner is not reduced below the Target Amount by more than the amount of the General Partner's obligation to recontribute amounts to the Partnership pursuant to Section 10.2(g) upon dissolution of the Partnership (with such obligation determined for this purpose by assuming that all Partnership assets and liabilities are sold or satisfied for an amount equal to their respective book values and by disregarding any limitations on such contribution obligations that are based on the Capital Account balances of the Limited Partners). A Contingent Loss may be restored only from future net Profit. As used herein, the "*Target Amount*" shall equal the product obtained by multiplying (a) a fraction, the numerator of which is the General Partner's Allocation Percentage and the denominator of which is the sum of the Allocation Percentages of the Limited Partners by (b) the aggregate Capital Account balances of the Limited Partners.

Section 4.8.     **Special Allocations**. The following special allocations shall be made, to the extent applicable, in the order prescribed by Treasury Regulations Section 1.704-1 and -2 and shall be interpreted in a manner consistent therewith:

(a)     **Qualified Income Offset**. If any Partner receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*), items of Partnership income and gain (including gross income) shall be specially allocated to each such Partner in a manner and amount sufficient to eliminate, to the extent required by such Treasury Regulations, the Adjusted Capital Account Deficit of the Partner created by such adjustments, allocations or distributions as quickly as possible. The foregoing provision is intended to comply with Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(b)     **Gross Income Allocation**. If any Partner has an Adjusted Capital Account Deficit at the end of any Fiscal Year, each such Partner shall be specially allocated items of Partnership income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible; *provided*, that an allocation pursuant to this Section 4.8(b) shall be made only if and to the extent that such Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV had been made as if Sections 4.8(a) and 4.8(b) were not included in this Agreement. The parties hereto acknowledge that all of the relevant facts and circumstances, and all available information as of the date of the adoption of this Agreement, indicate that it is unlikely that such an allocation will be made pursuant to this provision during the existence of the Partnership.

(c)     **Minimum Gain Chargebacks**. If there is a net decrease in the Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain (determined in accordance with the principles of Treasury Regulations Sections 1.704-2(d) and 1.704-2(i)) during any Partnership taxable year, then items of income and gain for such year (and, if necessary, for subsequent periods) shall be allocated to the Partners in the manner and to the extent required by Treasury Regulations Section 1.704-2(f) and 1.704-2(i) (subject to the exceptions to this requirement described therein). This Section 4.8(c) is intended to constitute a "minimum gain chargeback" (both of Partnership Minimum Gain and of Partner Nonrecourse Debt Minimum Gain) as provided by Treasury Regulations Section 1.704-2(f), and this clause shall be construed accordingly.

(d)     **Partner Nonrecourse Deductions**. Any Partner Nonrecourse Deductions shall be specially allocated to the Partner who bears the economic risk of loss with respect to the associated partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(e)     **Nonrecourse Deductions**. Nonrecourse deductions shall be allocated among the Partners in proportion to their respective Allocation Percentage.

Section 4.9.     **Allocation Rules**.

(a)     If during any taxable year there is a relative change among the respective Allocation Percentage, including a change in the Allocation Percentage pursuant to Article III

hereof, then the Profits, Losses and to the extent necessary, individual items of income, gain, loss or deduction of the Partnership for such taxable year shall be allocated for the period and according to the varying interests of the Partners pursuant to any reasonable method selected by the General Partner in Good Faith (including an interim closing of the Partnership's books) and determined to be permitted under Code Section 706.

(b)     For purposes of determining the Profits, Losses and individual items of income, gain, loss and deduction allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the General Partner using any method that is permissible under Code Section 706 and the Treasury Regulations thereunder.

(c)     Except as otherwise provided in this Agreement, all individual items of Partnership income, gain, loss and deduction shall be divided among the Partners in the same proportions as they share Profits and Losses for the Fiscal Year or other period in question.

Section 4.10.   **Tax Allocations**.

(a)     Except as otherwise provided in this Section 4.10, the taxable income or loss of the Partnership (and items thereof) shall be allocated among the Partners in the same manner as the corresponding items of Profits, Losses and separate items of income, gain, loss and deduction (excluding items for which there are no related tax items) are allocated among the Partners for Capital Account purposes; *provided*, that in the case of any Partnership asset whose Gross Asset Value differs from its adjusted tax basis for United States federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Code Section 704(c) (in any manner determined by the General Partner that constitutes a "reasonable method" under the Treasury Regulations thereunder) so as to take account of the difference between the Gross Asset Value and the adjusted tax basis of such asset.

(b)     Any elections or other decisions relating to allocations for tax purposes under this Article IV, including the selection of any allocation method permitted under Treasury Regulations Section 1.704-3, shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.

(c)     The Partners are aware of the income tax consequences of the allocations made by this Article IV and hereby agree to be bound by the provisions of this Article IV in reporting their shares of Partnership income and loss for income tax purposes.

Section 4.11.   **UBTI**. Tax-exempt investors may recognize "unrelated business taxable income" ("*UBTI*") within the meaning of the Code Sections 511 and 514 from an investment in the Partnership. To the fullest extent permitted by law, the General Partner will not be liable for the recognition of any UBTI by a Partner with respect to an investment in the Partnership for any reason, and potential investors hereby consent to some or all of their profits from the Partnership constituting UBTI for any reason.

# ARTICLE V

## RIGHTS AND DUTIES OF THE GENERAL PARTNER – EXPENSES

Section 5.1. **Management; Investment Limitations**.

(a) Except as otherwise expressly provided herein or required by law, the General Partner is hereby vested with the full, exclusive and complete right, power and discretion to operate, manage and control the business and affairs of the Partnership and to make all decisions affecting Partnership affairs in the conduct and furtherance of the purpose of the Partnership as described in Section 2.4. Without limiting the generality of the foregoing, all of the Limited Partners hereby specifically agree that the General Partner, at any time, and without further notice to or Consent from any Limited Partner may do the following on behalf and in the name of the Partnership and at the sole expense of the Partnership:

(i) acquire, invest in, hold, pledge, manage, operate or otherwise deal in or with Investments consistent with the purposes of the Partnership and the Investment Parameters and any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership, whether directly or indirectly, through holding companies, subsidiaries, partnership interests, listed or unlisted securities, joint ventures or otherwise;

(ii) sell, transfer or otherwise dispose of all or any part of any Investment, on such terms as the General Partner shall determine to be appropriate in its sole discretion;

(iii) perform, or arrange for the performance of, those management services that are necessary to foster the ultimate realization of the Investments, and delegate and/or contract for such other management and administrative services, as the General Partner may deem appropriate given the fundamental business purpose of the Partnership;

(iv) prepay in whole or in part, refinance, recast, assume, increase, reduce, modify, extend, foreclose or transfer any debt obligations constituting or affecting any of the Investments, and in connection therewith to execute any extensions, renewals, assumptions or modifications of any documents constituting or affecting any of the Investments;

(v) incur all expenditures permitted by this Agreement, and, to the extent that funds of the Partnership are available, pay all expenses, debts and obligations of the Partnership;

(vi) employ and dismiss from employment any and all consultants, asset managers and portfolio managers and other Partnership agents, including attorneys, accountants and other advisors;

(vii) enter into, execute, amend, supplement, acknowledge and deliver any and all contracts, agreements or other instruments (including agreements to form, own, invest in and/or acquire shares or interests in one or more joint ventures and partnerships)

as the General Partner shall determine to be appropriate in furtherance of the purposes of the Partnership, including entering into agreements to acquire or dispose of Investments which may include such representations, warranties, covenants, indemnities and guarantees as the General Partner deems necessary or advisable;

(viii)    admit an assignee of all or any portion of a Partner's Interest to be a Substituted Limited Partner in the Partnership pursuant to and subject to the terms of Section 9.3, admit Additional Limited Partners under Section 3.6 and execute and deliver all documents in connection therewith, including Subscription Agreements and any Side Letters with one or more Limited Partners and to allow any Limited Partner to make a Several Interest Election;

(ix)    make, or refrain from making, any election under federal, state and local tax laws;

(x)    act as, or designate, the Partnership Representative of the Partnership, as such term is defined in Code Section 6223(a), and exercise any authority permitted a Partnership Representative under the Code;

(xi)    settle or prosecute litigation on behalf of the Partnership;

(xii)    create, in the General Partner's sole discretion, the Parallel Investment Vehicles and Alternative Investment Vehicles described in Section 2.8 and 2.9;

(xiii)    create one or more entities to hold any assets of the Partnership or for any other Partnership purpose, and to hold or distribute, to the fullest extent permitted by law, to the Partners any interest in such entities (subject to the provisions herein on in-kind Distributions); *provided*, that the General Partner may have management rights and financial interests in any such entities so long as such arrangements preserve in all material respects the overall economic relationship and rights of the Partners; and

(xiv)    take any other action reserved to a General Partner under the Delaware Act.

(b)    Without the approval of the Advisory Committee, the Partnership shall not, and the General Partner shall not cause or permit the Partnership to do any of the following:

(i)    measured at the time of acquisition, invest more than 20% of Capital Commitments in a single Investment, or invest in a single Investment if the Fund would own in the aggregate more than 30% ownership interests in the Investment;

(ii)    waive the rights of the Partnership with respect to each such Investment opportunity in order to permit an investment by the General Partner or its Affiliates;

(iii)    waive any conflict of the General Partner or any Affiliate of the General Partner in pursuing any Investment opportunity;

(iv)     invest in swaps, hedges or other derivative financial instruments, except in connection with the Partnership's financing activities.

(c)     Subject to the provisions of this Section 5.1(c), the General Partner shall have the right, at its option, to cause the Partnership or any Affiliate to (A) borrow money from any Person, (B) provide customary non-recourse carve-out, environmental, payment/performance guarantees, indemnities and covenants in connection with construction loans and (C) provide guarantees in connection with the Investments.

(d)     To the fullest extent permitted by law, third parties dealing with the Partnership may rely conclusively upon any certificate of the General Partner to the effect that it is acting on behalf of the Partnership.

(e)     To the fullest extent permitted by law, the signature of the General Partner shall be sufficient to bind the Partnership in every manner to any agreement or on any document, including, but not limited to, documents drawn or agreements made in connection with the acquisition or Disposition of any Investments or other properties in furtherance of the purposes of the Partnership. To the fullest extent permitted by law, without limiting the generality of the foregoing, third parties need not confirm that the General Partner obtained any necessary approvals from the Advisory Committee or any Limited Partners.

Section 5.2.    **Duties and Obligations of the General Partner**.

(a)     The General Partner shall exercise its powers and duties under this Agreement in accordance with the duty of Good Faith. Each Limited Partner expressly acknowledges that any other duties that may be waived under the Delaware Act are hereby waived. Each Limited Partner expressly acknowledges that the Partnership has been formed to invest in the securities of privately-held companies involved in the construction industry or companies that, in the General Partner's discretion, hold or may develop technology-based solutions relevant to the construction industry, and that such investments are highly speculative in nature, and that the risks of the Partnership's actual results differing materially from the General Partner's expectations are significantly greater than would be the case were the investment objectives of the Partnership of a more conservative nature.

(b)     The General Partner will use commercially reasonable efforts to identify opportunities for equity investments in privately-held companies involved in the construction industry or companies that, in the General Partner's discretion, hold or may develop technology-based solutions relevant to the construction industry consistent with the purposes and objectives set forth in Section 2.4 and the Investment Parameters of the Partnership.

(c)     The General Partner shall take all lawful action which may be necessary or appropriate for the continuation of the Partnership's valid existence and authority to do business as a Partnership under Delaware law and of each other jurisdiction in which such authority to do business is necessary or, in the judgment of the General Partner, advisable to protect the limited liability of the Limited Partners or to enable the Partnership to conduct the business in which it is engaged. The General Partner shall not intentionally violate any law applicable to the Partnership.

(d) The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, insurance agents, brokers, and other consultants (each, a "*Consultant*" and, collectively, "*Consultants*") selected by the General Partner (who may serve the Partnership or any Affiliate of the General Partner). To the fullest extent permitted by law, the written advice by any Consultant on a matter which the General Partner reasonably believes to be within its professional or expert competence shall be full and complete protection as to any action taken or omitted by the General Partner based on such advice and taken or omitted in Good Faith, and shall not be deemed to be a breach of the General Partner's responsibilities under this Agreement. To the fullest extent permitted by law, the General Partner shall not be responsible for the misconduct, negligence, acts or omissions of any Consultant or of any agent who is not an Affiliate of the General Partner or its Affiliates and shall assume no obligations other than to use due care in the selection of all consultants.

(e) It is understood and agreed that any officer of the General Partner may act for and in the name of the General Partner under this Agreement. To the fullest extent permitted by law, in dealing with any such officer acting for or on behalf of the Partnership, no Person shall be required to inquire into, and Persons dealing with the Partnership are entitled to rely conclusively on, the right, power and authority of the General Partner to bind the Partnership.

(f) It shall be the duty and responsibility of the General Partner to use reasonable commercial efforts to manage and control the investments, business and affairs of the Partnership. The General Partner shall devote such time to the investments, business and affairs of the Partnership as it deems necessary, proper or desirable to supervise the investments, business and affairs of the Partnership in an efficient manner. Except as otherwise explicitly provided herein, the General Partner shall not be obligated as the General Partner of the Partnership to provide services directly to any Investments (including services that an Affiliate of the General Partner may be in the business of providing) and the General Partner may employ an agent or agents for such purpose (which, subject to the provisions of this Agreement, may include Affiliates of the General Partner).

(g) The General Partner has entered into an agreement (as amended from time to time, the "*Management Agreement*") with the Manager, and has arranged for the Manager, pursuant to such Management Agreement, to render significant management and investment assistance and advice, to provide economic and investment analysis, to provide day-to-day managerial and administrative services and to perform such other acts as may be lawfully approved the General Partner, in each case to the Partnership and any Alternative Investment Vehicles and Feeder Funds. Notwithstanding any such appointment or delegation, the management and conduct of the activities of the Partnership will remain the sole responsibility of the General Partner and all final decisions relating to the selection and disposition of the Partnership's investments will be made exclusively by the General Partner in accordance with this Agreement.

Section 5.3. **Determination of Fair Value**. For all purposes of this Agreement, the General Partner shall annually establish and notify the Limited Partners of the aggregate fair market values of the Investments and net assets of the Partnership as of the end of each Fiscal Year (incorporating the General Partner's Good Faith internal valuation for all Investments) (such value, except as otherwise provided in this Agreement, including Section 5.1, shall be the "*Fair Value*").

Section 5.4.    **Exclusivity; Other Businesses of the General Partner**.

(a)    Except for the transactions and other arrangements contemplated by this Agreement including, without limitation, investment in privately-held companies involved in the construction industry or companies that, in the General Partner's discretion, hold or may develop technology-based solutions relevant to the construction industry, and asset management services, none of the General Partner, the Manager, the Managing Members nor any of their respective Affiliates may (i) engage in any transaction with the Partnership or (ii) seek to acquire for the Partnership, interests in potential Investments that the General Partner, the Manager, the Managing Members or any of their respective Affiliates manage, control or in which any of them holds an ownership interest unless, in each case, (x) the Advisory Committee has approved such transaction or acquisition, or (y) the terms of such transaction or acquisition are on an arm's-length basis, at competitive market rates; *provided*, that nothing contained herein shall restrict the Partnership's ability to co-invest or joint venture in Investments with any third party or any subsequent fund permitted to be organized by the Managing Members (whether to fully invest the Capital Commitments of the Partnership on a *pro rata* basis per unit of investment with any successor fund or to meet investment restrictions), the General Partner or the Manager by this Section 5.4 or other co-investment activities permitted under this Agreement, or restrict direct or indirect passive investments by family members of any member, officer, director or employee of the General Partner or the Manager or any Affiliate of the General Partner or the Manager or trusts or other entities established by any of the foregoing for estate planning or charitable purposes. For clarity, ES may engage in any transaction with one or more of the Fund's portfolio companies in manners that differ materially from the transactions entered into by the Fund.

(b)    Each Partner acknowledges and agrees that the General Partner, any Affiliated Limited Partner (including ES), the Manager, the Advisory Committee and their respective members, managers, directors, officers, partners, employees and agents may exercise investment responsibility, or otherwise engage, directly or indirectly, in any other business, irrespective of whether any such business is similar to, or identical with, the business of the Partnership, which may include purchasing, selling, holding or otherwise dealing with investments, notwithstanding any provision to the contrary at law or in equity. To the fullest extent permitted by law, neither the Partnership, nor any Limited Partner, solely by reason of being a Limited Partner in the Partnership, will have any right to participate in any manner in any profits or income earned or derived by or accruing to the General Partner, any Affiliated Limited Partner (including ES), the Manager, the Advisory Committee or their respective members, managers, directors, officers, partners, employees, agents, and Affiliates from the conduct of any business or any investment activity other than the business of the Partnership or from any transaction or other investment effected by any such Person for any Person other than that of the Partnership. This paragraph is subject to all other provisions of this Agreement.

(c)    Furthermore, each of the Limited Partners recognizes and understands that the General Partner may select one or more entities associated with the General Partner or associated with certain ES investors and directors (including entities associated with Romulus Capital Management LLC and/or Mr. Neil Chheda) to provide services to the Partnership, including the Manager and an entity to provide outsourced accounting services. The Limited Partners hereby consent and agree that such selection of service providers by the General Partner,

even if any such entity is an Affiliate of the General Partner, shall not constitute a conflict of interest by, or create any liability for, the General Partner or any partner thereof.

(d)     The Limited Partners hereby agree that the General Partner may offer the right to participate, directly or indirectly, in investment opportunities of the Partnership to one or more Limited Partners or other private investors, groups, partnerships, or corporations, whenever the General Partner, in its discretion, so determines (and the Limited Partners acknowledge that such investment practices involve an inherent conflict of interest and agree that the General Partner shall have no liability attributable to or based upon such conflict of interest in the absence of intentional harm to the Partnership by the General Partner or a member thereof (it being understood that merely causing any subsequent investment vehicle permitted to be formed hereunder to take advantage of an investment opportunity or to exercise any legal or contractual rights available to it shall not be deemed intentional harm to the Partnership)).

(e)     The Limited Partners hereby acknowledge that the General Partner may be prohibited from taking action for the benefit of the Partnership: (i) due to confidential information acquired or obligations incurred in connection with an outside activity permitted to the General Partner, its Affiliates, equity holders or other related persons; (ii) in consequence of an equity holder, Affiliate or other related person of the General Partner serving as an officer or director of a portfolio company or of an Affiliated Limited Partner (including ES); or (iii) in connection with activities undertaken by an equity holder, Affiliate or other related person of the General Partner prior to the date to or after the launch of the Fund. The Limited Partners further acknowledge that the General Partner may cause the Partnership to decline investment opportunities that are not "qualifying investments" as defined in Rule 203(*l*)-1(c)(3) promulgated under the Advisers Act, for the purpose of enabling each of the Manager and the General Partner to remain exempt from registering as an investment adviser under the Advisers Act. No person shall be liable to the Partnership or any Partner for any failure to act for the benefit of the Partnership in consequence of a prohibition or consideration described in the two preceding sentences.

(f)     The Partners recognize that the differing financial, regulatory, income tax and other status and circumstances of the Partners may give rise to conflicts of interest among the Partners with regard to the timing of capital calls, selection of investments, disposition of assets, making tax elections, or other Partnership matters. Except as otherwise specifically provided in this Agreement, the General Partner, when making decisions or taking action with respect to the Partnership or its business, shall not be required to take into consideration the separate status or circumstances of any Partner or group of Partners.

(g)     Except with the consent of the Advisory Committee, neither the General Partner nor the Managing Members shall call down capital of any other entity with the same operations, objectives and investment focus as those of the Partnership (a "**Subsequent Fund**") prior to the earlier of (i) such time as funds equal to at least seventy five percent (75%) of the Partners' Capital Commitments have been invested, expensed, committed or reserved for follow-on investment in portfolio companies or future expenses, or (ii) the fifth (5th) anniversary of the Initial Closing Date (the earliest of (i) or (ii), the "**Substantial Investment Date**"). For the avoidance of doubt nothing in this Agreement shall prevent any partner of the General Partner from calling down capital with respect to an Opportunity Fund or any successor fund thereto. The General Partner shall provide reasonable detail to the Advisory Committee upon request regarding

any amounts deemed to be reserved for the purposes of determining the Substantial Investment Date.

Section 5.5. **Expenses and Reimbursements; Organizational Expenses**.

(a) **Operating Expenses**. Operating Expenses shall be borne by the Partnership. The Partnership shall pay Operating Expenses directly or shall reimburse the General Partner for the payment thereof as the case may be. Operating Expenses shall be paid either from Current Income, from Capital Transaction Proceeds, from Capital Contributions made by the Partners or from Partnership borrowings. The General Partner may cause the Partnership to borrow funds on a short-term basis to pay Operating Expenses if the Partnership does not have available funds, in which case the borrowings shall be repaid from Current Income, Capital Transaction Proceeds or Capital Contributions, as provided above. Operating Expenses shall include: all costs and expenses incurred in holding, monitoring, and disposing of Investments and operating the Fund, including any travel, legal, tax and accounting expenses; brokerage, banking, custodial, administration and brokerage fees, commissions and expenses; all fees, costs and expenses incurred in connection with the formation, organization and establishment of any intermediate investment vehicles; costs of preparing financial statements and reports to the Limited Partners, tax returns and Schedule K-1s; fees, costs and expenses of legal counsel, tax advisors, auditors, accountants, administrators, custodians, consultants and other outside advisors or service providers; expenses of the Investment Committee; costs and expenses related to the Fund's compliance with applicable laws, rules and regulations; expenses of meetings of the Partners; insurance, taxes and other costs of any audit, investigation and administrative or other proceedings; litigation and threatened litigation relating to the business or activities of the Fund; insurance costs; indemnification obligations; liquidation expenses of the Fund; interest expenses and other expenses for borrowed money; expenses of the Advisory Committee; government charges that may be assessed against the Fund; any extraordinary expense of the Fund; and all other expenses properly chargeable to the activities of the Fund. Fees paid may include source fees for Investments identified by wholly owned asset acquisition subsidiaries to the extent permitted by law. If any Operating Expenses incurred are for the account or for the benefit of the Fund and one or more Other TKF Participants (as defined below), the General Partner will allocate such expenses among the Fund and each such Other TKF Participant in such manner as the General Partner considers fair and reasonable (generally anticipated to be in proportion to the size of the investment made by such Other TKF Participants in the Investment or activity to which the expense relates). The Fund may invest with or alongside other funds, investors or groups, including Limited Partners (or their affiliates) or parties affiliated or associated with the General Partner and/or the Manager, at the sole discretion of the General Partner (collectively, the "Other TKF Participants"). All costs and expenses referred to in this Section 5.5(a) are collectively referred to as "*Operating Expenses*." All Operating Expenses are Partnership costs and reimbursable to the General Partner or the Manager, as the case may be, and shall be due and payable promptly following receipt of invoices therefor. For the avoidance of doubt, Operating Expenses shall not include Manager Expenses.

(b) **Organizational Expenses**. The Partnership shall bear all third-party and out-of-pocket expenses (the "*Organizational Expenses*"), incurred in connection with forming and establishing the General Partner, the Partnership, any Parallel Investment Vehicle and any Feeder Fund (each a "*Fund Entity*"), including, but not limited to, (i) fees of attorneys of the Fund, the General Partner, members, partners or shareholders of the General Partner, the Manager,

members, partners or shareholders of the Manager, and each of their Affiliates, including in connection with preparing and negotiating organizational documents, Side Letters and related agreements and preparing resolutions and regulatory filings; (ii) expenses for travel, entertainment and printing; (iii) any associated taxes and fees; (iv) accountants' fees and costs; (v) charges of escrow holders, depositaries and experts and (vi) offering Interests in the Fund, including filing fees, or regulatory compliance expenses.

Section 5.6. **Management Fee and Expenses**.

(a) (i) The Partnership shall pay the management fee (the "***Management Fee***") to the Manager, as set forth in this Section 5.6.

(ii) If, and to the extent that, at any time following the expiration of the Investment Period, the Partnership does not have sufficient funds to make all payments of the Management Fee to the Manager, the General Partner may (but shall not be obligated to) defer the payment of the Management Fee until the Partnership holds sufficient funds to pay the same, at which time the deferred and accrued Management Fee shall be paid to the Manager, prior to any Distributions pursuant to Section 4.2.

(b) The Management Fee payable by the Partnership with respect to a Partner shall commence accruing on the Effective Date and will be computed on a Partner-by-Partner basis. The Management Fee payable by the Partnership to the Manager, quarterly in advance (or its designee, as applicable) shall be equal to 2% *per annum* of each Partner's Capital Commitments, subject to the provisions of Section 15.6. The Management Fee shall be due and payable by the Partnership with respect to each such Partner quarterly in advance as of the first Business Day following the Initial Closing Date and on the first Business Day of each calendar quarter thereafter ("***Management Fee Due Date***"). If the first Business Day following the Initial Closing Date is not the first day of a calendar quarter, the Management Fee will be prorated based on the number of days from the Initial Closing Date (inclusive) until the first day of the next calendar quarter. The General Partner may cause a Subsidiary of the Partnership to pay a portion of the Management Fee in lieu of the Partnership, in which case any such amounts paid by such Subsidiary shall reduce the Management Fee payable by the Partnership to the Manager by the same amount.

(c) The General Partner and the Manager and their respective Affiliates will be responsible for all of their respective day-to-day operating expenses and overhead expenses, including, without limitation, office expenses (such as rent, computers, computer software and office supplies), employee compensation and due diligence expenses (collectively, "***GP and Manager Expenses***"). The Partnership shall not pay any GP and Manager Expenses unless such GP and Manager Expenses are waived by the Advisory Committee.

(d) If the effective date of the Partnership's dissolution is not the last day of a calendar quarter, the Manager shall rebate to the Partnership, and the Partnership shall subsequently rebate to the Limited Partners, a prorated portion of the Management Fees already paid by the Limited Partners for the calendar quarter during which dissolution occurs based on the number of days during such period that the Term was still in effect. Management Fees payable with respect to the period commencing on the Initial Closing Date and ending on the last day of

the calendar quarter in which the Initial Closing Date shall occur shall be computed with respect to the Aggregate Commitments as of the Initial Closing Date on a *pro rata* basis for such period.

      (e)      Certain adjustments to the Management Fee may be made as follows:

      (i)      The General Partner has the right to waive, reduce or make adjustments that will have the effect of waiving or reducing, from time to time, all or part of the Management Fee payable with respect to certain Partners (including employees and other Affiliates of the General Partner) without having the effect of waiving or reducing the Management Fee payable with respect to other Partners.

      (ii)      The General Partner may, in its sole discretion, waive, reduce or delay payment of the Management Fee related to any fiscal quarter.

      (iii)      The Manager may elect to waive its receipt of the Management Fee and convert the Management Fee so waived into a Capital Contribution as of the date the Management Fee would have otherwise been payable (the "***Converted Management Fee***"). To elect such a conversion, the Manager must provide notice to the General Partner on at least 30 calendar days prior to the relevant Management Fee Due Date. As a result of any such conversion, the Manager shall also become a Limited Partner and shall be subject to all of the provisions of this Agreement applicable to Limited Partners.

      (iv)      The Management Fee payable to the Manager shall be reduced on a dollar-for-dollar basis and shall neither be earned nor payable in an amount equal to the amount of any Placement Fees paid by the Fund. There will be no waiver of the Management Fee payable by any investor that is not permitted to pay Placement Fees and if an investor is not permitted to invest in an entity that pays Placement Fees, a Parallel Investment Vehicle may be formed for such investor and other similarly situated investors so that such investor and the entity in which it invests will not pay Placement Fees.

      (f)      To reflect the reduced time and effort the General Partner or the Manager or their respective members will devote to the Partnership by reason of performing services as a director or consultant to portfolio companies, one hundred percent (100%) of any directors' fees or consulting fees, Break-up Fees or equivalent compensation, whether in cash or in kind, received by the General Partner, a partner of the General Partner (for so long as he is a partner thereof), the Manager, any full-time employee of the Manager or any of their respective officers or directors (for so long as he is an officer or director thereof) from any company in which the Partnership then holds an interest or reasonably expects to hold an interest in the future (other than direct reimbursement of out-of-pocket expenses) (hereinafter, "**Fees Subject to Offset**") shall be offset against and reduce the amount of the management fee payment next due the Manager in each subsequent Fiscal Quarter pursuant to Section 5.6 until the entire amount of Fees Subject to Offset has been offset in full unless waived by the Advisory Committee. Fees Subject to Offset shall not include (i) compensation received by any Person from ES for services provided to ES or (ii) compensation for services rendered as an employee of or in the ordinary course of business of a portfolio company of the Fund.

Section 5.7.    Removal of the General Partner. The General Partner may be removed as the general partner of the Partnership following the vote of at least a Majority-in-Interest of the Limited Partners with or without the occurrence of a Cause Event. For purposes of this Section 5.7 only, the Allocation Percentage of ES, Arken and any Limited Partner controlled by ES or Arken shall be disregarded for purposes of determining a Majority-in-Interest, and none of ES, Arken and any such Limited Partner controlled by them shall be permitted to vote.  Control shall mean directly or indirectly possessing the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting shares, by contract or otherwise.  If the General Partner is removed as the general partner of the Partnership, then as of the effective date of such removal (i) the status of the General Partner shall be changed to that of a special Limited Partner Interest having the same rights with respect to its Capital Contributions and Distributions as if the General Partner had not been removed; (ii) the General Partner will continue to receive its Carried Interest in respect of all Investments made through the date of such removal; (iii) in the event of removal upon the occurrence of a Cause Event, both the General Partner and the Affiliated Limited Partners will be relieved of any of their remaining Capital Commitment obligations to the Partnership (both as the General Partner and in their capacities, if applicable, as Limited Partners); (iv) in the event of removal upon the occurrence of a Cause Event, the obligation of the Partnership to pay Management Fees shall terminate and the General Partner shall return to the Partnership such Management Fee amounts received following the date the claim of a Cause Event was made; and (v) in the event of removal upon the occurrence of a Cause Event, the Investment Period shall be terminated automatically unless expressly authorized to continue by a Majority-in-Interest. The removal of the General Partner shall be effected by written notice from the Limited Partners to the General Partner. A Majority in Interest of the Limited Partners may appoint a Successor General Partner to succeed a removed General Partner, which appointment shall become effective upon such removal and the acceptance by such Successor General Partner to become the Successor General Partner of the Partnership and to be bound by all of the terms and provisions of this Agreement. Such Successor General Partner shall continue the business of the Partnership without dissolution.

# ARTICLE VI

# INDEMNIFICATION

Section 6.1.    **Indemnification of General Partner and Manager**.

(a)    To the fullest extent permitted by law, neither the General Partner, nor the Manager, nor their Affiliates, nor their respective officers, directors, employees, managers, agents, stockholders, members or partners, nor any Person who serves at the specific request of the General Partner on behalf of the Partnership as a partner, member, officer, director, employee, agent or Consultant of any other Person, including for the avoidance of doubt, the Partnership Representative and its designated individual (in each case, an "***Indemnitee***") shall be liable to any Partner or the Partnership (and the Partners and the Partnership waive, and agree not to make, any such claim against an Indemnitee), and each is fully exculpated and held harmless by the Partnership hereby from any liability for actions taken or not taken (or omitted) in connection with the affairs of the Fund except where such action or omission (x) was not taken or omitted in the Good Faith belief, or (y) constitutes (i) fraud, (ii) gross negligence, (iii) willful misconduct, (iv) a material breach of this Agreement, (v) a violation of Federal securities laws or a knowing and

willful violation of state securities laws, or (vi) in the case of a criminal action or proceeding, such Indemnitee had reasonable cause to believe that his/her/its conduct was illegal.

Independent contractors engaged by the General Partner and/or its Affiliates shall not be or be deemed to be Indemnitees pursuant to this Section 6.1. An Indemnitee may consult with legal counsel, accountants, consultants or other advisors in respect of Partnership affairs and, except in respect of matters in which there is an alleged conflict of interest in respect of such legal counsel, accountants, consultants or other advisors, shall, to the fullest extent permitted by law, be fully protected and justified in any action or inaction which is taken or omitted in Good Faith, in reliance upon and in accordance with the opinion or advice of such counsel, accountants, consultants or other advisors; *provided*, that they shall have been selected and monitored with reasonable care; *provided*, *further*, that such Indemnitee discloses all information that it reasonably believes to be material to the rendering of such advice to the applicable counsel, accountants, consultants or advisor. No Indemnitee shall, to the fullest extent permitted by law, be liable for any loss due to the mistake, action, inaction, negligence, dishonesty, fraud or bad faith of any broker or other agent (other than brokers or other agents that are Affiliates). Further, no Indemnitee shall, to the fullest extent permitted by law, be liable for loss due to any action or inaction in connection with the affairs of the Partnership, except where such action or omission (x) was not taken or omitted in the Good Faith belief or (y) constitutes (i) fraud, (ii) gross negligence, (iii) willful misconduct, (iv) a material breach of this Agreement, (v) a violation of Federal securities laws or a knowing and willful violation of state securities laws, or (vi) in the case of a criminal action or proceeding, Indemnitee had reasonable cause to believe that his/her/its conduct was illegal.

(b) No Indemnitee shall be entitled to indemnification pursuant to this Section 6.1 with respect to any action, suit or proceeding that relates solely to a dispute between or among the General Partner, the Manager or their Affiliates or any of their respective members, managers or employees unless either a Limited Partner (which is not an Affiliated Limited Partner) or a third party is also a party to such action, suit or proceeding. If any such action, suit or proceeding relates to a dispute between or among the General Partner and any of its members, managers or employees and either a Limited Partner (which is not an Affiliated Limited Partner) or a third party, then such Indemnitee shall be entitled to indemnification under this Section 6.1 only to the extent such losses, liabilities, damages and expenses are attributable to the involvement of a Limited Partner and/or a third party. The Partnership shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnitee and the Liquidating Trustee (as defined herein) (and their respective heirs and legal and personal representatives) who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the Partnership or any Partners), by reason of any actions or omissions or alleged acts or omissions arising out of such Person's activities either on behalf of the Partnership or in furtherance of the interests of the Partnership or arising out of or in connection with the Partnership or as to the Liquidating Trustee, if such activities were performed in a manner reasonably believed by such Person to be within the scope of the authority conferred by this Agreement or by law or by the Consent of the Partners, against any claims, liabilities, costs and expenses (including legal fees, judgments and amounts paid in settlement (collectively "***Claims***")), as incurred, in connection with their activities on behalf of, or their association with, the Fund, the Partnership or any of its Partners, except where such action or omission (x) was not taken or omitted in the Good Faith belief, or (y) constitutes (i) fraud, (ii) gross negligence, (iii) willful misconduct, (iv) a material

breach of this Agreement, (v) violation of Federal securities laws or a knowing and willful violation of state securities laws, or (vi) in the case of a criminal action or proceeding, such Indemnitee had reasonable cause to believe that his/her/its conduct was illegal, and such conduct was the proximate cause of the Claims. An Indemnitee shall obtain the written consent of the General Partner prior to entering into any compromise or settlement which would result in an obligation of the Partnership to indemnify such Person. The General Partner may have the Partnership purchase, at the Partnership's expense, insurance to insure the Partnership, the General Partner, any other Indemnitee or any Person indemnified pursuant to Sections 6.1(a) or 6.1(b) against liability in connection with the activities of the Partnership. Each Indemnitee shall use commercially reasonable efforts to assist the Partnership to seek reimbursement for indemnified expenses from any insurance company or other third party liable for the applicable losses, all such recoveries shall be immediately paid to the Partnership and shall reduce the obligation of the Partnership hereunder (however, no Indemnitee shall be required to first proceed against any insurance policy before being reimbursed by the Fund).

(c)     If for any reason the indemnification called for by this Section 6.1 is unavailable or insufficient (after taking any insurance recovery into account that is available at the time when amounts are payable by an Indemnitee that are subject to indemnification) to indemnify and hold harmless an Indemnitee in accordance with the terms hereof (other than as a result of a failure to satisfy the conditions to such indemnification as set forth in Section 6.1(b)), then the Partnership shall, to the fullest extent permitted by law, contribute to the amount paid or payable by such Indemnitee (which contribution may equal up to 100% of such amount) as a result of any Claims referred to in Section 6.1(b) such that the Indemnitee would be in the same financial position it would have been in if the indemnification called for by this Section 6.1 were available and sufficient. Any Indemnitee may recover its indemnification payments (including costs) from the Partnership without first proceeding against any applicable insurance (with the Partnership being subrogated to the Indemnitee's rights of indemnification to that extent).

Section 6.2.     **Giveback Obligations**.

(a)     Each Partner (including any former Partner) may, to the fullest extent permitted by law, be required by the General Partner to return to the Partnership Distributions received by such Partner to pay Operating Expenses, to the extent that the Partnership does not have adequate assets to pay Operating Expenses as determined by the General Partner in its sole discretion, including to pay indemnification obligations. Each such Partner shall be required to make such payment, within ten Business Days after the demand therefor is received from the General Partner (the "***Payment Date***"), *pro rata* by all Partners and in the reverse order of priority in which such Distributions were made to the Partner or former Partner (or any of its predecessors in interest) (including any Distributions made to the General Partner in its capacity as such) pursuant to Section 4.2 for the purpose of meeting such Partner's share of the Partnership's indemnity obligations under Section 6.1 or other expenses of the Partnership (the "***Giveback***"); *provided*, that no Partner (other than the General Partner) shall be required to (i) return a distribution pursuant to this Section 6.2 after the second anniversary of the date of termination of the Partnership (as such period shall be extended by the General Partner for claims made prior to such second anniversary as provided in Section 6.2(b)), or (ii) return an amount exceeding the lesser of (x) 20% of the aggregate Distributions made to such Partner or (y) 20 % of such Partner's Capital Commitment. A Partner who fails to satisfy its obligation to repay any portion of its

Giveback obligation by the Payment Date shall have breached this Agreement and shall be deemed to be a Defaulting Partner for all purposes of this Agreement, effective upon the receipt of notice from the General Partner (which notice may be given or not given in the sole discretion of the General Partner).

(b) If prior to the second anniversary of the date of termination of the Partnership, the General Partner determines that there are any proceedings (including arbitration) then pending or any other liability or claim then outstanding that the General Partner is otherwise seeking to settle on behalf of the Partnership, the General Partner shall notify the Partners at such time that such proceeding or settlement discussions may require a Giveback (which notice shall include a brief description of each such proceeding (and of the liabilities asserted in such proceeding) or of such liabilities and claims) and, to the fullest extent permitted by law, the obligation of the Partners to return all or any portion of such Distributions (as specified in such notice) for the purpose of meeting the Partnership's obligations shall survive with respect to each such proceeding, liability and claim set forth in such notice until the date that such proceeding, liability or claim ultimately is resolved and satisfied.

(c) If any Partner is an agency or instrumentality of a state and if a provision of this Section 6.2 is inconsistent with the constitution or any other law of such state, then such Partner and the General Partner shall enter into alternative arrangements regarding such provision so that the economic benefits of the Partnership to such Partner are not materially more favorable to such Partner than the economic benefits received or to be received by Partners generally (as determined by the General Partner in Good Faith).

(d) Any Distributions returned pursuant to this Section 6.2 shall be treated as Capital Contributions and shall be required to be recontributed by such Partners, *pro rata*, in reverse order of Distributions to the Partners.

Section 6.3. **Advancement of Expenses**. Expenses reasonably incurred by an Indemnitee and any Person entitled to indemnification pursuant to this Article VI in defense or settlement of any claim that may be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee, in form and substance reasonably acceptable to the General Partner, to repay such amount to the extent that it shall be determined ultimately that such Indemnitee is not entitled to be indemnified hereunder. Notwithstanding anything to the contrary contained in this Agreement, (a) no expenses will be advanced and no indemnification will be made to a Limited Partner or other purported Indemnitee in connection with any claim made by such Person against the General Partner or the Partnership until the final adjudication of such claim in favor of the Person bringing such claim, and (b) in no event shall the General Partner make an advance payment of any indemnification expenses (i) to the General Partner or any of its Affiliates, if the expenses relate to a claim brought against the General Partner or any of its Affiliates by at least a Majority in Interest of the Limited Partners, or (ii) to a Limited Partner, if the expenses relate to a suit brought by such Limited Partner against the General Partner or any of its Affiliates; *provided*, that upon the final adjudication of such claim in favor of the General Partner, any of its Affiliates or such Limited Partner, indemnification expenses shall be reimbursed to such Persons, as applicable.

Section 6.4. **Cure Rights**. If the General Partner breaches any of the terms of this Agreement, the General Partner shall have 45 days after becoming aware of such breach to cure such breach; *provided*, that the time to cure such breach shall be extended to 90 days if the General Partner is using diligent efforts to cure such breach.

## ARTICLE VII

## ADVISORY COMMITTEE

Section 7.1. **The Advisory Committee**.

(a)     The General Partner will establish a committee of three representatives of Limited Partners (the "*Advisory Committee*"). The General Partner may, in its sole discretion, remove any member of the Advisory and/or designate additional Limited Partners and/or indirect investors to serve on the Advisory Committee. All members of the Advisory Committee shall be appointed by the General Partner, depending on, amongst other factors, the amount of the Capital Commitment of each Limited Partner. The General Partner may appoint representatives of Limited Partners to the Advisory Committee prior to the Final Closing Date (with the General Partner having the right to appoint Advisory Committee members beginning on the Initial Closing Date). The Advisory Committee shall be available to advise the General Partner and the Manager regarding Investments and consult with the General Partner and the Manager as requested by the General Partner concerning the Partnership's activities and operations. The General Partner may, in its discretion, present for resolution by the independent members of the Advisory Committee certain material conflicts of interest, including any purchases and sales of assets between the Partnership, on the one hand, and the General Partner or its Affiliates, on the other hand, and that are not otherwise provided for in this Agreement. The Advisory Committee will also review and approve the designation of "passive investments" and review the General Partner's valuation of Fund assets that are not readily marketable. In addition, the approval of the Advisory Committee will be sought to (i) invest in securities of an issuer that is not an existing portfolio company as of the expiration of the Investment Period, (ii) approve the organization of another fund prior to the Investment Period, or (iii) waive or vary any other requirements of the limited partnership agreement except as explicitly provided otherwise therein. The Advisory Committee may also be asked to resolve issues involving other conflicts of interest that are specified from time to time by the General Partner in its reasonable discretion. Each member of the Advisory Committee shall serve until (w) such member is removed by the General Partner with the consent of a majority of the other members of the Advisory Committee, (x) the Limited Partner that such member represents becomes a Defaulting Partner or transfers all or any portion of its Interest, (y) such member resigns, or (z) such member fails to vote (either in favor or against) in respect of three consecutive matters brought by the General Partner to the Advisory Committee for a vote. Any vacancy on the Advisory Committee shall be filled, if necessary, by a representative of a Limited Partner who is not an Affiliate of the General Partner and who is designated by the General Partner in its sole discretion. No Person who is a partner, member, stockholder, shareholder, director, general partner, manager, officer, employee or Affiliate of the General Partner or the Manager shall be a member of the Advisory Committee, however, the General Partner may designate representatives of the General Partner (or its Affiliates) to be present at all Advisory Committee meetings. Unless otherwise indicated, any matters requiring approval of the Advisory Committee will be considered approved only if a number of Advisory Committee representatives representing

at least a majority of the members of the Advisory Committee vote to approve such matter. Such approval may be given in writing, in person at a meeting or by means of a conference telephone, web-cast, or similar communications equipment by means of which members can hear each other.

(b)     In no event shall the Advisory Committee take part in the control or management of the Partnership, nor shall the Advisory Committee have any authority to act for or on behalf of the Partnership. Neither the Advisory Committee nor any member thereof shall have the power to bind the Partnership in any manner and in no event shall the Advisory Committee (or any member thereof) be considered a general partner of the Partnership by agreement, estoppel or otherwise or be deemed to participate in the control of the business of the Partnership as a result of the performance of its duties hereunder or otherwise. Notwithstanding the foregoing, the Advisory Committee is hereby expressly authorized to deliver any consent required of the "client" pursuant to the Advisers Act. To the fullest extent permitted by law, the Advisory Committee shall not owe any duties (fiduciary or otherwise) to any Partner, the Partnership, any Parallel Investment Vehicle, any Investment or any of their respective limited partners or members or owners in respect of the activities of the Advisory Committee. The participation by any Limited Partner whose representative is a member of the Advisory Committee in the activities of the Advisory Committee shall not be construed to constitute participation by such Limited Partner in the control of the business of the Partnership so as to make such Limited Partner a general partner or liable in any manner for the debts and obligations of the Partnership. No Limited Partner who has a representative serving on the Advisory Committee shall be deemed to be an Affiliate of the Partnership or the General Partner solely by reason of such representative's appointment. The actions of the Advisory Committee approving or disapproving any matter submitted to it pursuant to this Section 7.1 shall, to the fullest extent permitted by law, be binding on each of the Partners. Notwithstanding anything to the contrary herein, none of the members of the Advisory Committee are, nor shall any of them be deemed to be, fiduciaries of any of the Partners, the Partnership or any subsidiary of the Partnership (or of any other Fund Entity or any members or partners thereof) under any federal or state law (including Delaware law), and none of the members of the Advisory Committee shall be required to consider the interests of any Partner prior to making his/her decision as a member of the Advisory Committee.

(c)     Members of the Advisory Committee shall not receive any fees from the Partnership for fulfilling any Advisory Committee duties but shall be reimbursed by the Partnership for all reasonable travel and out-of-pocket expenses incurred in attending meetings thereof.

(d)     In addition to and without limiting the foregoing, to the fullest extent permitted by law, the General Partner is authorized to enter into additional agreements on behalf of the Partnership that provide for the exculpation and indemnification of the members of the Advisory Committee and their Affiliates and that contain additional provisions related to the Advisory Committee and its members, it being understood that such agreements may provide for levels of exculpation and indemnification that are more favorable to such Persons than comparable provisions in this Agreement that benefit the General Partner and its Affiliates.

(e)     The General Partner may, in its sole discretion, grant to certain Limited Partners the right to designate a representative to attend and observe meetings of the Advisory Committee without being a member of the Advisory Committee. Such representative shall have

the right to receive notices of meetings and copies of all materials provided to the members of the Advisory Committee but shall not have the right to participate in such meetings or to cast any vote with respect to any matters for which Advisory Committee approval is sought.

## ARTICLE VIII

## TRANSFERABILITY OF GENERAL PARTNER'S INTEREST

Section 8.1.    **Assignment of the General Partner's Interest**. Without the prior approval of a Super Majority-in-Interest of the Limited Partners, the General Partner shall not have the right to withdraw from the Partnership and shall not Transfer all or any portion of its Interest as a General Partner in the Partnership or its responsibility for the management of the Partnership, or enter into any agreement as a result of which any other Person shall have an Interest as a General Partner of the Partnership; *provided*, that nothing in this Agreement (a) shall preclude changes in the composition of the partners constituting, or the employees of, the General Partner so long as at least two of the Managing Members control, directly or indirectly, the General Partner, and (b) shall prohibit the Transfer by the General Partner of its Interest in the Partnership to Affiliates of the General Partner that are controlled, directly or indirectly, by at least two of the Managing Members.

Section 8.2.    **Transfer of General Partner's Interest**. Whenever all or a portion of the General Partner's Interest as a General Partner in the Partnership is transferred pursuant to this Article VIII, the assignee, purchaser or other transferee shall assume the Capital Account of the General Partner (or the appropriate portion thereof) and all corresponding obligations of the General Partner hereunder. In the event of a Transfer of all of the General Partner's Interest as a General Partner of the Partnership in accordance with this Article VIII, its assignee or transferee shall be admitted as a substitute General Partner with full power and authority to continue the business of the Partnership, and immediately thereafter the transferor General Partner shall cease to be General Partner. The transferor and assignee or transferee General Partner shall cause the execution of any necessary documents or instruments, including, as required by the Delaware Act, an amendment to the Certificate to record the admission of the assignee or transferee as a substitute General Partner of the Partnership without the consent of any other Person. Notwithstanding anything contained herein to the contrary, upon withdrawal or removal of the General Partner of the Partnership, if any Managing Member or Affiliated Limited Partner obligates itself in any way in connection with the Partnership or the General Partner, the Partnership shall obtain a release for such Person from any and all such obligations and each such Person shall, to the fullest extent permitted by law, be fully indemnified by the Partnership with respect to payments and costs with respect thereto pursuant to Sections 6.1 and 6.3 to the extent provided herein.

## ARTICLE IX

## TRANSFERABILITY OF A LIMITED PARTNER'S INTEREST

Section 9.1.    **Restrictions on Transfers of Interests**.

(a)    Except as expressly permitted in this Agreement, no Partner shall sell, assign, pledge or otherwise transfer, whether voluntarily or involuntarily, by operation of law, or

otherwise, all or any part of its Interests, except with the prior consent of the General Partner, which consent may be granted or withheld in the General Partner's sole discretion. For purposes of this Section 9.1, transferees must not:

(i)     have a reputation for litigiousness or discord;

(ii)    have used any business strategy that involved extortion, alleged extortion or disruptive activity within a fund designed to obtain economic benefits at the expense of the other participants in such fund;

(iii)   lack creditworthiness;

(iv)    have violated or allegedly violated the USA PATRIOT Act;

(v)     have a reputation that could have a material adverse impact on the Partnership or any of its Limited Partners;

(vi)    be another pooled investment fund;

(vii)   be a Person that sponsors, acts as an advisor to, is an employee of, or is part of the control group of another pooled investment fund;

(viii)  have a business that competes with the Partnership;

(ix)    be a lender (or any Affiliate of a lender) to the Partnership;

(x)     in the Good Faith belief of the General Partner, use its Interest or any information with respect to the Partnership, any Investment, or such Interest to harm the Partnership, the other Limited Partners or their respective reputations;

(xi)    in the Good Faith belief of the General Partner, attempt to obtain an economic benefit at the expense of the other Limited Partners, including the use of strategies of attempting a hostile takeover, appropriating any business opportunities of the Partnership, causing liquidation of the Partnership (or any of its assets) or forcing so-called "greenmail payments" or the like from the Partnership;

(xii)   result in the Partnership:

(A)     having to register under the Investment Company Act;

(B)     having all or any portion of its assets treated as Plan Assets;

(C)     being subject to the provisions of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law;

(D)     having its General Partner become a fiduciary with respect to any existing or contemplated ERISA Limited Partner or other Limited Partner for purposes of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law;

(E)     being a publicly traded partnership under Code Section 7704;

(F)     having an unaccredited investor as a Limited Partner; or

(xiii)   hold its Interest (or any portion thereof), directly or indirectly, for the benefit of any Person described in clauses (i) through (xii) above.

If a Limited Partner complies with the provisions of subsections (b) through (d) of this Section 9.1, such Limited Partner may, without the consent of the General Partner, Transfer all or a portion of its Interest to a Person that:

(i)      controls, is controlled by, or is under common control with, the Limited Partner;

(ii)     is an investment fund managed by an Affiliate of such Limited Partner;

(iii)    is a trust or a successor trust with the same beneficial ownership; or

(iv)    is an Immediate Family Member of such Limited Partner or a trust for the benefit of one or more Immediate Family Members (it being understood and agreed that notwithstanding such Transfer, the Limited Partner making such a Transfer shall thereafter remain liable for its Unused Capital Commitment, unless released in writing by the General Partner in its sole discretion).

(b)     Notwithstanding any other provisions of this Section 9.1, no Transfer of all or any portion of a Limited Partner's Interest may be made unless in the opinion of counsel, reasonably acceptable, and satisfactory in form and substance, to the General Partner (which opinion may be waived, in whole or in part, at the sole discretion of the General Partner):

(i)      the Transfer would not violate the registration or qualification provisions of the Securities Act, any state or securities "blue sky" or non-U.S. securities laws applicable to the Partnership or the Interest to be Transferred;

(ii)     the Transfer would not cause the Partnership to lose its status as a partnership for federal income tax purposes or cause the Partnership to become subject to the Investment Company Act or to be treated as a publicly traded partnership under Code Section 7704;

(iii)    the Transfer would not require the General Partner or the Manager or any of their Affiliates that is not registered under the Investment Advisers Act of 1940, as amended ("**Advisers Act**"), or the Partnership, to register as an investment adviser under the Advisers Act;

(iv)    the Transfer would not violate the laws, rules or regulations of any state or any governmental authority applicable to such Transfer; and

(v)    such additional opinions regarding the Transfer as the General Partner may reasonably require.

Each opinion of counsel must be delivered in writing to the Partnership not less than 10 days prior to the date of the Transfer. The General Partner agrees to cooperate with any Limited Partner making a Transfer by providing promptly such records and other factual information regarding the Partnership as may be reasonably requested with respect to any proposed Transfer. Except as permitted by this Agreement, each Limited Partner hereby severally agrees that it will not Transfer all or any portion of its Interest in the Partnership, and that any purported Transfer in violation of this Agreement shall, to the fullest extent permitted by law, be null and void. Each transferee or assignee of an Interest must complete an "Assignee Questionnaire" in a form deemed appropriate by the General Partner and containing information reasonably acceptable to the General Partner. In order for the General Partner to make the determination with respect to Sections (a)(xii)(B)-(a)(xii)(D), any proposed transferee of an Interest will be required to provide the General Partner with any information that the General Partner deems relevant, including, without limitation, evidence or confirmation relating to whether it is a Benefit Plan Investor or a Controlling Person.

(c)    Each Limited Partner agrees that it will pay all reasonable expenses, including attorneys' fees and accountants' fees, incurred by the Partnership in connection with a Transfer or requested Transfer of an Interest by such Limited Partner.

(d)    Any Person who acquires all or any portion of the Interest of a Limited Partner and who is admitted as a Limited Partner shall assume all or a proportionate amount of the Capital Account of such Limited Partner and shall be obligated (i) to pay to the Partnership the appropriate portion of any amounts thereafter becoming due in respect of the Capital Commitment made by its predecessor in interest, and (ii) to return any amounts to the Partnership as required by any provision of this Agreement or applicable law as if it had received all Distributions made to its predecessor in interest. Each Limited Partner agrees that, notwithstanding the Transfer of all or any portion of its Interest, as between the transferring Limited Partner and the Partnership, the transferring Limited Partner will remain liable for its Unused Capital Commitment and to return any Distributions previously made to such Limited Partner if return of any such Distributions is required by any provision of this Agreement; however, a transferring Limited Partner will not in any case have any liability for amounts required to be paid with respect to any Distributions made on its Interest after the time when the purchaser, assignee or transferee of such Interest, or portion thereof, is admitted as a Substituted Limited Partner.

(e)    Except as may be required by Section 3.2(f) and Section 3.10, no Limited Partner may withdraw from the Partnership without the written consent of the General Partner.

(f)    If the General Partner consents to a proposed Transfer pursuant to Section 9.1(a), the Limited Partner entering into an agreement to Transfer all or any part of its Interest in the Partnership to a *bona fide* third-party purchaser (the "***Proposed Assignee***") shall give written notice to the General Partner, certifying the name and address of the Proposed

Assignee, the terms and conditions of the proposed sale (including the purchase price and the proposed closing date).

(g)     If, under applicable law, a Transfer of an Interest in the Partnership that does not comply with this Agreement is nevertheless legally effective, the transferor and transferee, to the fullest extent permitted by law, shall be jointly and severally liable to the Partnership and the General Partner for, and shall indemnify and hold harmless the Partnership and the General Partner against, any losses, damages or expenses (including attorneys' fees, judgments, fines and amounts paid in settlement and costs of collection) actually and reasonably incurred by them in connection with such Transfer. To the fullest extent permitted under applicable law, each Limited Partner shall indemnify and hold harmless the Partnership, the General Partner and all other Limited Partners who were or are parties, or are threatened to be made parties, to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of or arising from any actual or alleged misrepresentation, misstatement of facts or omission to state facts made (or omitted to be made), noncompliance with any agreement or failure to perform any covenant by such Limited Partner in connection with any Transfer of all or any portion of such Limited Partner's Interest (or any economic interest therein) in the Partnership, against any losses, damages or expenses (including attorneys' fees, judgments, fines and amounts paid in settlement) actually and reasonably incurred by it or them in connection with such action, suit or proceeding and for which it or they have not otherwise been reimbursed.

Section 9.2.     **Assignees**.

(a)     The Partnership shall not recognize for any purpose any purported Transfer of all or any portion of the Interest of a Limited Partner unless the provisions of Section 9.1 shall have been complied with (or waived by the General Partner) and there shall have been filed with the Partnership a dated notice of such Transfer, in form prescribed by the General Partner, executed and acknowledged by both the seller, assignor or transferor and the purchaser, assignee or transferee, and such notice (i) contains the acceptance and assumption by the purchaser, assignee or transferee of all of the terms and provisions of this Agreement, including the provisions of Section 13.1, and its agreement to be bound hereby and thereby, (ii) contains a representation that such Transfer was made in accordance with all applicable laws and regulations and (iii) contains a power of attorney granted by the purchaser, assignee or transferee to the General Partner to execute this Agreement on its behalf.

(b)     Unless and until an assignee of an Interest becomes a Substituted Limited Partner in accordance with this Agreement, such assignee shall not be entitled to participate in any vote or written consent hereunder or under the Delaware Act with respect to such Interest.

(c)     Any Limited Partner who shall Transfer all of its Interest shall cease to be a Limited Partner immediately following the admission of a Substituted Limited Partner in place of such assigning Limited Partner.

(d)     Notwithstanding anything to the contrary contained in this Agreement, both the Partnership and the General Partner shall be entitled to treat the assignor of an Interest as the absolute owner thereof in all respects, and shall incur no liability for Distributions made in Good

Faith to it, until such time as a written assignment that conforms to the requirements of this Article IX has been received by the Partnership and accepted by the General Partner.

(e)     A Person who is the assignee of all or any portion of the Interest of a Limited Partner as permitted hereby but does not become a Substituted Limited Partner and who desires to make a further Transfer of such Interest, shall be subject to all of the provisions of this Article IX to the same extent and in the same manner as any Limited Partner desiring to make a Transfer of its Interest.

(f)     In the event of the Incapacity of a Limited Partner, such Incapacity shall not, in and of itself, cause the termination of the Partnership, and the Limited Partner's trustee in bankruptcy or other legal representative shall have only the rights of an assignee of the right to receive Partnership Distributions applicable to the Interest in the Partnership of such incapacitated Limited Partner as provided herein. Any Transfer from such trustee in bankruptcy or legal representative shall be subject to the provisions of this Agreement.

Section 9.3.     **Substituted Limited Partner**.

(a)     Notwithstanding anything to the contrary contained in this Agreement, no Limited Partner shall have the right to substitute a purchaser, assignee, transferee, donee, heir, legatee, distributee or other recipient of all or any portion of such Limited Partner's Interest for it in its capacity as a Limited Partner. Any such purchaser, assignee, transferee, donee, heir, legatee, distributee or other recipient of an Interest (whether pursuant to a voluntary or involuntary Transfer) shall be admitted to the Partnership, effective immediately prior to the Transfer by a Limited Partner of its Interest, as a Substituted Limited Partner only with the consent of the General Partner, which consent shall not be unreasonably withheld. Each Person admitted as a substitute Limited Partner is referred to herein as a "***Substituted Limited Partner***."

(b)     Each Substituted Limited Partner, as a condition to its admission as a Limited Partner shall execute and acknowledge such instruments, in form and substance reasonably satisfactory to the General Partner, as the General Partner reasonably deems necessary or desirable to effectuate such admission and to confirm the agreement of the Substituted Limited Partner to be bound by all the terms and provisions of this Agreement with respect to the Interest acquired. All expenses, including attorneys' fees not paid by the assignor Limited Partner that are incurred by the Partnership in connection with the Transfer and admission of the Limited Partner as a Substituted Limited Partner shall be borne by such Substituted Limited Partner. Any such costs not paid by the Substituted Limited Partner shall be treated as a loan and shall be repaid to the Partnership upon demand by the Partnership; *provided*, *however*, that in the General Partner's sole discretion, any such amount may be repaid by deduction from any Distributions payable to such Limited Partner pursuant to this Agreement (with such deduction treated as an amount distributed to the Limited Partner) as determined by the General Partner in its sole discretion. A Limited Partner who fails to satisfy its obligation to repay any portion of such obligations by the required date shall be in breach of this Agreement and shall be deemed to be a Defaulting Partner for all purposes of this Agreement, effective upon the receipt of notice from the General Partner (which notice may be given or not given in the sole discretion of the General Partner) and as detailed in Section 3.5.

(c)     Prior to an assignee's admission to the Partnership as a Substituted Limited Partner, such assignee shall nevertheless be entitled to all of the rights of an assignee of a Limited Partnership Interest under the Delaware Act (and any successor provision).

Section 9.4.    **Transfers During a Fiscal Year**. In the event of the Transfer of a Limited Partner's Interest at any time other than the end of a Fiscal Year, allocations and Distributions pursuant to Article IV shall be divided between the transferor and the transferee in any reasonable manner as determined by the General Partner and in compliance with Code Section 706. The General Partner may, for the convenience of the Partnership, select that the effective date of any Transfer be the end of any fiscal period determined by the General Partner in the exercise of its sole discretion. For purposes of determining the effective date of a transfer, the General Partner may adopt a mid-month convention (consistently applied) under which transfers made (or deemed made) on or before the 15th day of the current month are deemed made on the last day of the prior month, and transfers made after the 15th day of the current month are deemed made on the last day of the current month.

Section 9.5.    **Elections Under the Internal Revenue Code**. In the event of a Transfer of all or any part of a Limited Partner's Interest by sale or exchange, the General Partner shall, at its option and in its sole discretion (unless required by law or Treasury Regulations), if requested by such Limited Partner or its successor in interest, cause the Partnership to elect, pursuant to Code Section 754 (or corresponding provisions of subsequent law) to adjust the basis of the Partnership's assets as provided by Code Sections 734 and 743. Such Limited Partner and its successor in interest shall pay to the Partnership the increased accounting costs resulting from making such election as reasonably determined by the General Partner (with such amount payable being payable upon demand from the General Partner and the provisions of Section 9.3(b) being applicable with respect to the payment and any default in payment of such amount).

# ARTICLE X

# DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP

Section 10.1.  **Dissolution**. The Partnership shall be dissolved, and its affairs shall be wound up upon the first to occur of any of the following events:

(a)     the expiration of the Term as set forth in Section 2.6; or

(b)     the termination, liquidation, dissolution or withdrawal by the General Partner (other than in connection with a permitted assignment of interest).

Section 10.2.  **Liquidation**.

(a)     Upon dissolution of the Partnership, the General Partner or, if (i) there is none or (ii) the General Partner fails or refuses to act or (iii) such dissolution occurred pursuant to Section 10.1(b), the General Partner or a Person approved by a Super Majority-in-Interest of the Partners to act as a liquidating trustee (whether the General Partner or such Person, the "*Liquidating Trustee*"), shall wind up the affairs of the Partnership and proceed within a reasonable period of time to sell or otherwise liquidate the assets of the Partnership and, after paying or making due provision by the setting up of reserves for all liabilities to creditors of the

Partnership, to distribute the assets among the Partners in accordance with the provisions for the making of Distributions set forth in this Agreement and the Delaware Act.

(b)     Notwithstanding this Section 10.2, if the Liquidating Trustee shall, in Good Faith, determine a sale or other Disposition of part or all of the Investments would cause undue loss to the Partners or otherwise be impractical, the Liquidating Trustee may request consent of a Super Majority-In-Interest of the Limited Partners to either defer liquidation of, and withhold from distribution for a period of up to, but not more than, 24 months from the date of dissolution, or a longer period of time as determined by the Liquidating Trustee with the consent of a Super Majority-In-Interest of the Limited Partners.

(c)     The General Partner or the Liquidating Trustee shall make a final allocation of all items of income, gain, loss and expense in accordance with Article IV hereof, and the proceeds from liquidation shall, subject to the Delaware Act be paid in the following manner:

(i)     *first*, to pay the creditors of the Partnership, including Partners who are creditors except Partners withdrawn pursuant to Section 3.10(b), to the extent otherwise permitted by law, in satisfaction of the liabilities of the Partnership (whether by payment or the making of reasonable provision for payment thereof), including:

(A)     paying the expenses of liquidation (including legal and accounting expenses incurred in connection therewith up to and including the date that distribution of the Partnership's assets to the Partners has been completed);

(B)     establishing such reserves as the Liquidating Trustee deems necessary or desirable (including reserves for Management Fees expected to be earned prior to the complete dissolution and liquidation of the Partnership); and

(C)     paying, in accordance with the terms agreed among them and otherwise on a *pro rata* basis, debts to Partners, either by the payment thereof or the making of reserves therefor as the Liquidating Trustee deems necessary or desirable; and

(ii)     *second*, the balance, if any, shall be distributed to the Partners in accordance with the priorities of Article IV.

(d)     In any liquidation, the Partnership may distribute (after payment of the Partnership's obligations) the assets of the Partnership in cash, ratably in-kind, or any combination thereof as the Liquidating Trustee shall determine. Distributions consisting of both cash and property distributed in-kind shall be made, to the extent practicable, in *pro rata* portions of cash and in-kind Distributions as to each Partner receiving such Distributions. To the extent deemed desirable by the Liquidating Trustee, Distributions may be made into a liquidating trust or other appropriate entity, and reserves may be established for contingencies; *provided*, *however*, that the time during which Distributions may be withheld by such trust or other entity may not extend beyond 24 months from the date of dissolution without the approval of a Super-Majority-in-Interest of the Limited Partners.

(e)     When the Liquidating Trustee has complied with the foregoing liquidation provisions, the Liquidating Trustee, on behalf of all Partners, shall, in accordance with the

Delaware Act, execute, acknowledge and cause to be filed an instrument evidencing the cancellation of the Certificate and the Partnership shall terminate.

(f)        In carrying out the provisions of this Article X, the Liquidating Trustee shall comply with the requirement of Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2) that all liquidating Distributions be made on or before the later of (i) the last day of the Fiscal Year in which the liquidation occurs or (ii) the 90th day after such liquidation occurs.

(g)        No Partner shall have any obligation to restore a negative Capital Account balance at any time. This shall not affect any Partner's obligation to pay any amount pursuant to any other provision of this Agreement.

Section 10.3.    **Clawback Liability**.

(a)        Upon liquidation of the Partnership, the General Partner and, to the extent provided below, the Manager shall be severally required to repay to the Partnership an amount (the "**Clawback Amount**"), if any, by which the aggregated Carried Interest actually received by the General Partner (excluding the portion thereof equal to the General Partner's Carried Interest Tax Liability, which for this purpose shall be determined taking into account, without duplication, any tax benefits) exceed the Carried Interest the General Partner would have received if all other distributions, including distributions of the proceeds of the liquidation of the Partnership, were made at a single time on the date of liquidation (i.e., as though all of the Investments had been a single Investment, all Capital Contributions had been made with regard to that Investment, all Current Income had been derived from that Investment and all distributions of such Current Income had been made on the date of the liquidation of the Partnership); provided that any amount required to be returned pursuant to this Section 10.3(a) by the General Partner shall be net of any amounts returned by the General Partner pursuant to Section 6.2. The Clawback Amount is payable first by the Manager but only up to the amount of Converted Management Fee. Any remainder is payable by the General Partner. For the avoidance of doubt, the Clawback Amount shall not apply to distributions made to the General Partner or the Affiliated Limited Partners in respect of their Capital Contributions.

(b)        Each of the General Partner and the Manager agrees that its operating agreements (or equivalent organizational documents) shall provide that each Person that receives direct or indirect distributions with respect to the Carried Interest or any Converted Management Fee, as applicable (including all Persons that have a direct or indirect ownership interest in the General Partner or the Manager, in a portion of the Carried Interest through the General Partner, or in a portion of the Converted Management Fee through the Manager, as applicable) shall have the several obligation to repay to the General Partner or the Manager, as applicable, its proportionate share of the amount owed by the General Partner or the Manager, as the case may be, pursuant to this Section 10.3 within 30 days after the receipt of notice of a determination that such Clawback Amount payment is due.

## ARTICLE XI

## AMENDMENTS

Section 11.1.  **Adoption of Amendments; Limitations Thereon**.

(a)      This Agreement may be amended from time to time by the General Partner with the consent of a Majority in Interest of the Limited Partners, except (i) as required by law, (ii) as provided in Section 2.2 (*Name Change*), Section 2.10 (*Single Partnership Assumption*), Section 3.1 (*Schedule A*), Section 3.2 (*Schedule A*), Section 3.5(i) (*Feeder Fund*), Section 3.5(j) (*Several Interest Election*), Section 3.6(b)(iv) (*Schedule A*), Section 4.7(b) (*Allocations*), Section 8.2 (*Substitute General Partner*), the penultimate sentence of this Section 11.1(b) (*Unilateral Amendments*), Section 14.9(e) (*Safe Harbor Election and Forfeiture Allocations*), Section 15.5 (*Side Letters*) and Section 15.8(i) (*Anti-money laundering*), (iii) that any provision of this Agreement that permits or requires the vote or consent of Limited Partners representing greater than a Majority in Interest of the Limited Partners may only be amended with the consent of the General Partner and of Limited Partners representing the same percentage of the voting Interests of the Limited Partners that is required to approve the vote or consent of Limited Partners permitted or required by the Section of this Agreement to be amended, (iv) any amendment to any economic term or provision in Sections 5.6 (*Management Fee and Expenses*) that is materially adverse to the Limited Partners may only be amended by the General Partner with the approval of the Advisory Committee, and (v) without the consent of any Partner to be adversely affected thereby, this Agreement may not be amended to (x) increase such Limited Partner's Capital Commitment, or (y) disproportionately, vis-à-vis the other Limited Partners, materially and adversely affect such Limited Partner.

(b)      Notwithstanding anything to the contrary contained in Section 11.1(a), in addition to other amendments authorized herein, this Agreement may be amended from time to time by the General Partner without the consent of any other Limited Partner: to (i) amend Schedule A hereto at any time and from time to time to reflect the admission or withdrawal of any Limited Partner, or a change in any Limited Partner's Capital Commitment, pursuant to the terms of this Agreement; (ii) add to the General Partner's duties or surrender any right or power granted to it; (iii) correct errors, cure ambiguities, respond to changes in the law and make changes for the benefit of the Partners; (iv) delete or add any provision requested by any federal or state "blue sky" agency to the extent deemed to be for the benefit or protection of some or all of the Partners; (v) effectuate the admission or withdrawal of Partners in accordance with the terms of this Agreement; (vi) make amendments to this Agreement in order to reflect changes made to the Agreement in response to the comments of Partners admitted at Subsequent Closings if such amendments do not materially adversely affect the rights or obligations of such previously admitted Limited Partner; and (vii) improve, upon the advice of counsel to the Partnership, the Partnership's position in (A) satisfying any Investment Company Act exemptions, (B) qualifying for any applicable exemptions from the definition of "plan assets" under Section 3(42) of ERISA and the Plan Assets Regulation, (C) sustaining any tax positions of the Partnership or those of any of its Partners upon the advice of counsel (including with respect to UBTI), (D) avoiding publicly traded status for the Partnership, (E) to make modifications if a Feeder Fund is a Defaulting Partner as provided in Section 3.5(i), (F) as permitted under Section 14.9 regarding a Safe Harbor Election or (G) preventing the Partners' final Capital Accounts from deviating from the intended priority cash

Distributions described in this Agreement by amending the allocation provisions of Article IV (collectively, the "**Unilateral Amendments**"). Copies of any such Unilateral Amendments shall be forwarded to all Partners by the General Partner. Notwithstanding the foregoing, no amendment shall be made to provisions regarding ERISA in this Agreement without the written consent of the General Partner and of Limited Partners that are ERISA Partners and that have at least 2/3 of the Aggregate Commitments of all ERISA Partners.

(c)     Upon the adoption of any amendment to this Agreement, the amendment shall be executed by the General Partner on behalf of itself and on behalf of all of the other Partners by the power of attorney granted pursuant to Section 13.1. The General Partner will provide the Partners with notice of any amendments.

(d)     Any request for consent of the Partners in this Section 11.1 shall be made by written notice from the General Partner to each of the Partners at the address listed on such Partner's Schedule A. Each Partner hereby agrees that failure of a Partner to respond within 10 Business Days after notice is received or deemed received under Section 15.1 shall be deemed a consent to the proposed amendment by such Partner.

(e)     Notwithstanding any contrary provision of this Agreement, any provision of this Agreement that has a substantial equivalent in the governing agreement of any Parallel Investment Vehicle may only be amended by the vote or consent of Limited Partners with Capital Commitments and Parallel Investment Vehicle Limited Partners with Parallel Investment Vehicle Commitments which, when taken together, equal more than 50% (or such other specified percentage) of Aggregate Commitments. For the avoidance of doubt, to the extent that any amendment relates only to the Partnership and not any other Parallel Investment Vehicle, such amendment may be made with the consent of a Majority in Interest of the Limited Partners (or other specified percentage) instead of a majority in interest (or other specified percentage) of the Limited Partners and the Parallel Investment Vehicle Limited Partners.

## ARTICLE XII

## CONSENTS, VOTING AND MEETINGS

Section 12.1.  **Method of Giving Consent**. Any vote, consent or approval required by this Agreement ("**Consent**") may be given as follows:

(a)     by a written Consent given by the approving Partner (or member of the Advisory Committee, if formed) at or prior to effecting any act (including inaction) for which the Consent is solicited; *provided*, that such Consent shall not have been nullified by notice to the General Partner by the approving Partner (or member of the Advisory Committee, if formed) at or prior to effecting the act or taking action in furtherance thereof; or

(b)     by the affirmative vote by the approving Partner (or member of the Advisory Committee, if formed) to the doing of the act (including inaction) for which the Consent is solicited at any meeting called and held to consider the doing of such act or thing.

For purposes of this Agreement, a written Consent may be given by electronic mail and shall be effective for all purposes in determining whether the requisite Consent of Partners (or members of

the Advisory Committee) has been obtained with respect to matters for which such vote or approval is sought under this Agreement. Whenever under the terms of this Agreement the Consent of a specified percentage of the Interests of the Partners is required for any action, forbearance, amendment hereof, inaction, consent or otherwise, a Limited Partner with respect to which a Several Interest Election has been accepted by the General Partner may allocate its Interest in the Partnership for the purpose of casting such vote or giving such consent or approval in accordance with the respective directions of the underlying investors of such Limited Partner in accordance with their relative interests in such Limited Partner. If the General Partner reasonably determines that a particular action to be taken under this Agreement that requires Consent of the Limited Partners would not be applicable to one or more of the Parallel Investment Vehicles, including for legal, tax or regulatory reasons, then such action shall only require the Consent of the Limited Partners of the Partnership and the applicable Parallel Investment Vehicles, if any.

Section 12.2.  **Meetings**. The General Partner may, but is not required to, cause the Partnership to conduct an informational meeting of the Partners at which representatives of the General Partner will be present to discuss the business of the Partnership (the "***Annual Meeting***"). The General Partner shall not be required to (but may) submit any of the Partnership's potential Investments for discussion at an Annual Meeting and none of the Limited Partners shall play any role in the Partnership's governance or participate in the control of the business of the Partnership. Each Annual Meeting (and any other meeting of Partners or Partner vote) may be held in person, or by secure telephone conference, webcast or other electronic means. Voting at the Annual Meeting or any other vote of the Partners, may be held by such means or by written consent of the Partners.

Section 12.3.  **Record Dates**. The General Partner may set in advance a date for determining the Partners entitled to notice of and to vote at any meeting or by written consent. All record dates shall neither be more than 90 days prior to the date of the meeting to which such record date relates nor, in the case of a written consent, be more than 100 days prior to the date of the act (including inaction) or meeting for which consents are being solicited.

Section 12.4.  **Submissions to Partner**. The General Partner shall give all of the Partners notice of any proposal or other matter required by any provision of this Agreement or by Delaware law to be submitted for the consideration and approval of the Partners. Such notice shall include any information required by the relevant provisions of this Agreement or by Delaware law.

**ARTICLE XIII**

**POWER OF ATTORNEY**

Section 13.1.  **Power of Attorney**.

(a)      Each Limited Partner, by its execution hereof, hereby irrevocably makes, constitutes and appoints each of the General Partner, any Managing Member or general partner of the General Partner, and the Liquidating Trustee, if any (in such capacity as Liquidating Trustee for so long as it acts as such), each acting alone, as its true and lawful agent and attorney-in-fact, with full power of substitution and full power and authority in its name, place and stead, to make, execute, sign, acknowledge, swear to, record and file: (i) this Agreement and any amendment to

this Agreement which has been adopted as herein provided; (ii) the original Certificate and all amendments thereto required or permitted by law and the provisions of this Agreement; (iii) all certificates and other instruments deemed advisable by the General Partner or the Liquidating Trustee to carry out the provisions of this Agreement and applicable law or to permit the Partnership to become or to continue as a limited partnership; (iv) all instruments that the General Partner or the Liquidating Trustee deems appropriate to reflect a change or modification of this Agreement or the Partnership in accordance with this Agreement, including the admission of Substituted Limited Partners pursuant to the provisions of this Agreement; (v) all conveyances and other instruments or papers deemed advisable by the General Partner or the Liquidating Trustee to effect the dissolution and termination of the Partnership (consistent with Article X); (vi) all instruments necessary to effect the purchase of a Defaulting Partner's interest and the compulsory withdrawal of such Defaulting Partner; (vii) all documents and instruments to be executed by a Defaulting Partner under this Agreement (or by law) with respect to the Partnership or the Defaulting Partner's Interest, including those effecting the Defaulting Partner's withdrawal from the Partnership; and (viii) all other instruments or papers which may be required or permitted by law to be filed on behalf of the Partnership which do not subject the Partners to personal liability and are necessary or desirable to carry out the provisions of this Agreement.

(b)     The foregoing power of attorney:

(i)     is coupled with an interest, shall be irrevocable and shall survive and shall not be affected by the subsequent death, disability or Incapacity of any Limited Partner; may be exercised by the General Partner, its Managing Members or general partner or the Liquidating Trustee, as appropriate, either by signing separately as attorney-in-fact for each Limited Partner or by a single signature of the General Partner, its Managing Members or general partner or the Liquidating Trustee, as appropriate, acting as attorney-in-fact for all of them, with or without listing all of the Limited Partners executing the instrument, and

(ii)     shall survive the delivery of an assignment by a Limited Partner of the whole or any portion of its Interest; except that, where the assignee of the whole of such Limited Partner's Interest has been approved by the General Partner for admission to the Partnership as a Substituted Limited Partner, the power of attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling the General Partner, its Managing Members or general partner or the Liquidating Trustee, as appropriate, to execute, swear to, acknowledge and file any instrument necessary or appropriate to effect such substitution.

(c)     Each Limited Partner shall execute and deliver to the General Partner within 15 days after receipt of the General Partner's request therefor such other instruments as the General Partner reasonably deems necessary to carry out the terms of this Agreement. The General Partner shall notify each Limited Partner for which it has exercised a power-of-attorney as soon as practicable thereafter and shall provide each such Limited Partner with a copy of any document for which it has exercised a power-of-attorney as soon as practicable thereafter.

# ARTICLE XIV

## RECORDS AND ACCOUNTING; REPORTS; FISCAL AFFAIRS

Section 14.1.  **Records and Accounting**.

(a)  Proper and complete records and books of account of the business of the Partnership including a list of the names, addresses and Interests of all Partners, shall be maintained at the Partnership's principal place of business for a period of five years following the due date of the final tax return of the Partnership.

(b)  The books and records of the Partnership shall be maintained in U.S. dollars, on the accrual basis of accounting for tax purposes, on a GAAP (fair value) basis for reporting purposes, and the cash basis (subject to unpaid bills, projected short-term needs and reserves) for purposes of determining Distributions. The books shall be open to inspection by any Partner (or its authorized representative) at any time during ordinary business hours, upon reasonable notice, for any purpose reasonably related to its interest as a Partner. The financial statements of the Partnership provided to the Partners pursuant to this Article shall reflect the assets of the Partnership at their Fair Value as established pursuant to the terms of this Agreement. The taxable year of the Partnership shall be its Fiscal Year. The books and records that shall be available for inspection by Partners pursuant to this Section 14.1 and shall consist of annual income statements, balance sheets, statements of cash flow, tax returns, checking account ledgers, bank statements, appraisals or valuations of real property owned by the Partnership and copies of Partnership reports previously sent to the Partners (other than the portions thereof identifying other Partners).

(c)  The General Partner shall have the right at any time and for any reason to obtain fair market value appraisals of all or any part of the Partnership's Investments and shall obtain an independent appraisal of each Investment at the expense of the Partnership.

Section 14.2.  **Annual Reports**.

(a)  The General Partner shall use commercially reasonable efforts to cause to be prepared and mailed to each Partner who was a Partner at any time during the Fiscal Year, within 120 days after the end of each Fiscal Year, beginning with the first full Fiscal Year of the Partnership, an annual report containing the following (which reports, or portions thereof, may be internally prepared by the General Partner or prepared by the Partnership's accountants or other third parties at Partnership expense, as determined by the General Partner in its sole discretion):

(i)  a balance sheet of the Partnership;

(ii)  a statement of the net Profits or net Losses (and any other tax items) of the Partnership for such year, including a statement setting forth Management Fees and Operating Expenses incurred for such year;

(iii)  a statement of cash flow of the Partnership;

(iv)  a current valuation of the Partnership's Investments.

(b)     The annual financial statements are not required to be audited.

Section 14.3. **Tax Information; Tax Returns**. The General Partner will use commercially reasonable efforts to cause to be delivered to each Person who was a Partner at any time during such Fiscal Year, within 120 days after the end of each Fiscal Year, such information, if any, with respect to the Partnership as may be necessary for the preparation of such Partner's income tax returns, including a statement showing each Partner's share of income, gain or loss, expense and credits for such Fiscal Year for income tax purposes, including unrelated business income tax purposes. The General Partner shall use reasonable commercial efforts to prepare or cause to be prepared and to be filed on or before the due date (or any extension thereof elected by the General Partner in its sole discretion) any tax returns required to be filed by the Partnership. Each Partner is responsible for the preparation and filing of its own tax returns. Without limiting the foregoing, the General Partner shall have the right, but not the obligation, to file composite state tax returns for the benefit of Partners that elect to participate in the filing of such returns. The General Partner shall cause the Partnership to pay all taxes payable by the Partnership (it being understood that the expenses of preparing and filing such tax returns, the amounts of such taxes, and costs in connection with any controversy with any governmental taxing authority with respect thereto, are expenses of the Partnership and not of the General Partner); *provided*, that the General Partner shall not be required to cause the Partnership or any of its Affiliates to pay any tax so long as the General Partner or the Partnership or any of its Affiliates is in Good Faith and by appropriate legal proceedings contesting the validity, applicability or amount thereof. The General Partner will use commercially reasonable efforts to provide each Partner with a Schedule K-1 for tax purposes within 120 days after the end of the Fiscal Year of the Fund. If the General Partner is unable to deliver such Schedule K-1 by April 15th of each year, the General Partner will provide the Partners with estimates of taxable income or loss allocated to their investment in the Fund.

Section 14.4. **Partnership Funds**. The funds of the Partnership which are not invested in Investments may be deposited in the name of the Partnership in one or more bank accounts. Withdrawals therefrom shall be made upon such signature(s) as the General Partner may designate. No funds of the Partnership shall be kept in any account other than a Partnership account; funds shall not be commingled with the funds of any other Person; and the General Partner shall not employ, or permit any other Person to employ, such funds in any manner except for the benefit of the Partnership. Such funds may be held in interest bearing or non-interest-bearing accounts as determined by the General Partner in its sole discretion.

Section 14.5. **Partnership For Income Tax Purposes; Tax Elections, Determinations & Decisions**. The Partners agree that the Partnership will be treated as a partnership for purposes of federal, state, and local income tax laws and further agree not to take any position or any action or to make or cause to be made any election inconsistent with such treatment. Except as otherwise expressly provided in this Agreement, all tax elections by the Partnership, determinations for tax purposes and any other tax decisions with respect to the Partnership, will be made (or not made) by the General Partner in its reasonable discretion. Each Partner shall upon request supply promptly any information necessary to give proper effect to any election made by the Partnership. The determinations of the General Partner with respect to the Partnership's treatment of any item or its allocation for federal, state or local tax purposes shall be binding upon all of the Limited Partners so long as such determination (a) shall not be inconsistent with any express term hereof and (b) the Partnership's accountants shall not have disagreed therewith. The General Partner shall

make (or refrain from making, as applicable) all appropriate elections and take (or refrain from taking, as applicable) all other appropriate actions to the extent required pursuant to Code Section 7701 (and the Treasury Regulations thereunder) for the Partnership to be classified as a "partnership" for federal income tax purposes.

Section 14.6. **Other Information**. Subject to Section 14.7, with reasonable promptness, the General Partner will deliver such other information available to the General Partner, including financial statements and computations, relating to the Partnership or any Person in which the Partnership then holds Investments as any Partner may from time to time reasonably request.

Section 14.7. **Limited Partner Information**. Upon the reasonable request of the General Partner, each Limited Partner agrees to provide the Partnership with such non-confidential information concerning the Limited Partner and its business so that the Partnership can comply, or determine its compliance, with any laws or regulations applicable to it (including, without limitation, the Investment Company Act and ERISA). Notwithstanding anything in this Article XIV to the contrary, a Limited Partner shall have access to books and records of the Partnership and the right to receive copies of Partnership documents only for a purpose reasonably related to the Limited Partner's Interest as a Limited Partner of the Partnership, and any such access shall be subject to such reasonable standards (including standards governing what information and documents are to be furnished, at what time and location and at whose expense) as may be established from time to time by the General Partner (it being understood that such standards may be established by the General Partner following the receipt of an inspection request). In addition, the General Partner shall have the right to keep confidential from each Limited Partner for such period of time as the General Partner deems reasonable, any information which the General Partner reasonably believes to be in the nature of trade secrets or other information (or confidential information regarding another Limited Partner) the disclosure of which the General Partner in Good Faith believes is not in the best interest of the Partnership or could damage the Partnership or which the Partnership is required to keep confidential by law or by agreement with a Limited Partner or with a third party to keep confidential with respect to Partnership tax items. In addition, in order to protect the privacy of Limited Partners, to the fullest extent permitted by law, the General Partner may in its sole discretion (but is not required to) withhold from any Limited Partner information concerning any other Limited Partner, including such other Limited Partner's name, address, telephone number and other contact information. Each Limited Partner hereby agrees to provide the General Partner with such information as the General Partner may reasonably request from time to time with respect to non-U.S. Citizenship, residency, ownership or control of such Limited Partner so as to permit the General Partner to evaluate and comply with any regulatory and tax requirements applicable to the Partnership or proposed investments of the Partnership.

Section 14.8. **Partnership Representative**.

(a) **Designation**. The General Partner or a Person designated by the General Partner, at Partnership expense, shall act as the "partnership representative" of the Partnership (the "**Partnership Representative**"), as such term is defined in Code Section 6223(a), and in a similar capacity under any corresponding or similar provisions of applicable state and local law, and exercise any authority permitted the "partnership representative" under the Code and applicable state and local law, including settlement or extension of the statute of limitations with respect to

Partnership tax items. To the extent the Partnership Representative is not an individual, the General Partner shall be entitled to appoint, revoke or replace a "designated individual" (as such term is described in Treasury Regulations Section 301.6223-1(b)(3)(ii)) through whom the Partnership Representative will act.

(b)    **Tax Proceedings**. In the event the Partnership shall be the subject of an income tax audit, examination or other administrative or judicial proceeding with respect to taxes by any Federal, state or local authority ("***Tax Proceedings***"), the Partnership Representative shall be authorized to act for, and its decision shall be final and binding upon, the Partnership and each Partner thereof. All expenses incurred in connection with any such audit, investigation, settlement, review or any other Tax Proceeding shall be borne by the Partnership. The Partnership Representative shall have the right to make on behalf of the Partnership any and all elections and take any and all actions that are available to be made or taken by the Partnership Representative or the Partnership under the Code and the Partners shall take such actions requested by the Partnership Representative consistent with any such elections made and actions taken by the Partnership Representative, including filing amended tax returns and paying any tax due in accordance with Section 6225(c)(2) of the Code, it being understood that no such amended tax return shall be filed in accordance with such section with respect to the Partnership without the advance written consent of the Partnership Representative in its sole discretion. In the event the Partnership incurs any liability for taxes, interest or penalties as a result of an audit of the Partnership or other Tax Proceeding:

(i)    the Partnership Representative may cause the Partners (including any former Partner) to whom such liability relates, as determined by the Partnership Representative in its sole Good Faith discretion, to pay, and each such Partner hereby agrees to pay, such amount to the Partnership, and such amount shall not be treated as a Capital Contribution;

(ii)    any amount not paid by a Partner (or former Partner) at the time requested by Partnership Representative shall accrue interest at the rate of 8% *per annum*, compounded quarterly, until paid, and such Partner (or former Partner) shall also be liable to the Partnership for any damages resulting from a delay in making such payment beyond the date such payment is requested by Partnership Representative, and for this purpose the fact that the Partnership could have paid this amount with other funds shall not be taken into account in determining such damages;

(iii)    without reduction in a Partner's (or former Partner's) obligation under clauses (i) and (ii), any amount paid by the Partnership that is attributable to a Partner (or former Partner), as determined by the Partnership Representative in its reasonable, Good Faith discretion, and that is not paid by such Partner pursuant to clauses (i) and (ii) shall be treated for purposes of this Agreement as a distribution to such Partner (or former Partner); and

(iv)    the Partnership may deduct from, and set off against, any distribution or other amount otherwise due or payable to a Partner (or former Partner) by the Partnership pursuant to this Agreement or otherwise, the payment obligations of such Partner (or former Partner) under clauses (i) or (ii) of this Section 14.8(b).

(c)     The provisions of this Section 14.8, including the obligations of each Partner (or former Partner) shall survive the transfer by such Partner of its Interest in the Partnership and the dissolution of the Partnership.

Section 14.9.   **Safe Harbor Election and Forfeiture Allocations**.

(a)     The Partners agree that the General Partner may (but is not required to) make an election, on behalf of itself and of all Partners, to have the "Safe Harbor" of Section 3.03 of IRS Notice 2005-43 (or the corresponding provision in any Revenue Procedure or regulation issued pursuant to the provisions of such notice) (the "*Safe Harbor*") apply irrevocably with respect to all Interests transferred in connection with the performance of services by a Partner in a partner capacity or in anticipation of becoming a Partner (such election, the "*Safe Harbor Election*"), including the General Partner's Carried Interest. The Safe Harbor Election shall be effective as of the date hereof. The Partnership and each Partner agree to comply with all requirements of the Safe Harbor with respect to all Interests in the Partnership transferred in connection with the performance of services by a Partner in a partner capacity or in anticipation of becoming a Partner, whether such Partner was admitted as a Partner or as a transferee of a previous Partner. The General Partner shall cause the Partnership to comply with all record-keeping requirements and other administrative requirements with respect to the Safe Harbor as shall be required by proposed or final regulations relating thereto, to the extent the General Partner so determines in its sole discretion.

(b)     The Partners agree (for all purposes including Rev. Proc. 93-27 and similar provisions of subsequent law or IRS administrative interpretation) that (i) the General Partner's Carried Interest issued hereunder is a "Safe Harbor Partnership Interest" within the meaning of Section 3.02 of IRS Notice 2005-43 (or the corresponding provision in any Revenue Procedure or Treasury Regulation issued pursuant to the provisions of such Notice) and represents a profits interest received for services rendered or to be rendered to or for the benefit of the Partnership by the General Partner, and (ii) the "fair market value" of the Safe Harbor Partnership Interest and the Carried Interest upon receipt by the General Partner, as of the date of issuance on the date hereof is zero, representing the liquidation value of such interest upon receipt on the date hereof (with such valuation being consented to and approved by all Partners).

(c)     Each Partner, by signing this Agreement or by accepting such transfer, hereby agrees (i) to comply with all requirements of the Safe Harbor Election with respect to the Safe Harbor Partnership Interests while the Safe Harbor Election remains effective, and (ii) that to the extent that such profits interest is forfeited after the date hereof and to the extent that allocations of income have been made to the General Partner, with respect thereto and have not been matched with corresponding allocations of loss or deduction with respect thereto, or Distributions with respect thereto that may be retained by the General Partner, the Partnership shall make special forfeiture allocations of gross items of deduction or loss (including, as may be permitted by or under Treasury Regulations to be adopted, notional items of deduction or loss) in accordance with IRS Notice 2005-43 and the Treasury Regulations adopted under Code Sections 704(b) and 83.

(d)     The General Partner shall file or cause the Partnership to file all returns, reports and other documentation as may be required, as determined by the General Partner, to

perfect and maintain the Safe Harbor Election with respect to transfers of the Safe Harbor Partnership Interests without further vote or action of any other Person.

(e)     The General Partner is hereby authorized, without further vote or action of the Partners or any other Person, to amend this Agreement as necessary to comply with the Safe Harbor requirements, in order to provide for a Safe Harbor Election and the ability to maintain the same, and shall have the authority to execute any such amendment by and on behalf of each Partner pursuant to the power of attorney granted by this Agreement. Any undertaking by the Partners necessary to enable or preserve a Safe Harbor Election may be reflected in such amendments and, to the extent so reflected, shall be binding on each Partner.

(f)     Each Partner agrees to cooperate with the General Partner to perfect and maintain any Safe Harbor Election, and to timely execute and deliver any documentation with respect thereto reasonably requested by the General Partner at the expense of the Partnership.

(g)     No Transfer of any Interest in the Partnership by a Partner shall be effective unless prior to such Transfer, the assignee or intended recipient of such Interest shall have agreed in writing to be bound by the provisions of this Section 14.9, in a form satisfactory to the General Partner.

## ARTICLE XV

## MISCELLANEOUS

Section 15.1.   **Notices**.

(a)     Any notice to any Partner shall be at the mailing address or e-mail address of such Partner set forth in such Partner's Schedule A or such other mailing address or e-mail address of which such Partner shall advise the General Partner in writing; *provided*, that any notice to the Partnership or the General Partner shall be sent to its principal office. The General Partner may at any time change the location of the principal office. Notice of any change shall be given to the Partners on or before the date of any such change.

(b)     Any notice shall be deemed to have been duly given (i) if personally delivered, upon delivery, (ii) if sent by e-mail or telecopy on a Business Day, if there is no electronic notice of failure of delivery, when sent (or, if not sent on a Business Day, on the next Business Day), (iii) if sent by a nationally recognized overnight courier service, on the date of delivery to such service, or (iv) if sent by mail (certified or registered), on the date on which the piece of mail containing such communication is posted. The time to respond to any notice shall run from the date of actual delivery (or attempted delivery if delivery is refused during normal business hours on a Business Day).

Section 15.2.   **Governing Law; Separability of Provisions**.

(a)     All questions concerning the construction, interpretation and validity of this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether in the State of Delaware or any other jurisdiction) that would cause the application of the laws of

any jurisdiction other than the State of Delaware. Notwithstanding anything to the contrary contained in this Agreement (including any provision of this Agreement that is modified by the phrase "notwithstanding anything to the contrary contained in this Agreement" or words of similar import and effect), each provision of this Agreement shall be enforceable to the extent (and only to the extent) permitted by non-waivable provisions of the Delaware Act. In furtherance of the foregoing, and to the fullest extent permitted by law, the law of the State of Delaware shall control the interpretation and construction of this Agreement, even if under such jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily or necessarily apply.

(b)     The Partners desire, intend and agree that the provisions of this Agreement should be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if a court of competent jurisdiction shall adjudicate any particular provision of this Agreement to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 15.3.   [RESERVED]

Section 15.4.   **Waiver of Jury Trial; Expedited Arbitration**. Any claim, dispute or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement or any conflict of interest between the General Partner and the Partnership ("***Controversy***") shall be settled by arbitration pursuant to this section. In the event of such a Controversy, the complaining party shall deliver to the other a "***Dispute Notice***," which shall describe the Controversy with particularity. Within 10 days after receipt of any such Dispute Notice, the parties thereto shall meet and confer in person with fully authorized and empowered executives and with counsel regarding the matters set forth in the Dispute Notice and shall attempt in good faith to resolve all issues described therein. Unless otherwise agreed in writing by the negotiating parties, the above-described negotiation shall take place at a mutually acceptable time and place, and end at the close of the first meeting of executives and counsel described above. To the extent the parties either are not able to meet or otherwise are not able to resolve the Controversy within the time stated (unless extended by mutual agreement), such Controversy shall be determined by binding arbitration under and pursuant to JAMS' Streamlined Arbitration Rules (where the amount in controversy, not including estimated attorneys' fees or costs, is less than $250,000) or JAMS' Comprehensive Arbitration Rules And Procedures (where the amount in controversy, not including estimated attorneys' fees or costs, equals or exceeds $250,000). The arbitration shall proceed before one arbitrator, who, to the extent practicable, shall be a retired Article III federal court judge negotiated and agreed on by the parties. If the parties are unable to agree upon such an arbitrator within 30 days after the demand for arbitration is filed, then JAMS shall appoint a sole arbitrator in accordance with its rules ("***Rules***"). Nothing in this Section 15.3

precludes any of the parties from seeking injunctive and/or emergency relief (including, among other things, a temporary restraining order) from a court of competent jurisdiction. The prevailing party in any arbitration shall be reimbursed for its attorneys' fees by the non-prevailing party.

Notwithstanding anything to the contrary contained in such Rules, (i) the arbitrator, in deciding any Controversy, shall base his or her decision on the record and in accordance with this Agreement and applicable law, (ii) in no event shall the arbitrator make any ruling, finding or award that does not conform to the terms and conditions of this Agreement, is not supported by the weight of the evidence, or is contrary to statute, administrative regulations or established judicial precedents, (iii) the arbitration award shall be a factually detailed, reasoned opinion stating the arbitrator's findings of fact and conclusions of law, and (iv) any such arbitration, including the final hearing, shall be held in the State of Delaware, unless the parties mutually agree upon some other location, or unless another location is mandated by law, and (v) pending adjudication and subject to reallocation as provided therein, all costs of the arbitrator (including costs of administration by JAMS, excluding attorney's fees) shall be borne equally by the parties thereto.

Notwithstanding any provision of the Agreement to the contrary, this Section 15.3 shall be construed to the maximum extent possible to comply with the laws of the State of Delaware, including the Uniform Arbitration Act (10 Del. C. § 5701 *et seq.*) (the "***Delaware Arbitration Act***"). If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this Section 15.3, including any JAMS' Streamlined Arbitration Rules or JAMS' Comprehensive Arbitration Rules And Procedures, shall be invalid or unenforceable under the Delaware Arbitration Act, or other applicable law, such invalidity shall not invalidate all of this Section 15.3. In that case, this Section 15.3 shall be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of the Delaware Arbitration Act or other applicable law, and, in the event, such term or provision cannot be so limited, this Section 15.3 shall be construed to omit such invalid or unenforceable provision.

Section 15.5.   **Entire Agreement**. Except as the same may be amended in accordance with Section 11.1, this Agreement sets forth the entire understanding of all parties hereto. Notwithstanding anything to the contrary contained in this Agreement, the parties hereto acknowledge that the Partnership or the General Partner, without any further act, approval or vote of any Limited Partner, may enter into side agreements or other writings (collectively, the "***Side Letters***") with individual Limited Partners which have the effect of establishing rights under, or altering or supplementing, the terms of, this Agreement; *provided*, *however*, that the economic terms set forth in any such Side Letter shall not affect the economic rights of any other Limited Partner under any provision of this Agreement and such economic terms shall be determined solely as between such Limited Partner and the General Partner. The parties hereto agree that any rights established, or any terms of this Agreement altered or supplemented, in any such Side Letter with a Limited Partner shall govern with respect to such Limited Partner (but not any of such Limited Partner's assignees or transferees unless so specified in such Side Letter) notwithstanding any other provision of this Agreement or the Subscription Agreement.

Section 15.6.   **Binding Provisions; Third Party Beneficiaries**. Subject to any rights granted to a lender pursuant to Section 5.1(c), Article VIII and Article IX and to the fullest extent permitted by law, the covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, personal or legal representatives, successors

and assigns of the respective parties hereto; except that, to the fullest extent permitted by law, the provisions herein relating to contribution of capital to the Partnership are for the benefit of the Partners only, and not for the benefit of any third party. Nothing expressed or referred to in this Agreement shall be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except that Indemnitees, the Liquidating Trustee and the persons indemnified pursuant to Article VI are intended third party beneficiaries of the provisions of Article VI with the right to enforce those provisions as provided in this Agreement as if they were Limited Partners who were subject to such provisions (including this Section 15.6).

Section 15.7.  **No Waiver**. The failure of any Partner to seek redress for violation, or to insist on strict performance, of any covenant or condition of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

Section 15.8.  **Confidentiality**.

(a)     All information relating to the General Partner, the Partnership, the Parallel Investment Vehicles, their Subsidiaries, any Investment or the business or operations of such Persons (including processes, plans, data, reports, drawings, documents, business secrets, financial information or information of any other kind) received by any Limited Partner ("***Confidential Information***") shall be received and maintained in confidence by such Limited Partner. Notwithstanding anything contained in this Agreement to the contrary, each Partner's counterpart Schedule A to this Agreement shall be considered a confidential document of the Partnership, and the General Partner and, unless waived by the General Partner in its sole discretion, no Limited Partner shall have the right to receive, copy, or review all or any portion of any other Partner's Schedule A. Limited Partners may be asked to sign separate and additional non-disclosure agreements in connection with their investment in the Partnership.

(b)     Confidential Information may be used by Limited Partners only for the purpose of monitoring their investments in the Partnership (the "***Permitted Purpose***"). The Limited Partners agree that they will not use any Confidential Information for any other purpose, including use in conducting or furthering their own business or that of any Affiliates or any competing business.

(c)     The obligations of limited use and nondisclosure contained in this Section 15.8 will not: (i) restrict the disclosure of Confidential Information to a Limited Partner's attorneys, tax advisors, accountants or other professional advisors or consultants who have a reason to have access to such Confidential Information in connection with their duties and responsibilities to such Limited Partner relating to the Permitted Purpose (so long as such Persons are under an obligation of confidentiality consistent with the terms of this Section 15.8); (ii) restrict the disclosure of Confidential Information by a Limited Partner to the extent such disclosure is required by any governmental or regulatory authority or court entitled by law to such disclosure, or that is required by law to be disclosed, *provided*, that such Limited Partner promptly notifies the General Partner when such requirement to disclose arises (but only to the extent such notification by such Limited Partner is permitted by law) to enable the General Partner to seek an appropriate protective order and to make known to such governmental or regulatory authority or

court the proprietary nature of the Confidential Information and to make any applicable claim of confidentiality in respect thereof, and *provided*, *further*, that such party shall only make such disclosure to the extent it is required to do so by law; (iii) restrict the disclosure of Confidential Information by a Limited Partner to the extent permitted with the written consent of the General Partner; or (iv) apply to information that (x) was publicly known or otherwise known to a Limited Partner prior to the time it was disclosed pursuant to this Agreement and was not otherwise subject to any restriction on disclosure by such Limited Partner, (y) subsequently becomes publicly known through no act or omission by a Limited Partner or any Person acting on a Limited Partner's behalf, or (z) otherwise becomes known to a Limited Partner without breach of this Agreement (other than through disclosure by the Partnership or the General Partner) or any other contractual, legal, or fiduciary obligation and is not otherwise subject to any restriction on disclosure by such Limited Partner. Each Limited Partner agrees: (A) to cooperate in any appropriate action that the General Partner may decide to take to prevent or minimize the disclosure of such Confidential Information; (B) that all Confidential Information is and will be the exclusive property of the General Partner and its Affiliates, and upon the request of the General Partner, a Limited Partner shall immediately return, delete or destroy all Confidential Information, including all copies or derivations thereof, held by such Limited Partner (other than Confidential Information that constitutes tax information or other financial information necessary for such Limited Partner's internal and external audit activities); and (C) that the misappropriation or unauthorized disclosure of Confidential Information by a Limited Partner is likely to cause substantial and irreparable damage to the Partnership and/or one or more Affiliates such that damages may not be an adequate remedy for breach of this Section 15.8; accordingly, the Partnership and General Partner and its Affiliates shall be entitled to seek injunctive and other equitable relief, in addition to all other remedies available to them at law or at equity, and, to the fullest extent permitted by law, no proof of special damages shall be necessary for the enforcement of this Section 15.8.

(d)     Notwithstanding any provision contained herein to the contrary, unless otherwise required by applicable law, the General Partner shall not be required to disclose any information relating to any Investments to any Limited Partner who is subject to any law, rule or regulation that would require such Limited Partner to publicly disclose such information upon request of a third party or otherwise.

(e)     Each Limited Partner hereby consents to the disclosure by the General Partner of its identity and its investment in the Partnership or any Parallel Investment Vehicle or co-investment with the Partnership and any Affiliates (and other information concerning such Limited Partner and its Affiliates) (i) in order to demonstrate compliance or to comply with any laws, rules or regulations to which the Partnership, the General Partner, any Affiliate thereof, or any financial institution or any other service provider providing services to any of the foregoing is or becomes subject, (ii) if the contents thereof are relevant to any issue in any action, suit, or proceeding to which the Partnership, the General Partner or any Affiliate thereof is a party or by which it is or may be bound, (iii) to establish the availability under any applicable law of an exemption from registration of Interests in the Partnership, (iv) in response to requests for information by other investors in the Partnership or Partnership lenders or regulatory or law enforcement authorities, (v) if the General Partner believes in its sole discretion that doing so will be beneficial to the Partnership's business or that of another entity sponsored by the General Partner, and its Affiliates (and to its professionals under a duty of confidentiality) or other investment programs sponsored by the General Partner or its Affiliates, and (vi) to prospective

financial sources or to other parties who request such information in connection with conducting business with the Partnership (including brokers, purchasers, sellers or tenants); *provided*, that the General Partner shall not disclose the identity of any Limited Partner and its investment pursuant to Section 15.8(e) upon the prior written notice from the Limited Partner to the General Partner.

(f)     Each Limited Partner hereby consents to the use by the General Partner of the Partnership's performance data in subsequent offerings and in connection with future borrowings.

(g)     The General Partner will have the right to show any investor's Side Letter to (or provide an investor's identity to) any other investor, prospective investor, or lender (and to its professionals under a duty of confidentiality), however, the General Partner will have no obligation to do so except to the extent provided for in an investor's Side Letter.

(h)     Unless approved by the General Partner, to the fullest extent permitted by law, no Limited Partner shall have the right to receive a copy of any other Limited Partner's Schedule A or receive any information about any other Limited Partner who is not an Affiliate of the General Partner.

(i)     Notwithstanding anything to the contrary contained in this Agreement, the General Partner, in its own name and on behalf of the Partnership, shall be authorized without the consent of any Person, including any other Limited Partner, to take such lawful action as it determines in its sole discretion to be necessary or advisable to comply with the Bank Secrecy Act, the USA PATRIOT Act, and any other anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures. The Partnership and the General Partner also reserve the right to refuse to make any Distribution or other payment to a Limited Partner if the General Partner suspects or is advised that such payment might result in a breach or violation of any applicable anti-money laundering, anti-terrorist or other laws or regulations by any Person in any relevant jurisdiction, or if such refusal is considered necessary or appropriate to ensure the compliance by the Partnership, the General Partner, the Manager and their Affiliates with any such laws or regulations in any relevant jurisdiction.

Section 15.9.  **No Right to Partition**. To the fullest extent permitted by law, and except as otherwise expressly provided in this Agreement, the Partners, on behalf of themselves and their shareholders, members, partners, heirs, executors, administrators, personal or legal representatives, successors and assigns, if any, hereby specifically and irrevocably renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for voluntary dissolution or for partition of the Partnership, any Subsidiary or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to any such property may be held.

Section 15.10. [RESERVED]

Section 15.11. **Remedies Cumulative**. The remedies of the General Partner and the Partners under this Agreement are cumulative and shall not exclude any other remedies to which the acting party may lawfully be entitled.

Section 15.12. **Counterparts; E-Mail Signatures**. This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument; *provided*, that each such counterpart shall be executed by the General Partner. E- mail counterpart signatures to this Agreement shall be acceptable and binding.

Section 15.13. **Partner Communications**. If any Partner, other than the General Partner or if formed, a member of the Advisory Committee, desires to contact any other Partner, or group of Partners, with respect to any matter related to the Partnership, the Partner seeking to initiate communications may send a written request to the General Partner for a list of Partners and the most recent mailing address of each such Partner. If such information must be provided by non-waivable provisions of applicable law, the General Partner will provide such information to such Partner. The requesting Partner must first provide, with the request, a brief summary of the business purpose for the request and intended use of the information (the "***Proposal***") to the General Partner. Notwithstanding anything to the contrary in this Agreement, but subject to the express requirements of this Section 15.13, pursuant to Section 17-305(f) of the Delaware Act, each Partner hereby waives any right to receive a current list of the names and last known addresses of the other Partners.

Section 15.14. **Force Majeure**. Whenever any act or thing is required of the Partnership, the General Partner or the Manager hereunder to be done within any specified period of time, the Partnership, the General Partner and the Manager shall be entitled to such additional period of time to do such act or thing as shall equal any period of delay resulting from causes beyond the reasonable control of the Partnership, the General Partner, or the Manager, as the case may be, including bank holidays, actions of governmental agencies, acts of God, terrorist acts and financial crises of a nature materially affecting the purchase and sale of securities; *provided*, that this provision shall not have the effect of relieving the Partnership, the General Partner or the Manager from the obligation to perform any such act or thing.

Section 15.15. **UCC Article 8 Election**. Each limited partnership Interest in the Partnership shall constitute a "security" within the meaning of, and be governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 and the Partnership hereby "opts-in" to such provisions for the purpose of the Uniform Commercial Code.

Section 15.16. **Ownership and Use of Name**. The entire right, title and interest to the name "Takeoff," "TKF" or "TKF II" and the goodwill attached thereto are the sole and exclusive property of the Manager, which rights shall survive the liquidation and termination of the Partnership. The Manager and its Affiliates shall have the right to use the name "Takeoff," "TKF" or "TKF II" in other funds that may be sponsored by the Manager or any Affiliate. Upon any removal of the General Partner, the Partnership shall immediately cease using the name "Takeoff," "TKF" or "TKF II" and shall execute and deliver to the Manager an assignment of any and all right, title and interest in and to such name. This Section 15.16 shall not be amended without the consent of the Manager.

Section 15.17. **Legal Counsel and Other Professionals**. Each Partner hereby agrees and acknowledges that:

(a)     The General Partner and its Affiliates have retained Baker & McKenzie LLP in connection with the formation of the General Partner, the Partnership and the Parallel Investment Vehicles (and their Subsidiaries and Affiliates) and expect to retain such firm and other legal counsel (collectively, "*Law Firms*") in connection with the operation of the General Partner, the Partnership, and the Parallel Investment Vehicles (and their Subsidiaries and Affiliates) including making, holding and disposing of Investments. In addition, Baker & McKenzie LLP represents, and the other Law Firms may represent, ES with respect to a variety of other matters. The Law Firms are not representing and will not represent the Limited Partners (or the investors of any Parallel Investment Vehicle) in connection with the formation of the Partnership and the Parallel Investment Vehicles (and their Subsidiaries and Affiliates), the offering of Interests or interests in the Parallel Investment Vehicles, the management and operation of the Partnership and the Parallel Investment Vehicles (and their Subsidiaries) or any dispute which may arise between the Limited Partners on the one hand and the General Partner, the Partnership, any Parallel Investment Vehicle (or their respective Subsidiaries) or any Affiliate of the General Partner, on the other hand.

(b)     To the fullest extent permitted by law, no Law Firm, appraiser, accountant or other professional who at any time provides services to the General Partner, the Partnership, any Parallel Investment Vehicle (or their respective principals and subsidiaries and their Affiliates) or their respective Affiliates shall be disqualified from acting in such capacity because such Person also provides other services to the Partnership, the General Partner, any Parallel Investment Vehicle or any Affiliates or Subsidiaries of any such Persons in connection with the transactions contemplated by this Agreement or any other transactions (whether related or unrelated to this Agreement) at any time, and all conflicts of interest in connection with such Law Firm representations are hereby waived by each Partner.

Section 15.18. **Confidentiality of Investor Identity**. Except as otherwise required by non-waivable provisions of applicable law, unless the General Partner otherwise determines in its sole discretion, no Limited Partner shall be entitled to receive disclosure of the identity of any other Limited Partner or the identity of any investor in a Parallel Investment Vehicle.

Section 15.19. **Authorized Representatives**. The "*Authorized Representatives*" of a Partner that is not a natural person shall be those representatives named by a Limited Partner in such Limited Partner's Subscription Agreement. The written statements and representations of an Authorized Representative for a Limited Partner that is not a natural Person shall be the only authorized statements and representations of such Limited Partner with respect to the matters covered by this Agreement. The written statement or representation of any one Authorized Representative of such Limited Partner shall be sufficient to bind such Limited Partner with respect to all matters pertaining to the Partnership. The term "approved by" or "consented to by" or "consent of" or "satisfactory to" (or words of similar meaning) with respect to a Limited Partner that is not a natural person means a decision or action which has been consented to in writing by the Authorized Representative of such Limited Partner, and with respect to a Limited Partner who is an individual, means a decision or action which has been consented to in writing by such individual. The initial authorized representatives for the General Partner is Mr. William Schlacks.

Section 15.20. **Disqualifying Events**. Limited Partner acknowledges that the Partnership may be precluded from relying on SEC Regulation D Rule 506 under the Securities Act, if a Partner having 20% or more of the Partnership's voting securities or any person deemed to be a direct or indirect beneficial owner (as defined for purposes of Rule 13d-3 pursuant to the Securities and Exchange Act of 1934, as amended) of such voting securities (each, a "***Rule 506(d) Covered Person***"), is subject to a disqualifying event, as described in Rule 506(d)(i) through 506(d)(viii) (each, a "***Disqualifying Event***"). Accordingly, if (i) a Rule 506(d) Covered Person is or is reasonably likely to become subject to any Disqualifying Event, such Limited Partner, on behalf of the Rule 506(d) Covered Person, shall promptly notify the General Partner, regardless of the Limited Partner's percentage ownership of the Partnership, (ii) the General Partner notifies the Limited Partner that the Limited Partner's percentage ownership of the Partnership is over or approaching the relevant threshold, the Limited Partner shall promptly provide, or shall cause the applicable Rule 506(d) Covered Person to provide, any information reasonably requested by the General Partner to determine whether a Disqualifying Event may have occurred, and (iii) at any time the Limited Partner holds 20% or more of the Partnership's voting securities, if the General Partner reasonably determines that a Limited Partner or its Rule 506(d) Covered Persons may have experienced a Disqualifying Event such that the Fund may not rely on the safe harbor from registration set forth under Rule 506, the Limited Partner hereby agrees to waive such portion of its voting, consent or similar rights sufficient to reduce the Limited Partner's voting, consent or similar rights to less than 20% of such rights, *provided*, that any such waiver shall not impact such Limited Partner's economic interest in the Partnership.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Limited Partnership Agreement as of the date first above written.

**GENERAL PARTNER**:

TKF II GP, LLC

By: _____
     Name: William Schlacks
     Title:   Managing Member

**INITIAL LIMITED PARTNER**:

EQUIPMENTSHARE.COM INC

By: _____
Name: Trevor Schauenberg
Title:   CFO

[Signature Page to Limited Partnership Agreement]

# SCHEDULE A*

## Limited Partners' and General Partner's (and Affiliated Limited Partners')

## Capital Commitments

| General Partner and Affiliated Limited Partners | Initial Capital Contribution | Percentage of Ownership of TKF at Initial Close | Total Possible Capital Commitment |
|---|---|---|---|
| Arken, LLC | $500,000 | 12.5% | $2,000,000 (with flexibility to reduce or eliminate the remaining $1.5 million) |

| Limited Partners | Initial Capital Contribution | Percentage of Ownership of TKF at Initial Close | Total Possible Capital Commitment |
|---|---|---|---|
| EquipmentShare. com Inc. | $3,000,000 | 75% | $12,000,000 (with flexibility to reduce or eliminate the remaining $9 million) |
| RC Opportunity LLC | $500,000 | 12.5% | $2,000,000 (with flexibility to reduce or eliminate the remaining $1.5 million) |

Date: As of October 28, 2022.

\*    Separate Schedule A to be prepared for each Partner. Schedule A to be updated by the General Partner without the signature of any Limited Partner being required as provided in Section 11.1.

**EXHIBIT A**
**DEFINITIONS**

"*Additional Limited Partner*" has the meaning set forth in Section 3.6(b)(i).

"*Adjusted Capital Account Deficit*" means, with respect to any Partner, the deficit balance, if any, of the Partner's Capital Account as of the end of the Fiscal Year, after giving effect to the following adjustments: (i) there shall be credited to the Partner's Capital Account any amounts that the Partner is obligated to restore pursuant to the terms of this Agreement or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-l(b)(2)(ii)(*c*), the second sentence of Treasury Regulations Section 1.704-2(g)(1), and the second sentence of Treasury Regulations Section 1.704-2(i)(5); and (ii) there shall be debited to the Partner's Capital Account the items described in Treasury Regulations Sections 1.704-l(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

"*Advisers Act*" has the meaning set forth in Section 9.1(b)(iii).

"*Advisory Committee*" has the meaning set forth in Section 7.1(a).

"*Affiliate*" means, with respect to a Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with,such Person, and with respect to the General Partner, its partners, officers and employees and their Immediate Family Members (including the Managing Members). The term "control" includes the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise. No entity in which the Partnership invests shall be deemed to be an Affiliate of the Partnership, the General Partner, or the Manager, as applicable, solely as a result of the investment or as a result of a Managing Member serving as a director of the entity.

"*Affiliated Limited Partner*" means any Affiliate of the General Partner or the Manager and the so-called "friends and family" investors making a Capital Commitment as referred to in Section 3.1 who acquires an Interest as a Limited Partner and who is designated as an Affiliated Limited Partner by the General Partner upon becoming a Limited Partner. The General Partner may treat any Limited Partner who is managed or financially advised by the same Person as any other Limited Partner as such Limited Partner's Affiliate. For clarity, Arken, LLC is an Affiliated Limited Partner.

"*Aggregate Commitments*" means the sum of the Capital Commitments and Parallel Investment Vehicle Commitments.

"*Aggregator Vehicle*" has the meaning set forth in Section 2.8(b).

"*Agreement*" means this Limited Partnership Agreement of the Partnership (including the schedules and exhibits attached hereto) as originally executed and as amended, modified, supplemented or restated from time to time, in accordance with its terms, as the context requires.

"*Allocation Percentage*" means, with respect to each Partner as of any point in time, a fraction, the numerator of which is such Partner's Capital Commitment and the denominator of which is the aggregate Capital Commitments of all Partners, expressed as a percentage, as the same may be adjusted from time to time pursuant to the terms of this Agreement.

"*Allocation Provisions*" has the meaning set forth in Section 4.7(b).

"*Alternative Investment Vehicle*" has the meaning set forth in Section 2.8(a).

"*Annual Meeting*" has the meaning set forth in Section 12.2.

"*Authorized Representatives*" has the meaning set forth in Section 15.19.

"*Benefit Plan Investor*" means:

(a)    an "employee benefit plan" within the meaning of Section 3(3) of ERISA that is subject to Title I of ERISA;

(b)    a "plan" within the meaning of Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code; or

(c)    any Person whose underlying assets are deemed to be "plan assets" by reason of an investment in the Person by an employee benefit plan or plan described in (a) or (b) under the Plan Assets Regulation or otherwise for purposes of Title I of ERISA or Section 4975 of the Code.

"*Break-up Fees*" means any fees received by the General Partner, the Manager, or any of their respective Affiliates, in connection with a potential Investment that is not ultimately made or a Disposition of an Investment that is not actually consummated.

"*Broken Deal Expenses*" means the costs of unconsummated investments (including, without limitation, all costs and expenses incurred in developing, investigating, negotiating, structuring or terminating any proposed Investment in which the Partnership does not actually invest and any liquidated damages, reverse termination fees or other similar payments incurred in connection with unconsummated investments).

"*Business Day*" means any day other than a Saturday, Sunday, or other day on which banks are authorized or required by law to be closed in New York, New York.

"*Capital Account*" means the separate account, maintained by the Partnership under Section 4.6, for each Partner in accordance with the principles and requirements set forth in Code Section 704(b) and the Treasury Regulations (with no double counting of items taken into account in the definition of Profits or Losses).

"***Capital Commitment***" of a Partner means the amount set forth under the heading "Capital Commitment" opposite the name of such Partner on such Partner's Schedule A, as applicable, as each may be amended from time to time by the General Partner in accordance with this Agreement.

"***Capital Contributions***" of a Partner means, as of any date of determination, the total amount of all capital contributions such Partner has made to the capital of the Partnership pursuant to the terms of this Agreement as of that date, without regard to any repayment thereof

"***Capital Transaction Proceeds***" means all cash, securities and other property received by the Partnership in respect of any Investment or portion thereof (excluding non-cash proceeds, except to the extent that such portion or such proceeds are distributed to the Partners in kind), net of any indebtedness payment and any expenses or taxes borne by the Partnership in connection with such Investment (or proceeds with respect to thereto), but not including Current Income.

"***Carried Interest***" means the amounts distributed to the General Partner under Section 4.2(b).

"***Carried Interest Tax Distribution***" has the meaning set forth in Section 4.4.

"***Carried Interest Tax Liability***" has the meaning set forth in Section 4.4.

"***Cause Event***" shall be deemed to have occurred if (A) any of the Managing Members is convicted of committing fraud, embezzlement or a similar felony involving misappropriation of funds; (B) any of the Managing Members, the General Partner, or the Manager, is the subject of a determination by a court or arbitrator of competent jurisdiction (or the entry of an order of such a court upon settlement of any litigation which stipulates) that he/it has acted in a manner constituting fraud or willful misconduct in the discharge of a duty under this Agreement that has a material adverse effect on the Partnership, or (C) any of the Managing Members, the General Partner, or the Manager is the subject of a determination by a court or arbitrator of competent jurisdiction (or the entry of an order of such a court upon settlement of any litigation which stipulates) that he/it has breached this Agreement in a manner that has a material adverse effect on the Partnership.

"***Certificate***" means the Certificate of Limited Partnership of the Partnership filed with the Office of the Secretary of State of the State of Delaware pursuant to Section 2.5, as the same may be amended from time to time in accordance with the terms and conditions of this Agreement.

"***Claims***" has the meaning set forth in Section 6.1(b).

"***Clawback Amount***" has the meaning set forth in Section 10.3(a).

"***Closing***" means each event of consummation of the admission of Limited Partners to the Partnership on any Closing Date.

"**_Closing Date_**" means each date as of which the General Partner accepts Subscription Agreements from any prospective Limited Partners, as determined by the General Partner in its sole discretion.

"**_Code_**" means the U.S. Internal Revenue Code of 1986, as amended from time to time, or any successor federal income tax code.

"**_Confidential Information_**" has the meaning set forth in Section 15.8(a).

"**_Consent_**" has the meaning set forth in Section 12.1.

"**_Controlling Person_**" means:

(a)     a Person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the Partnership's assets;

(b)     a Person (other than a Benefit Plan Investor) that provides investment advice for a fee (direct or indirect) with respect to the Partnership's assets; or

(c)     any "affiliate" (other than a Benefit Plan Investor) within the meaning of paragraph (f)(3) of the Plan Assets Regulation of such a Person described in clause (a) or (b).

"**_Converted Management Fee_**" has the meaning set forth in Section 5.6(e)(iii).

"**_Current Income_**" means, with respect to an Investment for any period, interest, dividend, management fee, and similar income from Investments held by the Partnership.

"**_Default Date_**" has the meaning set forth in Section 3.5(b).

"**_Default Loan_**" has the meaning set forth in Section 3.5(b).

"**_Default Notice_**" has the meaning set forth in Section 3.5(b).

"**_Default Portion_**" has the meaning set forth in Section 3.5(i).

"**_Defaulted Interest_**" has the meaning set forth in Section 3.5(c).

"**_Defaulting Investor_**" has the meaning set forth in Section 3.5(i).

"**_Defaulting Partner_**" has the meaning set forth in Section 3.5(b).

"**_Delaware Act_**" has the meaning set forth in Section 2.1.

"**_Delaware Arbitration Act_**" has the meaning set forth in Section 15.3.

"**_Disposition of an Interest_**" means, with respect to any Interest or any portion thereof, a sale, assignment, transfer, pledge, hypothecation, conveyance, gift, exchange or other disposition of such Interest, whether such disposition be voluntary, involuntary or by operation of law. A Disposition of an Interest shall not include a merger or consolidation of a Person or a conversion

of a Person into another type of Person, so long as the Persons holding a majority of the voting power of such Person immediately prior to such merger, consolidation or conversion continue to hold a majority of the voting power of such Person thereafter. A Disposition of an Interest shall include the following: (a) in the case of an asset owned by a Person, a Distribution of such asset in connection with the dissolution, liquidation, winding up or termination of such Person (unless, in the case of dissolution, such Person's business is continued without the commencement of liquidation or winding up); and (b) a disposition in connection with, or in lieu of, a foreclosure of an encumbrance. With respect to any Interest, "Dispose," "Disposed" and "Disposing" have correlative meanings.

"***Disposition of an Investment***" or "***Disposition***" with respect to an Investment means the sale, exchange, or other disposition by the Partnership of all or any portion of such Investment for cash or property, and shall include the receipt by the Partnership of a liquidating dividend or other like Distribution in cash on such Investment and shall also include the Distribution in-kind of all or any portion of that Investment.

"***Distributable Cash Flow***" has the meaning set forth in Section 4.1(b).

"***Distributions***" means and refers to amounts from time to time distributed to the Partners pursuant to Article IV and Article X.

"***Drawdown Amount***" has the meaning set forth in Section 3.3(a).

"***Drawdown Date***" has the meaning set forth in Section 3.3(a).

"***Drawdown Notice***" has the meaning set forth in Section 3.3(a).

"***Due Date***" means the date on which the Capital Contributions are due to the Partnership.

"***Economic Capital Account***" means, with respect to any Partner, such Partner's Capital Account as of the date of determination, after crediting to such Capital Account any amounts that the Partner is deemed obligated to restore under Treasury Regulations Section 1.704-2.

"***Effective Date***" has the meaning set forth in Section 2.1.

"***ERISA***" means the U.S. Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Limited Partner***" means:

(a) a Limited Partner that is or is deemed to be a Benefit Plan Investor and has notified the General Partner in writing of the same; or

(b) any Person to the extent that the General Partner has otherwise agreed in writing shall be treated as an ERISA Limited Partner.

"***ES***" means EquipmentShare.com Inc., a Delaware corporation.

"***Estimated Value Capital Account***" means, with respect to any Partner, the amount such Partner would receive in a hypothetical liquidation of the Partnership following a hypothetical sale of all of the assets of the Partnership at prices equal to their most recent Fair Values as determined in accordance with Section 5.3, and the Distribution of the proceeds thereof to the Partners pursuant to this Agreement (after the hypothetical payment of all actual Partnership Indebtedness, and any other liabilities related to the Partnership's assets, limited, in the case of non-recourse liabilities, to the collateral securing or otherwise available to satisfy such liabilities). The calculation of any Estimated Value Capital Account (including any valuation of the assets of the Partnership) shall be determined by the General Partner in its sole discretion.

"***Fair Value***" means the value of Partnership assets and Investments determined as provided in Section 5.3.

"***Feeder Fund***" means an entity formed by any Affiliate of the General Partner, or by any third party approved by the General Partner in its discretion, for the purpose of aggregating investor subscriptions that are intended for investment in the Partnership through such entity; unlike a Parallel Investment Vehicle that would invest side-by-side with the Partnership in an Aggregator Vehicle or an Investment.

"***Final Closing***" has the meaning set forth in Section 3.6(b)(i).

"***Final Closing Date***" means the date upon which the Final Closing occurs, which shall occur no later than eighteen (18) months following the Initial Closing Date.

"***First Limited Partners***" means each of EquipmentShare.com Inc., Arken LLC, and RC Opportunity LLC.

"***Fiscal Quarter***" means the calendar quarter or, in the case of the first and last fiscal quarters, the portion thereof commencing on the Initial Closing Date or ending on the date on which the winding up of the Partnership is completed, as the case may be.

"***Fiscal Year***" means the calendar year or, in the case of the first and the last fiscal years, the portion thereof commencing on the Initial Closing Date or ending on the date on which winding up of the Partnership is completed, as the case may be.

"***Fund***" means and refers to the business and assets of the Partnership, any Parallel Investment Vehicles and any Feeder Funds, and any of their Subsidiaries, taken as a whole.

"***Fund Agreement***" means this Agreement and the limited partnership agreement or limited liability company agreement of each other Parallel Investment Vehicle.

"***Fund Entity***" has the meaning set forth in Section 5.5(b).

"***General Partner***" means TKF II GP LLC, a Delaware limited liability company, in its capacity as general partner of the Partnership and/or any other Person which becomes a Successor General Partner as provided herein in such Person's capacity as a general partner of the Partnership.

"**Giveback**" has the meaning set forth in Section 6.2(a).

"**Good Faith**" means a Person having acted in a manner such Person believes to be in, or not opposed to, the best interests of the Fund.

"**GP and Manager Expenses**" has the meaning set forth in Section 5.6(c).

"**Gross Asset Value**" means, with respect to any Investment or other asset of the Partnership, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed (or deemed contributed) by a Partner to the Partnership shall be the fair market value of such asset at the time of such contribution, as determined by the General Partner in Good Faith.

(b)     The Gross Asset Value of any Partnership asset distributed (or deemed distributed) to a Partner shall be the fair market value of such asset on the date of Distribution as determined by the General Partner in Good Faith.

(c)     The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective fair market values, as determined by the General Partner in Good Faith using such reasonable method of valuation as it may adopt, which shall not require an appraisal, as of the times listed below (provided, however, that notwithstanding anything contained herein to the contrary, the Partners acknowledge and agree that the General Partner will not, unless required to do so by the Code or the Treasury Regulations promulgated thereunder or the General Partner determines to do so in its sole discretion, adjust the Gross Asset Values of Partnership assets upon the admission of any Additional Limited Partners to the Partnership on or before the Final Closing Date):

(i)     immediately prior to the acquisition of an additional Interest in the Partnership by a new or existing Partner in exchange for more than a *de minimis* amount of Capital Contributions, if it is determined by the General Partner in Good Faith that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(ii)     immediately prior to the Distribution by the Partnership to a Partner of more than a *de minimis* amount of the Partnership property as consideration for an Interest if it is determined by the General Partner in Good Faith that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(iii)     immediately prior to the liquidation of the Partnership within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

(iv)     immediately prior to such other times as the General Partner shall determine (in Good Faith, after consulting with Partnership counsel) to be necessary or advisable in order to comply with Treasury Regulations Section 1.704-1(b) and 1.704-2, including upon the transfer or vesting of a compensatory interest in the Partnership as provided in the Treasury Regulations;

(d)     The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or

Code Section 743(b), however, only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*); *provided*, *however*, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) to the extent that the General Partner determines that an adjustment pursuant to subparagraph (b) or (c) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

(e)     If the Gross Asset Value of a Partnership asset has been determined or adjusted pursuant to subparagraph (a), (c) or (d), such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"*Immediate Family Members*" of any Person, means the spouse, children (natural or adopted), brothers, sisters and parents of such Person.

"*Incapacity*" means, as to any Person, (i) the adjudication of incompetence or insanity, (ii) the filing of a voluntary petition in bankruptcy, the entry of an order of relief in any bankruptcy or insolvency proceeding or the entry of an order that such Person is a bankrupt or insolvent, (iii) any involuntary proceeding seeking liquidation, reorganization or other relief against such Person under any bankruptcy, insolvency or other similar law now or hereafter in effect that has not been dismissed 120 days after the commencement thereof, and (iv) the death, dissolution or termination (other than by merger or consolidation), as the case may be, of such Person.

"*Indebtedness*" means, with respect to any Person, (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property, goods or services, including reimbursement, and all other obligations contingent or otherwise of such Person with respect to repurchase agreements, surety bonds, letters of credit and bankers acceptances, whether or not matured, and hedges and other derivative contracts and financial instruments, (ii) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments and (iii) all indebtedness of others guaranteed by such Person (in each case, without duplication of any amount included pursuant to any other clause hereof). Notwithstanding anything to the contrary contained herein, neither any Investment by the Partnership nor any interest that is junior to the Partnership's interest in any Person, in each case, that would constitute Indebtedness pursuant to the preceding sentence, shall be considered Indebtedness for any purpose herein.

"*Indemnitee*" has the meaning set forth in Section 6.1(a).

"*Initial Closing*" means the first Closing at which a Limited Partner or Parallel Investment Vehicle Limited Partner (other than the Initial Limited Partner and the initial limited partner of any Parallel Investment Vehicle) was admitted and makes a Capital Contribution to the Fund.

"*Initial Closing Date*" means the date on which the Initial Closing was held.

"*Initial Limited Partner*" has the meaning set forth in the introduction to this Agreement.

"*Interest*" means the entire partnership interest owned by a Partner in the Partnership at any particular time, including such Partner's share of the profits and losses of the Partnership and the right to receive distributions of the Partnership's assets.

"**_Investment_**" means any debt or equity investment by the Partnership subject to the Investment Parameters whether directly or indirectly through one or more Persons.

"**_Investment Committee_**" has the meaning set forth in Section 7.1.

"**_Investment Company Act_**" means the Investment Company Act of 1940, as amended.

"**_Investment Parameters_**" means investments primarily in privately-held companies involved in the construction industry or companies that, in the General Partner's discretion, hold or may develop technology-based solutions relevant to the construction industry. The Fund will not invest in securities of any issuer that is not an existing portfolio company at the expiration of the Investment Period without the approval of the Advisory Committee.

"**_Investment Period_**" means the period commencing on the Initial Closing Date and ending on the earlier of (i) four (4) years after the Initial Closing Date and (ii) the date on which at least 70% of the aggregate amount of the Partners' Capital Commitments have been allocated; *provided*, that the General Partner may terminate the Investment Period early pursuant to the following occurrences:

(i) if the General Partner determines in its reasonable discretion that (a) after consulting with counsel, changes in applicable law have materially adversely affected the ability of the Partnership to achieve its investment objective, or (b) there are insufficient business opportunities consistent with the investment objectives of the Fund;

(ii) the day on which all Unused Capital Commitments have been drawn down, invested, committed or reserved; and

(iii) the date of any early termination of the Investment Period.

"**_Law Firms_**" has the meaning set forth in Section 15.17(a).

"**_Limited Exclusion Right_**" has the meaning set forth in Section 3.9(a).

"**_Limited Partner_**" means the Person(s) executing this Agreement or a counterpart signature page hereto as of the Initial Closing Date, and any other Person which becomes an Additional Limited Partner or a Substituted Limited Partner as provided herein, in such Person's capacity as a limited partner of the Partnership.

"**_Liquidating Trustee_**" has the meaning set forth in Section 10.2(a).

"**_Majority in Interest_**" means, as of any date of determination, Partners who are entitled to vote and who hold more than 50% of the Allocation Percentages held by Partners who are entitled to vote. In computing Majority in Interest, the Allocation Percentage held by the General Partner, the Manager, any Affiliated Limited Partners and any Defaulting Partners shall not be entitled to vote.

"**_Management Fee_**" has the meaning set forth in Section 5.6(a).

"**Management Fee Due Date**" has the meaning set forth in Section 5.6(b).

"**Management Agreement**" has the meaning set forth in Section 5.2(g).

"**Manager**" means Takeoff Capital LLC, a Delaware limited liability company, or any other entity (which may or may not be an Affiliate of the General Partner, Romulus Capital Management LLC or Mr. Neil Chheda) chosen by the General Partner from time to time to be the Manager.

"**Managing Members**" means, individually or collectively, as the context may require, (i) Mr. William Schlacks and Mr. Jabbok Schlacks, and (ii) any other Person designated as a Managing Member by the General Partner.

"**Non-Default Portion**" has the meaning set forth in Section 3.5(i).

"**Operating Expenses**" has the meaning set forth in Section 5.5(a).

"**Opportunity Fund**" means any entity formed by the General Partner or an Affiliate thereof (including any related parallel funds, alternate investment vehicles and similarly related investment vehicles, as well as all successor funds thereto) to make: growth and late stage investments in companies; investments in portfolio companies of the Partnership or other funds managed by the General Partner of amounts that exceed such funds' capacity or desire to invest; "special situation," "opportunity" and other investments involving higher valuations, different risk-return profiles, smaller available ownership percentage amounts, fewer or non-standard investor rights and reduced opportunities to serve on boards of directors than those sought by the Partnership; or investments that do not operate in the sectors of the technology industry in which the Partnership invests.

"**Organizational Expenses**" has the meaning set forth in Section 5.5(b).

"**Parallel Investment Vehicle**" has the meaning set forth in Section 2.9(a).

"**Parallel Investment Vehicle Commitment**" means, with respect to each Parallel Investment Vehicle Partner, the amount of its capital commitment reflected in the books and records of such Parallel Investment Vehicle at any time.

"**Parallel Investment Vehicle Limited Partner**" means any Person that is listed as a limited partner, member or other equity holder of a Parallel Investment Vehicle in the books and records of such Parallel Investment Vehicle.

"**Parallel Investment Vehicle Partner**" means the general partner, managing member or other acting manager, applicable, of a Parallel Investment Vehicle or any Parallel Investment Vehicle Limited Partner.

"**Partner Nonrecourse Debt Minimum Gain**" has the meaning given to it in Treasury Regulations Section 1.704-2(i)(3).

"***Partner Nonrecourse Deductions***" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"***Partners***" means the General Partner and the Limited Partners.

"***Partnership***" has the meaning set forth in the introduction to this Agreement.

"***Partnership Minimum Gain***" has the meaning given to it in Treasury Regulations Sections 1.704-2(d) and 1.704-2(g).

"***Partnership Representative***" has the meaning set forth in Section 14.8(a).

"***Payment Date***" has the meaning set forth in Section 6.2(a).

"***Permitted Purpose***" has the meaning set forth in Section 15.8(b).

"***Person***" means any individual, company, corporation, partnership, limited liability company, unincorporated organization or association, trust (including the trustees thereof in their capacity as such) or other entity.

"***Placement Fees***" if any, means (whether incurred before, on, or after the date hereof) all placement agent fees of any placement agent relating to the sale of Interests in the Fund, any Parallel Investment Vehicle or any Feeder Fund.

"***Plan Assets***" means "plan assets" within the meaning of the Plan Assets Regulation for purposes of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law.

"***Plan Assets Regulation***" means the U.S. Department of Labor "plan asset" regulation at 29 C.F.R. § 2510.3-101, as amended by Section 3(42) of ERISA, *et seq*., as amended.

"***Prime Rate***" means the annual rate of interest published in the Wall Street Journal from time to time as the "Prime Rate" or a comparable source selected by the General Partner in its reasonable discretion.

"***Private Placement Memorandum***" means that certain Confidential Private Placement Memorandum of the Fund pursuant to which Interests are being offered (as amended or supplemented from time to time).

"***Profits***" or "***Losses***" means, for each Fiscal Year or other period, except as provided herein, the net profit or net loss of the Partnership for "book" or Capital Account purposes pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv). Without limiting the generality of the preceding sentence, "Profits" or "Losses" means the taxable income or loss of the Partnership, or particular items thereof, determined in accordance with the accounting method used by the Partnership for United States federal income tax purposes (which shall be the accrual method unless otherwise required by law), with the following adjustments: (a) all items of income, gain, loss or deduction allocated other than pursuant to Section 4.7 shall not be taken into account in computing such taxable income or loss (however, the amount of such items available for allocation shall be determined by applying rules analogous to the rules set out in clauses (b) through (e) below); (b)

any income of the Partnership that is exempt from United States federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss; (c) if the Gross Asset Value of any asset differs from its adjusted tax basis for United States federal income tax purposes, then any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Gross Asset Value; (d) upon an adjustment to the Gross Asset Value of any asset (other than an adjustment in respect of depreciation, amortization or other cost recovery deductions) pursuant to the definition of Gross Asset Value, the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss; and (e) if the Gross Asset Value of any asset differs from its adjusted tax basis for United States federal income tax purposes, then the amount of the depreciation, amortization or cost recovery deduction with respect to such asset for purposes of determining Profits or Losses shall be an amount that bears the same ratio to such Gross Asset Value as the United States federal income tax depreciation, amortization or other cost recovery deduction bears to such adjusted tax basis; *provided*, that if the United States federal income tax depreciation, amortization or other cost recovery deduction is zero, then the General Partner may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Profits or Losses.

"*Prohibited Limited Partner*" means any Person who is (i) a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization," or "blocked person" within the definitions set forth in the Foreign Assets Control Regulations of the United States Treasury Department, (ii) acting on behalf of, or a Person owned or controlled by, any government against whom the United States maintains economic sanctions or embargoes under the Regulations of the United States Treasury Department, including, but not limited to, the "Government of Sudan," the "Government of Iran," and the "Government of Libya," (iii) within the scope of Executive Order 13224 — Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001 or (iv) subject to additional restrictions imposed by the following statutes (or regulations and executive orders issued thereunder): the Trading with the Enemy Act, the National Emergencies Act, the Antiterrorism and Effective Death Penalty Act of 1996, the International Emergency Economic Powers Act, the United Nations Participation Act, the International Security and Development Cooperation Act, the Nuclear Proliferation Prevention Act of 1994, the Foreign Narcotics Kingpin Designation Act, the Iran and Libya Sanctions Act of 1996, the Cuban Democracy Act, the Cuban Liberty and Democratic Solidarity Act, and the Foreign Operations, Export Financing, and Related Programs Appropriations Act, or any other law of similar import, as each such act or law has been or may be amended, supplemented, adjusted, modified, or reviewed from time to time.

"*Proposal*" has the meaning set forth in Section 15.13.

"*Proposed Assignee*" has the meaning set forth in Section 9.1(f).

"*Rule 506(d) Covered Person*" has the meaning set forth in Section 15.20.

"*Safe Harbor*" has the meaning set forth in Section 14.9(a).

"*Safe Harbor Election*" has the meaning set forth in Section 14.9(a).

"**_Securities Act_**" means the United States Securities Act of 1933, as amended.

"**_Several Interest Election_**" means a written election made by a Limited Partner, and accepted by the General Partner in its reasonable discretion, pursuant to which the General Partner shall treat the Interest held by such Limited Partner as if it were held by more than one Limited Partner as expressly provided herein.

"**_Side Letters_**" has the meaning set forth in Section 15.5.

"**_Similar Law_**" means a U.S. federal, state, local, non-U.S. or other law or regulation that is substantially similar to the Plan Assets Regulation or otherwise provides that the Partnership's assets could be deemed to include "plan assets" under such a law or regulation and/or thereby subject the Partnership to a U.S. federal, state, local, non-U.S. or other law or regulation that is substantially similar to the fiduciary responsibility and prohibited transaction provisions of Title I of ERISA or Section 4975 of the Code.

"**_Single Partnership Assumption_**" has the meaning set forth in Section 2.10.

"**_Subscription Agreement_**" means the Subscription Agreement among the General Partner, the Limited Partner and the Partnership pursuant to which such Limited Partner has subscribed for and purchased Interests in the Partnership, including the investor questionnaire attached to such Subscription Agreement as completed by such Limited Partner prior to the Partnership's acceptance of the Limited Partner's subscription.

"**_Subsequent Closing_**" has the meaning set forth in Section 3.6(b)(i).

"**_Subsequent Closing Partner_**" means an Additional Limited Partner admitted at a Subsequent Closing or an existing Partner that is increasing its Capital Commitment at a Subsequent Closing.

"**_Subsequent Fund_**" has the meaning set forth in Section 5.4(g).

"**_Substantial Investment Date_**" has the meaning set forth in Section 5.4(g).

"**_Subsidiary_**" has the meaning set forth in Section 2.4.

"**_Substituted Limited Partner_**" means any Person admitted to the Partnership as a substitute limited partner pursuant to the provisions of Section 9.3.

"**_Successor General Partner_**" means any Person that is admitted as a general partner of the Partnership in accordance with all of the term and conditions of this Agreement to succeed TKF II GP LLC or its successors.

"**_Super Majority-in-Interest_**" means, as of any date of determination, Partners who are entitled to vote and who hold more than 66-2/3% of the Allocation Percentage held by Partners who are entitled to vote. In computing Super Majority-in-Interest, the Allocation Percentages held by the General Partner, the Manager, or any Affiliated Limited Partners and the Allocation Percentages held by any Defaulting Partners shall not be entitled to vote.

"**_Target Balance_**" means, with respect to any Partner as of the close of any period for which allocations are made under Article IV, the amount such Partner would receive (or be required to contribute) in a hypothetical liquidation of the Partnership as of the close of such period, assuming for purposes of such hypothetical liquidation:

(a)     a sale of all of the assets of the Partnership at prices equal to their then Gross Asset Values (taking into account only those revaluations of Gross Asset Values actually made by the General Partner prior to such hypothetical sale);

(b)     the distribution of the net proceeds thereof to the Partners pursuant to Section 4.2 (after the payment of all actual Partnership Indebtedness, and any other liabilities related to the Partnership's operations and assets, limited, in the case of nonrecourse liabilities, to the collateral securing or otherwise available to satisfy such liabilities); and

(c)     the contribution by all Partners of any Unused Capital Commitments as needed to satisfy any credit facility secured by the Capital Commitments described in this Agreement and the contribution by the General Partner of amounts needed to satisfy any remaining Partnership liabilities for which the General Partner would be liable.

"**_Target Amount_**" has the meaning set forth in Section 4.7(e).

"**_Tax Distribution Amount_**" has the meaning set forth in Section 4.4.

"**_Term_**" has the meaning set forth in Section 2.6.

"**_Transfer_**" means any sale, exchange, transfer (including any mortgage, hypothecation or pledge), assignment or other disposition.

"**_UBTI_**" has the meaning set forth in Section 4.11.

"**_Unreturned Capital_**" means, with respect to each Partner, as of the date of determination, an amount equal to the excess of such Partner's Capital Contributions made by such Partner over the amount previously distributed to such Partner pursuant to Section 4.2(b) or deemed distributed to such Partner hereunder.

"**_Unused Capital Commitments_**" means, with respect to any Partner and as of any date of determination, the amount of such Partner's Capital Commitment _minus_ the amount of all Capital Contributions made by that Partner as of such date _plus_ the amount of Capital Contributions that are returned to the Partners.

"**_Withdrawal Date_**" has the meaning set forth in Section 3.10(a).

"**_Withholding Payment_**" has the meaning set forth in Section 4.5.

# Exhibit 2

# OPTION AGREEMENT

THIS OPTION AGREEMENT dated as of December <u>31</u>, 2020 (the "Agreement") is by and among Jabbok Schlacks ("Seller") and Schlacks 2020 Transfer LLC ("Buyer").

**WHEREAS**, the Seller desires to grant to the Buyer and the Buyer desires to acquire from the Seller, an option to acquire shares of common stock (the "Common Stock") of EquipmentShare.com Inc., a Delaware corporation (the "Company") following a similar larger grant to Seller by Company, all in connection with services to be provided to the Company by or on behalf of Buyer;

**NOW THEREFORE**, in consideration for the foregoing and the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto hereby agree as follows:

1.      Option Right.

    (a)      It is anticipated that following the date hereof, the Seller will receive a grant of 767,196 shares of Common Stock (or options to purchase shares of Common Stock) (the "Award Shares") pursuant to an award agreement (the "Grant Agreement") with the Company, which Grant Agreement will provide for vesting conditions on the acquisition or retention of such Award Shares essentially similar to those set forth on Exhibit A hereto (such vesting conditions as set forth in the Grant Agreement, the "Vesting Conditions") and an exercise price to be paid to the Company to acquire such Award Shares (the "Per Share Exercise Price"). Seller shall notify Buyer promptly upon receipt by Seller of the Grant Agreement, providing a copy thereof.

    (b)      Subject to the terms and conditions of this Agreement, the Seller hereby grants the Buyer the right to acquire (the "Option Right") from time to time up to 255,732 shares (the "Option Shares") of Common Stock of the Company from Seller, subject to the terms and conditions of this Agreement including vesting provisions.

2.      Exercise of Option Right.

    (a)      The Option Right shall vest and become exercisable for tranches of Option Shares (such shares becoming "Vested Options Shares") at the time as the Vesting Condition for such tranche is satisfied for the corresponding Award Shares. Seller shall notify Buyer promptly each time any Vesting Conditions are so satisfied. The Buyer may purchase from Seller from time to time, pursuant to the terms hereof, the Vested Options Shares by notice to the Seller together with tender of payment in cash (by wire transfer, certified check or official bank check) of the Per Share Exercise Price for each such Vested Option Share (such transaction being referred to as a "Sale Closing"). The Sale Closing shall occur promptly following such notification and tender of payment by Buyer. For avoidance of doubt, the Option Right may be exercised at any time or from time to time with respect to all or any portions of the Vested Option Shares, and such right shall continue to be exercisable through the term of exercisability under the Grant Agreement (such time or event causing termination, a "Termination Event").

    (b)      If upon a Termination Event there are unexercised Option Shares, unless otherwise elected by the Buyer, the Option Right shall be deemed automatically exercised in full, immediately prior to the Termination Event and with no notice or consent required by Buyer, and

without the need for payment by Seller, but for the number of Option Shares computed using the following formula (such calculation, the "Cashless Exercise Computation"):

$$X = \frac{Y(A-B)}{A}$$

Where

X =     the number of Options Shares to be issued to Buyer

Y =     the number of Vested Options Shares (including those which vest in connection with the Termination Event or prior to that event) but with respect to which Buyer had not yet exercised under Section 2(a)

A =     is the value per share of Common Stock being received by the stockholders of Company as a result of the Termination Event

B =     Per Share Exercise Price (as adjusted to the date of such calculation)

3.      Adjustment of Option Right

(a)     Whenever Company shall (i) pay a dividend on Common Stock in shares of its Common Stock, (ii) subdivide its outstanding shares of Common Stock, (iii) combine its outstanding shares of Common Stock into a smaller number of shares, or (iv) issue any shares by reclassification of its shares of Common Stock, the number of Option Shares and the Per Share Exercise Price shall be equitably adjusted as of the payment date of such dividend or the effective date of such subdivision, combination or reclassification.

(b)     In the event that at any time, as a result of an adjustment made pursuant to this Section 3 Buyer shall become entitled, upon exercise hereof, to receive any shares of other than shares of Common Stock, then thereafter the number of such other shares so receivable upon exercise of the Option Right shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions contained in this Section 3 in respect of the Common Stock.

(c)     If Company shall be consolidated with or merged with or into another corporation (whether or not Company shall be the surviving entity), or shall sell or exchange all or substantially all of its assets, or shall reclassify or reorganize its capital structure (except a stock dividend, split or combination covered by Section 3(a)), the Option Right shall (subject to automatic exercise under Section 2(b) in the case of any such transaction which is a Termination Event) be exercisable, on the terms and conditions hereof, for the number of shares of stock or other securities or properties to which Buyer of the number of shares of Common Stock issuable upon exercise of the Option Right would have been entitled if they had been issued and held by Buyer on the record date for determining who is entitled to such other stock, securities or properties.

(d)     If any capital reorganization or reclassification of the Common Stock of Company (other than those covered by Section 3(a)), or consolidation or merger of Company with another corporation, or the sale of all or substantially all of its assets to another corporation, shall

2

be effected in such a way that holders of the Common Stock shall be entitled to receive stock, securities or assets with respect to or in exchange for the Common Stock, then, as a condition of such reorganization, reclassification, consolidation, merger or sale, Company or such successor, surviving or purchasing corporation, as the case may be, shall agree that Buyer shall have the right, upon the exercise of the Option Right, to receive the kind and amount of stock, securities or assets receivable upon such reorganization, reclassification, consolidation, merger or sale by a holder of the number of shares of the Common Stock issuable upon exercise of the Option Right immediately prior to such reorganization, reclassification, consolidation, merger or sale, subject to adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 3 (subject to automatic exercise under Section 2(b) in the case of any such transaction which is a Termination Event).

4.    Seller hereby represents and warrants to the Buyer as follows:

(a)    Seller has full power and authority to execute and deliver this Agreement and to perform Seller's obligations hereunder within the rights that apply to the sellers stock.  This Agreement constitutes the valid and legally binding obligation of Seller, enforceable in accordance with its terms.  Seller need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

(b)    Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Seller is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which Seller is bound or to which any of Seller's assets is subject.

(c)    Seller is the sole record and beneficial owner of the Option Shares sold at the Sale Closing and has full legal right to sell, assign and transfer the Option Shares to the Buyer and will, upon delivery of the Option Shares to the Buyer pursuant to the terms hereof and the Buyer's payment hereunder, transfer to the Buyer good and valid title to the Option Shares free and clear of any lien, security interest, charge, encumbrance, adverse claim, or voting agreement, trust proxy or other agreement relating to voting of the Option Shares.

(d)    Seller will at all times ensure that the Option Shares as from time to time shall be receivable upon the exercise of the Option Right, are free and clear of all restrictions on sale or transfer to the Buyer and free and clear of all preemptive rights.

(e)    Seller has not employed the services of a broker or finder in connection with this Agreement or any of the transactions contemplated hereby.

(f)    There are no representations, warranties, agreements or undertakings of the Buyer with respect to the transactions contemplated by this Agreement other than those set forth in this Agreement.

5.    The Buyer hereby represents and warrants to Seller as follows:

3

(a)     The Buyer has full power and authority to execute and deliver this Agreement and to perform their obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Buyer, enforceable in accordance with its terms.  The Buyer need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

(b)     Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Buyer is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Buyer is a party or by which they are bound or to which any of their assets are subject.

(c)     The Buyer has not employed the services of a broker or finder in connection with this Agreement or any of the transactions contemplated hereby.

(d)     There are no representations, warranties, agreements or undertakings of the Seller with respect to the transactions contemplated by this Agreement other than those set forth in this Agreement.

(e)     The Buyer is an "accredited investor" within the meaning of Rule 501 of the Securities Act.  The Buyer is purchasing Option Shares for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof.  The Buyer is able to bear the economic risk of an investment in the Company for an indefinite period of time and is aware that the transfer of all or any part of the Option Shares may not be possible because Option Shares have not been registered under the Securities Act or any applicable state or foreign securities laws and, therefore, cannot be sold unless subsequently registered under the Securities Act and such applicable state securities laws or an exemption from such registration is available.

6.     Each party understand that execution of this Agreement and receipt of amounts referred to hereunder may result in federal or state income tax consequences to such party.  Neither party is not providing the other party with any tax or legal advice regarding this Agreement.  Each party is responsible for any federal, state or other tax consequences to such party.

7.     All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by facsimile transmission, or sent, postage prepaid, by registered, certified or express mail, or reputable overnight courier service, and shall be deemed given when so delivered by hand or facsimile transmission, or if mailed, three days after mailing (one business day in the case of express mail or overnight courier service) to the address set forth on the signature pages hereto.

8.     This Agreement may be modified or amended only by a written agreement signed by all parties.

9.      This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute a single instrument.  This Agreement may be executed by signatures delivered by facsimile transmission.

10.     This agreement shall be deemed to be made under, and shall be construed in accordance with the laws of the State of Delaware, without giving effect to conflict of laws principles thereof.

11.     Except as set forth herein, no party shall convey, assign or otherwise transfer any of its rights or obligations under this Agreement without the express written consent of the other parties.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12.     The parties agree to execute such further instruments and to take such further action as may reasonably be necessary to carry out the intent of this Agreement.

1209321.9

This Agreement is executed and delivered by the Seller and Buyer on the date first set forth above.

"SELLER"

*Jabbok Schlacks*

_____

Jabbok Schlacks

<mark>Address:</mark> ████████

1209321.9

**"BUYER"**

**SCHLACKS 2020 TRANSFER LLC**

By: _Neil Chheda_

<mark>Address:</mark> ███████
Boston MA 02110

Exhibit A – Vesting Conditions

- Option Shares will vest on the following basis corresponding to the vesting under the Equity Bonus Plan approved by the Board of Directors of the Company on or about December __, 2020:

  o   42,622 shares (20% of "base shares") on date of grant under the Grant Agreement

  o   64,933 shares (30% of "base shares") at such time as the Company achieve Valuation of no less than $2 billion

  o   53,278 shares (25% of "base shares") at such time as the Company achieve a Valuation of no less than $3 billion

  o   53,277 shares (25% of "base share") at such time as the Company achieve a Valuation of no less than $4 billion, in each case, provided that such Valuation is achieved on or before December 31, 2023.

  o   42,622 shares ("bonus shares") in the event that a Deemed Liquidation Event or an IPO occurs on or prior to December 31, 2022 in excess of a Valuation to be determined by the Board of Directors of the Company under the Equity Bonus Plan

  o   "Valuation" for the purposes of this Exhibit A shall mean (a) upon a Deemed Liquidation Event (as defined in the Restated Certificate of the Company), the value of the aggregate consideration payable to equity holders of the Company in connection with such Deemed Liquidation Event (including any amounts subject to escrow, earn-out or similar arrangement) after satisfaction of indebtedness or expenses of the Company, as determined by the Board of Directors of the Company in connection with the Equity Bonus Plan or (b) upon an IPO (as defined in the Restated Certificate), the pre- money valuation of such IPO.

("base shares" and "bonus shares" refer to the different pools of shares specified in the Equity Bonus Plan)

# OPTION AGREEMENT

THIS OPTION AGREEMENT dated as of December 31, 2020 (the "Agreement") is by and among William J. Schlacks ("Seller") and Schlacks 2020 Transfer LLC ("Buyer").

**WHEREAS**, the Seller desires to grant to the Buyer and the Buyer desires to acquire from the Seller, an option to acquire shares of common stock (the "Common Stock") of EquipmentShare.com Inc., a Delaware corporation (the "Company") following a similar larger grant to Seller by Company, all in connection with services to be provided to the Company by or on behalf of Buyer;

**NOW THEREFORE**, in consideration for the foregoing and the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto hereby agree as follows:

1.  Option Right.

     (a)     It is anticipated that following the date hereof, the Seller will receive a grant of 767,196 shares of Common Stock (or options to purchase shares of Common Stock) (the "Award Shares") pursuant to an award agreement (the "Grant Agreement") with the Company, which Grant Agreement will provide for vesting conditions on the acquisition or retention of such Award Shares essentially similar to those set forth on Exhibit A hereto (such vesting conditions as set forth in the Grant Agreement, the "Vesting Conditions") and an exercise price to be paid to the Company to acquire such Award Shares (the "Per Share Exercise Price"). Seller shall notify Buyer promptly upon receipt by Seller of the Grant Agreement, providing a copy thereof.

     (b)     Subject to the terms and conditions of this Agreement, the Seller hereby grants the Buyer the right to acquire (the "Option Right") from time to time up to 255,732 shares (the "Option Shares") of Common Stock of the Company from Seller, subject to the terms and conditions of this Agreement including vesting provisions.

2.  Exercise of Option Right.

     (a)     The Option Right shall vest and become exercisable for tranches of Option Shares (such shares becoming "Vested Options Shares") at the time as the Vesting Condition for such tranche is satisfied for the corresponding Award Shares. Seller shall notify Buyer promptly each time any Vesting Conditions are so satisfied. The Buyer may purchase from Seller from time to time, pursuant to the terms hereof, the Vested Options Shares by notice to the Seller together with tender of payment in cash (by wire transfer, certified check or official bank check) of the Per Share Exercise Price for each such Vested Option Share (such transaction being referred to as a "Sale Closing"). The Sale Closing shall occur promptly following such notification and tender of payment by Buyer. For avoidance of doubt, the Option Right may be exercised at any time or from time to time with respect to all or any portions of the Vested Option Shares, and such right shall continue to be exercisable through the term of exercisability under the Grant Agreement (such time or event causing termination, a "Termination Event").

     (b)     If upon a Termination Event there are unexercised Option Shares, unless otherwise elected by the Buyer, the Option Right shall be deemed automatically exercised in full, immediately prior to the Termination Event and with no notice or consent required by Buyer, and

without the need for payment by Seller, but for the number of Option Shares computed using the following formula (such calculation, the "Cashless Exercise Computation"):

$$X = \frac{Y(A-B)}{A}$$

Where

X =     the number of Options Shares to be issued to Buyer

Y =     the number of Vested Options Shares (including those which vest in connection with the Termination Event or prior to that event) but with respect to which Buyer had not yet exercised under Section 2(a)

A =     is the value per share of Common Stock being received by the stockholders of Company as a result of the Termination Event

B =     Per Share Exercise Price (as adjusted to the date of such calculation)

3.      Adjustment of Option Right

(a)     Whenever Company shall (i) pay a dividend on Common Stock in shares of its Common Stock, (ii) subdivide its outstanding shares of Common Stock, (iii) combine its outstanding shares of Common Stock into a smaller number of shares, or (iv) issue any shares by reclassification of its shares of Common Stock, the number of Option Shares and the Per Share Exercise Price shall be equitably adjusted as of the payment date of such dividend or the effective date of such subdivision, combination or reclassification.

(b)     In the event that at any time, as a result of an adjustment made pursuant to this Section 3 Buyer shall become entitled, upon exercise hereof, to receive any shares of other than shares of Common Stock, then thereafter the number of such other shares so receivable upon exercise of the Option Right shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions contained in this Section 3 in respect of the Common Stock.

(c)     If Company shall be consolidated with or merged with or into another corporation (whether or not Company shall be the surviving entity), or shall sell or exchange all or substantially all of its assets, or shall reclassify or reorganize its capital structure (except a stock dividend, split or combination covered by Section 3(a)), the Option Right shall (subject to automatic exercise under Section 2(b) in the case of any such transaction which is a Termination Event) be exercisable, on the terms and conditions hereof, for the number of shares of stock or other securities or properties to which Buyer of the number of shares of Common Stock issuable upon exercise of the Option Right would have been entitled if they had been issued and held by Buyer on the record date for determining who is entitled to such other stock, securities or properties.

(d)     If any capital reorganization or reclassification of the Common Stock of Company (other than those covered by Section 3(a)), or consolidation or merger of Company with another corporation, or the sale of all or substantially all of its assets to another corporation, shall

2

be effected in such a way that holders of the Common Stock shall be entitled to receive stock, securities or assets with respect to or in exchange for the Common Stock, then, as a condition of such reorganization, reclassification, consolidation, merger or sale, Company or such successor, surviving or purchasing corporation, as the case may be, shall agree that Buyer shall have the right, upon the exercise of the Option Right, to receive the kind and amount of stock, securities or assets receivable upon such reorganization, reclassification, consolidation, merger or sale by a holder of the number of shares of the Common Stock issuable upon exercise of the Option Right immediately prior to such reorganization, reclassification, consolidation, merger or sale, subject to adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 3 (subject to automatic exercise under Section 2(b) in the case of any such transaction which is a Termination Event).

4.     Seller hereby represents and warrants to the Buyer as follows:

(a)     Seller has full power and authority to execute and deliver this Agreement and to perform Seller's obligations hereunder within the rights that apply to the sellers stock.  This Agreement constitutes the valid and legally binding obligation of Seller, enforceable in accordance with its terms.  Seller need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

(b)     Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Seller is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which Seller is bound or to which any of Seller's assets is subject.

(c)     Seller is the sole record and beneficial owner of the Option Shares sold at the Sale Closing and has full legal right to sell, assign and transfer the Option Shares to the Buyer and will, upon delivery of the Option Shares to the Buyer pursuant to the terms hereof and the Buyer's payment hereunder, transfer to the Buyer good and valid title to the Option Shares free and clear of any lien, security interest, charge, encumbrance, adverse claim, or voting agreement, trust proxy or other agreement relating to voting of the Option Shares.

(d)     Seller will at all times ensure that the Option Shares as from time to time shall be receivable upon the exercise of the Option Right, are free and clear of all restrictions on sale or transfer to the Buyer and free and clear of all preemptive rights.

(e)     Seller has not employed the services of a broker or finder in connection with this Agreement or any of the transactions contemplated hereby.

(f)     There are no representations, warranties, agreements or undertakings of the Buyer with respect to the transactions contemplated by this Agreement other than those set forth in this Agreement.

5.     The Buyer hereby represents and warrants to Seller as follows:

3

(a)     The Buyer has full power and authority to execute and deliver this Agreement and to perform their obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Buyer, enforceable in accordance with its terms. The Buyer need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

(b)     Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Buyer is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Buyer is a party or by which they are bound or to which any of their assets are subject.

(c)     The Buyer has not employed the services of a broker or finder in connection with this Agreement or any of the transactions contemplated hereby.

(d)     There are no representations, warranties, agreements or undertakings of the Seller with respect to the transactions contemplated by this Agreement other than those set forth in this Agreement.

(e)     The Buyer is an "accredited investor" within the meaning of Rule 501 of the Securities Act. The Buyer is purchasing Option Shares for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof. The Buyer is able to bear the economic risk of an investment in the Company for an indefinite period of time and is aware that the transfer of all or any part of the Option Shares may not be possible because Option Shares have not been registered under the Securities Act or any applicable state or foreign securities laws and, therefore, cannot be sold unless subsequently registered under the Securities Act and such applicable state securities laws or an exemption from such registration is available.

6.     Each party understand that execution of this Agreement and receipt of amounts referred to hereunder may result in federal or state income tax consequences to such party. Neither party is not providing the other party with any tax or legal advice regarding this Agreement. Each party is responsible for any federal, state or other tax consequences to such party.

7.     All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by facsimile transmission, or sent, postage prepaid, by registered, certified or express mail, or reputable overnight courier service, and shall be deemed given when so delivered by hand or facsimile transmission, or if mailed, three days after mailing (one business day in the case of express mail or overnight courier service) to the address set forth on the signature pages hereto.

8.     This Agreement may be modified or amended only by a written agreement signed by all parties.

9.      This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute a single instrument.  This Agreement may be executed by signatures delivered by facsimile transmission.

10.     This agreement shall be deemed to be made under, and shall be construed in accordance with the laws of the State of Delaware, without giving effect to conflict of laws principles thereof.

11.     Except as set forth herein, no party shall convey, assign or otherwise transfer any of its rights or obligations under this Agreement without the express written consent of the other parties.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12.     The parties agree to execute such further instruments and to take such further action as may reasonably be necessary to carry out the intent of this Agreement.

1209321.9

This Agreement is executed and delivered by the Seller and Buyer on the date first set forth above.

"SELLER"

_____
William J. Schlacks

Address:

**"BUYER"**

**SCHLACKS 2020 TRANSFER LLC**

By: *Neil Chheda* _____

<mark>Address:</mark> ███████
Boston MA 02110

Exhibit A – Vesting Conditions

- Option Shares will vest on the following basis corresponding to the vesting under the Equity Bonus Plan approved by the Board of Directors of the Company on or about December __, 2020:

  o 42,622 shares (20% of "base shares") on date of grant under the Grant Agreement

  o 64,933 shares (30% of "base shares") at such time as the Company achieve Valuation of no less than $2 billion

  o 53,278 shares (25% of "base shares") at such time as the Company achieve a Valuation of no less than $3 billion

  o 53,277 shares (25% of "base share") at such time as the Company achieve a Valuation of no less than $4 billion, in each case, provided that such Valuation is achieved on or before December 31, 2023.

  o 42,622 shares ("bonus shares") in the event that a Deemed Liquidation Event or an IPO occurs on or prior to December 31, 2022 in excess of a Valuation to be determined by the Board of Directors of the Company under the Equity Bonus Plan

  o "Valuation" for the purposes of this Exhibit A shall mean (a) upon a Deemed Liquidation Event (as defined in the Restated Certificate of the Company), the value of the aggregate consideration payable to equity holders of the Company in connection with such Deemed Liquidation Event (including any amounts subject to escrow, earn-out or similar arrangement) after satisfaction of indebtedness or expenses of the Company, as determined by the Board of Directors of the Company in connection with the Equity Bonus Plan or (b) upon an IPO (as defined in the Restated Certificate), the pre- money valuation of such IPO.

("base shares" and "bonus shares" refer to the different pools of shares specified in the Equity Bonus Plan)

# Exhibit 3

**AMENDMENT NO. 1. TO OPTION AGREEMENT**

AMENDMENT NO. 1 ("Amendment") dated as of June 16, 2021 ("Amendment No. 1 Effective Date") to the Option Agreement ("Agreement") dated as of December 31, 2020 by and between Jabbok Schlacks ("Seller") and Schlacks 2020 Transfer LLC ("Buyer").

WHEREAS, the parties desire to amend the Agreement to conform to revised vesting condition relating to the option to acquire shares of common stock (the "Common Stock") of EquipmentShare.com Inc., a Delaware corporation (the "Company") and make other corresponding adjustments.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for such other good and valuable consideration, the sufficiency of which is hereby acknowledged by the parties hereto, the parties agree as follows:

1.      Exhibit A of the Agreement (describing the vesting conditions) is hereby amended and restated in full as set forth in Exhibit A hereto.

2.      The parties confirm that the Per Share Option Price is $33.77 per share, which is set to be the fair market value of the shares based on a 409A valuation obtained recently.

3.      In connection with any exercise of the Option Right by the Buyer, Seller may incur tax liability based on the exercise of the option to acquire the corresponding Award Shares. Accordingly, Buyer will, in addition to the payment of the applicable Per Share Option Price, pay to Seller an amount equal to the aggregate amount of tax incurred by the Seller attributable to exercise of the option and the transfer to Buyer of the Option Shares acquired by Buyer from Seller (taking into account any deduction, exemption or offset of basis that Seller can utilize with respect to such transaction). Seller and Buyer will cooperate in ensuring that any required consent, waiver or other action to minimize any such tax is obtained and the tax rate applicable to Seller in the acquisition and transfer of shares to Buyer is no greater than the tax rate to be incurred by Seller in exercising and liquidating Seller's own corresponding Award Shares. Seller will provide Buyer on request documentation with respect to the amount of actual tax so incurred by Seller. Other than as set forth in this Section 3, each party is responsible for all taxes incurred by such party in connection with the Agreement, and neither party has an obligation to indemnify the other party for any such taxes.

4.      The parties acknowledge that in connection with the anticipated initial exercise of the Option Right by Buyer on or about the time of this Amendment, the fair market value of the Option Shares is equal to the Per Share Option Price and as the Seller intends to deliver shares acquired by exercise of the option granted to Seller (and not previously acquired shares) it is anticipated that Seller will not incur any tax liability in such initial transaction and Buyer will accordingly not need to make any tax payment with respect to any tax liability for the initial transaction.

5.      Precedence. In the event of any inconsistencies between this Amendment and the Agreement, the terms of this Amendment shall be controlling. Except as expressly modified herein, all other provisions of the Agreement shall remain in full force and effect.

**[signature page follows]**

1240191.5

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed by their respective duly authorized representatives as of the Amendment No. 1 Effective Date.

==Jabbok Schlacks==

By _____
Name:
Title:


Schlacks 2020 Transfer LLC


By _____
Name:
Title:

1240191.5

Exhibit A – Vesting Conditions

Option Shares will vest on the following basis:

105,490 Option Shares will vest on June 17, 2021.

Another 105,489 Option Shares will vest at such time as the Company achieves a Valuation of no less than $4 billion, provided that such Valuation is achieved on or before June 30, 2024 (unless the Company has not filed an S1 as of March 31, 2024 in which case such Valuation must have been achieved in each case as of March 31, 2024). 'Valuation' for the purposes of this Exhibit A shall mean (a) upon a Deemed Liquidation Event (as defined in the Restated Charter), the value of the aggregate consideration payable to equity holders of the Company in connection with such Deemed Liquidation Event (including any amounts subject to escrow, earn-out or similar arrangement) after satisfaction of indebtedness or expenses of the Company, as determined by the Board in its sole discretion or (b) upon an IPO (meaning when the shares of the Company are listed on a public exchange), the premoney valuation of such IPO.

## AMENDMENT NO. 1. TO OPTION AGREEMENT

AMENDMENT NO. 1 ("Amendment") dated as of June 16, 2021 ("Amendment No. 1 Effective Date") to the Option Agreement ("Agreement") dated as of December 31, 2020 by and between ==William J. Schlacks== ("Seller") and Schlacks 2020 Transfer LLC ("Buyer").

WHEREAS, the parties desire to amend the Agreement to conform to revised vesting condition relating to the option to acquire shares of common stock (the "Common Stock") of EquipmentShare.com Inc., a Delaware corporation (the "Company") and make other corresponding adjustments.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for such other good and valuable consideration, the sufficiency of which is hereby acknowledged by the parties hereto, the parties agree as follows:

1.      Exhibit A of the Agreement (describing the vesting conditions) is hereby amended and restated in full as set forth in Exhibit A hereto.

2.      The parties confirm that the Per Share Option Price is $33.77 per share, which is set to be the fair market value of the shares based on a 409A valuation obtained recently.

3.      In connection with any exercise of the Option Right by the Buyer, Seller may incur tax liability based on the exercise of the option to acquire the corresponding Award Shares. Accordingly, Buyer will, in addition to the payment of the applicable Per Share Option Price, pay to Seller an amount equal to the aggregate amount of tax incurred by the Seller attributable to exercise of the option and the transfer to Buyer of the Option Shares acquired by Buyer from Seller (taking into account any deduction, exemption or offset of basis that Seller can utilize with respect to such transaction). Seller and Buyer will cooperate in ensuring that any required consent, waiver or other action to minimize any such tax is obtained and the tax rate applicable to Seller in the acquisition and transfer of shares to Buyer is no greater than the tax rate to be incurred by Seller in exercising and liquidating Seller's own corresponding Award Shares. Seller will provide Buyer on request documentation with respect to the amount of actual tax so incurred by Seller. Other than as set forth in this Section 3, each party is responsible for all taxes incurred by such party in connection with the Agreement, and neither party has an obligation to indemnify the other party for any such taxes.

4.      The parties acknowledge that in connection with the anticipated initial exercise of the Option Right by Buyer on or about the time of this Amendment, the fair market value of the Option Shares is equal to the Per Share Option Price and as the Seller intends to deliver shares acquired by exercise of the option granted to Seller (and not previously acquired shares) it is anticipated that Seller will not incur any tax liability in such initial transaction and Buyer will accordingly not need to make any tax payment with respect to any tax liability for the initial transaction.

1240191.5

5.     Precedence.  In the event of any inconsistencies between this Amendment and the Agreement, the terms of this Amendment shall be controlling.  Except as expressly modified herein, all other provisions of the Agreement shall remain in full force and effect.

**[signature page follows]**

2

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed by their respective duly authorized representatives as of the Amendment No. 1 Effective Date.

<mark>William J. Schlacks</mark>

By _____
Name:
Title:

Schlacks 2020 Transfer LLC

By _____
Name:
Title:

1240191.5

Exhibit A – Vesting Conditions

Option Shares will vest on the following basis:

105,490 Option Shares will vest on June 17, 2021.

Another 105,489 Option Shares will vest at such time as the Company achieves a Valuation of no less than $4 billion, provided that such Valuation is achieved on or before June 30, 2024 (unless the Company has not filed an S1 as of March 31, 2024 in which case such Valuation must have been achieved in each case as of March 31, 2024). 'Valuation' for the purposes of this Exhibit A shall mean (a) upon a Deemed Liquidation Event (as defined in the Restated Charter), the value of the aggregate consideration payable to equity holders of the Company in connection with such Deemed Liquidation Event (including any amounts subject to escrow, earn-out or similar arrangement) after satisfaction of indebtedness or expenses of the Company, as determined by the Board in its sole discretion or (b) upon an IPO (meaning when the shares of the Company are listed on a public exchange), the premoney valuation of such IPO.

1240191.5

# Exhibit 4

## AMENDMENT NO. 2. TO OPTION AGREEMENT

AMENDMENT NO. 2 ("Amendment") dated as of December 16, 2022 ("Amendment No. 2 Effective Date") to the Option Agreement ("Agreement") dated as of December 31, 2020 by and between Jabbok Schlacks ("Seller") and Schlacks 2020 Transfer LLC ("Buyer").

WHEREAS, the parties desire to amend the Agreement to conform to revised vesting condition relating to the option to acquire shares of common stock (the "Common Stock") of EquipmentShare.com Inc., a Delaware corporation (the "Company") and make other corresponding adjustments.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for such other good and valuable consideration, the sufficiency of which is hereby acknowledged by the parties hereto, the parties agree as follows:

1.      Exhibit A of the Agreement (describing the vesting conditions) is hereby amended and restated in full as set forth in Exhibit A hereto.

**[signature page follows]**

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed by their respective duly authorized representatives as of the Amendment No. 1 Effective Date.

==Jabbok Schlacks==

By _____

Name: Jabbok Schlacks

Title:

Schlacks 2020 Transfer LLC

By _____

Name: Neil Chheda

Title:

2

Exhibit A – Vesting Conditions

Option Shares will vest on the following basis:

1,678,840 Option Shares will vest on June 17, 2021.

Another 1,678,840 Option Shares will vest at such time as the Company achieves a Valuation of $4,000,000,000.00 provided that such Valuation is achieved as of December 31, 2024 (unless the Company has not filed an S1 as of September 30, 2024 in which case such Valuation must have been achieved as of September 30, 2024). As used herein the term "Valuation" shall mean (a) upon a Deemed Liquidation Event (as defined in the Restated Charter), the value of the aggregate consideration payable to equity holders of the Company in connection with such Deemed Liquidation Event (including any amounts subject to escrow, earn-out or similar arrangement) after satisfaction of indebtedness or expenses of the Company, as determined by the Board in its sole discretion or (b) upon an IPO (meaning when the shares of the Company are listed on a public exchange) the premoney valuation of such IPO.

1240191.5

## AMENDMENT NO. 2. TO OPTION AGREEMENT

AMENDMENT NO. 2 ("Amendment") dated as of December 16, 2022 ("Amendment No. 2 Effective Date") to the Option Agreement ("Agreement") dated as of December 31, 2020 by and between William J. Schlacks ("Seller") and Schlacks 2020 Transfer LLC ("Buyer").

WHEREAS, the parties desire to amend the Agreement to conform to revised vesting condition relating to the option to acquire shares of common stock (the "Common Stock") of EquipmentShare.com Inc., a Delaware corporation (the "Company") and make other corresponding adjustments.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for such other good and valuable consideration, the sufficiency of which is hereby acknowledged by the parties hereto, the parties agree as follows:

1.      Exhibit A of the Agreement (describing the vesting conditions) is hereby amended and restated in full as set forth in Exhibit A hereto.

**[signature page follows]**

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed by their respective duly authorized representatives as of the Amendment No. 1 Effective Date.

William J. Schlacks

By _____

DocuSigned by:

*William J Schlacks*

7544BE1BBD114E5...

Name:   William J Schlacks

Title:

Schlacks 2020 Transfer LLC

By _____

DocuSigned by:

*Neil Chheda*

7CA65E7EE3CE4B8...

Name:   Neil Chheda

Title:

2

Exhibit A – Vesting Conditions

Option Shares will vest on the following basis:

1,678,840 Option Shares will vest on June 17, 2021.

Another 1,678,840 Option Shares will vest at such time as the Company achieves a Valuation of $4,000,000,000.00 provided that such Valuation is achieved as of December 31, 2024 (unless the Company has not filed an S1 as of September 30, 2024 in which case such Valuation must have been achieved as of September 30, 2024). As used herein the term "Valuation" shall mean (a) upon a Deemed Liquidation Event (as defined in the Restated Charter), the value of the aggregate consideration payable to equity holders of the Company in connection with such Deemed Liquidation Event (including any amounts subject to escrow, earn-out or similar arrangement) after satisfaction of indebtedness or expenses of the Company, as determined by the Board in its sole discretion or (b) upon an IPO (meaning when the shares of the Company are listed on a public exchange) the premoney valuation of such IPO.

# Exhibit 5

**From:** Neil Chheda <nchheda@romuluscap.com>
**Subject: Exercise**
**Date:** February 13, 2024 at 10:43:05 AM EST
**To:** Jabbok Schlacks <jabbok@equipmentshare.com>
**Cc:** John Griffin <john@equipmentshare.com>, Peter Moldave <Peter.Moldave@gesmer.com>

**Dear Jabbok,**

**Pursuant to amendment 2 of the option agreement, S2020T is hereby exercising 839,420 option shares (final part of first tranche which has already vested). Please immediately send your personal wiring instructions. Please deliver shares to:**
**Schlacks 2020 Transfer LLC**
█████████████

**Boston MA 02111**

**Best,**
**Neil**

_____

Neil Chheda
Romulus Capital

Tel: 516.603.9357
Email: nchheda@romuluscap.com
www.romuluscap.com



**From:** Neil Chheda <<u>nchheda@romuluscap.com</u>>
**Subject: Exercise**
**Date:** February 13, 2024 at 10:43:14 AM EST
**To:** Willy Schlacks <<u>will@equipmentshare.com</u>>
**Cc:** John Griffin <<u>john@equipmentshare.com</u>>, Peter Moldave
<<u>Peter.Moldave@gesmer.com</u>>

**Dear Willy,**

**Pursuant to amendment 2 of the option agreement, S2020T is hereby
exercising 839,420 option shares (final part of first tranche which has already
vested). Please immediately send your personal wiring instructions. Please
deliver shares to:**
**Schlacks 2020 Transfer LLC**

**Boston MA 02111**

**Best,**
**Neil**

_____

Neil Chheda
Romulus Capital

Tel: 516.603.9357
Email: <u>nchheda@romuluscap.com</u>
<u>www.romuluscap.com</u>

# Exhibit 6

<u>**STOCK TRANSFER AGREEMENT**</u>

(For consideration)

This Stock Transfer Agreement (this "***Agreement***") is made and entered into as of June 30, 2021 (the "***Effective Date***"), by and among Schlacks 2020 Transfer LLC ("***Purchaser***"), Jabbok Schlacks ("***Seller***") and EquipmentShare.com Inc, a Delaware corporation (the "***Company***").

WHEREAS, Seller has acquired shares of the Company's Common Stock ("***Common Stock***") pursuant to a certain Restricted Stock Purchase Agreement, dated December 9, 2014, by and between the Company and Seller (as amended, the "***Acquisition Agreement***").

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to buy from Seller, a portion of such shares for consideration, as indicated below.

NOW, THEREFORE, the parties hereby agree as follows.

1.　　**<u>SALE AND PURCHASE OF SHARES</u>.** On the Effective Date and subject to the terms and conditions of this Agreement, Seller hereby sells to Purchaser, and Purchaser hereby purchases from Seller, an aggregate of 105,490 shares of Common Stock (the "***Shares***"), at a price per share of $33.77 and for an aggregate purchase price of $3,562,397.30 (the "***Purchase Price***"). As used in this Agreement, "Shares" shall include all of the Shares sold and transferred under this Agreement and all securities received (a) in replacement of the Shares, (b) as a result of stock dividends or stock splits in respect of the Shares and (c) as substitution for the Shares in a recapitalization, merger, reorganization or the like.

2.　　**<u>CLOSING</u>.**

2.1　　**<u>Deliveries by Seller</u>.** Seller hereby delivers to the Company and Purchaser, as appropriate, or is causing to be delivered to the Company on Seller's behalf:  (a) to the extent the shares are certificated, any stock certificates representing the Shares, if in Seller's possession, or otherwise authorizes the Company to remove any such stock certificates from escrow for cancellation, if held in escrow; (b) a Stock Power and Assignment Separate from Stock Certificate, in substantially the form attached hereto as <u>Exhibit A</u> (a "***Stock Power***"), executed by Seller and, if Seller is a natural person and married, Seller's spouse; and (c) an executed copy of this Agreement.

2.2　　**<u>Deliveries by Purchaser</u>.** Purchaser hereby delivers to the Company and Seller, as appropriate, (a) an executed copy of this Agreement and (b) a check for the aggregate Purchase Price of the Shares, made payable to Seller, or a wire transfer of immediately available funds to an account designated by Seller.

2.3　　**<u>Deliveries of Stock Certificate</u>.** Seller hereby instructs the Company to: (a) cancel any stock certificate issued to Seller's representing the Shares; (b) issue a duly executed stock certificate evidencing the Shares in Purchaser's name; and (c) issue a duly executed stock certificate, in Seller's name, evidencing the number of shares of Common Stock that remain held by Seller after the transfer of the Shares to Purchaser.

**3.**       **REPRESENTATIONS AND WARRANTIES OF PURCHASER.** Purchaser represents and warrants to Seller and the Company as follows.

      **3.1**     **Power and Authority; Capacity.** Purchaser has full organizational and legal power and authority under its organizational documents, applicable law and otherwise to enter into this Agreement and to perform its obligations hereunder. The execution, delivery and performance of this Agreement by Purchaser has been duly and validly authorized by all necessary action under the organizational documents of Purchaser and does not require any further authorization or consent of Purchaser or its directors, officers, trustees, members, partners, stakeholder or other beneficial owners (including, without limitation, any foreign corollary to any such person), or of any public official. The signatory executing this Agreement on behalf of Purchaser is qualified and has the power to act and is properly exercising such person's powers under the organizational documents of Purchaser in connection with the execution and delivery of this Agreement and consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by Purchaser.

      **3.2**     **Non-Contravention; Legal Investment.** The execution, delivery and performance by Purchaser of this Agreement do not and will not contravene or constitute a default under, or violation of, or be subject to penalties under, (a) any agreement (or require the consent of any party under any such agreement that has not been made or obtained) to which Purchaser is a party, or (b) any judgment, injunction, order, decree or other instrument binding upon Purchaser, except where such contravention, default, violation or failure to obtain a consent, individually or in the aggregate, would not reasonably be expected to impair Purchaser's ability to perform fully any material obligation which Purchaser has or will have under this Agreement.

      **3.3**     **Enforceability.** This Agreement constitutes the legally valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as may be limited by bankruptcy, insolvency, organization, moratorium or similar laws relating to or affecting creditors' rights generally (including, without limitation, fraudulent conveyance laws) and by general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing and the possible unavailability of specific performance or injunctive relief, regardless of whether considered in a proceeding in equity or at law.

      **3.4**     **Government Authorizations.** All authorizations (including any authorizations necessary under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or from the Committee on Foreign Investment in the United States) from, and notices or filings with, any governmental authority by Purchaser that are necessary to enable Purchaser to perform its obligations under this Agreement and to purchase the Shares have been obtained or made (as the case may be) and are in full force and effect and all conditions of each such authorization have been complied with.

      **3.5**     **Purchase for Own Account for Investment.** Purchaser is acquiring the Shares for Purchaser's own account, for investment purposes only and not with a view to, or for sale in connection with, a distribution of the Shares within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***"). Purchaser has no present intention of selling or otherwise disposing of all or any portion of the Shares, and upon transfer of the Shares to Purchaser, no one

2

other than Purchaser will have any beneficial ownership of any of the Shares. Purchaser was not formed for the specific purpose of acquiring the Shares.

       3.6    **<u>Accredited Investor</u>.**  Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act.

       3.7    **<u>Disclosure of Information</u>.**  Purchaser has received all the information it considers necessary or appropriate for deciding whether to purchase the Shares.  Purchaser is satisfied, in its sole discretion, with its due diligence review of the business, legal, accounting and other investigations undertaken by Purchaser and/or its legal counsel, advisors, agents and/or independent investment representatives with respect to the Company.  Purchaser acknowledges and agrees that the Company has not made, and is not making, any representation or warranty to Purchaser with respect to the Company and the Shares, and Purchaser acknowledges and agrees that Purchaser is purchasing the Shares without reliance on any representations or warranties by Company.

       3.8    **<u>Potential Loss of Investment; Understanding of Risks</u>.**  Purchaser is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Shares or a portion thereof.  Purchaser further acknowledges that the Company may consummate a sale, acquisition, merger, liquidation, dissolution or other corporate event regarding the Company or its assets (a "***Corporate Event***") that may result in the payment by the Company or a third party of assets, funds or other proceeds to the Company's stockholders, including Purchaser, in a manner such that the value attributed to the Company's capital stock in such Corporate Event (either in an aggregate amount or on a per-share basis) may be less than the Purchase Price paid for the Shares.  Purchaser is fully aware of: (a) the highly speculative nature of the Shares; (b) the financial hazards involved with purchase of Shares and the restrictions on transferability of the Shares (<u>e.g.</u>, that Purchaser may not be able to sell or dispose of the Shares or use them as collateral for loans); (c) the lack of liquidity of the Shares; (d) the qualifications and backgrounds of the management of the Company; and (e) the tax consequences of purchasing the Shares.

       3.9    **<u>Purchaser's Qualifications</u>.**  Purchaser has a preexisting personal or business relationship with Seller, the Company and/or certain of its officers and/or directors of a nature and duration sufficient to make Purchaser aware of the character, business acumen and general business and financial circumstances of the Company and/or such officers and directors. By reason of Purchaser's business or financial experience, Purchaser is capable of evaluating the merits and risks of this purchase, has the ability to protect Purchaser's own interests in this transaction and is financially capable of bearing a total loss of the Shares.

       3.10   **<u>No General Solicitation</u>.**  At no time was Purchaser presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television, internet or other form of general advertising or solicitation in connection with the Shares.

       3.11   **<u>Brokers</u>.** Purchaser acknowledges and agrees that neither the Company nor Seller has effected this transfer of the Shares by or through a broker-dealer in any public offering.

Neither the Company nor Seller are, nor will they become, obligated to pay any compensation to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated hereby based upon any arrangement made by or on behalf of Purchaser or any of its affiliates or agents.

      **3.12**    <u>**Compliance with Securities Laws**</u>.    Purchaser understands and acknowledges that, in reliance upon the representations and warranties made by Purchaser herein, the Shares have not been and are not being registered with the Securities and Exchange Commission (the "***SEC***") under the 1933 Act, or any other state securities or blue sky law, but instead are being transferred under an exemption or exemptions from the registration and qualification requirements of the 1933 Act or other applicable securities laws which impose certain restrictions on Purchaser's ability to transfer the Shares.

      **3.13**    <u>**Restricted Securities**</u>. Purchaser understands that (a) the Shares have not been registered under the 1933 Act and (b) the Shares may not be sold, pledged or otherwise transferred unless a registration statement for such transaction is effective under the 1933 Act or unless an exemption from such registration is available. Purchaser understands that only the Company may file a registration statement with the SEC or other applicable securities commissioners and that, except as set forth in the Amended and Restated Investors' Rights Agreement, dated as of March 31, 2021 (the "***IRA***"), the Company is under no obligation to do so with respect to the Shares. Purchaser has also been advised that exemptions from registration and qualification may not be available or may not permit Purchaser to transfer all or any of the Shares in the amounts or at the times proposed by Purchaser.

      **3.14**    <u>**Rule 144**</u>. In addition, Purchaser has been advised that SEC Rule 144 promulgated under the 1933 Act, which permits certain limited sales of unregistered securities, may not be presently available with respect to the Shares and, in any event, requires that the Shares be held for a minimum of six (6) months, and in certain cases one (1) year, after they have been purchased <u>and paid for</u> (within the meaning of SEC Rule 144), before they may be resold under SEC Rule 144. Under certain circumstances where Seller is not an "affiliate" as defined under the 1933 Act, the holding period of Seller will carry over to Purchaser.

      **3.15**    <u>**Foreign Status**</u>. If Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended), Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to purchase the Shares or any use of this Agreement, including (a) the legal requirements within its jurisdiction for the purchase of the Shares, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. Purchaser's continued beneficial ownership of the Shares will not violate any applicable securities or other laws of Purchaser's jurisdiction.

      **3.16**    <u>**No Public Market**</u>. Purchaser understands and agrees that no public market now exists for the Shares and that the Company has made no assurances that a public market will ever exist for the Shares. Purchaser understands and agrees that the Company has no present

intention to file a registration statement with the SEC in connection with a proposed public offering of its securities.

      **3.17**    **Sophisticated Purchaser.** Purchaser (a) is a sophisticated party familiar with transactions similar to those contemplated hereby, (b) has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the purchase the Shares and (c) has independently and without reliance upon Seller or the Company, and based on such information and the advice of such advisors as Purchaser has deemed appropriate, made Purchaser's own analysis and decision to consummate the transactions contemplated hereby. Purchaser acknowledges that none of Seller, the Company or their affiliates is acting as a fiduciary or financial or investment adviser to Purchaser, and none of the foregoing have given Purchaser any investment advice, opinion or other information on whether the purchase of the Shares is prudent. Purchaser acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to the Company that is not known to Purchaser and that may be material to a decision to purchase the Shares (the "***Purchaser Excluded Information***"), (ii) Purchaser has determined to purchase the Shares notwithstanding Purchaser's lack of knowledge of the Purchaser Excluded Information and (iii) Seller shall not have any liability to Purchaser, other than for fraud, with respect to the nondisclosure of the Purchaser Excluded Information in connection with the sale of the Shares and the transactions contemplated hereby. Purchaser understands that the Company and Seller will rely on the accuracy and truth of the foregoing representations, and Purchaser hereby consents to such reliance.

      **4.**    **REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller represents and warrants to the Company and Purchaser as follows.

      **4.1**    **Transfer for Own Account.** Seller is selling the Shares for Seller's own account only and not with a view to, or for sale in connection with, a distribution of the Shares within the meaning of the 1933 Act. No portion of the Purchase Price will be received indirectly by the Company.

      **4.2**    **No General Solicitation.** At no time has Seller presented Purchaser or any other party with or solicited Purchaser or any other party through any publicly issued or circulated newspaper, mail, radio, television, Internet or other form of general advertisement or solicitation in connection with the transfer of the Shares.

      **4.3**    **No Broker-Dealer.** Seller has not effected this transfer of the Shares by or through a broker-dealer in any public offering.

      **4.4**    **Title to Shares.** Immediately prior to the Effective Date, Seller had valid marketable title to the Shares to be transferred under this Agreement, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest other than pursuant to any Agreement or other document described in Section 5 below.

      **4.5**    **Consents.** All consents, approvals, authorizations and orders required for the execution and delivery of this Agreement and the transfer of the Shares under this Agreement have been obtained and are in full force and effect.

**4.6**    **Authority.**  Seller has full legal right, power and authority to enter into and perform its obligations under this Agreement and to transfer the Shares under this Agreement. Seller, if other than a natural person, has been duly organized and is validly existing in good standing under the laws of the jurisdiction of its organization as the type of entity that it purports to be and all corporate or other entity actions necessary to authorize the transactions contemplated by this Agreement have been duly taken.  The person(s) executing and delivering this Agreement on behalf of Seller are duly authorized to do so.

**4.7**    **Sophisticated Seller.**  Seller (a) is a sophisticated individual familiar with transactions similar to those contemplated by this Agreement, (b) has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the sale of the Shares, (c) has independently and without reliance upon Purchaser, and based on such information and the advice of such advisors as Seller has deemed appropriate, made Seller's own analysis and decision to enter into this Agreement. Seller acknowledges that neither Purchaser nor any of its affiliates is acting as a fiduciary or financial or investment adviser to Seller, and has not given Seller any investment advice, opinion or other information on whether the sale of the Shares is prudent.  In making its decision to sell the Shares, Seller is relying on Seller's own knowledge and experience, the representations and warranties of Purchaser contained in this Agreement and the information it received from the Company.  Seller understands that all non-public information it has received regarding the Company and the sale of Shares, including, without limitation, the terms of this Agreement, is subject to strict confidentiality restrictions and shall not be disclosed to any third party nor used by Seller other than in connection with the sale of Shares.  Seller acknowledges that (i) Purchaser currently may have, and later may come into possession of, information with respect to the Company that is not known to Seller and that may be material to a decision to sell the Shares ("***Seller Excluded Information***"), (ii) Seller has determined to sell the Shares notwithstanding its lack of knowledge of the Seller Excluded Information and (iii) Purchaser shall not have any liability to Seller, and Seller waives and releases any claims that it might have against Purchaser whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information in connection with the sale of the Shares and the transactions contemplated by this Agreement.  Seller understands that Purchaser will rely on the accuracy and truth of the foregoing representations, and Seller hereby consents to such reliance.

**4.8**    **Tax Consequences.**  Seller has had an opportunity to review the federal, state and local tax consequences of the sale of the Shares to Purchaser and the transactions contemplated by this Agreement with its own tax advisors.  Seller is relying solely on such advisors and not on any statements or representations of Purchaser or the Company.  Seller understands that Seller shall be responsible for its own tax liability that may arise as a result of the transactions contemplated by this Agreement.   Seller expressly acknowledges and agrees that neither Purchaser, the Company, nor any of their respective agents or affiliates, makes any representation to Seller with respect to the tax treatment of the transactions contemplated by this Agreement.

**4.9**    **No Continuing Rights.**  Seller understands, acknowledges and agrees that Seller shall have no rights with respect to the Shares, as a stockholder of the Company or otherwise, with respect to any Corporate Event regarding the Company or its assets, or any public offering, tender offer or other offer to purchase any of the Company's shares, whether by Purchaser or any other person or entity.  Seller further acknowledges that the value attributed to the Shares or

6

comparable shares in any such transaction, may be greater than the Purchase Price. Seller acknowledges that the price for the Shares may significantly appreciate or depreciate over time and by agreeing to sell the Shares to Purchaser pursuant to this Agreement, Seller is giving up the opportunity to sell the Shares at a possible higher price in the future.

5.   **COMPLIANCE WITH RELATED AGREEMENT(S).**   Purchaser acknowledges that the following restrictions upon transfer of the Shares will continue to be applicable to the Shares after Purchaser's acquisition thereof pursuant to the terms and conditions of the agreement(s) or documents described below (collectively, the "***Stock Restrictions***").

5.1   **Terms Continue to Apply.**   Purchaser agrees to be bound by the right of first refusal section of the Acquisition Agreement in the same manner as Seller is bound (other than Section 3(b)(vi) of the Acquisition Agreement, which shall not apply to Purchaser), a copy of which is attached hereto as Exhibit B.  Purchaser expressly agrees to comply with such sections of the Acquisition Agreement and that the Shares shall be subject to the right of first refusal granted to the Company thereunder (the "***Right of First Refusal***") to the same extent the Shares would be if retained by Seller (other than Section 3(b)(vi) of the Acquisition Agreement, which shall not apply to Purchaser).  Subject to the terms and conditions of this Agreement, Purchaser will have all of the rights of a shareholder of the Company with respect to the Shares until such time as Purchaser disposes of the Shares and/or the Company and/or its assignee(s) exercise(s) the right of first refusal.

5.2   **Transfer of Obligations.**   Purchaser agrees to be bound by the terms and conditions of the following additional agreements ("***Related Agreements***") in the same manner as Seller is bound with respect to the Shares:  (a) the IRA; (b) the Amended and Restated Right of First Refusal and Co-Sale Agreement dated March 32, 2021, among the Company, Seller and certain of the Company's stockholders (it being understood and agreed that Subsections 3.1(e) 3.1(f) thereof shall not apply to Purchaser); and (b) the Amended and Restated Voting Agreement, dated March 31, 2021, among the Company and certain of its stockholders. In furtherance of the immediately preceding sentence, Purchaser expressly agrees that the Shares shall be subject to Seller's obligations set forth in such Related Agreements to the same extent the Shares would be if retained by the Seller.  If required by the terms of any Related Agreement, Purchaser hereby agrees to execute a copy of such Agreement.  Purchaser acknowledges that Purchaser has received a copy of, and has read and understood, each of the Related Agreements

5.3   **Restrictions in Bylaws.**   Purchaser agrees to be bound by and comply with the limitations on transfer contained in the Bylaws of the Company, as may be amended from time to time (the "***Bylaws***"), and acknowledges that such Purchaser has received a copy of the Bylaws containing such provisions (it being understood and agreed that Section 10.1.2(vii) of the Bylaws shall not apply to Purchaser).

6.   **COMPLIANCE WITH LAWS AND REGULATIONS.**   The sale and transfer of the Shares will be subject to and conditioned upon compliance by the Company and Purchaser with all applicable state and federal laws and regulations and with all applicable requirements of any stock exchange or automated quotation system on which the Common Stock may be listed or quoted at the time of such issuance or transfer.

7

**7.** **NO RELIANCE.** Each of Seller and Purchaser acknowledges and agrees that neither the Company, nor any of its stockholders, officers, directors, employees, or agents (other than Seller and Purchaser) have (a) acted as an agent, finder or broker for Seller or Purchaser or their respective agents with respect to the offer, purchase and/or sale of the Shares, (b) made any representations or warranties of any kind, express or implied, to Seller or Purchaser or their respective agents in connection with the offer, purchase and/or sale of the Shares or (c) have at any time had any duty to Seller or Purchaser or their respective agents to disclose any information relating to the Company, its business, or financial condition or relating to any other matters in connection with the offer, purchase and/or sale of the Shares. In making its decision to sell the Shares, Seller is relying solely on its own knowledge and experience and the representations and warranties of Purchaser (and not on any information provided by the Company or its agents). In making its decision to purchase the Shares, Purchaser is relying solely on its own knowledge and experience and the representations and warranties of Seller (and not on any information provided by the Company or its agents).

**8.** **RESTRICTIVE LEGENDS AND STOP-TRANSFER ORDERS.**

**8.1** **Legends.** Purchaser understands and agrees that the Company will place the legends set forth below or similar legends on any stock certificate(s) evidencing the Shares, together with any other legends that may be required by state or federal securities laws, the Company's Certificate of Incorporation or Bylaws, any other agreement affecting the Shares between Seller and the Company, including but not limited to the Acquisition Agreement and the Related Agreements, or between Seller and any third party, or any other agreement applicable to Purchaser:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AS SET FORTH IN A STOCK TRANSFER AGREEMENT BETWEEN THE ISSUER, THE HOLDER OF THESE SHARES AND THE HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS ARE BINDING ON PURCHASERS OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANFERABILITY AND RESALE CONTAINED IN THE BYLAWS OF THE COMPANY.

THE SALE, PLEDGE, HYPOTHECATION, OR TRANSFER OF THE SECURITIES REPRESENTED HEREBY IS SUBJECT TO, AND IN CERTAIN CASES PROHIBITED BY, THE TERMS AND CONDITIONS OF A CERTAIN RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT BY AND AMONG THE STOCKHOLDER, THE CORPORATION AND CERTAIN OTHER HOLDERS OF STOCK OF THE CORPORATION. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION.

THE SHARES REPRESENTED HEREBY ARE SUBJECT TO A VOTING AGREEMENT, AS MAY BE AMENDED FROM TIME TO TIME, (A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST FROM THE COMPANY), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF THAT VOTING AGREEMENT, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER AND OWNERSHIP SET FORTH THEREIN.

      8.2    **Stop-Transfer Instructions.**  Purchaser agrees that, in order to ensure compliance with the restrictions imposed by this Agreement, the Company may issue appropriate "stop-transfer" instructions to its transfer agent, if any, and if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records. The Company will not be required (a) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (b) to treat as owner of such Shares, or to accord the right to vote or pay dividends, to any purchaser or other purchaser to whom such Shares have been so transferred. Purchaser further understands and agrees that the Company may require written assurances, in form and substance satisfactory to counsel for the Company (which may include a requirement that Purchaser's counsel provide a legal opinion acceptable to the Company), before the Company effects any future transfers of the Shares.

9.      **GENERAL PROVISIONS.**

      9.1    **Successors and Assigns; Assignment.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

      9.2    **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to that body of laws pertaining to conflict of laws.

**9.3** **Dispute Resolution.** The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the federal or state courts located in the District of Delaware for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the federal or state courts located in the District of Delaware, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

**9.4** **Notices.** Any and all notices required or permitted to be given to a party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed to provide such party sufficient notice under this Agreement on the earliest of the following: (a) at the time of personal delivery, if delivery is in person; (b) one (1) business day after deposit with an express overnight courier for United States deliveries, or two (2) business days after such deposit for deliveries outside of the United States; or (c) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "***business day***" shall be a day, other than Saturday or Sunday, when the banks in the city of St. Louis are open for business.

**9.5** **Further Assurances.** The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

**9.6** **Titles and Headings.** The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement. Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

**9.7** **Entire Agreement.** This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof. This Agreement shall not be effective until signed by all parties hereto, including the Company.

**9.8** **Severability.** If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this

Agreement. Notwithstanding the forgoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

        **9.9**    **Amendment and Waivers.** This Agreement may be amended only by a written agreement executed by each of the parties hereto. No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought. Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

        **9.10**    **Confidentiality.** Each of Seller and Purchaser agrees that it will keep confidential and will not disclose or use for any purpose any information about the terms of this Agreement and the transactions contemplated hereby and any confidential information obtained from the Company in connection herewith, unless any such information (a) is known or becomes known to the public in general (other than as a result of a breach of this Agreement by the disclosing party), or (b) is or has been made known or disclosed to the disclosing party by a third party without a breach of any confidentiality obligations by such third party; provided, however, that either Seller or Purchaser may disclose such information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with the transfer and ownership of the Shares, provided that such persons agree to maintain the confidentiality of such information in accordance herewith; (ii) to any affiliate in the ordinary course of business, provided that such affiliate agrees to maintain the confidentiality of such information in accordance herewith; or (iii) as may be required by law, provided that the disclosing party promptly notifies the other parties hereto in advance of such disclosure and agrees to cooperate to take reasonable steps to minimize the extent of any such required disclosure.

        **9.11**    **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or other means of electronic delivery and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

        **9.12**    **Expenses.** Each party hereto shall pay its own expenses.

        **9.13**    **Specific Performance.** Unless this Agreement has been terminated, each party to this Agreement acknowledges and agrees that any breach by it of this Agreement shall cause any (or either) of the other parties irreparable harm which may not be adequately compensable by money damages. Accordingly, except in the case of termination, in the event of a breach or threatened breach by a party of any provision of this Agreement, each party shall be entitled to seek the remedies of specific performance, injunction or other preliminary or equitable

relief, without having to prove irreparable harm or actual damages. The foregoing right shall be in addition to such other rights or remedies as may be available to any party for such breach or threatened breach, including but not limited to the recovery of money damages.

**9.14** **Costs of Enforcement.** If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings against any other party to this Agreement, the non-prevailing party or parties named in such legal proceedings shall pay all costs and expenses incurred by the prevailing party or parties, including, without limitation, all reasonable attorneys' fees.

**[SIGNATURE PAGE FOLLOWS]**

DocuSign Envelope ID: 3BB94D1A-B528-43DA-A26F-4B5CDA735CAC

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Seller and Purchaser have each executed this Agreement, as of the Effective Date.

<u>**SELLER**</u>**:**

**JABBOK SCHLACKS**

By: _Jabbok Schlacks_                Address: ████████████
1A76C5C01E7F4E3...

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Seller and Purchaser have each executed this Agreement, as of the Effective Date.

<u>**PURCHASER**</u>:

**SCHLACKS 2020 TRANSFER LLC**

By: _Neil Chheda_        Address: ███████████

Name: Neil Chheda        Boston, MA 02111

Title: Member

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Seller and Purchaser have each executed this Agreement, as of the Effective Date.

<u>**THE COMPANY**</u>:

**EQUIPMENTSHARE.COM INC**

By: _Jabbok Schlacks_
Name: <u>Jabbok Schlacks</u>
Title: <u>CEO</u>

Address: ███████████

DocuSign Envelope ID: 3BB94D1A-B528-43DA-A26F-4B5CDA735CAC

# **EXHIBIT A**

SELLER'S **STOCK POWER**
**AND ASSIGNMENT SEPARATE FROM CERTIFICATE**

## SELLER'S STOCK POWER AND ASSIGNMENT
## SEPARATE FROM STOCK CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Stock Transfer Agreement dated as of June 30, 2021, (the "***Agreement***"), the undersigned Seller hereby sells, assigns and transfers, for consideration, unto Schlacks 2020 Transfer LLC, as Purchaser, 105,490 shares of the Common Stock of EquipmentShare.com Inc, a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No. CS-050 delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company.

Dated:  June, 30, 2021



(Seller's Signature)

Jabbok Schlacks

(Please Print Seller's Name)

(Seller's Spouse's Signature, if any)

Danielle Schlacks

(Please Print Seller's Spouse's Name)

**Instruction:**  Please fill in the blanks above, sign this Stock Power and obtain the signature of Seller's spouse, if any.  This Stock Power will be used to transfer the Shares from Seller to Purchaser.

DocuSign Envelope ID: 3BB94D1A-B528-43DA-A26F-4B5CDA735CAC

## **EXHIBIT B**

## **COPY OF ACQUISITION AGREEMENT**

DocuSign Envelope ID: 3D341E6A-A6C9-49C2-BEF3-F7437E09B9CE

<u>**STOCK TRANSFER AGREEMENT**</u>

(For consideration)

This Stock Transfer Agreement (this "***Agreement***") is made and entered into as of June 30, 2021 (the "***Effective Date***"), by and among Schlacks 2020 Transfer LLC ("***Purchaser***"), William Schlacks IV ("***Seller***") and EquipmentShare.com Inc, a Delaware corporation (the "***Company***").

WHEREAS, Seller has acquired shares of the Company's Common Stock ("***Common Stock***") pursuant to a certain Restricted Stock Purchase Agreement, dated December 9, 2014, by and between the Company and Seller (as amended, the "***Acquisition Agreement***").

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to buy from Seller, a portion of such shares for consideration, as indicated below.

NOW, THEREFORE, the parties hereby agree as follows.

1.　　<u>**SALE AND PURCHASE OF SHARES.**</u>　On the Effective Date and subject to the terms and conditions of this Agreement, Seller hereby sells to Purchaser, and Purchaser hereby purchases from Seller, an aggregate of 105,490 shares of Common Stock (the "***Shares***"), at a price per share of $33.77 and for an aggregate purchase price of $3,562,397.30 (the "***Purchase Price***"). As used in this Agreement, "Shares" shall include all of the Shares sold and transferred under this Agreement and all securities received (a) in replacement of the Shares, (b) as a result of stock dividends or stock splits in respect of the Shares and (c) as substitution for the Shares in a recapitalization, merger, reorganization or the like.

2.　　<u>**CLOSING.**</u>

2.1　　<u>**Deliveries by Seller.**</u>　Seller hereby delivers to the Company and Purchaser, as appropriate, or is causing to be delivered to the Company on Seller's behalf: (a) to the extent the shares are certificated, any stock certificates representing the Shares, if in Seller's possession, or otherwise authorizes the Company to remove any such stock certificates from escrow for cancellation, if held in escrow; (b) a Stock Power and Assignment Separate from Stock Certificate, in substantially the form attached hereto as <u>Exhibit A</u> (a "***Stock Power***"), executed by Seller and, if Seller is a natural person and married, Seller's spouse; and (c) an executed copy of this Agreement.

2.2　　<u>**Deliveries by Purchaser.**</u>　Purchaser hereby delivers to the Company and Seller, as appropriate, (a) an executed copy of this Agreement and (b) a check for the aggregate Purchase Price of the Shares, made payable to Seller, or a wire transfer of immediately available funds to an account designated by Seller.

2.3　　<u>**Deliveries of Stock Certificate.**</u>　Seller hereby instructs the Company to: (a) cancel any stock certificate issued to Seller's representing the Shares; (b) issue a duly executed stock certificate evidencing the Shares in Purchaser's name; and (c) issue a duly executed stock certificate, in Seller's name, evidencing the number of shares of Common Stock that remain held by Seller after the transfer of the Shares to Purchaser.

DocuSign Envelope ID: 3D341E6A-A6C9-49C2-BEF3-F7437E09B9CE

3.     **REPRESENTATIONS AND WARRANTIES OF PURCHASER.**  Purchaser represents and warrants to Seller and the Company as follows.

3.1     **Power and Authority; Capacity.**  Purchaser has full organizational and legal power and authority under its organizational documents, applicable law and otherwise to enter into this Agreement and to perform its obligations hereunder.  The execution, delivery and performance of this Agreement by Purchaser has been duly and validly authorized by all necessary action under the organizational documents of Purchaser and does not require any further authorization or consent of Purchaser or its directors, officers, trustees, members, partners, stakeholder or other beneficial owners (including, without limitation, any foreign corollary to any such person), or of any public official.  The signatory executing this Agreement on behalf of Purchaser is qualified and has the power to act and is properly exercising such person's powers under the organizational documents of Purchaser in connection with the execution and delivery of this Agreement and consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by Purchaser.

3.2     **Non-Contravention; Legal Investment.**  The execution, delivery and performance by Purchaser of this Agreement do not and will not contravene or constitute a default under, or violation of, or be subject to penalties under, (a) any agreement (or require the consent of any party under any such agreement that has not been made or obtained) to which Purchaser is a party, or (b) any judgment, injunction, order, decree or other instrument binding upon Purchaser, except where such contravention, default, violation or failure to obtain a consent, individually or in the aggregate, would not reasonably be expected to impair Purchaser's ability to perform fully any material obligation which Purchaser has or will have under this Agreement.

3.3     **Enforceability.**  This Agreement constitutes the legally valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as may be limited by bankruptcy, insolvency, organization, moratorium or similar laws relating to or affecting creditors' rights generally (including, without limitation, fraudulent conveyance laws) and by general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing and the possible unavailability of specific performance or injunctive relief, regardless of whether considered in a proceeding in equity or at law.

3.4     **Government Authorizations.**     All authorizations (including any authorizations necessary under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or from the Committee on Foreign Investment in the United States) from, and notices or filings with, any governmental authority by Purchaser that are necessary to enable Purchaser to perform its obligations under this Agreement and to purchase the Shares have been obtained or made (as the case may be) and are in full force and effect and all conditions of each such authorization have been complied with.

3.5     **Purchase for Own Account for Investment.**  Purchaser is acquiring the Shares for Purchaser's own account, for investment purposes only and not with a view to, or for sale in connection with, a distribution of the Shares within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***").  Purchaser has no present intention of selling or otherwise disposing of all or any portion of the Shares, and upon transfer of the Shares to Purchaser, no one

other than Purchaser will have any beneficial ownership of any of the Shares. Purchaser was not formed for the specific purpose of acquiring the Shares.

      **3.6**     <u>**Accredited Investor**</u>. Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act.

      **3.7**     <u>**Disclosure of Information**</u>. Purchaser has received all the information it considers necessary or appropriate for deciding whether to purchase the Shares. Purchaser is satisfied, in its sole discretion, with its due diligence review of the business, legal, accounting and other investigations undertaken by Purchaser and/or its legal counsel, advisors, agents and/or independent investment representatives with respect to the Company. Purchaser acknowledges and agrees that the Company has not made, and is not making, any representation or warranty to Purchaser with respect to the Company and the Shares, and Purchaser acknowledges and agrees that Purchaser is purchasing the Shares without reliance on any representations or warranties by Company.

      **3.8**     <u>**Potential Loss of Investment; Understanding of Risks**</u>. Purchaser is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Shares or a portion thereof. Purchaser further acknowledges that the Company may consummate a sale, acquisition, merger, liquidation, dissolution or other corporate event regarding the Company or its assets (a "***Corporate Event***") that may result in the payment by the Company or a third party of assets, funds or other proceeds to the Company's stockholders, including Purchaser, in a manner such that the value attributed to the Company's capital stock in such Corporate Event (either in an aggregate amount or on a per-share basis) may be less than the Purchase Price paid for the Shares. Purchaser is fully aware of: (a) the highly speculative nature of the Shares; (b) the financial hazards involved with purchase of Shares and the restrictions on transferability of the Shares (<u>e.g.</u>, that Purchaser may not be able to sell or dispose of the Shares or use them as collateral for loans); (c) the lack of liquidity of the Shares; (d) the qualifications and backgrounds of the management of the Company; and (e) the tax consequences of purchasing the Shares.

      **3.9**     <u>**Purchaser's Qualifications**</u>. Purchaser has a preexisting personal or business relationship with Seller, the Company and/or certain of its officers and/or directors of a nature and duration sufficient to make Purchaser aware of the character, business acumen and general business and financial circumstances of the Company and/or such officers and directors. By reason of Purchaser's business or financial experience, Purchaser is capable of evaluating the merits and risks of this purchase, has the ability to protect Purchaser's own interests in this transaction and is financially capable of bearing a total loss of the Shares.

      **3.10**     <u>**No General Solicitation**</u>. At no time was Purchaser presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television, internet or other form of general advertising or solicitation in connection with the Shares.

      **3.11**     <u>**Brokers**</u>. Purchaser acknowledges and agrees that neither the Company nor Seller has effected this transfer of the Shares by or through a broker-dealer in any public offering.

3

DocuSign Envelope ID: 3D341E6A-A6C9-49C2-BEF3-F7437E09B9CE

Neither the Company nor Seller are, nor will they become, obligated to pay any compensation to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated hereby based upon any arrangement made by or on behalf of Purchaser or any of its affiliates or agents.

        **3.12** **Compliance with Securities Laws.** Purchaser understands and acknowledges that, in reliance upon the representations and warranties made by Purchaser herein, the Shares have not been and are not being registered with the Securities and Exchange Commission (the "**SEC**") under the 1933 Act, or any other state securities or blue sky law, but instead are being transferred under an exemption or exemptions from the registration and qualification requirements of the 1933 Act or other applicable securities laws which impose certain restrictions on Purchaser's ability to transfer the Shares.

        **3.13** **Restricted Securities.** Purchaser understands that (a) the Shares have not been registered under the 1933 Act and (b) the Shares may not be sold, pledged or otherwise transferred unless a registration statement for such transaction is effective under the 1933 Act or unless an exemption from such registration is available. Purchaser understands that only the Company may file a registration statement with the SEC or other applicable securities commissioners and that, except as set forth in the Amended and Restated Investors' Rights Agreement, dated as of March 31, 2021 (the "**IRA**"), the Company is under no obligation to do so with respect to the Shares. Purchaser has also been advised that exemptions from registration and qualification may not be available or may not permit Purchaser to transfer all or any of the Shares in the amounts or at the times proposed by Purchaser.

        **3.14** **Rule 144.** In addition, Purchaser has been advised that SEC Rule 144 promulgated under the 1933 Act, which permits certain limited sales of unregistered securities, may not be presently available with respect to the Shares and, in any event, requires that the Shares be held for a minimum of six (6) months, and in certain cases one (1) year, after they have been purchased and paid for (within the meaning of SEC Rule 144), before they may be resold under SEC Rule 144. Under certain circumstances where Seller is not an "affiliate" as defined under the 1933 Act, the holding period of Seller will carry over to Purchaser.

        **3.15** **Foreign Status.** If Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended), Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to purchase the Shares or any use of this Agreement, including (a) the legal requirements within its jurisdiction for the purchase of the Shares, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. Purchaser's continued beneficial ownership of the Shares will not violate any applicable securities or other laws of Purchaser's jurisdiction.

        **3.16** **No Public Market.** Purchaser understands and agrees that no public market now exists for the Shares and that the Company has made no assurances that a public market will ever exist for the Shares. Purchaser understands and agrees that the Company has no present

intention to file a registration statement with the SEC in connection with a proposed public offering of its securities.

    **3.17** **Sophisticated Purchaser.** Purchaser (a) is a sophisticated party familiar with transactions similar to those contemplated hereby, (b) has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the purchase the Shares and (c) has independently and without reliance upon Seller or the Company, and based on such information and the advice of such advisors as Purchaser has deemed appropriate, made Purchaser's own analysis and decision to consummate the transactions contemplated hereby. Purchaser acknowledges that none of Seller, the Company or their affiliates is acting as a fiduciary or financial or investment adviser to Purchaser, and none of the foregoing have given Purchaser any investment advice, opinion or other information on whether the purchase of the Shares is prudent. Purchaser acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to the Company that is not known to Purchaser and that may be material to a decision to purchase the Shares (the "***Purchaser Excluded Information***"), (ii) Purchaser has determined to purchase the Shares notwithstanding Purchaser's lack of knowledge of the Purchaser Excluded Information and (iii) Seller shall not have any liability to Purchaser, other than for fraud, with respect to the nondisclosure of the Purchaser Excluded Information in connection with the sale of the Shares and the transactions contemplated hereby. Purchaser understands that the Company and Seller will rely on the accuracy and truth of the foregoing representations, and Purchaser hereby consents to such reliance.

   **4.** **REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller represents and warrants to the Company and Purchaser as follows.

    **4.1** **Transfer for Own Account.** Seller is selling the Shares for Seller's own account only and not with a view to, or for sale in connection with, a distribution of the Shares within the meaning of the 1933 Act. No portion of the Purchase Price will be received indirectly by the Company.

    **4.2** **No General Solicitation.** At no time has Seller presented Purchaser or any other party with or solicited Purchaser or any other party through any publicly issued or circulated newspaper, mail, radio, television, Internet or other form of general advertisement or solicitation in connection with the transfer of the Shares.

    **4.3** **No Broker-Dealer.** Seller has not effected this transfer of the Shares by or through a broker-dealer in any public offering.

    **4.4** **Title to Shares.** Immediately prior to the Effective Date, Seller had valid marketable title to the Shares to be transferred under this Agreement, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest other than pursuant to any Agreement or other document described in Section 5 below.

    **4.5** **Consents.** All consents, approvals, authorizations and orders required for the execution and delivery of this Agreement and the transfer of the Shares under this Agreement have been obtained and are in full force and effect.

     **4.6**    **Authority.**  Seller has full legal right, power and authority to enter into and perform its obligations under this Agreement and to transfer the Shares under this Agreement. Seller, if other than a natural person, has been duly organized and is validly existing in good standing under the laws of the jurisdiction of its organization as the type of entity that it purports to be and all corporate or other entity actions necessary to authorize the transactions contemplated by this Agreement have been duly taken.  The person(s) executing and delivering this Agreement on behalf of Seller are duly authorized to do so.

     **4.7**    **Sophisticated Seller.**  Seller (a) is a sophisticated individual familiar with transactions similar to those contemplated by this Agreement, (b) has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the sale of the Shares, (c) has independently and without reliance upon Purchaser, and based on such information and the advice of such advisors as Seller has deemed appropriate, made Seller's own analysis and decision to enter into this Agreement. Seller acknowledges that neither Purchaser nor any of its affiliates is acting as a fiduciary or financial or investment adviser to Seller, and has not given Seller any investment advice, opinion or other information on whether the sale of the Shares is prudent.  In making its decision to sell the Shares, Seller is relying on Seller's own knowledge and experience, the representations and warranties of Purchaser contained in this Agreement and the information it received from the Company.  Seller understands that all non-public information it has received regarding the Company and the sale of Shares, including, without limitation, the terms of this Agreement, is subject to strict confidentiality restrictions and shall not be disclosed to any third party nor used by Seller other than in connection with the sale of Shares.  Seller acknowledges that (i) Purchaser currently may have, and later may come into possession of, information with respect to the Company that is not known to Seller and that may be material to a decision to sell the Shares ("***Seller Excluded Information***"), (ii) Seller has determined to sell the Shares notwithstanding its lack of knowledge of the Seller Excluded Information and (iii) Purchaser shall not have any liability to Seller, and Seller waives and releases any claims that it might have against Purchaser whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information in connection with the sale of the Shares and the transactions contemplated by this Agreement.  Seller understands that Purchaser will rely on the accuracy and truth of the foregoing representations, and Seller hereby consents to such reliance.

     **4.8**    **Tax Consequences.**  Seller has had an opportunity to review the federal, state and local tax consequences of the sale of the Shares to Purchaser and the transactions contemplated by this Agreement with its own tax advisors.  Seller is relying solely on such advisors and not on any statements or representations of Purchaser or the Company.  Seller understands that Seller shall be responsible for its own tax liability that may arise as a result of the transactions contemplated by this Agreement.   Seller expressly acknowledges and agrees that neither Purchaser, the Company, nor any of their respective agents or affiliates, makes any representation to Seller with respect to the tax treatment of the transactions contemplated by this Agreement.

     **4.9**    **No Continuing Rights.**  Seller understands, acknowledges and agrees that Seller shall have no rights with respect to the Shares, as a stockholder of the Company or otherwise, with respect to any Corporate Event regarding the Company or its assets, or any public offering, tender offer or other offer to purchase any of the Company's shares, whether by Purchaser or any other person or entity.  Seller further acknowledges that the value attributed to the Shares or

comparable shares in any such transaction, may be greater than the Purchase Price. Seller acknowledges that the price for the Shares may significantly appreciate or depreciate over time and by agreeing to sell the Shares to Purchaser pursuant to this Agreement, Seller is giving up the opportunity to sell the Shares at a possible higher price in the future.

5.   **COMPLIANCE WITH RELATED AGREEMENT(S).** Purchaser acknowledges that the following restrictions upon transfer of the Shares will continue to be applicable to the Shares after Purchaser's acquisition thereof pursuant to the terms and conditions of the agreement(s) or documents described below (collectively, the "***Stock Restrictions***").

5.1   **Terms Continue to Apply.** Purchaser agrees to be bound by the right of first refusal section of the Acquisition Agreement in the same manner as Seller is bound (other than Section 3(b)(vi) of the Acquisition Agreement, which shall not apply to Purchaser), a copy of which is attached hereto as Exhibit B. Purchaser expressly agrees to comply with such sections of the Acquisition Agreement and that the Shares shall be subject to the right of first refusal granted to the Company thereunder (the "***Right of First Refusal***") to the same extent the Shares would be if retained by Seller (other than Section 3(b)(vi) of the Acquisition Agreement, which shall not apply to Purchaser). Subject to the terms and conditions of this Agreement, Purchaser will have all of the rights of a shareholder of the Company with respect to the Shares until such time as Purchaser disposes of the Shares and/or the Company and/or its assignee(s) exercise(s) the right of first refusal.

5.2   **Transfer of Obligations.** Purchaser agrees to be bound by the terms and conditions of the following additional agreements ("***Related Agreements***") in the same manner as Seller is bound with respect to the Shares: (a) the IRA; (b) the Amended and Restated Right of First Refusal and Co-Sale Agreement dated March 32, 2021, among the Company, Seller and certain of the Company's stockholders (it being understood and agreed that Subsections 3.1(e) 3.1(f) thereof shall not apply to Purchaser); and (b) the Amended and Restated Voting Agreement, dated March 31, 2021, among the Company and certain of its stockholders. In furtherance of the immediately preceding sentence, Purchaser expressly agrees that the Shares shall be subject to Seller's obligations set forth in such Related Agreements to the same extent the Shares would be if retained by the Seller. If required by the terms of any Related Agreement, Purchaser hereby agrees to execute a copy of such Agreement. Purchaser acknowledges that Purchaser has received a copy of, and has read and understood, each of the Related Agreements

5.3   **Restrictions in Bylaws.** Purchaser agrees to be bound by and comply with the limitations on transfer contained in the Bylaws of the Company, as may be amended from time to time (the "***Bylaws***"), and acknowledges that such Purchaser has received a copy of the Bylaws containing such provisions (it being understood and agreed that Section 10.1.2(vii) of the Bylaws shall not apply to Purchaser).

6.   **COMPLIANCE WITH LAWS AND REGULATIONS.** The sale and transfer of the Shares will be subject to and conditioned upon compliance by the Company and Purchaser with all applicable state and federal laws and regulations and with all applicable requirements of any stock exchange or automated quotation system on which the Common Stock may be listed or quoted at the time of such issuance or transfer.

7. **NO RELIANCE.** Each of Seller and Purchaser acknowledges and agrees that neither the Company, nor any of its stockholders, officers, directors, employees, or agents (other than Seller and Purchaser) have (a) acted as an agent, finder or broker for Seller or Purchaser or their respective agents with respect to the offer, purchase and/or sale of the Shares, (b) made any representations or warranties of any kind, express or implied, to Seller or Purchaser or their respective agents in connection with the offer, purchase and/or sale of the Shares or (c) have at any time had any duty to Seller or Purchaser or their respective agents to disclose any information relating to the Company, its business, or financial condition or relating to any other matters in connection with the offer, purchase and/or sale of the Shares. In making its decision to sell the Shares, Seller is relying solely on its own knowledge and experience and the representations and warranties of Purchaser (and not on any information provided by the Company or its agents). In making its decision to purchase the Shares, Purchaser is relying solely on its own knowledge and experience and the representations and warranties of Seller (and not on any information provided by the Company or its agents).

8. **RESTRICTIVE LEGENDS AND STOP-TRANSFER ORDERS.**

8.1 **Legends.** Purchaser understands and agrees that the Company will place the legends set forth below or similar legends on any stock certificate(s) evidencing the Shares, together with any other legends that may be required by state or federal securities laws, the Company's Certificate of Incorporation or Bylaws, any other agreement affecting the Shares between Seller and the Company, including but not limited to the Acquisition Agreement and the Related Agreements, or between Seller and any third party, or any other agreement applicable to Purchaser:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AS SET FORTH IN A STOCK TRANSFER AGREEMENT BETWEEN THE ISSUER, THE HOLDER OF THESE SHARES AND THE HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS ARE BINDING ON PURCHASERS OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANFERABILITY AND RESALE CONTAINED IN THE BYLAWS OF THE COMPANY.

THE SALE, PLEDGE, HYPOTHECATION, OR TRANSFER OF THE SECURITIES REPRESENTED HEREBY IS SUBJECT TO, AND IN CERTAIN CASES PROHIBITED BY, THE TERMS AND CONDITIONS OF A CERTAIN RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT BY AND AMONG THE STOCKHOLDER, THE CORPORATION AND CERTAIN OTHER HOLDERS OF STOCK OF THE CORPORATION. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION.

THE SHARES REPRESENTED HEREBY ARE SUBJECT TO A VOTING AGREEMENT, AS MAY BE AMENDED FROM TIME TO TIME, (A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST FROM THE COMPANY), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF THAT VOTING AGREEMENT, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER AND OWNERSHIP SET FORTH THEREIN.

       **8.2** **Stop-Transfer Instructions.** Purchaser agrees that, in order to ensure compliance with the restrictions imposed by this Agreement, the Company may issue appropriate "stop-transfer" instructions to its transfer agent, if any, and if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records. The Company will not be required (a) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (b) to treat as owner of such Shares, or to accord the right to vote or pay dividends, to any purchaser or other purchaser to whom such Shares have been so transferred. Purchaser further understands and agrees that the Company may require written assurances, in form and substance satisfactory to counsel for the Company (which may include a requirement that Purchaser's counsel provide a legal opinion acceptable to the Company), before the Company effects any future transfers of the Shares.

       **9.** **GENERAL PROVISIONS.**

       **9.1** **Successors and Assigns; Assignment.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

       **9.2** **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to that body of laws pertaining to conflict of laws.

9.3     **Dispute Resolution.**     The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the federal or state courts located in the District of Delaware for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the federal or state courts located in the District of Delaware, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

9.4     **Notices.**     Any and all notices required or permitted to be given to a party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed to provide such party sufficient notice under this Agreement on the earliest of the following:  (a) at the time of personal delivery, if delivery is in person; (b) one (1) business day after deposit with an express overnight courier for United States deliveries, or two (2) business days after such deposit for deliveries outside of the United States; or (c) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries.  All notices for delivery outside the United States will be sent by express courier.  All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto.  A "***business day***" shall be a day, other than Saturday or Sunday, when the banks in the city of St. Louis are open for business.

9.5     **Further Assurances.**  The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

9.6     **Titles and Headings.**  The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement.  Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

9.7     **Entire Agreement.**  This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.  This Agreement shall not be effective until signed by all parties hereto, including the Company.

9.8     **Severability.**  If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto.  If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this

Agreement. Notwithstanding the forgoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

        **9.9**    **Amendment and Waivers.** This Agreement may be amended only by a written agreement executed by each of the parties hereto. No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought. Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

        **9.10**    **Confidentiality.** Each of Seller and Purchaser agrees that it will keep confidential and will not disclose or use for any purpose any information about the terms of this Agreement and the transactions contemplated hereby and any confidential information obtained from the Company in connection herewith, unless any such information (a) is known or becomes known to the public in general (other than as a result of a breach of this Agreement by the disclosing party), or (b) is or has been made known or disclosed to the disclosing party by a third party without a breach of any confidentiality obligations by such third party; provided, however, that either Seller or Purchaser may disclose such information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with the transfer and ownership of the Shares, provided that such persons agree to maintain the confidentiality of such information in accordance herewith; (ii) to any affiliate in the ordinary course of business, provided that such affiliate agrees to maintain the confidentiality of such information in accordance herewith; or (iii) as may be required by law, provided that the disclosing party promptly notifies the other parties hereto in advance of such disclosure and agrees to cooperate to take reasonable steps to minimize the extent of any such required disclosure.

        **9.11**    **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or other means of electronic delivery and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

        **9.12**    **Expenses.** Each party hereto shall pay its own expenses.

        **9.13**    **Specific Performance.** Unless this Agreement has been terminated, each party to this Agreement acknowledges and agrees that any breach by it of this Agreement shall cause any (or either) of the other parties irreparable harm which may not be adequately compensable by money damages. Accordingly, except in the case of termination, in the event of a breach or threatened breach by a party of any provision of this Agreement, each party shall be entitled to seek the remedies of specific performance, injunction or other preliminary or equitable

relief, without having to prove irreparable harm or actual damages. The foregoing right shall be in addition to such other rights or remedies as may be available to any party for such breach or threatened breach, including but not limited to the recovery of money damages.

**9.14** **Costs of Enforcement.** If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings against any other party to this Agreement, the non-prevailing party or parties named in such legal proceedings shall pay all costs and expenses incurred by the prevailing party or parties, including, without limitation, all reasonable attorneys' fees.

**[SIGNATURE PAGE FOLLOWS]**

DocuSign Envelope ID: 3D341E6A-A6C9-49C2-BEF3-F7437E09B9CE

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Seller and Purchaser have each executed this Agreement, as of the Effective Date.

<u>**SELLER**</u>**:**

**WILLIAM SCHLACKS IV**

By: _____          Address: _____

7544BE1BBD114E5...                                                _____

                                                                              _____

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Seller and Purchaser have each executed this Agreement, as of the Effective Date.

<u>**PURCHASER**</u>**:**

**SCHLACKS 2020 TRANSFER LLC**

By: _Neil Chheda_          Address: ██████████

Name: Neil Chheda                     Boston, MA 02111

Title: Member

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Seller and Purchaser have each executed this Agreement, as of the Effective Date.

<u>**THE COMPANY**</u>:

**EQUIPMENTSHARE.COM INC**

By: _Jabbok Schlacks_               Address: ████████████

Name: Jabbok Schlacks                Columbia, MO 65201

Title: CEO

## EXHIBIT A

SELLER'S **STOCK POWER**
**AND ASSIGNMENT SEPARATE FROM CERTIFICATE**

## SELLER'S STOCK POWER AND ASSIGNMENT
## SEPARATE FROM STOCK CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Stock Transfer Agreement dated as of June 30, 2021, (the "*Agreement*"), the undersigned Seller hereby sells, assigns and transfers, for consideration, unto Schlacks 2020 Transfer LLC, as Purchaser, 105,490 shares of the Common Stock of EquipmentShare.com Inc, a Delaware corporation (the "*Company*"), standing in the undersigned's name on the books of the Company represented by Certificate No. CS-051 delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company.

Dated:  June 30, 2021

_____
(Seller's Signature)

William J. Schlacks IV
_____
(Please Print Seller's Name)

_____
(Seller's Spouse's Signature, if any)

Kaitlyn Schlacks
_____
(Please Print Seller's Spouse's Name)

**Instruction:**  Please fill in the blanks above, sign this Stock Power and obtain the signature of Seller's spouse, if any.  This Stock Power will be used to transfer the Shares from Seller to Purchaser.

DocuSign Envelope ID: 3D341E6A-A6C9-49C2-BEF3-F7437E09B9CE

**<u>EXHIBIT B</u>**

**COPY OF ACQUISITION AGREEMENT**

# Exhibit 7

**STATEMENT OF INVESTMENT CONSIDERATIONS**

October 28, 2022

*This Statement of Investment Considerations (this "**Statement**") relates to the proposed sale of limited partnership interests (the "**Interests**") of TKF II L.P., a Delaware limited partnership (the "**Fund**" or "**Partnership**") to selected investors. The general partner of the Fund is TKF II GP LLC, a Delaware limited liability company (the "**General Partner**"). The managing members of the Fund are Mr. William Schlacks and Mr. Jabbok Schlacks (the "**Managing Members**"). Takeoff Capital LLC, a Delaware limited liability company, is the Manager of the Fund (the "**Manager**").*

*This Statement is being furnished to prospective investors ("**Investors**" or "**Limited Partners**") on a confidential basis so that they may consider an investment in the Fund. By accepting this Statement, the recipient acknowledges and agrees that it (a) will maintain the information contained herein in the strictest of confidence and will not, in any circumstance whatsoever, reproduce this Statement or disclose any of the contents hereof to any other person and (b) will return this Statement to the Fund if so requested by the Fund or a representative of the General Partner or if the recipient does not wish to pursue an investment in the securities offered hereby and will return to the Fund any other material that the recipient may have received from the Fund in the course of reviewing such investment.*

*The Interests are being offered only to Investors who meet certain qualifications. The General Partner reserves the right to approve each Investor in whole or in part for any reason.*

*Terms used but not defined herein shall have the respective meanings given to them in the limited partnership agreement of the Fund.*

THE INTERESTS OFFERED BY THE FUND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), NOR UNDER ANY APPLICABLE STATE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. THE SECURITIES OFFERED BY THE FUND HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION, NOR HAS THE COMMISSIONER OF ANY SUCH AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR IN ANY OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED. EACH PURCHASER OF THE INTERESTS OFFERED HEREBY MUST MEET CERTAIN QUALIFICATIONS SET FORTH BY THE GENERAL PARTNER AND MUST BE AN ACCREDITED INVESTOR (WITHIN THE MEANING OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933).

AN INVESTMENT IN THE INTERESTS WILL INVOLVE SIGNIFICANT RISKS DUE TO, AMONG OTHER THINGS, THE NATURE OF THE FUND'S INVESTMENTS, WHICH WILL BE CHARACTERIZED BY A HIGH DEGREE OF RISK, VOLATILITY AND ILLIQUIDITY. INVESTORS SHOULD HAVE THE FINANCIAL ABILITY AND WILLINGNESS TO ACCEPT THE RISKS AND LACK OF LIQUIDITY THAT ARE CHARACTERISTIC OF THE INVESTMENTS DESCRIBED HEREIN (SEE RISK FACTORS BELOW). INVESTORS MUST BE ABLE TO WITHSTAND A TOTAL LOSS OF THEIR INVESTMENT. THERE WILL BE NO PUBLIC MARKET FOR THE INTERESTS, AND THE INTERESTS, SUBJECT TO CERTAIN LIMITED EXCEPTIONS, WILL NOT BE TRANSFERABLE.

EXCEPT FOR THE GENERAL PARTNER AND CERTAIN OTHER IDENTIFIED REPRESENTATIVES OF THE FUND, NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY

Case 2:24-cv-04118-BCW   Document 8-29   Filed 07/26/24   Page 196 of 227

INFORMATION OR TO MAKE ANY REPRESENTATION RELATING TO THE FUND OR THE SECURITIES OFFERED HEREBY. EACH PROSPECTIVE INVESTOR WILL BE AFFORDED THE REASONABLE OPPORTUNITY TO (A) OBTAIN ALL ADDITIONAL INFORMATION WHICH IT MAY REASONABLY REQUEST RELATING TO THE FUND OR THIS OFFERING AND (B) ASK QUESTIONS OF THE GENERAL PARTNER AND THE MANAGER CONCERNING THE TERMS AND CONDITIONS OF THE SECURITIES OFFERED HEREBY, ANY INFORMATION SET FORTH IN THIS STATEMENT AND ANY SUPPLEMENTAL INFORMATION THAT MAY BE PROVIDED TO PROSPECTIVE INVESTORS BY THE GENERAL PARTNER AND THE MANAGER.

THE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM, AND EXCEPT AS PERMITTED PURSUANT TO THE TERMS OF THE FUND'S LIMITED PARTNERSHIP AGREEMENT, AS MAY BE AMENDED FROM TIME TO TIME. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THIS STATEMENT DOES NOT PURPORT TO BE ALL-INCLUSIVE NOR TO CONTAIN ALL THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE IN INVESTIGATING THE FUND. EACH INVESTOR MUST CONDUCT AND RELY ON ITS OWN INVESTIGATION AND EVALUATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION WITH RESPECT TO THE INTERESTS. INVESTORS SHOULD, WITH THE ASSISTANCE OF PROFESSIONAL ADVISORS, INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS APPLICABLE TO THEM IN RESPECT OF THE ACQUISITION, HOLDING AND DISPOSITION OF THE INTERESTS, AND AS TO THE INCOME AND OTHER TAX CONSEQUENCES TO THEM OF SUCH ACQUISITION, HOLDING AND DISPOSITION. SEE RISK FACTORS BELOW FOR A DISCUSSION OF CERTAIN FACTORS, WHICH SHOULD BE CONSIDERED IN CONNECTION WITH THE PURCHASE OF THE INTERESTS.

THE FUND CURRENTLY DOES NOT INTEND TO BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "COMPANY ACT"), AND THE GENERAL PARTNER AND THE MANAGER FOR THE FUND ARE NOT AND DO NOT INTEND TO BE REGISTERED AS INVESTMENT ADVISERS UNDER THE UNITED STATES INVESTMENT ADVISERS ACT OF 1940, AS AMENDED, OR UNDER THE LAWS OF ANY STATE OR FOREIGN JURISDICTION. CONSEQUENTLY, INVESTORS WILL NOT BE AFFORDED THE PROTECTIONS OF SUCH ACTS.

EXCEPT AS OTHERWISE INDICATED, THIS STATEMENT SPEAKS AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS STATEMENT NOR ANY SALE OF THE INTERESTS SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE FUND AFTER THE DATE HEREOF. THE INFORMATION CONTAINED IN THIS STATEMENT HAS BEEN COMPILED FROM SOURCES BELIEVED RELIABLE. PAST PERFORMANCE OF THE MANAGING MEMBERS OR THEIR AFFILIATES IS NOT A GUARANTEE OF FUTURE RESULTS OF THE FUND. INFORMATION PROVIDED BY THE MANAGING MEMBERS MAY CONTAIN FORWARD-LOOKING STATEMENTS THAT INVOLVE A HIGH DEGREE OF RISK AND UNCERTAINTY. ACTUAL RESULTS MAY DIFFER MATERIALLY FROM EXPECTATIONS DISCUSSED IN SUCH FORWARD-LOOKING STATEMENTS. THE FUND DOES NOT ASSUME ANY OBLIGATION TO CORRECT OR UPDATE THE HISTORICAL OR FORWARD-LOOKING INFORMATION PROVIDED TO ANY INVESTOR.

THIS STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FUND'S LIMITED

PARTNERSHIP AGREEMENT. IN ORDER TO EFFECTUATE THE PURCHASE OF THE INTERESTS, A PROSPECTIVE INVESTOR WILL BE REQUIRED TO EXECUTE THE LIMITED PARTNERSHIP AGREEMENT AND OTHER SUBSCRIPTION DOCUMENTS. IN THE EVENT THAT ANY OF THE TERMS, CONDITIONS OR OTHER PROVISIONS OF SUCH AGREEMENTS ARE INCONSISTENT OR CONTRARY TO THE DESCRIPTIONS AND TERMS IN THIS STATEMENT, SUCH AGREEMENTS SHALL CONTROL.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS STATEMENT OR ANY PRIOR OR SUBSEQUENT COMMUNICATION FROM THE GENERAL PARTNER, THE MANAGING MEMBERS, THE MANAGER, THE FUND OR THEIR AFFILIATES, OR ANY PROFESSIONAL ASSOCIATED WITH THIS OFFERING, AS LEGAL, TAX OR INVESTMENT ADVICE. PRIOR TO ACQUIRING AN INTEREST, EACH INVESTOR SHOULD CONSULT WITH AND RELY ON ITS OWN LEGAL, INVESTMENT, TAX, ACCOUNTING AND OTHER ADVISORS AS TO LEGAL, TAX AND ECONOMIC IMPLICATIONS OF THE INVESTMENT DESCRIBED HEREIN AND ITS SUITABILITY FOR SUCH INVESTOR.

**NOTICE TO NON-UNITED STATES RESIDENTS:** NO ACTION HAS BEEN OR WILL BE TAKEN IN ANY JURISDICTION OUTSIDE THE UNITED STATES OF AMERICA THAT WOULD PERMIT AN OFFERING OF THESE INTERESTS, OR POSSESSION OR DISTRIBUTION OF OFFERING MATERIAL IN CONNECTION WITH THE ISSUANCE OF THE INTERESTS, IN ANY COUNTRY OR JURISDICTION WHERE ACTION FOR THAT PURPOSE IS REQUIRED. IT IS THE RESPONSIBILITY OF ANY PERSONS WISHING TO PURCHASE THESE SECURITIES TO SATISFY THEMSELVES AS TO FULL OBSERVANCE OF THE LAWS OF ANY RELEVANT TERRITORY OUTSIDE THE UNITED STATES OF AMERICA IN CONNECTION WITH ANY SUCH PURCHASE, INCLUDING OBTAINING ANY REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER APPLICABLE FORMALITIES.

\* \* \* \*

Case 2:24-cv-04118-BCW   Document 8-29   Filed 07/26/24   Page 198 of 227

# TKF II, L.P.  RISK FACTORS

*An investment in the Fund involves a high degree of risk, and is suitable only for investors of substantial means who have no immediate need for liquidity of the amount invested and who can afford a risk of loss of all or a substantial part of such investment. There can be no assurance that the Fund's investment objectives will be achieved, or that a Limited Partner will receive a return of its capital. Investors may be subject to a number of risks, only some of which are set forth below. Such risks include, but are not limited to, those discussed below. In addition to the other information contained in this Statement, each prospective investor should consult with his, her or its personal legal, tax and financial advisers and carefully consider and evaluate the risks before executing any subscription documents with respect to the Fund.*

## General Risks

***Reliance on the General Partner and the Manager*** The Limited Partners will not have a right or power to participate in the management of the Fund. Accordingly, no investor should purchase any interest in the Fund unless it is willing to entrust all aspects of management of the Fund to the General Partner and the Manager. In addition, the Limited Partners will not receive detailed financial information issued by the business entities in which the Fund invests (the "***Portfolio Companies***"), which may be available to the Fund.

***Lack of prior management history*** The Fund, the General Partner, and the Manager are newly created entities with no prior operating history. It is possible that additional management resources, in the form of additional analysts or other investment professionals, will be required in order for the Fund to fully implement its investment and exit strategies. There can be no assurance that each of the investment professionals currently associated with the Manager and the General Partner will continue to be associated with the Fund throughout the Fund's anticipated term.

***Competition for investments*** The Fund will compete with other entities for the acquisition of investments. Such competition may come from groups such as institutional investors, investment managers, industrial groups, operating companies and merchant banks that have greater resources than the Fund and are owned by large and well-capitalized investors. There may be intense competition for investments of the type in which the Fund intends to invest, and such competition may result in less favorable investment terms than would otherwise be the case. Additional funds with similar investment objectives may be formed in the future by other unrelated parties. It is possible that competition for appropriate investment opportunities may increase, which may also require the Fund to participate in competitive bidding situations, the outcome of which cannot be guaranteed, thus reducing the number of investment opportunities available to the Fund and adversely affecting the terms upon which investments can be made. Participation in competitive bidding situations will also increase the pressure on the Fund with respect to pricing of transactions. Moreover, the Fund may incur bid, due diligence or other costs on investments which may not be successful. As a result, the Fund may not recover all of its costs, which would adversely affect returns. The Fund may be unable to find a sufficient number of attractive opportunities to meet its investment objectives. There can, therefore, be no assurance that investments of the Fund will meet all the investment objectives of the Fund, or that the Fund will be able to invest all of its available capital.

***Unspecified investments*** The capital commitments received from the Limited Partners pursuant to this offering are going into a blind pool. The Fund has not identified the particular investments it will make. Accordingly, an investor in the Fund must rely upon the ability of the General Partner and the Manager to identify suitable investments consistent with the Fund's investment objectives and policies. An investor will not have the opportunity to individually evaluate the relevant economic, financial and other information that will be utilized by the General Partner and the Manager in its selection of investments or otherwise approve of such investments. Moreover, the investment guidelines set forth in the Fund's limited partnership agreement, as it may be amended from time to time (the "***Partnership Agreement***"), are subject to the good faith interpretation of the General Partner and the Manager and transactions within such

objectives may be effected using a broad array of transaction types, structures and techniques.

***Issuer and non-issuer transactions*** The General Partner and the Manager intend that the Fund may acquire its investments through both issuer and non-issuer transactions. In the case of a non-issuer transaction, the Fund would purchase securities from existing shareholders (either directly or by means of a secondary market). In many cases, the price that the Fund must pay to acquire securities in a non-issuer transaction may exceed the price that the Fund would have paid if it were able to have acquired such securities directly from the issuer. Furthermore, in the event of a non-issuer transaction, there is no guarantee that the Fund will accede to the same rights (e.g., information rights, voting rights and right of first refusal, etc.) as the selling shareholder.

***Forward-looking statements*** Statements contained in this Statement and/or in other communications that are not historical facts are based on current expectations, estimates, projections, opinions and/or beliefs of the General Partner, the Manager and/or the Managing Members. Such statements involve known and unknown risks, uncertainties and other factors, and undue reliance should not be placed thereon. Moreover, certain information contained in this Statement constitutes "forward looking" statements, which often can be identified by the use of forward-looking terminology such as "may," "will," "seek," "should," "expect," "anticipate," "project," "estimate," "intend," "continue," "target," "plan" or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those set forth herein, actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

***No assurance of investment return*** The General Partner's and the Manager's task of identifying opportunities in private operating companies, managing such investments and realizing a significant return for investors is difficult. Many organizations operated by persons of competence and integrity have been unable to make, manage and realize such investments successfully. There is no assurance that the Fund will be able to invest its capital on attractive terms or generate returns for its investors. There is no assurance that the Fund's investments will be profitable, and there is a risk that the Fund's losses and expenses will exceed its income and gains. As such, there is no assurance of any distribution to the Limited Partners prior to, or upon, liquidation of the Fund.

***Valuation of securities*** Different methods of valuing securities may provide materially different results. Actual realized returns on all unrealized investments will depend among other things on the value of the securities at the time of disposition, any related transaction costs and the manner of sale. The Fund's investment program should be evaluated on the basis that there can be no assurance that the General Partner's and the Manager's assessment of the prospects of investments will prove accurate or that the Fund will achieve its investment objectives. Accordingly, the actual realized return on all unrealized investments may differ materially from the values presented to the Limited Partners.

***Long-term and illiquid investment within the Fund*** An investment in the Fund is a long-term commitment. Interests in the Fund are highly illiquid and have no public market value. No secondary market for the interests exists, and no such market will be established or supported by the General Partner. Furthermore, the sale or transfer of interests in the Fund is subject to approval of the General Partner and other restrictions contained in the Partnership Agreement. Consequently, Limited Partners may not be able to liquidate their investment in the Fund in the event of an emergency or for any other reason. An investment in the Fund is suitable only for persons and entities that have no need for liquidity with respect to their investments and can withstand a total loss of capital. The interests in the Fund have not been registered under the United States Securities Act of 1933, and no such registration is contemplated.

***Distributions in kind*** It is possible that not all portfolio investments will be realized by the end of the Fund's term. Although the General Partner and the Manager expect that the Fund's portfolio investments will be disposed of prior to dissolution, or be suitable for in-kind distribution at dissolution, the Fund may have to sell, distribute or otherwise dispose of investments at a disadvantageous time as a result of dissolution. In

5

such cases, in the General Partner's sole and absolute discretion, there may be in-kind distributions by the Fund to its partners of illiquid securities or instruments, whereas during the term of the Fund, the Fund may make cash distributions and in-kind distributions of marketable securities. There can be no assurance that Limited Partners will be able to dispose of any such securities or instruments or that the fair market value of such securities or instruments determined by the Fund for purposes of the determination of distributions and the calculation of the General Partner's carried interest ultimately will be realized. In addition, if a Limited Partner receives distributions in kind of any portfolio investment from the Fund, it may incur additional costs, risks and delays in connection with the disposition of such assets. Any such distribution or disposition could put downward pressure on the price of the issuer's securities.

*Economic conditions* Changes in economic conditions, including, for example, interest rates, credit availability, inflation rates, industry conditions, government regulation, competition, technological developments, political and diplomatic events and trends, tax and other laws and innumerable other factors, can affect the Fund's investments and prospects materially and adversely. None of these conditions is within the General Partner's or the Manager's control, and they may not be able to effectively anticipate these developments. These factors may affect the volatility, liquidity and value of the Fund's investments. Unexpected volatility or illiquidity could impair the Fund's profitability or result in losses.

*Diverse Partner group* There may be divergent and conflicting investment, legal, tax, business and other interests among the various Partners with respect to their investments in the Fund. The conflicting interests of individual Partners may relate to or arise from, among other things, the nature of investments made by the Fund, the structuring or the acquisition of investments and the timing of disposition of investments. As a consequence, conflicts of interest may arise in connection with decisions made by the General Partner or the Manager, including with respect to the nature or structuring of investments or distributions that may be more beneficial for one investor than for another investor, particularly with respect to investors' individual tax situations. In selecting and structuring investments appropriate for the Fund, the General Partner and the Manager will consider the investment, legal and tax objectives of the Fund and the Fund's Partners as a whole, and not the investment, tax, business or other objectives of any Limited Partner individually. The General Partner may form parallel funds for tax or other reasons, and the investment returns of the limited partners of any such parallel funds may differ from the investment returns of the Limited Partners of the Fund as a result of the structure of the acquisition and disposition of portfolio investments, the economic terms of such parallel funds or other reasons.

*Consequences of default* If a Limited Partner fails to pay in full any requested capital contributions, the General Partner may take certain actions that may result in a sale of such Limited Partner's interest in the Fund or a forfeiture of all or a portion of such Limited Partner's interest in the Fund. Additionally, the General Partner may pursue any available legal or equitable remedies, with the expenses of collection of the unpaid amount, including attorneys' fees, to be paid by such defaulting Limited Partner. The General Partner will be granted additional powers to deal with defaulting Limited Partners in the Partnership Agreement.

*Voluntary Withdrawals* Voluntary withdrawals of the Interests from the Fund are not permitted, except in limited instances when required or when necessary to comply with the laws or regulations applicable to a Limited Partner, to the extent so provided in the Partnership Agreement. As a result, investors may not be able to liquidate their investments prior to the end of the Fund's term. A withdrawn Limited Partner may not be entitled to immediate payment for its interest in the Fund. Any withdrawal of a Limited Partner may reduce the amount of Fund capital available for investment or other activities.

*Mandatory withdrawals* The General Partner may, under certain circumstances, require a Limited Partner to withdraw from the Fund. If a Limited Partner is required to withdraw from the Fund and/or prevented from making any future capital contributions, the Fund may face a shortfall. If the Fund is unable to finance the shortfall from other sources, it is possible that the Fund may be required to limit the scope of its investments or it may default on its obligations and/or its ability to continue operations may otherwise be

impaired.

***Economic interest of the General Partner and the Manager*** The existence of the General Partner's carried interest (which may be shared with the Manager and its Affiliates) may create an incentive for the General Partner and Manager to make more speculative investments on behalf of the Fund than it would otherwise make in the absence of such performance-based compensation. In addition, upon the dissolution of the Fund, the General Partner may receive carried interest distributions with respect to a distribution in-kind of non-marketable securities. The valuation of such securities for such purposes will be determined by the General Partner, as set forth in the Partnership Agreement. The clawback obligations of the General Partner and the Manager may create an incentive to defer the disposition of investments that would result in a realized loss or the completion of the liquidation of the Fund where a clawback obligation would be owed. Under the terms of the Partnership Agreement, the Manager is responsible for a portion of the clawback obligations. The Manager is also permitted by the Partnership Agreement to waive any portion of its management fee and invest the waived amount into the Fund as a capital contribution. These terms may discourage the Manager from expending cash received from the Management Fee for the benefit of the Fund. In addition, the General Partner and the Manager may be incentivized to make certain determinations with respect to allocation of capital, expenses, and leverage with respect to portfolio investments in a manner that favors its receipt of carried interest. Also, the members and partners of the General Partner and the Manager are generally subject to U.S. federal and local income tax (unlike certain of the Limited Partners). The General Partner and the Manager may be incentivized to operate the Fund, including to hold and/or sell Investments, in a manner that takes into account the tax treatment of carried interest. Investors should note in this regard that there is a lower capital gains tax rate for carried interest in respect of investments held for at least three years. While the General Partner and the Manager generally intend to seek to maximize pre-tax returns for the Fund as a whole, the General Partner and the Manager may nonetheless be incentivized, for example, to hold portfolio investments longer to ensure long-term capital gains treatment and/or realize investments prior to any change in law that results in a higher effective income tax rate on carried interest. The General Partner may waive or reduce carried interest obligations with respect to certain investors within the Fund. The General Partner may generally waive the carried interest for investors who are employees or former employees of the General Partner, the Manager, and their respective Affiliates.

***Liquidation*** If the Fund should become insolvent, the Limited Partners may be required to return with interest any property distributed that represented a return of capital, repay any distributions wrongfully made to them and forfeit any undistributed profits.

***Investments longer than term*** The Fund may make investments that may not be advantageously disposed of, or have liabilities that may not be resolved, prior to the date that the Fund will be dissolved, either by expiration of the Fund's term or otherwise. Although the General Partner and the Manager expect that investments will generally be disposed of prior to dissolution or will be suitable for in-kind distribution at dissolution, the General Partner has a limited ability to extend the term of the Fund, and the Fund may have to sell, distribute or otherwise dispose of investments or resolve litigation or other contingent liabilities at a disadvantageous time as a result of dissolution. In addition, although upon the dissolution of the Fund the General Partner and the Manager expect to timely reduce to cash and cash equivalents such assets of the Fund as the General Partner and the Manager shall deem it advisable to sell, subject to obtaining fair value for such assets and any tax or other legal considerations, there can be no assurances with respect to the time frame in which the winding up and the final distribution of proceeds to the Limited Partners will occur.

***Side Letters*** The General Partner may enter into a side letter or other similar agreement with particular Limited Partners in connection with their admission to the Fund without the approval of any other Limited Partner, which would have the effect of establishing rights under or altering the terms of the Partnership Agreement with respect to such Limited Partners in a manner more favorable to such Limited Partners than those applicable to other Limited Partners. Such rights or terms in any such side letter or other similar agreement may include, without limitation, (i) the exclusion of rights and obligations applicable to

7

particular investments (which may increase the percentage interest of other Limited Partners in, and contribution obligations of other Limited Partners with respect to, such investments), (ii) the reduction or elimination of certain fees and expenses that would otherwise be payable by a Limited Partner associated with its investment in the Fund; (iii) additional reporting obligations of the General Partner, (iv) waiver of certain confidentiality obligations, (v) consent of the General Partner to certain transfers by such Limited Partner, and (vi) rights or terms required by such Limited Partner in light of particular legal, regulatory or public policy characteristics of such Limited Partner. A Limited Partner that has a side letter with the General Partner may have the opportunity to receive most favored nation treatment with respect to the applicable provisions of the side letters of other Limited Partners, subject to certain limitations set forth in the master side letter entered into with each Limited Partner that has entered into a side letter. Limited Partners that do not have side letters with the General Partner will not participate in the most favored nation process, will not have notice of (unless they request to see the side letters) and will not receive the benefits of the rights obtained by other Limited Partners through side letters.

*Material non-public information* By reason of their responsibilities in connection with their other activities, the General Partner and the Manager (or their employees) may acquire confidential or material non-public information regarding or be restricted from initiating transactions in certain securities. The Fund will not be free to act upon any such information. Due to these restrictions, the Fund may not be able to initiate a transaction that it otherwise might have initiated and may not be able to sell a portfolio investment that it otherwise might have sold.

*Advisory Committee approvals* The Partnership Agreement will contain certain protections for investors against conflicts of interest faced by the General Partner and the Manager, but will not purport to address all types of conflicts that may arise. Under the Partnership Agreement, certain transactions that involve conflicts of interest between the General Partner, the Manager, and the Fund may be submitted to the Advisory Committee for resolution. However, the Advisory Committee will not necessarily represent the interests of all the Limited Partners, and the members of the Advisory Committee may themselves be subject to various conflicts of interest (including as investors in other entities related to owners of the Manager and/or the General Partner). In general, the Limited Partners will not be entitled to control the selection of members of the Advisory Committee.

*Limited access to information* Limited Partners' rights to information regarding the Fund will be specified, and strictly limited, in the Partnership Agreement. In particular, it is anticipated that the General Partner and the Manager will obtain certain types of material information from portfolio investments that will not be disclosed to Limited Partners because such disclosure is prohibited for contractual, legal, fiduciary or similar obligations outside of the General Partner's or the Manager's control. Decisions by the General Partner and the Manager to withhold information may have adverse consequences for Limited Partners in a variety of circumstances. For example, a Limited Partner that seeks to transfer its interests may have difficulty in determining an appropriate price for such interests. Decisions to withhold information also may make it difficult for Limited Partners to monitor the General Partner and the Manager and their performance. Additionally, it is expected that Limited Partners who designate representatives to participate on the Advisory Committee may, by virtue of such participation, have more information about the Fund and portfolio investments in certain circumstances than other Limited Partners generally, and may be disseminated information in advance of communication to other Limited Partners generally.

**Portfolio Company Risks**

***Early stage investments*** The Fund will pursue a venture capital strategy and will invest primarily in equity and equity-oriented securities of privately held early-stage companies. The Fund may often be the first source of professional financing for such companies. These companies typically have limited or no revenues, are not profitable and may require considerable additional capital to develop products, audiences, technologies and markets, acquire customers and achieve or maintain a competitive position. This additional capital may not be available at all, or on acceptable terms. Furthermore, the products, audiences, technologies and markets of such companies may not develop as anticipated, even after substantial expenditures of capital. Such companies may face intense competition, including competition from established companies with much greater financial and technical resources, more extensive development, manufacturing, marketing and service capabilities, and a greater number of qualified managerial and technical personnel. Typically, although the Fund may be represented by a partner of the General Partner or the Manager on a Portfolio Company's board of directors, each Portfolio Company will be managed by its own officers (who generally will not be affiliated with the Fund, the General Partner or the Manager). Portfolio Companies may have substantial variations in operating results from period to period and experience failures or substantial declines in value at any stage.

***Investments in Private Companies*** The Fund is expected to invest in privately held companies. These companies will sometimes be smaller in scale and less capitalized than larger, public companies, and therefore particularly susceptible to economic downturns. The availability of information about private companies may be limited, and to the extent it is available, it may be unreliable. These companies frequently have shorter operating histories, narrower product lines and smaller market shares than larger businesses, which render them more vulnerable to competitors' actions and market conditions, as well as general economic downturns. These companies are also more likely to depend on the management talents and efforts of a small group of persons and, as a result, the death, disability, resignation or termination of one or more of these persons could have a material adverse impact on these companies' ability to meet their obligations and execute their business plans. For these reasons, investments in private companies involve a high degree of risk and uncertainty, and therefore may cause the Fund to incur losses.

***Reliance on Portfolio Company management team*** The Fund will generally hold minority equity positions in its Portfolio Companies, with limited control and information rights. Each Portfolio Company's day-to-day operations will be the responsibility of such company's management team. Although the General Partner and the Manager will be responsible for monitoring the performance of each investment by the Fund, and the Fund will seek to invest in companies operated by strong management, there can be no assurance that the existing management team, or any successor, will be able to operate a Portfolio Company in accordance with the Fund's plans or policies. The success of each Portfolio Company depends in substantial part upon the skill and expertise of each Portfolio Company's management team. Additionally, Portfolio Companies will need to attract, retain and develop executives and members of their management teams. The market for executive talent is, notwithstanding general unemployment levels or developments within a particular industry, extremely competitive. There can be no assurance that Portfolio Companies will be able to attract, develop, integrate and retain suitable members of its management team and, as a result, the Fund may be adversely affected thereby. In addition, certain Portfolio Companies, or employees of Portfolio Companies, may engage in misconduct or otherwise act in a manner that adversely affects such Portfolio Companies or the Fund, without the knowledge of the General Partner or the Manager. Any instances of fraud, misconduct, and other deceptive or abusive practices committed by the management teams or other employees of Portfolio Companies in which the Fund has an investment may undermine the General Partner's and Manager's due diligence, investment monitoring and compliance efforts with respect to such companies. Further, any discovery or allegation of any such deceptive or abusive practices could adversely affect the valuations of the Fund's investments and may contribute to overall market volatility that may negatively impact the Fund's investment portfolio.

***Lack of diversification*** Except as set forth in the Partnership Agreement, the Fund is not subject to any diversification requirements and may invest in a limited number of companies, sectors, countries or regions. The Fund focuses on investments in securities of privately-held companies involved in the construction industry or companies that, in the General Partner's and the Manager's discretion, hold or may develop technology-based solutions relevant to the construction industry. To the extent the Fund concentrates its investments in a particular company, sector, country or region, its investments will become more susceptible to fluctuations in value resulting from adverse business or economic conditions affecting that particular company, sector, country or region. As a consequence, the aggregate return of the Fund may be adversely affected by the unfavorable performance of one or a small number of companies, sectors, countries or regions in which the Fund has invested. In certain cases, the Fund may acquire majority or 100% interests in Portfolio Companies, which could further increase the vulnerability of the Fund's portfolio.

***Legal and regulatory risks in Portfolio Companies*** Legal and regulatory changes could occur during the term of the Fund. The products and services of Portfolio Companies and some Fund assets may be subject to extensive and rigorous regulation by United States local, state and federal regulatory authorities and by foreign regulatory bodies. There can be no assurance that products and services developed by the Fund's Portfolio Companies will ever be approved by such governmental authorities, if such approval is required. There may be instances when the discovery of previously unknown problems with a product, service, manufacturer or facility could result in restrictions on the use or the manufacture of such product or delivery of such service, including costly recalls or even withdrawal of the product or service from the market. Such events, whether voluntary or mandated by a regulatory authority, typically result in an immediate reduction or discontinuation of revenues from the product or service worldwide. If such an event were to occur, it would likely have a significant and adverse effect on the performance of a particular Portfolio Company and could have a material adverse effect on the aggregate performance of the Fund.

***Availability of investment capital*** Early-stage investments often require several additional rounds of capital infusions before the Portfolio Company reaches maturity. If a venture capital investor does not have funds available to participate in subsequent rounds of financing, that shortfall may have a significant negative impact on both the Portfolio Company and the face value of the venture capital investor's original investment. Although the Fund may reserve sufficient liquidity to allow it to participate in follow-on rounds of financings, the Fund does not intend to provide all necessary follow-on capital required by any Portfolio Company. Accordingly, third-party sources of financing will likely be required. There is no assurance that such additional sources of financing will be available, or, if available, will be on terms beneficial to the Fund. Furthermore, the Fund's capital is limited and may not be adequate to protect the Fund from dilution in subsequent rounds of Portfolio Company financing.

***Reserves*** As is customary in the venture capital industry, the General Partner and the Manager may elect to establish reasonable reserves for follow-on investments by the Fund in Portfolio Companies, operating expenses, Fund liabilities and other matters. Estimating the appropriate amount of such reserves is difficult, especially for follow-on investment opportunities, which directly tie to the success and capital needs of Portfolio Companies. Inadequate or excessive reserves could impair the investment returns to the Limited Partners. If reserves are inadequate, the Fund may be unable to take advantage of attractive follow-on or other investment opportunities or to protect its existing investments from dilutive or similar terms. If reserves are excessive, the Fund may decline or forego attractive investment opportunities without ever identifying more advantageous opportunities.

***Lack of liquidity within the investment portfolio.*** The inherent nature of venture capital investing dictates a significant length of time between the initial investment and realization of gains, if any. Despite some historical examples of accelerated rates of return over a short period of time, venture capital investments, if successful, typically take five to seven years or more from the date of investment to reach a state of maturity where liquidity is possible. The Fund's investment portfolio will consist, to a significant extent, of investments in early-stage private companies. The marketability and value of each such investment will

depend upon many factors beyond the General Partner's and the Manager's control. Generally, the investments made by the Fund will be illiquid and difficult to value, and there will be little or no collateral to protect an investment once made. At the time of the Fund's investment, a Portfolio Company may lack one or more key attributes *(e.g.,* proven technology, marketable product, complete management team, or strategic alliances) necessary for success. There may be no readily available market for the Fund's investments, many of which will be difficult to value, and the disposal of a portfolio investment by the Fund may be prohibited or delayed many years from the date of initial investment for legal and/or regulatory reasons. The public market for the construction industry or companies that develop technology-based solutions relevant to the construction industry may be volatile and subject to the cyclical trends of the construction industry. Such volatility may adversely affect the development of Portfolio Companies, the ability of the Fund to dispose of investments, and the value of investment securities on the date of sale or distribution by the Fund.

*Risks of certain dispositions* In connection with the disposition of an investment in a Portfolio Company or otherwise, the Fund may be required to make representations about the business and financial affairs of the Portfolio Company typical of those made in connection with the sale of any business. It may also be required to indemnify the purchasers of such investment to the extent that any such representations are inaccurate, even if the Fund had no knowledge that the representations were inaccurate when made. These arrangements may result in the incurrence of contingent liabilities for which the General Partner may establish reserves or escrow accounts. In that regard, under certain circumstances described in the Partnership Agreement, the General Partner may make distributions of cash or securities to the partners that remain subject to recall from the partners for the payment (in whole or in part) of such contingent liabilities. These arrangements may result in contingent liabilities, which might ultimately have to be funded by the Fund.

*Non-controlling investments.* The Fund will typically hold non-controlling interests in its Portfolio Companies and, therefore, may have a limited ability to protect its position in such Portfolio Companies. As a condition to an investment in a Portfolio Company, it is expected that appropriate rights generally will be sought to protect the Fund's interests to the extent possible, however, there can be no assurance that such minority shareholder rights will be available or sufficient. Co-investments with third parties in Portfolio Companies may involve risks not present in portfolio investments where a third party is not involved, including the possibility that a third party investor may have financial difficulties resulting in a negative impact on such portfolio investment, may have economic or business interests or goals which are inconsistent with those of the Fund or may be in a position to take action contrary to the Fund's investment objectives. In addition, the Fund may in certain circumstances be liable for the actions of such third party co-investors.

*Due diligence risks* Before making investments, the General Partner and the Manager intend to conduct due diligence that it deems reasonable and appropriate based on the facts and circumstances applicable to each investment. When conducting due diligence and making an assessment regarding an investment, the General Partner and the Manager will rely on resources available to it, including information provided by the target of the investment and, in some circumstances, third-party investigations. The due diligence process may at times be subjective with respect to early stage companies for which only limited information is available. Accordingly, there can be no assurance that the due diligence investigation that the General Partner and the Manager will carry out with respect to any investment opportunity will reveal or highlight all relevant facts that may be necessary or helpful in evaluating such investment opportunity. Further, there can be no assurance that such an investigation will result in an investment being successful.

*Expedited transactions*. Investment analyses and decisions by the General Partner and the Manager may be undertaken on an expedited basis in order for the Fund to take advantage of available investment opportunities. In such cases, the information available to the General Partner or the Manager at the time of an investment decision may be limited, and the General Partner and the Manager may not have access to the detailed information necessary for a full evaluation of the investment opportunity. The Fund may

Case 2:24-cv-04118-BCW   Document 8-29   Filed 07/26/24   Page 206 of 227

conduct its due diligence activities over a very brief period of time and may assume the risks of obtaining certain consents or waivers under contractual obligations. In addition, the General Partner and the Manager may rely upon independent consultants or advisors in connection with the evaluation of proposed investments. There can be no assurance that these consultants or advisors will accurately evaluate such investments. While the General Partner and the Manager expect to negotiate representations, warranties, termination rights and other protections, such rights may not be available or, if available, the General Partner in consultation with the Manager may elect not to exercise them.

***Securities laws restrictions on trading*** A partner, officer, employee or other representative of the General Partner, Manager or other Affiliate of the Fund may serve as a director of a Portfolio Company. As a result, the Fund (through its representatives or otherwise) may receive or be deemed to receive information that would restrict its ability to cause the Fund to buy or sell securities of a company for substantial periods of time when profit could otherwise be realized or loss avoided, which may adversely affect the Fund's ability to buy, sell, distribute or otherwise dispose of securities. In addition, the ability of the Fund to execute trades in securities of these companies may also be restricted by securities laws, including but not limited to Section 16 of the United States Securities Exchange Act of 1934, as amended, and Rule 144 promulgated under the United States Securities Act of 1933, as a result of the board participation or extent of ownership of the Fund and its Affiliates.

***Intellectual Property Risks*** Some Portfolio Companies rely on a combination of patent, copyright, trademark and trade secret protection and non-disclosure agreements to establish and protect proprietary rights, including source code. There can be no assurance that the Fund or a Portfolio Company will be able to protect these rights or will have the financial resources to do so, or that competitors will not develop technologies substantially equivalent or superior to a Portfolio Company's technologies. Unauthorized access or theft of source code and other proprietary information may make a Portfolio Company or its products and services more vulnerable to malicious attack. While piracy can adversely affect Portfolio Companies' revenue, the impact on revenue from outside the United States can be particularly significant, especially in countries where laws are less protective of intellectual property rights. The absence of harmonized patent laws across national borders makes it more difficult to ensure consistent respect for patent rights. Reductions in the legal protection for software intellectual property rights could adversely affect Portfolio Companies.

***Third-party Infringement Claims*** A Portfolio Company may, from time to time, receive notices from others claiming such Portfolio Company has infringed their intellectual property rights. The number of these claims may grow because of constant technological change in the software industry, increased user-generated content, the extensive patent coverage of existing technologies, and the rapid rate of issuance of new patents. Additionally, Portfolio Companies may use "open source" software in their products, or may use such software in the future. Such open source software is licensed by its copyright holders under licenses that in some cases may require disclosure of the company's code to third parties. Copyright owners or third parties may allege that a Portfolio Company has not complied with the conditions of one or more of these licenses. To resolve these and other intellectual property infringement claims, the Fund and/or Portfolio Companies may enter into royalty and licensing agreements on terms that are less favorable than currently available, stop selling or redesign affected products, or pay damages to satisfy indemnification commitments with customers. These outcomes may cause operating margins to decline. In addition to money damages, in some jurisdictions plaintiffs can seek injunctive relief that may limit or prevent importing, marketing and selling products that have infringing technologies. In some countries, an injunction can be issued before the parties have fully litigated the validity of the underlying patents.

***Unfunded Pension Liabilities of 80%-Owned Portfolio Companies*** Recent court decisions have suggested that, where an investment fund owns 80% or more of a Portfolio Company, the fund (and any other 80%-owned Portfolio Companies of the fund) might be found liable for certain pension liabilities of such a Portfolio Company to the extent the Portfolio Company is unable to satisfy such liabilities. Although the Fund intends to manage its investments to minimize any such exposure, the Fund may, from time to time,

12

own an 80% or greater interest in a Portfolio Company that has unfunded pension fund liabilities. If the Fund (or other 80%-owned Portfolio Companies of the Fund) were deemed to be liable for such pension liabilities, this could have a material adverse effect on the operations of the Fund and the companies in which the Fund invests.

## Management Risks

***Dependence on the management team*** The Fund will be dependent on the activities of the General Partner, the Manager and their managers and employees (the "***Investment Team***") and will be particularly dependent upon the Managing Members. The General Partner has discretion over the investment of the capital committed to the Fund, as well as the ultimate realization of any profits, but will receive advice from the Manager. As such, the pool of funds in the Fund primarily represents a blind pool of funds. Therefore, the Fund and the Limited Partners will be relying on the management expertise of the Managing Members and the other members of the Investment Team in identifying, acquiring, administering and disposing of the Fund's investments. Past investment performance by the Managing Members or the Investment Team provides no assurance of future results, and there can be no assurance that the Fund will be able to duplicate prior levels of success of any member of the Investment Team or their prior investment vehicles. The loss of any Managing Member or another member of the Investment Team could have a material, adverse effect on the Fund. Additional partners may be admitted to the General Partner or the Manager following the Fund's initial closing, and the Limited Partners will have no power to prevent any specific person from being admitted to the General Partner or the Manager as a partner thereof. A Majority-in-Interest of the Limited Partners (excluding the vote of ES, Arken and any other entities controlled by them) will be able to remove the General Partner, with or without cause, in accordance with Section 5.7 of the Partnership Agreement and, in that event and until a suitable successor General Partner can be identified and appointed, it is possible the performance of the Fund may be adversely affected. The track record, investment expertise and industry knowledge of a successor General Partner may be different from the General Partner. Similarly, if for any reason the Managing Members or another member of the Investment Team should cease to be involved in the investment management of the Fund, suitable replacements may take some time to identify and obtain, with the result that the performance of the Fund may be adversely affected. If for any reason the Managing Members or another member of the Investment Team should cease to be involved in the investment management of the Fund, suitable replacements may be difficult to obtain, with the result that the performance of the Fund may be adversely affected.

***Other activities*** The members of the Investment Team and their Affiliates will devote only such portion of their time to the affairs of the Fund as they consider appropriate in their respective judgment to manage effectively the affairs of the Fund. Other activities and responsibilities of the Investment Team -- including responsibilities to Affiliates of the General Partner or the Manager with which such personnel are associated, or with which they may become associated in the future -- will require them to devote substantial amounts of their time to matters unrelated to the business of the Fund. For example, the Managing Members are the Chief Executive Officer and President, and members of the Board of Directors, of EquipmentShare.com Inc, a fast-growing technology company in the construction industry, as well as other businesses related to the construction industry. Other members of the Investment Team and of the Manager are affiliated with Romulus Capital Management LLC ("Romulus Capital"), a venture capital fund whose affiliated entities are investors in EquipmentShare.com Inc, and as such have significant responsibilities both to Romulus Capital and its portfolio companies.

***Indemnification*** The Fund will be required to indemnify the General Partner, the Manager, their partners, members, employees, agents, Affiliates of the foregoing and the members of the Advisory Committee for liabilities incurred in connection with the affairs of the Fund. Such liabilities may be material and have an adverse effect on the returns to the Limited Partners. For example, in their capacity as director of Portfolio Companies of the Fund, a person may be subject to derivative or other similar claims brought by shareholders of such companies. The indemnification obligations of the Fund would be payable from the assets of the Fund, including the unpaid capital commitments of the Limited Partners. If the assets of the Fund are insufficient, the General Partner may recall distributions made to the Limited Partners.

***Reliance on technology***. Certain strategies and critical aspects of the General Partner's and the Manager's operations are reliant on technology, including hardware, software and telecommunications systems.

14

Significant parts of the technology used in the management of the Fund may be provided by third parties and are therefore beyond the General Partner's and the Manager's direct control. Although the General Partner and the Manager seek, on an ongoing basis, to ensure adequate backups of software and hardware where possible and the General Partner and the Manager will attempt to conduct adequate due diligence and monitoring of providers, if such efforts are unsuccessful or inadequate, software or hardware errors or failures may result in errors, data loss and/or failures in trade execution, risk management, portfolio management, compliance or accounting. Errors or failures may also result in the inaccuracy of data and reporting or the unavailability of data or vulnerability of data to the risk of loss or theft. Errors may occur gradually and once in the code may be very hard to detect and can potentially affect results over a long period of time. If an unforeseeable software or hardware malfunction or problem is caused by a defect, virus or other outside force, the Fund may be materially adversely affected.

In particular, the General Partner and the Manager may rely on cloud (including private and public cloud-based) technology for certain operations, including data storage. Cloud-based technology, like any electronic data storage or processing technology, is not fail-safe. It may be subject to certain defects, failures or interruptions of service beyond the General Partner's and the Manager's direct control. It is also possible that such technology could be compromised by a third party, including through the use of malicious software or programs, such as viruses, which may expose the General Partner, the Manager and the Fund to theft (of data or other assets) and/or significant business interruption. In addition, a software provider may cease operations or be relatively thinly capitalized and the General Partner's, the Manager's and the Fund's ability to be made whole after any loss may be compromised as a result.

***Cyber security, breaches and identity theft***. Cyber security incidents and cyberattacks have been occurring globally at a more frequent and severe level and will likely continue to increase in frequency in the future. The General Partner's and the Manager's and their respective service providers' information and technology systems may be vulnerable to damage or interruption from computer viruses and other malicious code, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches (by physical or electronic means), usage errors by their respective users or service providers, power, communications or other service outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. If unauthorized parties gain access to such information and technology systems, they may be able to steal, publish, delete or modify private and sensitive information. Although the General Partner and the Manager expect to implement, and service providers may implement, various measures to manage risks relating to these types of events, such systems could be inadequate and, if compromised, could become inoperable for extended periods of time, or cease to function properly or fail to adequately secure private information. Breaches such as those involving covertly introduced malware, impersonation of authorized users and industrial or other espionage may not be identified even with sophisticated prevention and detection systems, potentially resulting in further harm and preventing it from being addressed appropriately. The General Partner and the Manager may have to make a significant investment to fix or replace any inoperable or compromised systems. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the General Partner's and the Manager's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors (and the beneficial owners of investors) and the intellectual property and trade secrets of the General Partner and the Manager. Such a failure could harm the General Partner and the Manager's reputation, subject the General Partner, the Manager and their respective Affiliates (including the Fund) to legal claims and otherwise affect their business and financial performance.

***Adequacy and Availability of Insurance*** While the Fund may seek to make investments where insurance and other risk management products are, to the extent available on commercially reasonable terms, utilized to mitigate the potential loss resulting from catastrophic events and other risks customarily covered by insurance, such coverage may not always be practicable or feasible. Moreover, it will not be possible to insure against all such risks, and any insurance proceeds from covered risks may be inadequate to completely or even partially cover a loss of revenues, an increase in operating and maintenance expenses

and/or any necessary replacement or rehabilitation, as applicable. Certain losses of a catastrophic nature (i.e., those caused by force majeure events) may be either uninsurable or insurable at such high rates as to adversely impact the Fund's profitability if such insurance were obtained.

## Legal, Tax and Regulatory Risks

***Tax Risks*** Certain federal income tax considerations applicable to this offering by the Fund are summarized in "Tax Considerations" of this Statement. This discussion under "Legal, Tax, and Regulatory Risks" and the discussion in "Tax Considerations" of this Statement do not cover all material U.S. federal income tax considerations, and do not take into account any prospective investor's particular financial or tax situation and assume that an investor is sophisticated in tax matters or has retained its own tax advisors regarding possible U.S. federal, state and local tax consequences of an investment in the Fund. An investment in the Fund involves complex U.S. federal, state and local income tax considerations that will differ for each Limited Partner. Limited Partners generally will be required to include in their U.S. federal taxable income their allocable shares of the Fund's items of income, gain, deduction and loss, regardless of whether and to what extent the Fund makes distributions to its investors.

Each Limited Partner should consult with its tax advisors concerning the U.S. federal, state and local tax consequences arising from its investment in the Fund, and should review this discussion and the "Tax Considerations" section of this Memorandum for a discussion of certain federal income tax considerations.

***Risks related to U.S. tax-exempt investors*** Tax-exempt entities, though generally exempt from tax, are subject to U.S. Federal income tax on their unrelated business taxable income ("UBTI") which is income derived from a trade or business regularly carried on by a tax-exempt entity that is unrelated to its exempt purpose (including an unrelated trade or business regularly carried on by a partnership of which the entity is a partner). UBTI generally does not include rents, dividends, interest and gains from the sale of property that is neither inventory nor held for sale to customers in the ordinary course of business, but does include operating income from operating assets that are held in a "flow-through" entity for U.S. Federal income tax purposes. UBTI can also be generated by any fees for services paid to the Fund. If a tax-exempt entity's acquisition of an interest in a partnership is debt-financed, or a partnership incurs "acquisition indebtedness" that is allocated to the acquisition of a partnership investment, then all or a portion of the income attributed to the debt-financed property would be included in UBTI regardless of whether such income would otherwise be excluded as dividends, interests, rents, gain or loss from sale of eligible property or similar income. Accordingly, tax-exempt investors may recognize UBTI as a result of investing in the Fund, and in such instance they would be subject to U.S. Federal income tax at corporate rates. The General Partner will not be liable for the recognition of any UBTI by an investor with respect to an investment in the Fund.

***Risks related to non-U.S. investors*** Non-U.S. investors may have U.S. income tax payment and tax return filing obligations with respect to (1) their allocable shares of the Fund's income that is treated as effectively connected with a U.S. trade or business ("ECI"), and (2) the disposition of their Interests. Any gain or loss of a non-U.S. investor that is realized in connection with the (actual or constructive) disposition of a "United States real property interest" (which may include Interests in the Fund and in certain subsidiary entities) generally would be treated as ECI. Further, if the Fund were deemed as engaged in a U.S. trade or business, any non-U.S. investor in the Fund would also be considered to be so engaged, non-U.S. investors would thus be liable for U.S. Federal income tax on their distributive shares of ECI, and the Fund will be required to withhold on such ECI. In addition, a non-U.S. investor will be subject to a 30% U.S. Federal withholding tax on certain U.S.-source income that is not ECI, such as dividends, interest and other passive income. This withholding may be reduced or eliminated under applicable income tax treaties. Non-U.S. investors that are corporations may also be subject to an additional 30% "branch profits tax" with respect to their distributive shares of ECI of the Fund. The branch profits tax may be reduced by an applicable income tax treaty.

***Legal, legislative and regulatory risks*** Legal, legislative and regulatory changes could occur during the

term of the Fund that may adversely affect the Fund, its Portfolio Companies or the investors. For example, changes in laws and regulations applicable to taxation of carried interest may result in certain types of investments and/or investment returns being treated differently and accordingly may influence the General Partner's and the Manager's decisions as to how to best structure the investment profiles of the Fund. The Fund may have limited legal recourse in the event of a dispute, and remedies might have to be pursued in the courts of a variety of locations. There can be no assurance that regulations promulgated in locations where the Fund invests will not adversely affect the Fund or its portfolio investments.

*Taxes in other jurisdictions* Prospective Limited Partners should also consider the potential state, local and non-U.S. tax consequences of an investment in the Fund. In addition to being taxed in its own state or locality of residence, a Limited Partner may be subject to tax return filing obligations and income, franchise and other taxes in jurisdictions in which the Fund operates. Potential Limited Partners should consult their own tax advisors regarding the tax consequences of an investment in the Fund. Income or gains from investments held by the Fund may be subject to withholding taxes or other taxes in jurisdictions, subject to the possibility of reduction under applicable tax treaties or arrangements between states.

*Investment Company Act of 1940* The General Partner believes the nature of the Fund will not subject it to the registration requirements of the United States Investment Company Act of 1940, as amended (the "*Company Act*"). However, there is no assurance that the General Partner's belief in this regard will continue to be correct. In order to ensure that the Fund may continue to rely upon an exemption from registration under the Company Act, appropriate representation and undertakings will be obtained from the Limited Partners. Due to the various burdens of compliance with the Company Act, the performance of the Fund's investment portfolio could be materially adversely affected, and risks involved in financing developing companies could substantially increase, if the Fund becomes subject to the Company Act. Neither the Fund nor its counsel can assure investors that, under certain conditions, changing circumstances, or changes in the law, the Fund may not become subject to the Company Act or other burdensome regulation.

*Investment Advisers Act of 1940* Neither the General Partner nor the Manager is currently registered with the Securities and Exchange Commission or any state administrator as an investment adviser and, consequently, investors will not be afforded the protections of the United States Investment Advisers Act of 1940 (the "*Advisers Act*") or similar state acts. The General Partner and the Manager believe that the nature of the Fund will not subject either of them to such registration requirements. There is no assurance that the General Partner's and the Manager's beliefs in this regard will continue to be correct. In order to ensure that the General Partner and the Manager and their respective Affiliates may continue to rely upon an exemption from registration under the Advisers Act, the Fund may have to be operated in a manner that allows it to be a "venture capital fund," which may limit the ability of the Fund to make certain types of investments, which in turn could materially adversely affect the returns to the Limited Partners. Due to the various burdens of compliance with the Advisers Act, the performance of the Fund's investment portfolio could be materially adversely affected, and risks involved in financing developing companies could substantially increase, if the General Partner, the Manager or any of their respective Affiliates were required to register under the Advisers Act or with any state administrator. None of the General Partner, the Manager or their respective counsel can assure investors that, under certain conditions, changing circumstances or changes in law, the General Partner, the Manager or any of their respective Affiliates may not be required to register under the Advisers Act or under similar state acts.

*Absence of recourse* The governing documents of the Fund limit the circumstances under which the General Partner, the Manager and their Affiliates, including their officers, directors, partners, employees, shareholders, members, and other agents, can be held liable to the Fund or the Limited Partners. As a result, investors may have a more limited right of action in certain cases than they would have in the absence of such limitations.

*Audit risks* The Fund may take positions with respect to certain tax issues that depend on legal conclusions

not yet addressed by the courts. Should any such positions be successfully challenged by the Internal Revenue Service (the "**Service**") or another applicable taxing authority, there could be a material adverse effect on the Fund and the Limited Partners. It is possible that an audit of the Fund's tax return by the Service, if conducted, may result in an audit of a Limited Partner's U.S. tax return, if any. A Limited Partner that files a U.S. tax return must report each Fund item for U.S. federal income tax purposes consistent with its treatment on the Fund's return, unless such Limited Partner files a statement with its return that identifies the inconsistency. In the event of an audit, the tax treatment of all Fund items may be determined at the Fund level in a single proceeding rather than in separate proceedings with each Limited Partner. The General Partner will be the "partnership representative for the Fund and as such, the General Partner will have sole authority to negotiate and solve tax audits with the Service. The partnership representative's actions are binding on the Fund and the Limited Partners.

*SEC investigations* There can be no assurance that the Fund, the General Partner, the Manager or any of their respective Affiliates will avoid regulatory examination and possible enforcement actions in the future. Recent SEC enforcement actions and settlements involving U.S.-based private fund advisers have involved a number of issues, including the undisclosed (or insufficient disclosure of) allocation of the fees, costs and expenses related to transactions and operations. The SEC or any other governmental authority, regulatory agency or similar body may take issue with practices of the General Partner or the Manager or any of their respective Affiliates as they pertain to Fund activities and operations. In such instances, the General Partner and Manager and/or such Affiliates may be at risk for regulatory sanction. Even if an investigation or proceeding does not result in a sanction, the Fund, the General Partner, the Manager or their respective Affiliates may be subject to adverse publicity relating to the investigation, proceeding or proposed imposition of any such sanction. The adverse publicity relating to the investigation, proceeding or proposed imposition of any such sanction could harm the Fund, the General Partner, the Manager or their respective Affiliates' reputations which may adversely affect the Fund's investment performance by hindering its ability to obtain favorable financing or consummate a potentially profitable investment.

## Conflicts of Interest

The Managing Members, the General Partner, the Manager and their Affiliates engage, or may engage, in a broad range of activities, including investment activities for their own account. In the ordinary course of conducting its activities, the interests of the Fund may conflict with the interests of the Managing Members, the Manager and the General Partner. A description of certain of these potential conflicts of interest is provided below. The discussion below does not necessarily describe all conflicts that may arise. Any references to the Managing Members, the Manager, and/or the General Partner, will be deemed to include their respective Affiliates, partners, members, shareholders, officers, directors and employees, as applicable.

*Direct Conflicts with Respect to Investment Opportunities* The General Partner, the Manager, their principals, their Affiliates and EquipmentShare.com Inc ("*Conflict Parties*") may hold direct investments in Portfolio Companies and companies that are potential Portfolio Companies. The Conflict Parties may therefore be directly adverse to the Partnership to a greater extent than in many other similar private investment vehicles. In addition, the allocation of investment opportunities by the General Partner and the Manager require them to make subjective judgments regarding their good faith determination of the appropriateness of certain investments for the Fund or other investors. The General Partner and the Manager may be conflicted when making such judgments in the event they have disparate economic interests as between the Fund and such other investors.

Further, the Conflict Parties are not precluded from engaging directly or indirectly in any other business or activity, including exercising investment advisory and management responsibility and buying, selling or otherwise dealing with investments for their own accounts, for the accounts of their family members and estate or wealth planning vehicles, and for the accounts of other funds or business entities to the extent not otherwise restricted by the Partnership Agreement.

*EquipmentShare as a Strategic Investor* The relationship between the General Partner and EquipmentShare.com Inc ("*ES*"), a strategic investor of the Fund which is an Affiliate of the General Partner, may present conflicts of interest, including those described below. The General Partner may enter into a Side Letter with ES, which may have the effect of amending certain terms of the Partnership Agreement as they apply to ES, including by reducing or eliminating certain fees and expenses that would otherwise be payable by ES associated with its investment in the Fund. ES may engage in transactions (including investment, commercial and acquisition transactions) with one or more of the Fund's Portfolio Companies in manners that differ materially from the transactions entered into by the Fund. Investors in the Fund should be aware that these transactions may present conflicts of interest and that ES nonetheless intends to pursue such transactions actively. The General Partner will attempt to resolve any conflicts of interest by exercising good faith judgment considering the interests of the Fund and ES taken as a whole and believes that it will generally be able to resolve any conflicts on an equitable basis, although it is possible that potential conflicts may not be resolved in favor of the Fund.

*Relationship with ES* Members of the Investment Team serve as directors and/or officers or ES and thus have fiduciary duties to ES. Therefore, such persons may at times act adversely to the interests of the Limited Partners and the Fund. In particular, such persons may negotiate transactions in which ES receives benefits at a direct cost to the Fund. For example, the Fund may invest in Portfolio Companies that enter into, or have entered into, agreements (including investment, commercial and acquisition transactions) with ES, and such commercial agreements may be negotiated by the principals of the General Partner and/or the Manager. The Fund's investment in such Portfolio Company thus may directly help ES's arrangements and economic objectives. The principals of the General Partner and the Manager are obligated by their fiduciary duties, and incentivized by their compensation arrangements, to act in the best interest of ES and its stakeholders, and in doing so they may at times act at the expense of the Fund and its Limited Partners.

*Relationship with Romulus Capital* The General Partner will initially be owned by Arken LLC, a Missouri

limited liability company ("Arken), and RCO TKF LLC, a Delaware limited liability company ("RCO TKF").  Arken is owned and controlled by William Schlacks and Jabbok Schlacks, who are officers and directors of ES.  Neil Chheda is a director of ES and also is general partner and/or has an economic interest in each of RC EquipmentShare Growth VI L.P., RC EquipmentShare Growth VII L.P., Romulus Capital II LP, Romulus Capital III L.P., Romulus EquipmentShare Growth LP, Romulus EquipmentShare Growth II LP, Romulus EquipmentShare Growth III LP, PROOF II ES, LLC, PROOF II RC, LLC and Schlacks 2020 Transfer LLC, each of which is an investor in ES.  Each of RCO TKF and the Manager are owned and controlled by Joey Kim and Warren Chia who are employees or contractors of RC Opportunity LLC .  RC Opportunity LLC is owned and controlled by Neil Chheda. All of RCO TKF, RC Opportunity LLC, RC EquipmentShare Growth VI L.P., RC EquipmentShare Growth VII L.P., Romulus Capital II LP, Romulus Capital III L.P., Romulus EquipmentShare Growth LP, Romulus EquipmentShare Growth II LP, Romulus EquipmentShare Growth III LP, PROOF II ES, LLC, PROOF II RC, LLC and Schlacks 2020 Transfer LLC may be considered to be Affiliates of Romulus Capital.  Romulus Capital also operates other investment funds and investment mandates that may overlap with the Fund. While Romulus Capital has policies governing conflicts of interest, there can be no guarantee that any conflicts will be resolved in favor of the Fund. In its capacity as the Manager of the Fund, RCO TKF LLC acts as an agent of the General Partner and receives information about the Fund, its investment strategies and its portfolio companies, but has no fiduciary or direct contractual relationship with the Partnership or the Limited Partners. RCO TKF LLC is also permitted to waive any portion of its Management Fee and convert such waived portion into a Capital Contribution in the Fund; any such waivers may discourage the Manager from expending cash received from the Management Fee for the benefit of the Fund.

***First Closing Investors in the Fund and Capital Commitment Reduction Rights***   Arken and RC Opportunity LLC each intend to invest in and become a limited partner in the Fund in the first closing of the Fund, together with ES. After the first closing, Arken, RC Opportunity LLC and ES will each be permitted, under the terms of the Partnership Agreement, to reduce their capital commitment to the Fund in their discretion without penalty.

***Other Business and Competing Activities*** The General Partner, affiliated Limited Partners (including ES), the Manager, the Advisory Committee and their respective members, managers, directors, officers, partners, employees and agents may exercise investment responsibility, or otherwise engage, directly or indirectly, in any other business, irrespective of whether any such business is similar to, or identical with, the business of the Fund, which may include purchasing, selling, holding or otherwise dealing with investments. Such persons have fiduciary duties and obligations with respect to other entities (including ES and Romulus), which may have made or may make investments along lines substantially similar to those to be made by the Fund. The fiduciary duties owed to other parties may be in direct conflict with the interests of the Fund, and there will be occasions when such conflicts are not resolved in favor of the Fund.  To the fullest extent permitted by law, neither the Fund, nor any Limited Partner, solely by reason of being a Limited Partner in the Fund, will have any right to participate in any manner in any profits or income earned or derived by or accruing to the General Partner, affiliated Limited Partners (including ES), the Manager the Advisory Committee or their respective members, managers, directors, officers, partners, employees, agents, and Affiliates from the conduct of any business or any investment activity other than the business of the Fund or from any transaction or other investment effected by any such Person for any Person other than that of the Fund.

The Managing Members, the Manager, and the General Partner may work on projects for themselves or other client that do not relate to the Fund. The Managing Members, the Manager, and the General Partner may, through other investments, including other investment funds, have interests in investments in which the Fund invests as well as interests in investments in which the Fund does not invest, including but not limited to investment in companies that were reviewed by or for the Fund but in which the Fund did not invest as a Portfolio Company. Conflicts of interest may arise in allocating investment opportunities, management time, services or functions of the Managing Members, the Manager, and the General Partner between and among the Fund and other activities, client and/or entities. In addition, the Managing Members,

the Manager, and the General Partner may have a greater financial interest in activities, clients and/or entities that are unrelated to the Fund.

*Allocation of Investment Opportunities*. The Manager and its Affiliates may, now or in the future, manage the investments of other funds, which invest in assets eligible for purchase by the Fund (collectively, the "Other Funds"). The investment objective, strategies and policies, fee arrangements and other circumstances of the Fund may vary from those of Other Funds. The Manager may, from time to time, be presented with investment opportunities that fall within the investment objectives of the Fund and Other Funds, and in such circumstances the Manager expects to allocate such opportunities among the Fund and such Other Funds on a basis that the Manager determines in good faith is appropriate taking into consideration such factors as the Manager determines, including but not limited to the capital available to Fund and such Other Funds, any restrictions on investment, the sourcing of the transaction, the size of the transaction and the other portfolio investments of the Fund and such Other Funds, the relation of such opportunity to the investment strategy of the Fund and such Other Fund, reasons of portfolio balance, the nature and extent of involvement in the transaction on the part of the respective teams of investment professionals for the Fund and each such Other Fund, potential conflicts of interest, including whether the Fund or such Other Fund has an existing investment in the opportunity in question, tax, legal or regulatory considerations and other considerations deemed relevant by the Manager. The Manager's investment decision with respect to the Fund may differ from the Manager's investment decision with respect to any Other Fund.

*Investor Due Diligence Information*. Due in part to the fact that potential investors in the Fund may ask different questions and request different information, the General Partner may provide certain information to one or more prospective investors that it does not provide to all of the prospective or current investors of the Fund. In addition, certain Limited Partners may invest on terms that provide access to information that is not generally available to other Limited Partners and, as a result, may be able to act on such additional information that other Limited Partners do not receive.

*Relationship with Service Providers* The General Partner may select one or more entities associated with the General Partner to provide services to the Fund, including the Manager and an entity to provide outsourced accounting services. The agreements and arrangements among the Fund, the General Partner, its partners, the Manager, their respective Affiliates and such service providers have been established by the General Partner and are not the result of arms-length negotiations. By acquiring an interest in the Fund, each investor will be deemed, to the extent possible under applicable law, to have waived any claim with respect to the existence of any conflict of interest with respect to the selection of such service providers by the General Partner, even if any such entity is an Affiliate of the General Partner.

*Other Fees*. The General Partner and the Manager may receive certain fees or other compensation from companies in which the Fund has interests in connection with the purchase or disposition of investments or in connection with unconsummated transactions (*e.g.*, break-up, directors' organizational, set-up, advisory and other similar fees). Although these fees will offset the Management Fee, conflicts may arise with respect to the payment of such fees.

*Co-investments*. The General Partner and its Affiliates may, from time to time, offer co-investments to one or more Limited Partners or other private investors, groups, partnerships, or corporations, when the General Partner deems it appropriate and consistent with the interests of the Fund. Such co-investments may reduce the amount the Fund can invest in any given opportunity and the General Partner may be unable to make as large of an investment on behalf of the Fund as otherwise might be desirable. In addition, the allocation of investments between co-investors and the Fund will be at the General Partner's discretion and if the co-investors receive more favorable economic terms for the same investment than the Fund, the General Partner may have a conflict of interest with respect to allocating investments between the co-investors and the Fund. The General Partner is not obligated to arrange co-investment opportunities or to offer any investor the opportunity to co-invest and no such investors or beneficial owners will be obligated to

21

participate in such an opportunity if offered. Any investment by co-investors alongside the Fund will be subject to approval by the General Partner in its sole discretion, on a case-by-case basis and by determining whether such co-investment is appropriate. If approved, the General Partner will allocate an investment among the Fund, on the one hand, and the co-investors, on the other hand, in its sole discretion, taking into account factors including, but not limited to: (i) the ability of a co-investor to commit to invest in a short period of time, in light of the timing constraints applicable to the co-investment; (ii) the ability of a co-investor to commit to a significant portion of such opportunity; (iii) whether a co-investor is a strategic investor; (iv) the size of a co-investor commitment to or investment in the Fund; (v) a co-investor's tenure as an investor with the General Partner or its Affiliates; and (vi) tax and regulatory considerations relevant to a co-investor and the particular co-investment opportunity.

Because co-investments will not be made through the Fund, any compensation received in connection with a co-investment does not arise out of the investment activities of the Fund or actions taken directly or indirectly by the Manager, and/or the General Partner on behalf of the Fund and, therefore, none of such fees and other co-investor-related compensation will reduce or offset the Management Fee paid by the Fund.

***Actions For the Benefit of the Fund*** The General Partner and the Manager may be prohibited from taking action for the benefit of the Fund: (i) due to confidential information acquired or obligations incurred in connection with an outside activity permitted to the General Partner and the Manager, their respective Affiliates, equity holders or other related persons; (ii) in consequence of an equity holder, Affiliate or other related person of the General Partner or the Manager serving as an officer or director of a Portfolio Company or of an affiliated Limited Partner (including ES); or (iii) in connection with activities undertaken by an equity holder, Affiliate or other related person of the General Partner or the Manager prior to or after the launch of the Fund. The General Partner and the Manager may cause the Fund to decline investment opportunities that are not "qualifying investments" as defined in Rule 203(*l*)-1(c)(3) promulgated under the Advisers Act, for the purpose of enabling each Manager and the General Partner to remain exempt from registering as an investment adviser under the Advisers Act. All such conflicts will be resolved in the good faith judgment of the General Partner.

***Conflicting duties to other funds*** The Fund may purchase or dispose of investments in which another investment vehicle affiliated with the General Partner or the Manager has an interest, or otherwise another such entity may purchase or dispose of an investment in a Portfolio Company of the Fund, and may do so at different points in time. The Managing Members, the General Partner, and the Manager may owe contractual and/or fiduciary duties to such other affiliated entities.

***Investments in which affiliated vehicles have a different principal investment*** The Fund may also co-invest with other affiliated investment funds (including co-investment or other vehicles in which the General Partner, the Manager or their Affiliates invest and that co-invest with such other affiliated investment funds) or have accounts in investments that are suitable for both the Fund and such other affiliated entities. To the extent the Fund holds securities or instruments that are different (including with respect to their relative seniority or liquidation preferences) than those held by such other affiliated entities, the General Partner, the Manager and their Affiliates may be presented with decisions when the interests of multiple funds are in conflict. In that regard, actions may be taken for the other affiliated entities that are adverse to the Fund, and vice-versa.

Conflicts may also arise in connection with the Fund's provision of additional capital necessary to support positions taken by Affiliates or other investment funds. For example, if another fund or ES had the potential to incur a loss on its investment in a business entity as a result of financial or other difficulties at that business entity, the General Partner, and Manager's ability to recommend actions in the best interests of the Fund might be impaired. There is a risk that if the Fund were to make an investment in such distressed business entity owned by ES or another fund, such financing may be done on such terms and in such amounts that do not favor the Fund or may adversely impact the Fund to the benefit of ES or the other fund. There is no assurance that the General Partner and/or Manager will determine to resolve these conflicts in a manner that

will not have an adverse impact on the Fund or that the returns to the Fund would be equal to and not less than the Fund would have achieved if such conflict did not occur.

*Capital Structure Conflicts* While currently not contemplated, the Fund may invest in a company in which one or more other Affiliates hold an investment in a different class of such company's debt or equity, or vice versa. Conflicts of interest may arise under such circumstances. For example, in the event that such issuer enters bankruptcy, the Fund may hold securities which are more senior in bankruptcy preference than the securities held by another Affiliate and may have the right to aggressively pursue the issuer's assets to fully satisfy the issuer's indebtedness to the Fund, and the General Partner, the Manager or their respective Affiliates might have an obligation to pursue such remedy on behalf of the Fund. As a result, the other Affiliate holding assets of the same issuer which are more junior in the capital structure might not have access to sufficient assets of the issuer to completely satisfy its bankruptcy claim against the issuer and suffer a loss. In those circumstances where the Fund and another Affiliate hold investments in different classes of a company's debt or equity, the General Partner and the Manager may also, to the fullest extent permitted by applicable law, take steps to reduce the potential for adversity between the Fund and the other Affiliate, including causing the Fund to take certain actions that, in the absence of such conflict, it would not take, such as (A) remaining passive in a restructuring, foreclosure, refinancing or similar situations (including electing not to vote or voting pro rata with other security holders), (B) investing in the same or similar classes of securities as the other Affiliate in order to align their interests, (C) divesting investments or (D) otherwise taking an action designed to reduce adversity. Any such step could have the effect of benefiting another Affiliate and therefore may not have been in the best interests of, and may have been adverse to, the Fund.

*Devotion of Time*: While the officers and employees of the General Partner, and the Manager and their respective Affiliates will devote such time as is reasonably required to conduct the investment and other activities of the Fund, such officers and employees will also work on projects for Affiliates of the General Partner and/or Manager and other funds. Such officers and employees have significant duties to ES and/or Romulus. Conflicts of interests may arise in allocating investment opportunities, management time, services and such functions among the Fund, such Affiliates, and other funds. Moreover, potential conflicts of interest could arise from time to time in view of the personnel of Manager having roles as manager of multiple funds with rights to receive management fees and other fees and its potential for investing other than through the Fund.

*ES Relationship with Portfolio Companies and Procurement* ES may provide funds, strategic advice and/or services to certain Portfolio Companies and work with them toward improving their operations. ES may receive benefits, including equity ownership, goods and/or services, from Portfolio Companies in return. The Conflict Parties believe that ES can add significant value to those Portfolio Companies and, thus, ultimately to the Fund. These arrangements are determined by ES and may not be set through arms' length negotiations. A conflict of interest exists because ES determines the extent of such investment and/or commercial relationships, and the Conflict Parties are involved in the governance of ES. ES may be a significant consumer of Portfolio Company goods and/or services but has no responsibility to continue using the goods or services of such Portfolio Companies on an ongoing basis. If ES elects to stop using Portfolio Company services or technologies, the results of such Portfolio Company may be adversely affected. ES may also establish joint procurement programs for Portfolio Companies, which it may in the future expand or decrease. By pooling the buying power of multiple companies, joint procurement programs permit the companies to obtain volume discounts. The General Partner and the Manager do not currently expect to charge any service fees for organizing joint procurement arrangements, although vendors may charge fees for their programs, which will be passed along to the participating Portfolio Companies. ES may also plan and organize meetings that give Portfolio Companies that participate the opportunity to meet and present to potential customers. While these programs (to the extent implemented) are intended to benefit Portfolio Companies, they may also benefit ES.

*Potential Conflicts in Calculation of Certain Costs and Expenses* The Partnership Agreement provides that the Fund will be responsible for all costs and expenses in connection with its operation, other than the costs

and expenses that will be the responsibility of the General Partner. With respect to certain operating expenses that are common among the Fund and other Affiliates, such as insurance premiums or annual meeting expenses, such expenses are allocated by the General Partner among the Fund and such other Affiliates as provided in the limited partnership agreements of the Fund and in the governance documents of such Affiliates or, if not so provided, on a case-by-case basis pursuant to a method that the General Partner believes to be appropriate under the circumstances which may include, without limitation, by relative amounts invested, relative capital commitments or relative net asset values. The Fund will be reliant on the determinations of the General Partner in this regard, and also in regard to the allocation of investment expenses and any common operating expenses as between the Fund and any other Affiliates, including how the expenses of proposed but unconsummated transactions are allocated and what the allocation of a co-investment that is never completed might have been. There can be no assurance that errors will not arise in such allocations or that other methods of allocation would not produce a result that is more favorable to the Fund.

***Legal Counsel***. The Manager and the General Partner have retained the services of legal counsel ("**Legal Counsel**") in connection with the formation of the Fund and the issuance of interests in the Fund. Separate counsel has not been engaged to act on behalf of investors in the Fund. The Legal Counsel also represents EquipmentShare.com Inc with respect to a variety of matters. Legal Counsel is not representing, and will not be deemed to owe any obligations or duties to, any prospective investor or investors in connection with their investments in the Fund, whether or not Legal Counsel has in the past represented or is currently representing such prospective investor with respect to other matters. Legal Counsel does not undertake to monitor the compliance of the Managing Members, the Manager or the General Partner with the investment program and other guidelines and terms set forth in the offering materials and the Partnership Agreement, nor will Legal Counsel monitor their compliance with applicable laws.

## Special Risks

***Compliance with Anti-Money Laundering Requirements.*** In response to increased regulatory concerns with respect to the sources of funds used in investment and other activities, the General Partner may request that a Limited Partner provide additional documentation verifying such Limited Partner's identity, tax risk profile and source of funds used to purchase its Interests. The General Partner may decline to accept a subscription on the basis of information provided or if such information is not provided. In addition, the General Partner may be required to provide such information to appropriate governmental, regulatory or taxation authorities under any applicable laws or jurisdictions without notifying the Limited Partners that such information has been so provided. The General Partner will take such steps as it determines are necessary to comply with applicable law, regulations, orders, directives, ordinances or special measures.

***Public Health Risks and COVID-19.*** Epidemics and pandemics may materially and adversely affect the global economy and the Fund's performance. COVID-19 has spread rapidly across much of the world, including the United States, leading to restrictions on travel and group activities, the cancellation or rescheduling of entertainment and sporting events, periodic shutdowns of businesses, universities and schools, decreased usage of and demand for commercial real estate assets, the closing of international borders, and government directives for persons to "shelter in place." It is unknown how global supply chains, public and private capital markets and Portfolio Companies will be affected by the COVID-19 pandemic, particularly if it persists for an extended period of time. The spread of COVID-19 may cause Portfolio Companies to lose revenue and incur additional expenses and delays, thereby leading to a material adverse impact on their businesses, operating results and financial condition. In addition, the COVID-19 pandemic may reduce Portfolio Companies' access to equity or debt investment capital, or cause the terms pursuant to which such capital is available to be substantially less favorable than is customary, thereby leading to a material adverse impact on such Portfolio Companies' businesses, operating results and financial condition, as well as a material adverse impact on the Fund's relative position in Portfolio Company capital structures and potential investment returns. If unabated, the COVID-19 pandemic may create significant global economic uncertainty, which in turn may cause Portfolio Companies or their

partners, suppliers and potential customers, to more closely monitor costs and reduce spending budgets, and may cause Portfolio Company equity investors or debt providers to reduce, slow or eliminate their investment or lending activities. The availability of investment opportunities of the Fund may be adversely impacted by reductions of economic activity as a result of COVID-19, including as a result of the responses of businesses and local and national governments. The impact of COVID-19 could be significant on markets in which the Fund invests, which could affect the availability, valuations, and returns of the Fund's portfolio investments. The extent to which COVID-19 impacts the Fund's results will depend on future developments, which cannot be predicted with any certainty, including new information which may emerge concerning the severity of COVID-19, the ultimate geographic spread of COVID-19, the duration of the pandemic, travel restrictions imposed, business closures or general business disruption, and the actions taken throughout the world, including in domestic markets, to contain COVID-19 or treat its impact. As a result, the performance of the Fund and the Fund's Portfolio Companies could be adversely affected.

THE FOREGOING RISK FACTORS DO NOT COMPLETELY EXPLAIN THE RISKS INVOLVED IN THIS OFFERING. POTENTIAL INVESTORS MUST CONSULT THEIR OWN ADVISERS BEFORE INVESTING IN THE FUND.

* * * *

**TKF II, L.P.**
**TAX CONSIDERATIONS**

The Fund expects to be characterized as a partnership for U.S. federal income tax purposes and not as an association taxable as a corporation or as a "publicly traded partnership." As a partnership, the Fund generally will not pay U.S. federal income taxes, but each partner will be required to report its share (whether or not distributed) of the income gains, losses, deductions and credits of the Fund as specified in the Internal Revenue Code of 1986, as amended (the "Code"). Each item generally will have the same character and source as if the Limited Partner had realized the item directly. Each Limited Partner is responsible for keeping its own records for determining such Limited Partner's tax basis in its Interests in the Fund and calculating and reporting any gain or loss resulting from a Fund distribution or on disposition of an Interest in the Fund. Each Limited Partner will be liable for any taxes owed upon its distributive share of the income or gains realized by the Fund and may claim deductions for its distributive share of the Partnership's losses and deductions and credits, to the extent allowed under the Code. Part or all of the Fund's expenses allocated to a Partner in a given year may not be deductible by such Partner or may be subject to limitations on deductibility (e.g., the Fund's management fees expenses that are allocated to U.S. taxpayers who are individuals). Each Limited Partner will be taxed on its distributive share of the Partnership's taxable income and gain regardless of whether it has received or will receive a distribution from the Partnership and thus may incur income tax liabilities in excess of any distributions from the Partnership.

The Fund's taxable year will be the calendar year or such other year as required by the Code. The General Partner will have the authority to make tax elections on behalf of the Fund and will use commercially reasonable efforts to cause tax information to be distributed to each Limited Partner as soon as practicable after the end of each tax year. The General Partner is authorized to withhold amounts from distributions to a Limited Partner to make payments to any governmental authority with respect to any federal, state or local tax liabilities of such Limited Partner. Amounts so withheld and paid will be treated as distributed to such Partner. Each U.S. investor will be required to submit an IRS Form W-9 in order to provide the Fund with the investor's taxpayer identification number and certification as to back-up withholding status. Each foreign investor will be required to submit an applicable U.S. IRS Form W-8, which confirms such investor as a non-resident alien, allows such investor to claim available tax treaty benefits, and provides the Fund with the foreign investor's status under the Foreign Account Tax Compliance Act (FATCA) and, in some cases, such investor's U.S. taxpayer identification number. The Fund and each Limited Partner may also be required to file an IRS Form 8886 (Reportable Transaction Disclosure Statement) with respect to its investment in the Fund.

The Fund will be required to file a U.S. information return on IRS Form 1065 and, following the close of the Fund's taxable year, to provide each Limited Partner with a Schedule K-1 (or other forms as may be required by the IRS) indicating such Limited Partner's allocable share of respective Fund income, gain, losses, deductions, credits and items of tax preference for such year. For any given year, the Fund may be unable to provide this information to the Limited Partners prior to the due date for the filing of income tax returns by such Limited Partners with respect to that year as a result of the Fund not receiving all of the necessary underlying information from Investments on a timely basis. Each Limited Partner should be prepared to obtain extensions of the filing date for its income tax returns.

The description of U.S. tax consequences set forth above is based on current U.S. federal income tax laws, the provisions of the Fund's Partnership Agreement as initially adopted, and certain assumptions. No rulings have been or will be requested from the Service, and no assurance can be given that the Service will concur with the tax consequences described above. An audit of the Fund may result in increased tax liabilities, which could materially impact an investment in the Fund. No assurance can be given that current tax laws, rulings and regulations will not be changed during the life of the Fund, and any such changes may have retroactive effect. Furthermore, any changes in the Fund's Partnership Agreement or the operations of the Fund could affect the tax consequences described above.

26

This description of U.S. tax matters does not address all of the U.S. federal income tax consequences to U.S. and non-U.S. investors in the Fund and does not address any of the foreign, state, local or local tax consequences of such investment to any investor. The effect of existing U.S. income tax laws and treaties, the tax laws of other jurisdictions to which an investor may be subject, and possible changes in such laws and treaties will vary with the particular circumstances of each investor.

INFORMATION IN THIS INFORMATION SUPPLEMENT ADDRESSING OR OTHERWISE RELATING TO THE TAX TREATMENT OF THE FUND AND THE TAX CONSEQUENCES TO A PERSON OF ACQUIRING, HOLDING OR DISPOSING OF A LIMITED PARTNER INTEREST IN THE FUND WAS PREPARED, AND IS BEING PROVIDED, TO SUPPORT THE PROMOTION OR MARKETING OF THE SALE OF INTERESTS IN THE FUND. THE TAX CONSEQUENCES OF ACQUIRING, HOLDING AND DISPOSING OF AN INTEREST IN THE FUND (INCLUDING, WITHOUT LIMITATION, THE EFFECT OF EXISTING U.S. INCOME TAX LAWS AND TREATIES, THE TAX LAWS OF OTHER JURISDICTIONS TO WHICH AN INVESTOR MAY BE SUBJECT, AND POSSIBLE CHANGES IN SUCH LAWS AND TREATIES) WILL VARY IN ACCORDANCE WITH THE SPECIFIC CIRCUMSTANCES OF EACH PERSON. ACCORDINGLY, EACH PERSON SHOULD CONSULT HIS OR HER OWN INDEPENDENT TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF ACQUIRING, HOLDING AND DISPOSING OF AN INTEREST IN THE FUND.

Case 2:24-cv-04118-BCW   Document 8-29   Filed 07/26/24   Page 222 of 227

# Exhibit 8

# Schlacks 2020 Transfer LLC

May 15, 2024

**VIA EMAIL AND OVERNIGHT UPS**

Jabbok Schlacks



**Re: Response to Your Position Disputing Exercise and Supplemental Notice of Exercise**

Dear Jabbok:

As you know, pursuant to the Option Agreement dated December 31, 2020 between you and Schlacks 2020 Transfer LLC ("Transfer 2020") (as amended, the "Option Agreement"), on February 13, 2024, on behalf of 2020, I provided notice of Transfer 2020's exercise of its option to purchase 839,420 Option Shares (the "Notice"). (Capitalized words not otherwise defined herein have the meanings given them in the Option Agreement.) You plainly received the Notice as my counsel has conferred with your counsel on four occasions concerning the exercise over the last six weeks. I have spoken to Willy about the Notice received by both of you. Also, as you recall, I had sent you a similar notice in June of 2021 and we completed a Sale Closing with respect to that prior exercise to acquire Option Shares (the "Prior Exercise"). In the Notice, I asked for bank wiring instructions so I could wire the payment for the Option Shares.

You have refused to honor the Notice or the exercise with respect to the Option Shares. One of your positions, as communicated through your counsel, is that you intended that the Option Shares or the options themselves were to be held by (or contributed to) TKF II L.P. ("TKF") but that you entered into the Option Agreement to transfer the options and the Option Shares to Transfer 2020 either as the result of duress you experienced in December 2020 or due to mistake.

My counsel and I have investigated this position and it does not appear to be credible for many reasons, including without limitation that (a) TKF did not even exist at the time we entered into the original Option Agreement on December 31, 2020 and did not come into existence until October 28, 2022; (b) you affirmed Transfer 2020 as the recipient of the Option Shares and the holder of the options in two subsequent amendments on June 16, 2021 and December 16, 2022 (long after any alleged duress in December 2020 must have dissipated); and (c) you also affirmed the transfer of shares to Transfer 2020 in a June 30, 2021 Stock Transfer Agreement (pursuant to the Prior Exercise) and in that document instructed the Secretary of EquipmentShare, Inc. ("ES") to transfer the shares to Transfer LLC.

I have located your bank wiring instructions from the Prior Exercise (which I copy below). Accordingly, as the sole Manager of Transfer 2020, I hereby send this supplemental notice on its behalf of its exercise to purchase 834,920 Option Shares. ***Please confirm via email at nchheda@romuluscap.com by Friday, May 17, that the wiring instructions below continue to be valid.*** Once I receive that confirmation I will wire $3,524,614.78 to your account. That amount equals the number of Option Shares times the Per Share Option Price of $33.77 as adjusted by Paragraph 3(a) of the Option Agreement to account for the 1:8 stock split.

Transfer 2020 reserves all rights.

**<u>Wiring Instructions:</u>**

Central Trust Bank
238 Madison Street
Jefferson City, MO 65101
Checking Account Number: ███
ABA Routing: ███

Sincerely,

Schlacks 2020 Transfer LLC

By: *Neil Chheda* _____
    Neil Chheda, Manager

# Schlacks 2020 Transfer LLC

May 15, 2024

**VIA EMAIL AND OVERNIGHT UPS**

William Schlacks

███████████

**Re:  Response to Your Position Disputing Exercise and Supplemental Notice of Exercise**

Dear William:

As you know, pursuant to the Option Agreement dated December 31, 2020 between you and Schlacks 2020 Transfer LLC ("Transfer 2020") (as amended, the "Option Agreement"), on February 13, 2024, on behalf of 2020, I provided notice of Transfer 2020's exercise of its option to purchase 839,420 Option Shares (the "Notice").  (Capitalized words not otherwise defined herein have the meanings given them in the Option Agreement.)  You plainly received the Notice as my counsel has conferred with your counsel on four occasions concerning the exercise over the last six weeks.  You and I have also directly spoken about my Notice.  Also, as you recall, I had sent you a similar notice in June of 2021 and we completed a Sale Closing with respect to that prior exercise to acquire Option Shares (the "Prior Exercise").  In the Notice, I asked for bank wiring instructions so I could wire the payment for the Option Shares.

You have refused to honor the Notice or the exercise with respect to the Option Shares.  One of your positions, as communicated through your counsel, is that you intended that the Option Shares or the options themselves were to be held by (or contributed to) TKF II L.P. ("TKF") but that you entered into the Option Agreement to transfer the options and the Option Shares to Transfer 2020 either as the result of duress you experienced in December 2020 or due to mistake.

My counsel and I have investigated this position and it does not appear to be credible for many reasons, including without limitation that (a) TKF did not even exist at the time we entered into the original Option Agreement on December 31, 2020 and did not come into existence until October 28, 2022; (b) you affirmed Transfer 2020 as the recipient of the Option Shares and the holder of the options in two subsequent amendments on June 16, 2021 and December 16, 2022 (long after any alleged duress in December 2020 must have dissipated); and (c) you also affirmed the transfer of shares to Transfer 2020 in a June 30, 2021 Stock Transfer Agreement (pursuant to the Prior Exercise) and in that document instructed the Secretary of EquipmentShare, Inc. ("ES") to transfer the shares to Transfer LLC.

I have located your bank wiring instructions from the Prior Exercise (which I copy below). Accordingly, as the sole Manager of Transfer 2020, I hereby send this supplemental notice on its behalf of its exercise to purchase 834,920 Option Shares. ***Please confirm via email at nchheda@romuluscap.com by Friday, May 17, that the wiring instructions below continue to be valid.*** Once I receive that confirmation I will wire $3,524,614.78 to your account. That amount equals the number of Option Shares times the Per Share Option Price of $33.77 as adjusted by Paragraph 3(a) of the Option Agreement to account for the 1:8 stock split.

Transfer 2020 reserves all rights.

**<u>Wiring Instructions</u>:**

Central Trust Bank
238 Madison Street
Jefferson City, MO 65101
Checking Account Number: █████
ABA Routing: █████

Sincerely,

Schlacks 2020 Transfer LLC

By: *Neil Chheda*
    Neil Chheda, Manager