# Exhibit E

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

# TKF II L.P.

## LIMITED PARTNERSHIP AGREEMENT

## DATED AS OF OCTOBER 28, 2022

THE LIMITED PARTNERSHIP INTERESTS (THE "*INTERESTS*") OF TKF II L.P. (THE "*PARTNERSHIP*") HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), THE SECURITIES LAWS OF ANY U.S. STATE OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (i) THE SECURITIES ACT, ANY APPLICABLE SECURITIES LAWS OF ANY U.S. STATE, AND ANY OTHER APPLICABLE SECURITIES LAWS AND (ii) THE TERMS AND CONDITIONS OF THIS LIMITED PARTNERSHIP AGREEMENT. THEREFORE, PURCHASERS OF THE INTERESTS SHALL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE PARTNERSHIP IS NOT REGISTERED AND WILL NOT REGISTER AS AN INVESTMENT COMPANY UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "*INVESTMENT COMPANY ACT*"), IN RELIANCE ON ONE OR MORE EXCLUSIONS OR EXEMPTIONS THEREFROM.

4896-2176-5935.2

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS; RULES OF CONSTRUCTION** .................................................. 1

Section 1.1.     Definitions .................................................................................. 1

Section 1.2.     Rules of Construction ................................................................ 1

**ARTICLE II ORGANIZATION** ................................................................................... 2

Section 2.1.     Organization .............................................................................. 2

Section 2.2.     Name ......................................................................................... 2

Section 2.3.     Principal Office; Registered Agent ........................................... 2

Section 2.4.     Purpose ..................................................................................... 3

Section 2.5.     Certificate of Limited Partnership ........................................... 3

Section 2.6.     Term ......................................................................................... 3

Section 2.7.     Qualification in Other Jurisdictions ......................................... 3

Section 2.8.     Alternative Investment Vehicles .............................................. 4

Section 2.9.     Parallel Investment Vehicles ................................................... 5

Section 2.10.     Single Partnership Assumption ............................................... 7

Section 2.11.     Co-investments ........................................................................ 8

**ARTICLE III PARTNERS AND CAPITAL** ................................................................. 9

Section 3.1.     General Partner ........................................................................ 9

Section 3.2.     Offering; Partners; Initial Closing .......................................... 9

Section 3.3.     Capital Contributions ............................................................ 11

Section 3.4.     Liability of Partners ............................................................... 12

Section 3.5.     Default in Payment ................................................................ 12

Section 3.6.     Admission of Limited Partners .............................................. 16

Section 3.7.     Strategic Investors ................................................................. 18

Section 3.8.     ERISA Matters ....................................................................... 18

Section 3.9.     Limited Exclusion Right ........................................................ 20

Section 3.10.     Mandatory Withdrawal .......................................................... 21

**ARTICLE IV DISTRIBUTIONS; ALLOCATION OF PROFITS AND LOSSES** ............. 22

Section 4.1.     Distributions ........................................................................... 22

Section 4.2.     Amounts and Priority of Distributions ................................... 23

Section 4.3.     Special Distributions ............................................................. 23

Section 4.4.     Special Tax Distributions ....................................................... 23

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        CHHEDA-TRANLLC-RC-00000129

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

| | | |
|---|---|---|
| Section 4.5. | Tax Withholding | 24 |
| Section 4.6. | Capital Accounts | 25 |
| Section 4.7. | Allocations of Profits and Losses | 26 |
| Section 4.8. | Special Allocations | 28 |
| Section 4.9. | Allocation Rules | 29 |
| Section 4.10. | Tax Allocations | 29 |
| Section 4.11. | UBTI | 29 |

**ARTICLE V RIGHTS AND DUTIES OF THE GENERAL PARTNER – EXPENSES** .... 30

| | | |
|---|---|---|
| Section 5.1. | Management; Investment Limitations | 30 |
| Section 5.2. | Duties and Obligations of the General Partner | 32 |
| Section 5.3. | Determination of Fair Value | 33 |
| Section 5.4. | Exclusivity; Other Businesses of the General Partner | 34 |
| Section 5.5. | Expenses and Reimbursements; Organizational Expenses | 36 |
| Section 5.6. | Management Fee and Expenses | 37 |
| Section 5.7. | Removal of the General Partner | 37 |

**ARTICLE VI INDEMNIFICATION** 39

| | | |
|---|---|---|
| Section 6.1. | Indemnification of General Partner and the Manager | 39 |
| Section 6.2. | Giveback Obligations | 41 |
| Section 6.3. | Advancement of Expenses | 42 |
| Section 6.4. | Cure Rights | 42 |

**ARTICLE VII ADVISORY COMMITTEE** 42

| | | |
|---|---|---|
| Section 7.1. | The Advisory Committee | 43 |

**ARTICLE VIII TRANSFERABILITY OF GENERAL PARTNER'S INTEREST** 44

| | | |
|---|---|---|
| Section 8.1. | Assignment of the General Partner's Interest | 45 |
| Section 8.2. | Transfer of General Partner's Interest | 45 |

**ARTICLE IX TRANSFERABILITY OF A LIMITED PARTNER'S INTEREST** 45

| | | |
|---|---|---|
| Section 9.1. | Restrictions on Transfers of Interests | 45 |
| Section 9.2. | Assignees | 48 |
| Section 9.3. | Substituted Limited Partner | 50 |
| Section 9.4. | Transfers During a Fiscal Year | 50 |
| Section 9.5. | Elections Under the Internal Revenue Code | 51 |

**ARTICLE X DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP** 51

| | | |
|---|---|---|
| Section 10.1. | Dissolution | 51 |
| Section 10.2. | Liquidation | 51 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER       CHHEDA-TRANLLC-RC-00000130

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

Section 10.3. Clawback Liability..................................................................53

**ARTICLE XI AMENDMENTS** ......................................................................53

Section 11.1. Adoption of Amendments; Limitations Thereon......................53

**ARTICLE XII CONSENTS, VOTING AND MEETINGS** ............................55

Section 12.1. Method of Giving Consent ......................................................55

Section 12.2. Meetings ..................................................................................56

Section 12.3. Record Dates............................................................................56

Section 12.4. Submissions to Partner ............................................................56

**ARTICLE XIII POWER OF ATTORNEY** .....................................................56

Section 13.1. Power of Attorney....................................................................56

**ARTICLE XIV RECORDS AND ACCOUNTING; REPORTS; FISCAL AFFAIRS** ........57

Section 14.1. Records and Accounting...........................................................57

Section 14.2. Annual Reports ........................................................................58

Section 14.3. Tax Information; Tax Returns ..................................................58

Section 14.4. Partnership Funds ....................................................................59

Section 14.5. Partnership For Income Tax Purposes; Tax Elections, Determinations & Decisions .........................................................................59

Section 14.6. Other Information .....................................................................59

Section 14.7. Limited Partner Information .....................................................60

Section 14.8. Partnership Representative .......................................................60

Section 14.9. Safe Harbor Election and Forfeiture Allocations ....................61

**ARTICLE XV MISCELLANEOUS** ...............................................................63

Section 15.1. Notices .....................................................................................63

Section 15.2. Governing Law; Separability of Provisions .............................63

Section 15.3. [RESERVED]............................................................................64

Section 15.4. Waiver of Jury Trial; Expedited Arbitration ............................64

Section 15.5. Entire Agreement......................................................................65

Section 15.6. Binding Provisions; Third Party Beneficiaries.........................65

Section 15.7. No Waiver.................................................................................66

Section 15.8. Confidentiality .........................................................................66

Section 15.9. No Right to Partition.................................................................68

Section 15.10. [RESERVED]............................................................................68

Section 15.11. Remedies Cumulative...............................................................68

Section 15.12. Counterparts; E-Mail Signatures .............................................68

Section 15.13. Partner Communications ..........................................................69

Click or tap here to enter text.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CHHEDA-TRANLLC-RC-00000131

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

Section 15.14. Force Majeure ........................................................................... 69

Section 15.15. UCC Article 8 Election ............................................................... 69

Section 15.16. Ownership and Use of Name ...................................................... 69

Section 15.17. Legal Counsel and Other Professionals ..................................... 70

Section 15.18. Confidentiality of Investor Identity ........................................... 70

Section 15.19. Authorized Representatives ........................................................ 70

Section 15.20. Disqualifying Events ................................................................. 71


SCHEDULE A    Limited Partners' and General Partner's (and Affiliated Limited Partners')
Capital Commitments

EXHIBIT A    Definitions

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     CHHEDA-TRANLLC-RC-00000132

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

This LIMITED PARTNERSHIP AGREEMENT (this "*Agreement*") of TKF II L.P., a Delaware limited partnership (the "*Partnership*"), is made as of October 28, 2022, among TKF II GP, LLC, a Delaware limited liability company (together with any successor appointed in accordance with this Agreement, the "*General Partner*"), EquipmentShare.com Inc., a Delaware corporation (the "*Initial Limited Partner*") as the Initial Limited Partner, and such Persons becoming limited partners of the Partnership on the date hereof for so long as they shall be Limited Partners hereunder and such other Persons as may hereafter become limited partners of the Partnership as hereinafter provided for so long as they shall be Limited Partners hereunder (each individually referred to as a "*Limited Partner*" and collectively with the General Partner, the "*Partners*").

W I T N E S S E T H:

WHEREAS, the Partnership was formed as a limited partnership by the filing of a Certificate of Limited Partnership with the Office of the Secretary of State of the State of Delaware on July 29, 2022; and

WHEREAS, the parties hereto wish to form and operate the Partnership on the terms set forth herein.

NOW THEREFORE, in consideration of the mutual promises of the parties hereto hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned parties hereby agree as follows:

**ARTICLE I**

**DEFINITIONS; RULES OF CONSTRUCTION**

Section 1.1. **Definitions**. For purposes of this Agreement, unless the context otherwise requires capitalized terms shall have the meaning ascribed to such terms in Exhibit A annexed hereto.

Section 1.2. **Rules of Construction**. Accounting terms used that are not otherwise defined herein shall have the meanings given to them under U.S. generally accepted accounting principles. As used in this Agreement, the masculine, feminine or neuter gender and the singular or plural numbers shall be deemed to include the others whenever the context so requires. References to Sections and Articles refer to sections and articles of this Agreement unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder" and words of like import refer to this Agreement as a whole unless the context otherwise requires. Whenever the words "including", "include" or "includes" are used in this Agreement, they should be interpreted in a non-exclusive manner as though the words ", without limitation," immediately followed the same. The headings or captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement. All references herein to funds, dollars or payments means United States dollars. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any party (notwithstanding any rule of law requiring an agreement to be strictly construed against the drafting party), it being understood that the parties

- 1 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER      CHHEDA-TRANLLC-RC-00000133

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

to this Agreement are sophisticated and have had adequate opportunity and means to retain counsel to represent their interests. Whenever the word "or" is used in this Agreement, it shall be interpreted as non-exclusive in the same manner as "and/or." Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement the General Partner or any other Person is authorized or required to make a decision or take or omit to take an action or exercise or refrain from exercising a right (which the Partners hereby agree is generally signified by the use of the word "may" or "shall," respectively, unless the context otherwise requires) (1) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, such Person shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall, to the maximum extent not prohibited by applicable law, have no fiduciary or other duty or obligation to give any consideration to any interest of or factors affecting the Partnership, the Partners or any other Person, or (2) in "Good Faith" or under another express standard, such Person shall act under such express standard and shall not be subject to any other or different standards. The rights and liabilities of the Partners shall be as provided for in the Delaware Act if not otherwise expressly provided for in this Agreement or the Subscription Agreement. To the extent that the rights or obligations of any Partner are different by reason of any provision of this Agreement or the Subscription Agreement than they would be in the absence of such provision, this Agreement or the Subscription Agreement, as the case may be, shall control.

# ARTICLE II

## ORGANIZATION

Section 2.1.    **Organization**. The Partnership was formed pursuant to and in accordance with the Delaware Revised Uniform Limited Partnership Act (6 Del. C. Sections 17-101 *et seq.*), as amended from time to time (the "***Delaware Act***"). The Agreement is effective as of October 28, 2022 (the "***Effective Date***"). The Term of the Partnership commenced upon the filing of the Certificate pursuant to Section 2.5 and shall continue until the dissolution of the Partnership in accordance with the provisions of ARTICLE X.

Section 2.2.    **Name**. The name of the Partnership shall be TKF II L.P. The General Partner is authorized to make any variations in the name of the Partnership and may otherwise conduct the business of the Partnership under any other name, upon compliance with all applicable laws, that the General Partner may deem necessary or advisable. The General Partner shall advise the Limited Partners in writing of any change in the name of the Partnership. In the case of a change of name of the Partnership pursuant to this Section 2.2, specific references herein to the name of the Partnership shall be deemed to have been amended to reflect the name change. The General Partner reserves the right to use one or more names that are similar to or include a material portion of the name of the Partnership, without compensation to the Partnership, in connection with any future business activities of the General Partner or any of its Affiliates not otherwise inconsistent with its obligations hereunder.

Section 2.3.    **Principal Office; Registered Agent**. The Partnership shall maintain its principal office at 8 W 5th Street, Fulton, MO 65251. The General Partner may change the location of the Partnership's principal office and may establish such additional offices of the Partnership as it may from time to time determine. The General Partner shall provide notice to the Limited Partners of any change in the Partnership's principal place of business. The registered office of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CHHEDA-TRANLLC-RC-00000134

Partnership in the State of Delaware is the Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, county of New Castle, Delaware 19801, and the registered agent for service of process on the Partnership in the State of Delaware at such registered office is Corporation Service Company. The General Partner may change the registered office or registered agent as it may from time to time determine and shall provide notice of any such change to the Limited Partners.

Section 2.4. **Purpose**. The purpose of the Partnership is (i) to acquire and develop the Investments pursuant to the Investment Parameters, as such term is defined in Exhibit A attached hereto, (ii) to own, manage and dispose of the Investments, sharing profits and losses therefrom, and (iii) to conduct such other business activities as may be incidental to, or in furtherance of, the foregoing purpose, and to engage in any lawful act or activity and to exercise any powers permitted to a limited partnership formed under the Delaware Act in furtherance thereof. Where the General Partner deems it appropriate, the General Partner may use special purpose entities, including corporations, limited liability companies, limited partnerships to make and hold Interests in the Partnership or the Fund. In order to address certain legal, tax, and/or regulatory investment requirements, the General Partner may also cause the Partnership to form one or more parallel investment vehicles, feeder funds, and/or intermediate investment vehicles. The General Partner may also cause the Partnership to invest (or permit an investor to invest in the Partnership, the Fund or in an Investment) through corporations, limited liability companies, limited partnerships, parallel entities, joint ventures or other arrangements in which the Partnership has an economic interest and where such arrangements do not breach this Agreement (each, a "*Subsidiary*").

Section 2.5. **Certificate of Limited Partnership**. The General Partner has caused the Certificate to be filed and recorded in the Office of the Secretary of State of the State of Delaware in accordance with the Delaware Act and, to the extent required by applicable law, shall cause the Certificate to be filed in the appropriate place in each state in which the Partnership may hereafter establish a place of business. The General Partner shall also cause to be filed, recorded and published, such amendments, notices, certificates, statements or other instruments required by any provision of any applicable law that governs the formation of the Partnership or the conduct of its business from time to time.

Section 2.6. **Term**. The term of the Partnership (the "*Term*") commenced on the Effective Date and shall continue until the tenth (10) anniversary of the Initial Closing Date, unless the Partnership is sooner dissolved in accordance with Section 10.1, which period, (a) may be extended for an additional period of up to two (2) years following a determination by the General Partner with the approval of the Advisory Committee (as defined below). The existence of the Partnership as a separate legal entity shall continue until cancellation of the Certificate as provided in the Delaware Act.

Section 2.7. **Qualification in Other Jurisdictions**. The General Partner shall cause the Partnership to be qualified or registered under its name or under assumed or fictitious names under foreign company statutes or similar laws in any jurisdiction in which the Partnership owns property, if any, or transacts business to the extent such qualification or registration is necessary or, in the judgment of the General Partner, advisable in order to preserve the limited liability of the Limited Partners or to permit the Partnership to lawfully own property, if any, or transact business, and shall cause the Partnership not to own property or transact business in any

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CHHEDA-TRANLLC-RC-00000135

jurisdiction until it is qualified or registered to do so. The General Partner shall, as required by applicable law, execute, file and publish all such certificates, notices, statements or other instruments necessary to permit the Partnership lawfully to own property, if any, and conduct business as a Partnership in all jurisdictions where the Partnership elects to own property or transact business and to maintain the limited liability of the Limited Partners.

Section 2.8.    **Alternative Investment Vehicles**.

(a)    If the Partnership or any investor encounters legal, tax or regulatory impediments to the investment in a potential asset or in the Partnership or in the Fund, to the fullest extent permitted by law, the General Partner may hold the asset outside the Partnership in (or permit the investors to hold their Interests in the Partnership or in the Fund through) one or more alternative vehicles (which entities may include a group trust, a blocker entity or an off-shore vehicle) organized by the General Partner or the investor and having investment objectives substantially identical, to the extent practicable, to those of the Partnership, but that would not encounter (or would appear to mitigate) such legal, tax or regulatory impediments (such alternative vehicles, the "***Alternative Investment Vehicles***"); *provided*, that the terms of such Alternative Investment Vehicles do not breach this Agreement. Each Alternative Investment Vehicle will be a limited partnership, limited liability company, or corporation whose general partner, managing member or voting shareholder, as the case may be, will be the General Partner and whose limited partners, non-managing members, or non-voting shareholders, as the case may be, will be investors of a similar class (such as institutional investors or tax-exempt investors). The conditions, concessions and economic terms of each such Alternative Investment Vehicle shall be substantially the same as those set forth in this Agreement. In connection with the investment program of the Fund, the General Partner may cause an Alternative Investment Vehicle to enter into obligations jointly and severally, including with respect to Investments and Indebtedness, with the Partnership, other Alternative Investment Vehicles, Parallel Investment Vehicles, and other Affiliates of the General Partner, including investment vehicles organized by the General Partner or its Affiliates. For the avoidance of doubt, the General Partner may organize other special purpose vehicles for any reason, and this provision shall not limit the General Partner's authority in this respect.

(b)    If the General Partner forms any Alternative Investment Vehicles to co-invest with the Partnership, the Partnership may (i) make its Investment through an Aggregator Vehicle (the "***Aggregator Vehicle***") among the Partnership and such Alternative Investment Vehicle with each such vehicle making capital contributions to such Aggregator Vehicle in proportion to the aggregate capital commitments of their respective partners or other equity owners (treating any participant in the Alternative Investment Vehicle as a partner or equity owner of such Alternative Investment Vehicle and not a partner or equity owner of the Partnership), or (ii) may cause the Alternative Investment Vehicle to invest side-by-side with the Partnership in the Investment directly, subject to applicable legal, tax or regulatory considerations. The General Partner (and its Affiliates) may make a portion of any Capital Commitment to, and receive a portion of the Carried Interest through, the Aggregator Vehicle, so long as the intended economic deal among the Limited Partners and the General Partner (and its Affiliates) set forth in this Agreement are not changed in any material way in the aggregate.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    CHHEDA-TRANLLC-RC-00000136

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

(c)     Any Fund expenses that are applicable to the Partnership and any Alternative Investment Vehicle (including the Partnership's and any Alternative Investment Vehicle's *pro rata* share of the expenses of any investment entities) will be equitably allocated by the General Partner. Except as provided in Section 4.3 (with respect to distributions to account for a disproportionate accrual of the Management Fee), distributions from the Aggregator Vehicle or an Investment will be made among the Partnership and any other Alternative Investment Vehicles in accordance with the relative capital contributions made by each of them to the Aggregator Vehicle or such Investment. To the extent that any Alternative Investment Vehicle and the Partnership are jointly liable for any investment expenses, costs or indemnification obligations and the Partnership funds more than its *pro rata* share of any such costs or expenses, the General Partner shall use commercially reasonable efforts to cause such Alternative Investment Vehicle to make the Partnership whole in respect of any such costs or expenses. Other investment vehicles may be designated as Alternative Investment Vehicles by the General Partner under Section 5.1(a)(xii).

Section 2.9.    **Parallel Investment Vehicles**.

(a)     The General Partner may establish one or more additional collective investment vehicles for certain types of investors to invest in Investments (as more fully provided in each such vehicle's partnership agreement) alongside the Partnership (each, a "*Parallel Investment Vehicle*"). The terms, including fees and carried interest, of each Parallel Investment Vehicle may differ from the terms herein. The General Partner or an Affiliate of the General Partner shall serve as general partner or similar manager of each Parallel Investment Vehicle. Subject to legal, tax, regulatory, investment guideline and similar considerations: (i) any Parallel Investment Vehicle shall invest in all Investments alongside the Partnership, (ii) the Partnership and any Parallel Investment Vehicle shall invest and divest on economic terms that are the same, and at the same time, in all material respects and (iii) the respective interests of the Partnership and any Parallel Investment Vehicle in any Investment generally shall be in proportion to the respective aggregate Unused Capital Commitments of their partners. In connection with the investment program of the Fund, the General Partner may cause a Parallel Investment Vehicle to enter into obligations jointly and severally, including with respect to Investments and Indebtedness, with, or guaranty obligations of, the Partnership, Alternative Investment Vehicles, other Parallel Investment Vehicles, subsidiaries of Alternative Investment Vehicles and Parallel Investment Vehicles and other Affiliates of the General Partner, including investment vehicles organized by the General Partner or its Affiliates. For the avoidance of doubt, nothing in this Section 2.9 shall be read to prohibit organization of other investment vehicles to make subsequent investments in any Investment.

(b)     To the fullest extent permitted by law, if Additional Limited Partners are admitted to the Partnership (or additional limited partners or members are admitted to any Parallel Investment Vehicle) after any Partner has made Capital Contributions to the Partnership (or partners or members of any Parallel Investment Vehicle have made capital contributions to such Parallel Investment Vehicle(s)), regardless of whether such contributions have then been made to the Aggregator Vehicle or an Investment, the Capital Contributions of such additional Partners (or partners or members of any Parallel Investment Vehicle) (and other payments by such additional Partners or members, as described in Section 3.6(b) (based on the Single Partnership Assumption)) shall be contributed (or paid, as applicable) by such Partner (or partner or member, as the case may

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    CHHEDA-TRANLLC-RC-00000137

be) to the Aggregator Vehicle or the Investment (through the applicable Fund Entity) and then distributed (or paid, as applicable) by the Aggregator Vehicle or the Investment (through the applicable Fund Entity) to the entities comprising the Fund and then to such entities' respective Partners (or partners or members, as applicable) as necessary to cause all Partners (and partners and members of Parallel Investment Vehicles, as applicable) of all entities comprising the Aggregator Vehicle or participating in such Investment to satisfy the provisions of Section 3.6(b) of each Fund Agreement (based on the Single Partnership Assumption). Each of the Fund Agreements shall contain provisions that match the provisions of this Section 2.9.

(c)     The General Partner may, at any time with the Consent of the applicable Limited Partner, (i) transfer all or a portion of a Limited Partner's Capital Commitment and Interest to a Parallel Investment Vehicle or (ii) transfer all or a portion of the Parallel Investment Vehicle Commitment and interest of a Parallel Investment Vehicle Partner to the Partnership; *provided*, that, in each case, the relative holdings of the Partnership and such Parallel Investment Vehicle in each Investment shall be rebalanced to ensure a proportionate allocation between the vehicles.

(d)     If the General Partner forms any Parallel Investment Vehicles to co-invest with the Partnership, the Partnership may (i) make its Investment through an Aggregator Vehicle among the Partnership and such Parallel Investment Vehicles with each such vehicle making capital contributions to such Aggregator Vehicle in proportion to the aggregate capital commitments of the Partnership, or (ii) may cause the Parallel Investment Vehicle to invest side-by-side with the Partnership in the Investment directly, subject to applicable legal, tax or regulatory considerations. The General Partner (and its Affiliates) may make a portion of any Capital Commitment to, and receive a portion of the Carried Interest through, the Aggregator Vehicle, so long as the intended economic deal among the Limited Partners and the General Partner (and its Affiliates) set forth in this Agreement are not changed in any material way in the aggregate.

(e)     Any Operating Expenses that are applicable to the Partnership and any Parallel Investment Vehicle (including the Partnership's and any Parallel Investment Vehicle's *pro rata* share of the expenses of any investment entities) will be equitably allocated by the General Partner. Except as provided in Section 4.3 (with respect to distributions to account for a disproportionate accrual of the Management Fee), distributions from the Aggregator Vehicle or an Investment will be made among the Partnership and any other Parallel Investment Vehicles in accordance with the relative capital contributions made by each of them to the Aggregator Vehicle or such Investment. Other investment vehicles may be designated as Parallel Investment Vehicles by the General Partner under Section 5.1(a)(xii). To the extent that any Parallel Investment Vehicle and the Partnership are jointly liable for any investment expenses, costs or indemnification obligations and the Partnership funds more than its *pro rata* share of any such costs or expenses, the General Partner shall use commercially reasonable efforts to cause such Parallel Investment Vehicle to make the Partnership whole in respect of any such costs or expenses.

(f)     The General Partner may use placement agents and may cause the Fund to incur Placement Fees. Any Placement Fees shall be paid by the Fund. To the fullest extent permitted by law, the General Partner in Good Faith shall allocate any Placement Fees and the Management Fee to the Partners of each Parallel Investment Vehicle and among the Partners thereof with respect to whom such Placement Fees and the Management Fee are payable pursuant

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                CHHEDA-TRANLLC-RC-00000138

to the Fund Agreements. All other Operating Expenses and Organizational Expenses shall be allocated among the Partnership and the other Parallel Investment Vehicles in proportion to the respective aggregate capital contributions of each of the Partnership and the other Parallel Investment Vehicles to the Aggregator Vehicle or the applicable Investment; *provided*, that any such Placement Fees, Operating Expenses or Organizational Expenses that the General Partner determines are specific to the Partnership or one or more of the Partnership or other Parallel Investment Vehicles (including expenses associated with Partnership or Parallel Investment Vehicle level taxes or brokerage commissions) may be allocated to the Partnership or such Parallel Investment Vehicle, as the case may be, on a basis the General Partner determines is fair and reasonable. Notwithstanding anything to the contrary contained in this Agreement, if an investor is not permitted to invest in an entity that pays Placement Fees, a Parallel Investment Vehicle may be formed for such investor and other similarly situated investors so that such investor and the entity in which it invests will not pay Placement Fees.

Section 2.10. **Single Partnership Assumption**.

(a)     To the fullest extent permitted by law, but not for federal, state or local income tax purposes, the Partnership and all Alternative Investment Vehicles and Parallel Investment Vehicles comprising the Fund shall be treated as a single entity (using the assumption that all Limited Partners, members and partners of all Fund entities were partners in a single limited partnership comprising the Fund) (the "***Single Partnership Assumption***") when the context requires, for purposes of applying the following provisions of the Fund Agreement:

(i)     the Capital Commitment of the General Partner and its Affiliates pursuant to Section 3.1;

(ii)     the purchase of a Defaulted Interest pursuant to Sections 3.5(c) and 3.5(d);

(iii)     the provisions regarding Subsequent Closings in Section 3.6(b);

(iv)     the investment and leverage targets of Sections 5.1(b) and 5.1(c), respectively;

(v)     the provisions of Sections 5.5(a) and 5.5(b) (relating to Operating Expenses and Organizational Expenses);

(vi)     the indemnification and exculpation provisions of Article VI;

(vii)     the selection of Advisory Committee members pursuant to Section 7.1; and

(viii)    the voting of the Limited Partners (except with respect to matters that solely apply internally to the Partnership or another Alternative Investment Vehicle or Parallel Investment Vehicle), including any vote that results in the dissolution or liquidation of the Partnership, an Alternative Investment Vehicle or a Parallel Investment Vehicle, with all Alternative Investment Vehicles and Parallel Investment Vehicles comprising the Fund (including the Partnership) being required to liquidate or dissolve simultaneously. The Term

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CHHEDA-TRANLLC-RC-00000139

of the Partnership and each Alternative Investment Vehicle and Parallel Investment Vehicle shall end simultaneously. Any amendment made to any Fund Agreement pursuant to Article XI thereof shall be made to each of the Fund Agreements to the extent applicable and/or permitted by the relevant Fund Agreements and Side Letters.

(b)     Investment results in respect of any Alternative Investment Vehicle will generally be (i) aggregated, solely for calculation purposes, with the investment results of the Partnership, (ii) determined in conjunction with and after giving effect to any and all distributions and allocations previously made pursuant to Article IV in connection with investments of the Partnership, (iii) taken into account and treated as a distribution or allocation, as the case may be, under Article IV, with respect to investments of the Partnership; and (iv) taken into account in determining the Clawback Amount (if any) under Section 10.2(g); in each case, unless the General Partner elects otherwise based on its determination that such aggregation would create or increase the risk of any adverse tax consequences, impose legal or regulatory constraints or create contractual or business risks that would be undesirable for the Partnership or for the Partners taken as a whole; *provided* that the General Partner shall provide reasonable written notice to the Advisory Committee prior to making any final determination to disaggregate the Partnership from any Alternative Investment Vehicle. Notwithstanding any provisions to the contrary contained herein, each Alternative Investment Vehicle may enter into agreements with the Partnership and other appropriate parties to allocate investment expenses and other obligations, as well as any applicable fees or items of income or expenses, or any capital contributions, among such Alternative Investment Vehicle, the Partnership and any other Alternative Investment Vehicle, any Parallel Investment Vehicle or any co-investment vehicle formed for the purpose of making such investment, including making joint and several borrowings. In furtherance of the foregoing, and notwithstanding any other provision of this Agreement, in the event that an Alternative Investment Vehicle is used and, as a result, the Alternative Investment Vehicle results in materially differential tax treatment or consequences for any Limited Partner with respect to an investment as compared to the tax treatment or consequences that would have applied for such Limited Partner in respect of such investment had it been made directly by the Partnership, then the General Partner's share of distributions and allocations under Articles IV and X for all purposes will be determined with respect to the affected Limited Partners as if such investment had been made directly by the Partnership.

Section 2.11.  **Co-investments**. The General Partner may seek co-investors to participate in a co-investment opportunity alongside an Investment if the General Partner has determined that it is appropriate and in the best interest of the Partnership to do so. If the General Partner determines to seek such co-investors, the General Partner may offer to one or more of the non-defaulting Limited Partners (to be selected by the General Partner in its sole discretion) the opportunity to co-invest with the Partnership in such Investment. The General Partner may also offer the amounts available for investment in such co-investment opportunity to strategic investors, lenders and/or other investment vehicles or managed accounts managed by the General Partner, the Manager, and/or their Affiliates. Any such co-investments shall be made upon such terms and conditions as the General Partner may determine and may be made available through limited partnerships or other entities formed in connection with any such co-investment opportunity. Each co-investor shall be required to bear a *pro rata* share of the costs and expenses relating to the co-investment in which the co-investor participates. The General Partner may, in its sole discretion, determine that any proposed participants in a co-investment opportunity will not be required to

- 8 -

bear any Broken Deal Expenses which would result in the Fund participating in such proposed investment, if any, bearing such Broken Deal Expenses; *provided*, that if the Partnership pays any Broken Deal Expenses, the General Partner shall use commercially reasonable efforts to provide that the Partnership receive any Break-up Fees paid in connection with the Partnership's pursuit of such co-investment opportunity. Notwithstanding any implication to the contrary and to the fullest extent permitted by law, any participation by any selected Limited Partners in a co-investment vehicle:

(a) will be entirely the investment decision and responsibility of the selected Limited Partners, and neither the General Partner, the Manager, nor any of its Affiliates, will assume any risk, responsibility or expense, or be deemed to have provided any advice or recommendation in connection with any participation by the selected Limited Partners in an Investment;

(b) will be consummated and disposed of at substantially the same time, on an arm's length basis, and on terms and conditions that are substantially similar to those obtained by the Partnership; and

(c) will not entitle any Limited Partner to participate in the management or control of any co-investment vehicle.

## ARTICLE III

## PARTNERS AND CAPITAL

Section 3.1. **General Partner**. The name, address and Capital Commitment of the General Partner and the Affiliated Limited Partners are set forth in Schedule A hereto. The General Partner, the Affiliated Limited Partners and their respective Affiliates shall make a combined Capital Commitment in the amount of at least one percent (1%) of the Aggregate Commitments as of the Effective Date. The Capital Commitment obligation of the General Partner and the Affiliated Limited Partners may be satisfied (a) by causing a co-investment Person that is an Affiliate of the General Partner to invest with the Partnership in all Investments on the same terms as the Partnership's investment, (b) through direct investment as a Limited Partner in the Partnership or indirectly through investment of one or more Affiliates as a Partner in the Partnership, and (c) by investing in Parallel Investment Vehicles or an Aggregator Vehicle. The Capital Commitment obligation of the General Partner and the Affiliated Limited Partners may be increased in the sole discretion of the General Partner at any time, including to reflect its election to forego all or a portion of its Management Fee and deem such amount as a Capital Contribution pursuant to Section 5.6.

Section 3.2. **Offering; Partners; Initial Closing**.

(a) The Fund is seeking Aggregate Commitments from qualified individuals and institutional investors who will become limited partners of the Fund up to a maximum aggregate amount of $100,000,000, including the aggregate Capital Commitment of the General Partner and the Affiliated Limited Partners to the Fund; *provided*, that the General Partner, in its sole discretion, reserves the right to accept Capital Commitments of a lesser or greater amount.

- 9 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CHHEDA-TRANLLC-RC-00000141

The minimum Capital Commitment for a Limited Partner is $250,000; *provided*, that the General Partner, in its sole discretion, reserves the right to accept Capital Commitments of a lesser or greater amount. The name, address and Capital Commitment of any Limited Partner shall be as set forth on such Limited Partner's counterpart of Schedule A hereto that applies to such Limited Partner, as amended from time to time. A Person shall be deemed admitted as a Limited Partner of the Partnership at the time such Person's Subscription Agreement is accepted by the General Partner as evidenced by the General Partner signing such Person's Subscription Agreement and holding a Closing with respect to such Person. The Interests issued to the Limited Partners represent valid limited partnership Interests in the Partnership.

(b)     Unless admitted to the Partnership as a General Partner or Limited Partner, as provided in this Agreement, no Person shall be considered a Partner. The Partnership and the General Partner need deal only with Persons as Partners that have been duly admitted. Neither the Partnership nor the General Partner shall be required to deal with any other Person (other than with respect to Distributions and allocations to assignees pursuant to assignments in compliance with Article IX) merely because of an assignment or Transfer of an Interest to such Person. To the fullest extent permitted by law, neither the Partnership nor the General Partner shall have any liability with respect to any Distribution or allocation made in accordance with this Agreement to the Person shown on the Partnership records as a Partner or to its legal representatives, or to the assignee of the right to receive Distributions and allocations pursuant to an assignment in compliance with Article IX.

(c)     The General Partner may also be a Limited Partner and its Affiliates may also be Limited Partners of the Partnership, by acquiring an Interest on the Closing Date, or upon acquiring the Interest of a Limited Partner or otherwise in accordance with this Agreement.

(d)     Except as expressly provided for herein, the Limited Partners shall not participate in, or take part in the control of, the business of the Partnership, and shall have no right or authority to act for or bind the Partnership. All Limited Partners of the Partnership shall be deemed to constitute a single class or group and, except as may be specifically otherwise provided herein, shall vote or grant written consents as a single class with respect to any matters on which Limited Partners have the right to vote or act by written consent hereunder or under the Delaware Act. If pursuant to the terms of this Agreement any Limited Partner is excluded from voting or granting or withholding written consent on any matter to be acted on by the Limited Partners, then the Interest of that Limited Partner shall not be included (and shall not be deemed outstanding) for purposes of determining whether the required vote or written consent of Limited Partners has been obtained hereunder or under the Delaware Act.

(e)     The General Partner shall have full power and authority, on behalf of the Partnership and so as to bind the Partnership thereby, to take any action that it determines to be necessary or desirable in its reasonable judgement:

(i)     so that the Partnership's assets will not be deemed to include Plan Assets, which may include, without limitations:

(A)     making structural, operating or other changes in the Partnership;

- 10 -

     CHHEDA-TRANLLC-RC-00000142

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

        (B)      selling or otherwise disposing of an Investment;

        (C)      cancelling the remaining Capital Commitment of any Limited Partner;

        (D)      requiring the withdrawal of any Limited Partner or the sale in whole or in part of any Limited Partner's Interest;

        (E)      dissolving the Partnership; or

        (F)      using its reasonable best efforts to take any action in its sole and absolute discretion to ensure that participation by ERISA Limited Partners is not "significant" within the meaning of the Plan Assets Regulation for purposes of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law; and

        (ii)      to avoid the occurrence of a non-exempt "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code.

(f)      If any Limited Partner shall be required to withdraw in accordance with the provisions of Section 3.2(e), there shall be distributed to such Limited Partner or its legal representative within 180 days after the last day of the Fiscal Year of the Partnership in which such withdrawal occurred, an amount equal to the balance of such Limited Partner's Estimated Value Capital Account as of the end of such Fiscal Year of the Partnership or, if withdrawal occurs other than at the end of a Fiscal Year, as of the date of such withdrawal; *provided, however*, that for purposes of determining the Estimated Value Capital Account in connection with the payment to be made pursuant to Section 3.2(e) to such withdrawn Limited Partner, the General Partner may deduct from the valuations of the Partnership's assets such costs or expenses in an amount, not to exceed 3.0%% of such valuations, as the General Partner may determine (in its sole discretion) to be necessary to cover the costs of implementing such withdrawal.

Section 3.3.    **Capital Contributions**

(a)      Limited Partners shall make additional capital contributions, in cash, to the Partnership, payable by wire transfer or check, upon at least ten (10) Business Days' prior written notice (which may be by facsimile or electronic mail) from the General Partner (the "***Drawdown Notice***") at such time (the "***Drawdown Date***") and in such amount (the "***Drawdown Amount***") as shall be specified in the Drawdown Notice.

(b)      No Partner shall be paid interest on any Capital Contribution to the Partnership or on such Partner's Capital Account.

(c)      Except upon dissolution of the Partnership pursuant to Article X (and then only to the extent provided in Section 10.2(c)(ii)), no Partner shall have any right to demand the return of its Capital Contributions.

(d)      No Partner shall have the right to demand or receive property other than cash in return for its Capital Contributions.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        CHHEDA-TRANLLC-RC-00000143

(e)  To facilitate Investments by the Partnership, the General Partner (or an Affiliate) may purchase or acquire Investments initially without the use of any debt financing, with the intention of obtaining debt financing after the Investment is acquired. The amount of any Distributions to a Partner (made at any time during the period in which Capital Contributions may be called in accordance with this Agreement) representing the amount of Capital Contributions associated with the net proceeds from debt financing of an Investment that was initially acquired without the use of debt financing and constituting a return of such Capital Contributions shall be added to such Partner's Unused Capital Commitments, and the General Partner may recall such Distributions for any purpose for which Capital Contributions may be called under and, in accordance with the terms and conditions of, this Agreement.

Section 3.4.  **Liability of Partners**.

(a)  Except as otherwise provided by the Delaware Act, no Partner (or former Partner) shall be obligated to make any contribution to the Partnership in addition to its Unused Capital Commitment or have any liability for the repayment or discharge of the debts and obligations of the Partnership; *provided*, that (i) such Partner shall be obligated to return any Distribution to the extent required by the Delaware Act or other applicable law and to recontribute (in reverse order of Distribution priority) Distributions in order to pay indemnity and other expenses of the Partnership as set forth in Section 6.2 and at any time to rectify any mistake in Distributions, and (ii) each Partner shall have such other liabilities as are expressly provided for in this Agreement (including Section 3.5).

(b)  Subject to the terms of this Agreement, neither the General Partner nor any of its Affiliates shall have any liability to any Limited Partner in respect of any amounts outstanding in the Capital Account of a Limited Partner, including Capital Contributions.

(c)  If, notwithstanding the terms of this Agreement, any Partner has received a Distribution that the Partner is required to return to or for the account of the Partnership or Partnership creditors under applicable law, then the obligation under applicable law of any Partner to return all or any part of a Distribution made to such Partner shall be the obligation of such Partner and not of any other Partner.

Section 3.5.  **Default in Payment**.

(a)  The Partnership shall be entitled to enforce the obligations of each Partner to make the Capital Contributions set forth in Section 3.3 and to return Distributions as provided in Section 3.4, and the Partnership shall have all remedies available at law or in equity in the event any Capital Contribution or return of Distribution is not so made.

(b)  If a Partner (a "***Defaulting Partner***") fails to pay any amount required to be paid by it under this Agreement within five days after the Due Date therefor, the General Partner may send a notice of default (a "***Default Notice***") to such Partner. If the payment is not received by the Partnership within 10 days after the receipt by the Defaulting Partner of a Default Notice (i) such failure shall constitute a breach of this Agreement and (ii) in the General Partner's sole discretion, such amount shall constitute a demand loan ("***Default Loan***") to such Partner that shall

- 12 -

CHHEDA-TRANLLC-RC-00000144

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

bear interest payable to the Partnership at a rate of 5.0% plus the Prime Rate *per annum*, compounded monthly, or, if lower, the highest rate of interest permitted under applicable law, from and after the original due date of such installment (the "***Default Date***") until the earliest of either (A) the payment of such installment, including any interest accruing under this Section 3.5(b), (B) the purchase of such Defaulting Partner's Defaulted Interest (as defined below) under Section 3.5(c), or (C) the conclusion of foreclosure proceedings under Section 3.5(e). Any interest paid by a Defaulting Partner pursuant to this Section 3.5(b) shall not be treated as a Capital Contribution but shall be treated as income of the Partnership. Alternatively, the General Partner, in its sole discretion, may allow one or more non-defaulting Partners to make Default Loans to the Defaulting Partner at a rate equal to the lesser of 5.0% plus the Prime Rate *per annum*, compounded monthly, and the maximum interest rate permitted by law, to be repaid from the Distributions otherwise payable to the Defaulting Partner (with such Distributions being deemed to have been first made to the Defaulting Partner and then paid to the lending non-defaulting Partners in repayment of such Default Loan). Notwithstanding any other provision of this Agreement, the Partnership shall have the right to withhold any Distributions due to a Defaulting Partner and apply any such Distributions to the payment of such Defaulting Partner's Default Loan and any interest accrued and unpaid thereon, and any amounts so withheld shall be treated, for all purposes, as if such amounts had first been distributed to the Defaulting Partner in the order of priority set forth in Section 4.2 and thereafter paid by the Defaulting Partner to the Partnership or any Partners who have made such Default Loan as provided above, as applicable, in payment of the principal and any accrued and unpaid interest on such Default Loan.

(c)     In addition to, and not in limitation of, the foregoing, the General Partner may designate (in its sole discretion) in the Default Notice provided to a Defaulting Partner, one or more parties, which parties may be the Partnership, the Limited Partners, the General Partner, Affiliates of the General Partner or third parties, that will be permitted to acquire (by redemption in the case of the Partnership or by purchase in the case of any other Person) all or any portion of the Interest of the Defaulting Partner in the Partnership (the "***Defaulted Interest***"); *provided*, that such default has not been cured by the Defaulting Partner within 10 days after receipt by the Defaulting Partner of the Default Notice. If a Defaulting Partner shall pay any overdue installment of its Capital Commitment, *plus* interest in accordance with Section 3.5(b), prior to the expiration of the above-referenced 10-day period, (i) such Partner shall cease to be a Defaulting Partner, (ii) such Partner shall cease to be in breach of this Agreement and (iii) the remedies provided in this Section 3.5(c) and in Section 3.5(e) shall not be available with respect thereto. If a Defaulting Partner shall fail to cure its default within the above-referenced 10-day period, such failure shall constitute a breach of this Agreement and such Defaulting Partner shall forfeit its Interest and thereby cease to be a Partner for all purposes as of the date of the issuance of the Default Notice.

(d)     With respect to any redemption or purchase made pursuant to Section 3.5(c), the General Partner may determine that no consideration be paid other than the attorneys' fees and costs of enforcing payment and the transfer and removal of the Defaulting Partner as a Partner. The provisions of Section 3.5, including the discount set forth in the immediately preceding sentence shall constitute a penalty for breach of this Agreement as permitted by the Delaware Act that has been fully negotiated and discussed and each Partner completely understands and comprehends the intent, effect and potential ramifications thereof. The Partners agree that the provisions of Section 3.5, including this Section 3.5(d) are a reasonable remedy for the monetary damage that would result from any Partner's failing to make its required

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CHHEDA-TRANLLC-RC-00000145

Capital Contributions as and when from time to time required pursuant to the provisions of this Agreement. Each party redeeming or purchasing the Defaulted Interest pursuant to Section 3.5(c) shall be obligated, severally and not jointly, to pay its *pro rata* portion of the aforesaid consideration based on the percentage of the Defaulting Partner's Defaulted Interest acquired by such party. If the General Partner exercises its right to cause the Partnership to redeem all or a portion of a Defaulting Partner's Defaulted Interest pursuant to Section 3.5(c), the General Partner may, in its sole discretion, issue a Drawdown Notice for an amount up to the aggregate Unused Capital Commitment of each Partner and for purposes of determining each Partner's liability under any such Drawdown Notice, the Allocation Percentage of the Partners shall be calculated assuming that the Partnership's proposed redemption of all or a portion of the Defaulted Interest has been completed. Any non-Defaulting Partner or third party that acquires all or a portion of a Defaulting Partner's Defaulted Interest shall also assume the portion of the Defaulting Partner's Capital Commitment corresponding to the acquired portion of the Defaulted Interest and shall pay to the Partnership, concurrently with the payment of the purchase price to the Defaulting Partner, an amount representing the portion of the Defaulting Partner's Capital Contribution that is then due and unpaid (excluding any interest accrued under Section 3.5(b)) that corresponds to the acquired portion of the Defaulted Interest. If the Partnership acquires any portion of a Defaulting Partner's Defaulted Interest, the portion of the Defaulting Partner's Capital Commitment that corresponds to the portion of the Defaulted Interest acquired by the Partnership shall be cancelled. Any interest that accrues under Section 3.5(b) with respect to a Defaulting Partner's Defaulted Interest prior to the acquisition of such Defaulted Interest pursuant to Section 3.5(c) and this Section 3.5(d), shall remain an obligation of the Defaulting Partner and shall not be assumed by any Person acquiring the Defaulted Interest unless otherwise agreed in writing by such Person and the Defaulting Partner.

(e)     In addition to or in lieu of, and not in limitation of, any of the foregoing, upon termination of the 10-day period provided in Section 3.5(c) if a breach of this Agreement by the Defaulting Partner has occurred, the General Partner, in its sole discretion, may (i) commence proceedings to collect any due and unpaid installment of the Defaulting Partner's Capital Commitment (*plus* interest in accordance with Section 3.5(b)) and the expenses of collection, including arbitration or court costs and attorneys' fees and disbursements, and (ii) elect (effective upon giving notice to the Defaulting Partner) that the Defaulting Partner have no further co-investment opportunities to the extent that the Defaulting Partner otherwise would qualify for such opportunities.

(f)     Any actions taken by the General Partner or the Partnership pursuant to this Section 3.5 shall be in addition to and not in limitation of any other rights or remedies that the Partnership may have against the Defaulting Partner, including, but not limited to, the right to hold the Defaulting Partner responsible for any damages or liabilities (including attorneys' fees, arbitration or court costs and other expenses of collection) to which the Partnership may be subjected (in whole or in part) under applicable law as a result of the default by the Defaulting Partner.

(g)     Each Limited Partner hereby agrees that, if such Limited Partner shall fail to pay when due any installment of its Capital Commitment required pursuant to Section 3.3 and the General Partner elects to pursue one or more remedies set forth in Section 3.5(c), such Limited Partner shall sell, assign, transfer and convey to the Partnership, any designee of the General

- 14 -

     CHHEDA-TRANLLC-RC-00000146

Partner or any and all Limited Partners making the election contemplated by Section 3.5(c), as applicable, the Defaulted Interest in consideration of the amount determined in accordance with the provisions of Section 3.5(d).

(h)     So long as a Defaulting Partner remains a Defaulting Partner, such Limited Partner shall not, to the fullest extent permitted by law, be entitled to exercise any voting rights or right to purchase any other Defaulting Partner's Interest otherwise granted to such Limited Partner under this Agreement and its representative shall cease to serve on the Advisory Committee upon notice from the General Partner (which may be given or not given in the General Partner's sole discretion). In addition, to the fullest extent permitted by law, a Defaulting Partner shall not be entitled to make any demands upon the Partnership for inspection of the Partnership's books and records, or any lists of Partners of the Partnership. A Limited Partner shall be considered a Defaulting Partner from and after the date of delivery of the Default Notice. Whenever the Consent or decision of a Limited Partner or of the Limited Partners is required or permitted pursuant to this Agreement or under the Delaware Act, a Defaulting Partner shall not, to the fullest extent permitted by law, be entitled to participate in such Consent or to make such decision.

(i)     If a Feeder Fund is a Defaulting Partner because of a default by an investor in such Feeder Fund (a "***Defaulting Investor***") in the payment of amounts that the Defaulting Investor is obligated to pay to the Feeder Fund, then the Feeder Fund's Interest shall be separated into two parts for purposes of exercising all default remedies under this Section 3.5. One part will consist of the Defaulted Interest and will represent an amount of the Feeder Fund's Interest that corresponds to the interest of the Defaulting Investor in the Feeder Fund (the "***Default Portion***"). The second part will consist of the balance of the Feeder Fund's Interest (the "***Non-Default Portion***"). Only the Default Portion of the Feeder Fund's Interest will be treated as a Defaulted Interest for purposes of this Agreement and the Feeder Fund will continue to have the same rights as all other non-defaulting Partners to the extent of the Non-Default Portion of the Feeder Fund's Interest. If the Partnership or any non-defaulting Partner (other than the Feeder Fund) elects to purchase part or all of the Default Portion, such purchase shall occur by the Partnership or the non-defaulting Partner, as the case may be, redeeming or purchasing, as applicable, part or all of the Default Portion and the Feeder Fund using the proceeds received from such purchase to then acquire from the Defaulting Investor the corresponding portion of the Defaulting Investor's interest in the Feeder Fund. If the Feeder Fund is a Defaulting Partner as a result of a default by one of its investors, the General Partner may make such modifications to this Section 3.5 and Article IV as are necessary or appropriate so that an ownership Interest in the Feeder Fund is the economic equivalent (other than with respect to tax attributes) of an Interest of the same subscription amount.

(j)     Notwithstanding any other provision of this Section 3.5, if any underlying investor in a Limited Partner with respect to which a Several Interest Election has been accepted fails to satisfy a drawdown request to such Limited Partner and as a result such Limited Partner fails to make its Capital Contribution to the Partnership, in whole or in part, or fails to make any other payment contemplated by this Agreement, such Limited Partner may be treated as a Defaulting Partner in accordance with this Section 3.5, but solely with respect to that portion of such Limited Partner's Interest attributable to such underlying investor's indirect interest in the Partnership. The General Partner may make any adjustments to the Interest of such Limited Partner to accomplish the overall objectives of this Section 3.5(j); *provided*, that such adjustments shall

- 15 -

not have a material adverse effect on the Interests of any other Partner. In addition, to the extent the General Partner permits the Limited Partners to exercise any of the remedies set forth in this Section 3.5 with respect to a defaulting Limited Partner, it shall permit any Limited Partner that has made a Several Interest Election to participate in any such remedy being exercised solely for the benefit of one or more underlying investors of such Limited Partner as if such underlying investor has invested in the Partnership directly. Nothing in this Section 3.5(j) shall be construed as making any underlying investor in such Limited Partner a Limited Partner for any purpose whatsoever.

(k)     Unless the General Partner otherwise elects to terminate a Defaulting Partner's Unused Capital Commitment, each Defaulting Partner shall remain obligated to make Capital Contributions as required by the General Partner up to the full amount of the Defaulting Partner's Capital Commitment.

(l)     In addition to the other rights provided in this Section 3.5 and to the extent not inconsistent with such other rights, upon termination of the 10-day period provided in Section 3.5(c) if a breach of this Agreement by the Defaulting Partner has occurred, the General Partner may freeze or, in its discretion, permanently reduce to zero, the Capital Account of the Defaulting Partner, by notice to the Defaulting Partner, in which event (i) the Defaulting Partner shall, to the fullest extent permitted by law, no longer have any right to participate in the Profits, Losses and Distributions of profits of the Partnership arising at any time thereafter, (ii) the Partnership may withhold from the Defaulting Partner all Distributions to which it might otherwise be entitled hereunder, including Distributions upon liquidation (which amounts shall be deemed to have been first distributed to such Partner for all purposes and then paid by such Partner with respect to the amounts owed by such Partner), (iii) all Distributions that would otherwise be made to the Defaulting Partner on or after such date shall be subject and subordinate in timing and right of payment to payment in full to all Partners who are not Defaulting Partners of the positive balances in their Capital Accounts upon the liquidation and dissolution of the Partnership, and (iv) the amounts withheld from the Defaulting Partner by the Partnership pursuant to this sentence shall not accrue any interest.

(m)     Notwithstanding anything to the contrary in this Section 3.5, if any of the First Limited Partners becomes a Defaulting Partner, then the Unused Capital Commitment of such First Limited Partner shall be terminated and the General Partner shall not pursue any other remedy set forth in this Section 3.5 with respect to such First Limited Partner.

Section 3.6.     **Admission of Limited Partners**.

(a)     Person(s) executing this Agreement or a counterpart signature page hereto as of the Initial Closing Date are admitted to the Partnership as Limited Partners effective as of the Effective Date. Except as provided in the first sentence of this Section 3.6(a), a Person, including an Additional Limited Partner or substitute limited partner meeting the further requirements of this Agreement, shall be deemed admitted as a Limited Partner at the time such Person and the General Partner have executed this Agreement or a counterpart signature page to this Agreement and the effective date of such admission (as determined by the General Partner in its sole discretion) has occurred.

- 16 -

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

(b)     Additional Limited Partners may be admitted to the Partnership after the Initial Closing Date at the time and in the manner provided in this Section 3.6(b) as follows:

(i)     After the Initial Closing Date, the General Partner may admit additional Limited Partners (each, an "*Additional Limited Partner*"), or accept additional Capital Commitments from existing Partners, at one or more additional closings (each a "*Subsequent Closing*"); *provided, however*, that no Subsequent Closings shall be permitted after the date that is eighteen (18) months after the Initial Closing Date (the last Subsequent Closing occurring under this Section 3.6(b)(i) is referred to as the "*Final Closing*").

(ii)     In connection with any Subsequent Closing, Subsequent Closing Partners shall be deemed to contribute an amount equal to (a) such Partner's pro-rata share of all drawn Capital Commitments less (b) such Partner's pro-rata share of all Distributions (if any) made to Partners admitted in any prior Closing ("*Subsequent Closing Commitments*"). For the avoidance of doubt, Limited Partners admitted in any prior Closing will be deemed to immediately contribute any such amounts so that the General Partner and the Manager may make new Investments. Subsequent Closing Commitments will be drawn immediately and allocated towards new Investments at the General Partner's discretion.

(iii)     Unless waived by the General Partner in its sole discretion, Subsequent Closing Partners shall also contribute an amount equal to interest that would be payable on a debt obligation in the amount of the contribution required pursuant to clause (ii) above, calculated like interest at the Prime Rate plus 3% per annum, compounded annually, for the period from the due date or dates on which the other Partners were required to make their earlier contributions through the date of payment ("**Interest Charge**"). An Interest Charge shall not be treated as a capital contribution by the Subsequent Closing Partner. An Interest Charge in respect of amounts other than the Management Fee shall be allocated and distributed to the Partners pro rata based on all previous capital contributions to the Partnership as adjusted to reflect the date on which such previous capital contributions were made.

(iv)     In connection with each Subsequent Closing, the General Partner shall modify each Limited Partner's Schedule A and the books and records of the Partnership to accurately reflect the Capital Contribution, Capital Commitments subject to call and Capital Account of each Partner, determined as of the time of such Subsequent Closing. The Capital Commitment of each existing Partner shall not be increased or decreased by any Subsequent Closing Commitment received.

(v)     Notwithstanding the other provisions of this Section 3.6(b), in order to prevent certain economic distortions that might otherwise occur, any Additional Limited Partner that is treated as the same taxpayer as an existing Limited Partner for federal income tax purposes shall be treated in the same manner as the existing Limited Partner under this Section 3.6(b), and references to the existing Limited Partner in the other provisions of this Section 3.6(b) shall include any such Additional Limited Partner.

(vi)     For purposes of Article IV, any item of income, gain, loss, or deduction previously allocated pursuant to Article IV hereof with respect to any portion of an

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    CHHEDA-TRANLLC-RC-00000149

Interest sold for a Subsequent Closing Commitment pursuant to Section 3.6(b)(ii) shall be deemed attributable to such transferred Interests.

(vii)    If one or more Alternative Investment Vehicles are established pursuant to Section 2.8, the above procedures for subsequent admissions will be applied (to the maximum extent reasonably practicable) on an aggregate basis across the Fund entities as described in Section 2.9.

(viii)    If one or more Parallel Investment Vehicles are established pursuant to Section 2.9, the above procedures for subsequent admissions will be applied (to the maximum extent reasonably practicable) on an aggregate basis across the Fund entities as described in Sections 2.9(e) and 2.9(f).

(c)    The admission of a Person to the Partnership that would cause the Partnership to be an "investment company" within the meaning of Section 3 of the Investment Company Act, shall, to the fullest extent permitted by law, be void *ab initio* and shall not bind or be recognized by the Partnership.

(d)    The General Partner shall take such actions as are reasonably appropriate to cause the provisions of this Section 3.6 to be applied among all Partners and Parallel Investment Vehicle Partners without regard for the vehicle through which a particular investor participates in the Fund.

Section 3.7.    **Strategic Investors.** Subject to the provisions of Section 3.5(m), EquipmentShare.com, Inc. (*"ES"*) shall make a Capital Commitment of $12,000,000; Arken LLC shall make a Capital Commitment of $2,000,000, and RC Opportunity LLC shall make a Capital Commitment of $2,000,000. The parties agree that, the General Partner will enter into a separate Side Letter with ES, which will have the effect of amending certain terms of this Agreement as they apply to ES including by reducing or eliminating certain fees and expenses that would otherwise be payable by ES associated with its investments in the Fund. Each of these investors will be a First Limited Partner in the Initial Closing and will therefore be entitled to reduce their Capital Commitments in accordance with Section 3.5(m).

Section 3.8.    **ERISA Matters**.

(a)    The General Partner shall use commercially reasonable efforts to ensure that the terms and conditions of the Investments, and the contractual rights obtained and exercised with respect to the Investments, will not (1) cause the Partnership to fail to qualify as a "venture capital operating company" as defined in the Plan Assets Regulation (if such qualification is otherwise being sought) or (2) otherwise cause the assets of the Partnership to be treated as Plan Assets. For the avoidance of doubt, no ERISA Limited Partner shall be admitted to the Partnership without the General Partner's express written consent.

(b)    In connection with the General Partner's efforts set out in Section 3.8(a):

(i)    no transaction affecting the Interests shall be effective if the General Partner determines that such Investments may result in a material risk that the Partnership's assets would be deemed to include Plan Assets;

- 18 -

(ii)     the General Partner may take any action it deems appropriate in connection with assuring that the assets of the Partnership will not include Plan Assets, including, without limitation:

(A)     precluding, limiting or otherwise not giving effect to all or any portion of any purchase, acquisition, assignment or transfer of any Interest or withdrawal of any Limited Partner; and

(B)     effecting *pro rata* withdrawals by Limited Partners who have represented that they are Benefit Plan Investors and by (unless otherwise determined by the General Partner) a Controlling Person to reduce the aggregate holdings of such Benefit Plan Investors so that participation by Benefit Plan Investors should not be deemed "significant" within the meaning of the Plan Assets Regulation.

(c)     If the General Partner determines, including, without limitation, taking into account any relevant information provided by an ERISA Limited Partner, that:

(i)     participation by Benefit Plan Investors in the Partnership is "significant" within the meaning of the Plan Assets Regulation for purposes of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law; and

(ii)     no other exception from the treatment as Plan Assets under the Plan Assets Regulation or any applicable Similar Law applies,

then the General Partner shall promptly notify the ERISA Limited Partner of such determination. The General Partner is hereby authorized and empowered to take actions as it determines in its discretion are appropriate to mitigate, prevent or cure any adverse consequence of such determinations, which may include, without limitation and as appropriate:

(i)     renegotiating the terms of any Investment or otherwise modifying the manner in which the Partnership conducts its business;

(ii)     permitting or requiring the assignment of all or any portion of the Interests of any or all of the ERISA Limited Partners; and

(iii)     requiring each ERISA Limited Partner that is a Benefit Plan Investor (on a *pro rata* basis unless otherwise consented to by the ERISA Limited Partner):

(A)     assign all or any portion of its Interests at a price not less than the fair value of such an Interest or portion thereof, with such a fair value being determined by the General Partner; and/or

(B)     completely or partially withdraw from the Partnership and receive in consideration an amount, as determined under Section 3.2(f), of such an Interest or portion thereof being withdrawn,

- 19 -

and in either case, with such an amount being payable, in the sole and absolute discretion of the General Partner, either in cash or in the form of a promissory note (which may be prepaid by the Partnership at any time).

(d)     Notwithstanding any provision to the contrary contained in this Agreement, no in-kind Distribution shall be made to an ERISA Limited Partner to the extent that such an ERISA Limited Partner provides an opinion of counsel or other evidence reasonably acceptable to the General Partner that receipt of such an in-kind Distribution would result in a non-exempt "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code.

Section 3.9.     **Limited Exclusion Right.**

(a)     Prior to making any Investment, the General Partner shall have the right (a "***Limited Exclusion Right***"), but not an obligation, to exclude any Limited Partner from participating in such Investment and in any item of income, gain, loss, deduction, credit or Distribution with respect thereto if the General Partner determines in Good Faith (*provided*, that acting in Good Faith shall include relying on any oral or written representation or acknowledgement of a Limited Partner) that:

(i)     participation by such Limited Partner in such Investment will (A) result in a violation by the Partnership of the provisions of any law, statute, rule, regulation or order applicable to the Partnership, any Parallel Investment Vehicle, such Investment or any other Limited Partner or (B) subject the Partnership, any Parallel Investment Vehicle, such Investment or any other Limited Partner to any material penalty under any such law, statute, rule, regulation or order;

(ii)     participation by such Limited Partner in such Investment would require the Partnership to register as an investment company under the Investment Company Act; or

(iii)     participation by such Limited Partner in such Investment would cause (or be reasonably likely to cause) a significant delay, extraordinary expense, violation of applicable law or a material adverse effect on the Partnership or its Affiliates, any Investment or future Investment, a Partner or a Parallel Investment Vehicle.

(b)     In exercising its Limited Exclusion Right pursuant to Section 3.9(a), the General Partner's Good Faith determination pursuant to clauses (i) and (ii) of such Section 3.9(a) shall be supported by an opinion of the Partnership's counsel in order for the General Partner to exclude a Limited Partner from an Investment. If the General Partner exercises a Limited Exclusion Right hereunder or if the General Partner exercises an equivalent right with respect to a Parallel Investment Vehicle, the General Partner shall (x) so notify each Limited Partner to be excluded at least five days prior to making any Investment, which notice shall be accompanied by reasonable detail of the basis therefor (including a summary of the facts leading to the exercise of such right) and (y) give at least 10 days' notice to the non-excluded Limited Partners of the amount of any additional Capital Contributions that they are required to make (in an amount that represents their *pro rata* share of the aggregate amount payable by all non-excluded Limited Partners (based upon their Unused Capital Commitments)) in order to consummate the proposed Investment as to

- 20 -

which such right has been exercised. If appropriate, the General Partner may apply this Section 3.9(b) with respect to any Limited Partner that has made a Several Interest Election to the portion of the Interest of such Limited Partner to which such exclusion applies.

Section 3.10. **Mandatory Withdrawal.**

(a) In addition to the right of the General Partner to cause a Limited Partner to withdraw from the Partnership as set forth in Section 3.2(e), the General Partner shall have the right at any time upon written notice to require a Limited Partner to withdraw from the Partnership if (i) the General Partner reasonably determines, in Good Faith, that such Limited Partner has made a material misrepresentation in, or violated any covenant of, this Agreement or such Limited Partner's Subscription Agreement, is a Prohibited Limited Partner or has suffered an Incapacity event, (ii) in the reasonable judgment of the General Partner, a significant delay, extraordinary expense, violation of law or material adverse effect (including a material likelihood that the Partnership's assets would be deemed to include Plan Assets) on the Limited Partners, the Partnership or any of its Affiliates, any Investment or any future Investment is likely to result, or (iii) the General Partner reasonably determines, in Good Faith, that the participation of such Limited Partner in the Partnership is illegal. Upon the giving of such notice, such Limited Partner shall be required to withdraw as a Limited Partner as of the date specified in such notice (the "***Withdrawal Date***").

(b) Effective upon the Withdrawal Date, such Limited Partner shall cease to be a Limited Partner of the Partnership for all purposes and, except for its right to receive payment for its Interest in the Partnership as provided in Section 3.10(c), shall no longer be entitled to the rights of a Limited Partner under this Agreement (including the right to have any allocations made to its Capital Account pursuant to Article IV, the right to receive Distributions pursuant to Article IV and upon dissolution of the Partnership pursuant to Article X and the right to vote on matters as provided in this Agreement).

(c) The Capital Accounts of the Partners shall be adjusted as of any Withdrawal Date to reflect allocations made pursuant to the Allocation Provisions through such date. If, after such adjustments, there is a positive balance in such Partner's Capital Account, then the amount of such balance shall be paid by the Partnership to such Partner in cash as promptly as is reasonably practicable following such withdrawal (taking into account the liquidity needs of the Partnership); *provided*, that the General Partner shall be under no obligation to sell, finance or refinance any Investment to effect such withdrawal. If appropriate, the General Partner may apply this Section 3.10 with respect to any Limited Partner that has made a Several Interest Election to the portion of the Interest of such Limited Partner to which such withdrawal applies.

# ARTICLE IV

# DISTRIBUTIONS; ALLOCATION OF PROFITS AND LOSSES

Section 4.1. **Distributions.**

(a) Distributions from the Partnership will consist of the following categories of items: (i) Current Income; and (ii) Capital Transaction Proceeds. The General Partner shall

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CHHEDA-TRANLLC-RC-00000153

periodically review any reserves created for the payment of anticipated Operating Expenses or other legal obligations and release any excess amounts in such reserves for distribution in accordance with this Article IV.

(b)     The Partnership may reinvest Current Income. The Partnership will be permitted to reinvest (and shall not be required to distribute) proceeds realized on the sale or disposition of Investments, provided that the Partnership's cumulative investment in securities other than money market investments, bridge securities and other passive investments over the term of the Partnership will not exceed one hundred twenty percent (120%) of the Partnership's aggregate capital commitments.

(c)     Subject to the ability of the General Partner to reinvest proceeds pursuant to Section 4.1(b), distributions by the General Partner will be distributed as follows: (i) Current Income at such time and in such amounts as determined in the General Partner's sole discretion; and (ii) Capital Transaction Proceeds within 90 days after receipt (or if distribution within such 90-day period is not practicable, as soon as practicable thereafter); (items (i) through (ii) together, less any reserves established in the sole discretion of the General Partner, the "*Distributable Cash Flow*").

(d)     Distributions pursuant to this ARTICLE IV or upon liquidation of the Partnership under Section 10.2 may be made in-kind by distributing all or a portion of the Partnership's share of publicly traded portfolio company securities, upon such terms and conditions, as the General Partner deems appropriate. Cash distributions shall be made, to the extent practicable, in *pro rata* portions of cash as to each Partner receiving such Distributions.

(e)     All Distributions to be made to the Partners pursuant to this Article IV or upon liquidation of the Partnership under Article X, as applicable, shall be adjusted to take into account any Partner who has not contributed its Capital Contributions as called for by the General Partner pursuant to the terms of this Agreement, whether as a result of such Partner's default under Section 3.5, or otherwise.

(f)     Notwithstanding any provision to the contrary contained in this Agreement, the Partnership shall not be required to make a Distribution to a Limited Partner on account of its Interest in the Partnership if such Distribution is likely to violate the Delaware Act or any other applicable law.

Section 4.2.     **Amounts and Priority of Distributions.**

Subject to the provisions of Sections 4.1, Section 4.3 and 4.4, and the Delaware Act, Distributable Cash Flow initially will be apportioned among the Partners *pro rata* in accordance with their respective Allocation Percentage. The amount apportioned to the General Partner and Affiliated Limited Partners will be distributed to the General Partner and such Affiliated Limited Partners, as applicable, in the sole discretion of the General Partner. The amount apportioned to the Limited Partners other than Affiliated Limited Partners will be allocated among them in accordance with their respective Allocation Percentage and, subject to the provisions of Sections 4.1, Section 4.3, 4.4, Section 4.7(d) and the Delaware Act, the amount so allocated to each such Limited Partner will be distributed in the following order of priority:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     CHHEDA-TRANLLC-RC-00000154

(a)     *First*, 100% pro rata to such Partner in proportion to such Partner's Unreturned Capital, until such Partner has received an amount equal to such Partner's Unreturned Capital;

(b)     *Second*,

(i)     for any period when cumulative distributions to a Limited Partner are, in the aggregate, less than 500% of such Limited Partner's Capital Contributions received (A) 80% of any excess over the amount allocated to the Partnership in clause (a) to each Partner in proportion to such Partner's Allocation Percentage and (B) 20% of such excess over the amount allocated to the Partnership to the General Partner

(ii)     for any period when cumulative distributions to a Limited Partner are, in the aggregate, equal or exceed 500% of such Limited Partner's Capital Contribution received (A) 60% of any excess over the amount allocated to the Partnership in clauses (a) and (b) to each Partner in proportion to such Partner's Allocation Percentage and (B) 40% of such excess over the amount allocated to the Partnership to the General Partner

*(either such amount in (b)(1) and (b)(2) above allocated to the General Partner, the "**Carried Interest**").*

In lieu of receiving Distributions of Carried Interest from the Partnership, the General Partner may elect to receive such amounts from Subsidiaries of the Partnership (including an Aggregator Vehicle) or a Parallel Investment Vehicle.

Section 4.3.     **Special Distributions**.

(a)     To the extent that the Management Fee paid by the Partnership with respect to a Partner for a particular quarter accrues at a different rate than the rate at which the Management Fee is paid by the Partnership with respect to such calendar quarter, distributions to the Partners from the Partnership pursuant to Section 4.2 shall be adjusted to the extent necessary, as determined by the General Partner in its discretion, to account for such disproportionate accrual of the Management Fee.

Section 4.4.     **Special Tax Distributions**. To the extent that the Distribution priorities set forth in Section 4.2 do not provide cumulative Distributions to any Partner as of the end of any Fiscal Year in an amount at least equal to the aggregate federal, state and local taxes that would (based on the assumptions below) be deemed to be payable by such Partner on the cumulative taxable income of the Partnership allocated to the l Partner and other payments, as of the end of such Fiscal Year (determined by assuming that the Partner is an individual subject to the highest marginal rate of federal, state and local taxation applicable to individuals residing in New York, New York or San Francisco, California, whichever is higher, and taking into account the character of income allocated to the Partner (including income required to be taxed as ordinary income when received by a Partner, self-employment taxes, and tax under Code Section 1411) and the deductibility of state and local taxes for federal tax purposes (to the extent such state and local taxes are deductible) and any loss limitations contained in Code Section 470 restricting the ability to deduct Partnership losses or deductions allocated to the General Partner) (a "***Tax Distribution Amount***", if to a Limited Partner, and the "***Carried Interest Tax Liability***" with respect to the

- 23 -

General Partner), then the General Partner shall cause a Distribution to be made to such Partner for the Fiscal Year equal to such Partner's Tax Distribution Amount (a "***Limited Partner Tax Distribution***") or its Carried Interest Tax Liability (the "***Carried Interest Tax Distribution***"), as applicable. For the avoidance of doubt, Carried Interest Tax Liability shall also include any taxable income to the General Partner resulting from or caused by the Carried Interest, including but not limited to any deemed income or compensation to the General Partner for tax purposes on account of Carried Interest. Carried Interest Tax Distributions will be treated as advance payments of Carried Interest and will reduce future payments thereof (but will not be repayable by the General Partner.)

Section 4.5. **Tax Withholding**.

(a) (i) The General Partner shall at all times be entitled to make payments with respect to any Partner in amounts required to discharge any obligation of the Partnership to withhold from a Distribution or make payments to any governmental authority with respect to any foreign, federal, state or local tax liability of such Partner arising as a result of such Partner's interest in the Partnership (a "***Withholding Payment***"). Any Withholding Payment made from funds withheld upon a Distribution to a Partner will be treated as (and deemed to have been) distributed to such Partner for all purposes of this Agreement and then paid by the Partnership as the agent of such Partner. Any other Withholding Payment will be deemed to be a recourse demand loan by the Partnership to the relevant Partner. The amount of any Withholding Payment treated as a loan, *plus* interest thereon, from the date of each such Withholding Payment until such amount is repaid to the Partnership at a rate of Prime Rate + 3.0% per annum, shall be repaid to the Partnership upon demand by the Partnership; *provided, however,* that in the General Partner's sole discretion, any such amount may be repaid by deduction from any Distributions payable to such Partner pursuant to this Agreement (with such deduction treated as an amount distributed to the Partner) as determined by the General Partner in its sole discretion. Notwithstanding anything contained herein to the contrary, the Partnership may be required to withhold Distributions and make payments to United States tax authorities, including under Sections 1441, 1442, 1445, 1446 and 1471 through 1474 of the Code, and the General Partner is hereby authorized to do so to the extent the Partnership is subject to such requirements.

(ii) The General Partner agrees that, with respect to any allocation or distribution from the Fund, before withholding and paying over to any United States federal, state or local taxing authority any amount purportedly representing a tax liability of a Limited Partner by reason of an investment in the Partnership, the General Partner will use commercially reasonable efforts to provide the Limited Partner with written notice of the amount proposed to be withheld from the Limited Partner and an opportunity for the Limited Partner to establish (at the Limited Partner's sole expense, including, without limitation, any costs, expenses, fees or penalties of any nature incurred or payable by or assessed on the General Partner or the Partnership and to the satisfaction of the General Partner in its sole discretion) the basis for an exemption from such withholding requirement applicable to the Limited Partner, as long as the foregoing does not subject the Partnership, the other investors, the General Partner or any of their respective partners, members, shareholders, or owners, as reasonably determined by the General Partner, to any potential liability to such taxing authority or any other governmental authority for any such claimed withholding and payment and would not otherwise, as reasonably determined by the General Partner, result in adverse consequences

- 24 -

to the Fund or its Limited Partners. For the avoidance of doubt, the withholdings referred to in this Section 4.5 shall be made at the maximum applicable statutory rate under applicable law unless the General Partner receives documentation, satisfactory to the General Partner in its discretion, to the effect that a lower rate is applicable, or that no withholding is applicable.

(b)     If the proceeds to the Partnership (or any fiscally transparent entity in which the Partnership holds an interest) from an investment are reduced on account of taxes withheld at the source, and such taxes are attributable to one or more, but not all, of the Partners in the Partnership, the amount of the reduction shall be borne by the relevant Partners to whom such taxes are attributable as determined by the General Partner in its discretion and treated as if it were paid by the Partnership as a Withholding Payment with respect to such Partners pursuant to Section 4.5(a). If the proceeds to the Partnership (or any fiscally transparent entity in which the Partnership holds an interest) from an investment are reduced on account of taxes withheld at the source, and such taxes are attributable to all Partners, the amount of the reduction shall be treated as an expense of the Partnership. This Section 4.5 and the other provisions of this Agreement shall be applied consistently with the requirements of Treasury Regulations Section 1.704-1.

(c)     Promptly upon request, each Partner shall provide the General Partner with any information, representations, certificates, affidavits or forms related to such Partner (or its direct or indirect partners, members, owners or account holders, as the case may be) necessary (i) to establish the Partnership's (or that of any Investment, Parallel Investment Vehicle, Feeder Fund, Aggregator Vehicle, Alternative Investment Vehicle, or Subsidiary) legal entitlement to an exemption from, or reduction of, withholding or other tax under applicable law, and (ii) for the Partnership to comply with any tax reporting, withholding or payment obligations under applicable law. Each Partner represents and warrants that any information, representations, certificates, affidavits or forms furnished by such Partner pursuant to this Section 4.5 shall be true, accurate and complete and agrees to promptly update them if the Partner becomes aware anything previously provided is no longer true, accurate and complete.

Section 4.6.     **Capital Accounts**.

(a)     A separate Capital Account shall be established and maintained for each Partner. Any references in this Agreement to the Capital Account of a Partner shall be deemed to refer to such Capital Account as the same may be credited or debited from time to time as set forth in this Section 4.6.

(b)     The Capital Account of each Partner shall be computed separately with respect to each Partner. The Capital Account of each Partner shall be credited with such Partner's Capital Contributions to the Partnership and shall be credited or debited pursuant to Section 4.6(c).

(c)     The Capital Account of each Partner shall be maintained in accordance with the rules of Code Section 704(b) and the Treasury Regulations (including Section 1.704-1(b)(2)(iv) thereof) thereunder (with no double counting of items taken into account in determining Profits or Losses). In general, a Partner's Capital Account shall be increased by (i) the amount of money and the Gross Asset Value of any property (net of liabilities secured by such contributed property that the Partnership is considered to assume or to take subject to) contributed to the Partnership by the Partner, and (ii) allocations to the Partner of Profits and any items of income or gain that are

- 25 -

     CHHEDA-TRANLLC-RC-00000157

specially allocated pursuant to Section 4.8, and decreased by (x) the amount of money distributed to the Partner by the Partnership, (y) the Gross Asset Value of any property distributed to the Partner by the Partnership (net of liabilities secured by such distributed property that such Partner is considered to assume or take subject to) and (z) allocations to the Partner of Losses and any items of expense or loss that are specially allocated pursuant to Section 4.8. The foregoing provisions relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1 and 1.704-2 and shall be applied in a manner consistent with such Treasury Regulations.

(d)     Whenever the Partnership would be permitted to adjust the Capital Accounts of the Partners pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) to reflect revaluations of Partnership property, if any, the Partnership may so adjust the Capital Accounts of the Partners. In the event that the Capital Accounts of the Partners are adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) to reflect revaluations of Partnership property, if any, (i) the Capital Accounts of the Partners shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property, (ii) the Partners' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and book value of such property in the same manner as under Code Section 704(c), and (iii) the amount of upward and/or downward adjustments to the book value of the Partnership property shall be treated as income, gain, deduction and/or loss for purposes of applying the allocation provisions of this Article IV.

Section 4.7.    **Allocations of Profits and Losses**.

(a)     After application of Section 4.7(d) and Section 14.9(c), and subject to the other provisions of this Article IV, any remaining Profits or Losses for the taxable year (or items thereof) shall be allocated among the Partners in such ratio or ratios as may be required to cause the balances of the Partners' respective Economic Capital Accounts to be as nearly equal to their respective Target Balances as possible, consistent with compliance with Code Section 704(b).

(b)     The Partners intend that the provisions of Section 4.7 through Section 4.10 and Section 14.9(c) (the "*Allocation Provisions*") shall produce final Capital Account balances of the Partners that are identical to the Distributions that the Partners would receive in accordance with Section 10.2(c)(ii) upon the liquidation of the Partnership. To the extent that the Allocation Provisions would fail to produce such final Capital Account balances as of the close of any taxable year of the Partnership (based on the assumptions that (i) all assets still owned by the Partnership and its Subsidiaries at the close of such year, other than interests in each other, are sold at such time for their Gross Asset Values, (ii) all Partners have contributed any Unused Capital Commitments as needed to satisfy any credit facility secured by the Capital Commitments and the General Partner has contributed any amounts needed to satisfy any remaining Partnership liabilities for which the General Partner would be liable, to the extent such obligations would apply after the deemed sale described in preceding clause (i), and (iii) all proceeds were distributed in liquidation of the Partnership), Profits and Losses of the Partnership for the current taxable year and future taxable years (or items of gross income and deduction of the Partnership for such years) shall be reallocated by the General Partner among the Partners as necessary to produce such result

- 26 -

(or, to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years, for prior open taxable years) as determined by the General Partner in Good Faith. Notwithstanding the foregoing, the General Partner may make such allocations as it deems necessary to give economic effect to the provisions of this Agreement, taking into account facts and circumstances as the General Partner deems reasonably necessary for this purpose, including the timing and amounts of distributions pursuant to Section 4.3 of the Agreement, if any. The General Partner shall have the power to amend this Agreement, as it considers advisable in Good Faith after consulting with counsel, to produce the results described above.

(c)      Notwithstanding the foregoing, the General Partner shall be entitled to defer Distributions and the allocation of Profits and Losses to the General Partner in respect of its Carried Interest in a manner intended to minimize the allocation of Profits to the General Partner that would cause the General Partner to recognize short-term capital gain as a result of the application of Code Section 1061.

(d)      Profits and Losses shall be allocated to the Partners, at such times, and in the amounts necessary, as determined by the General Partner, to account for any adjustment to distributions of Distributable Cash Flow pursuant to Section 4.3 of this Agreement. Allocations of Profits and Losses under this Section 4.7(d) shall take precedence over, and be made prior to, allocations under Section 4.7(b) and (c).

(e)      If for any Fiscal Year after the Partnership's net Profit or Loss has been allocated pursuant to Section 4.7 the closing adjusted Capital Account balance of the General Partner for such Fiscal Year has been reduced to less than the Target Amount by more than the amount of the General Partner's obligation to recontribute amounts to the Partnership pursuant to Section 10.2(g) upon dissolution of the Partnership (with such obligation determined for this purpose by assuming that all Partnership assets and liabilities are sold or satisfied for an amount equal to their respective book values and by disregarding any limitations on such contribution obligations that are based on the Capital Account balances of the Limited Partners), then an amount of net Loss (collectively, the "**Contingent Loss**") for such Fiscal Year shall be reallocated from the General Partner's Capital Account to the Capital Accounts of the Limited Partners as a group so that the closing adjusted Capital Account balance of the General Partner is not reduced below the Target Amount by more than the amount of the General Partner's obligation to recontribute amounts to the Partnership pursuant to Section 10.2(g) upon dissolution of the Partnership (with such obligation determined for this purpose by assuming that all Partnership assets and liabilities are sold or satisfied for an amount equal to their respective book values and by disregarding any limitations on such contribution obligations that are based on the Capital Account balances of the Limited Partners). A Contingent Loss may be restored only from future net Profit. As used herein, the "*Target Amount*" shall equal the product obtained by multiplying (a) a fraction, the numerator of which is the General Partner's Allocation Percentage and the denominator of which is the sum of the Allocation Percentages of the Limited Partners by (b) the aggregate Capital Account balances of the Limited Partners.

- 27 -

Section 4.8. **Special Allocations**. The following special allocations shall be made, to the extent applicable, in the order prescribed by Treasury Regulations Section 1.704-1 and -2 and shall be interpreted in a manner consistent therewith:

(a) **Qualified Income Offset**. If any Partner receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*), items of Partnership income and gain (including gross income) shall be specially allocated to each such Partner in a manner and amount sufficient to eliminate, to the extent required by such Treasury Regulations, the Adjusted Capital Account Deficit of the Partner created by such adjustments, allocations or distributions as quickly as possible. The foregoing provision is intended to comply with Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(b) **Gross Income Allocation**. If any Partner has an Adjusted Capital Account Deficit at the end of any Fiscal Year, each such Partner shall be specially allocated items of Partnership income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible; *provided*, that an allocation pursuant to this Section 4.8(b) shall be made only if and to the extent that such Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV had been made as if Sections 4.8(a) and 4.8(b) were not included in this Agreement. The parties hereto acknowledge that all of the relevant facts and circumstances, and all available information as of the date of the adoption of this Agreement, indicate that it is unlikely that such an allocation will be made pursuant to this provision during the existence of the Partnership.

(c) **Minimum Gain Chargebacks**. If there is a net decrease in the Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain (determined in accordance with the principles of Treasury Regulations Sections 1.704-2(d) and 1.704-2(i)) during any Partnership taxable year, then items of income and gain for such year (and, if necessary, for subsequent periods) shall be allocated to the Partners in the manner and to the extent required by Treasury Regulations Section 1.704-2(f) and 1.704-2(i) (subject to the exceptions to this requirement described therein). This Section 4.8(c) is intended to constitute a "minimum gain chargeback" (both of Partnership Minimum Gain and of Partner Nonrecourse Debt Minimum Gain) as provided by Treasury Regulations Section 1.704-2(f), and this clause shall be construed accordingly.

(d) **Partner Nonrecourse Deductions**. Any Partner Nonrecourse Deductions shall be specially allocated to the Partner who bears the economic risk of loss with respect to the associated partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(e) **Nonrecourse Deductions**. Nonrecourse deductions shall be allocated among the Partners in proportion to their respective Allocation Percentage.

Section 4.9. **Allocation Rules**.

(a) If during any taxable year there is a relative change among the respective Allocation Percentage, including a change in the Allocation Percentage pursuant to Article III

- 28 -

hereof, then the Profits, Losses and to the extent necessary, individual items of income, gain, loss or deduction of the Partnership for such taxable year shall be allocated for the period and according to the varying interests of the Partners pursuant to any reasonable method selected by the General Partner in Good Faith (including an interim closing of the Partnership's books) and determined to be permitted under Code Section 706.

(b)     For purposes of determining the Profits, Losses and individual items of income, gain, loss and deduction allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the General Partner using any method that is permissible under Code Section 706 and the Treasury Regulations thereunder.

(c)     Except as otherwise provided in this Agreement, all individual items of Partnership income, gain, loss and deduction shall be divided among the Partners in the same proportions as they share Profits and Losses for the Fiscal Year or other period in question.

Section 4.10.  **Tax Allocations**.

(a)     Except as otherwise provided in this Section 4.10, the taxable income or loss of the Partnership (and items thereof) shall be allocated among the Partners in the same manner as the corresponding items of Profits, Losses and separate items of income, gain, loss and deduction (excluding items for which there are no related tax items) are allocated among the Partners for Capital Account purposes; *provided*, that in the case of any Partnership asset whose Gross Asset Value differs from its adjusted tax basis for United States federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Code Section 704(c) (in any manner determined by the General Partner that constitutes a "reasonable method" under the Treasury Regulations thereunder) so as to take account of the difference between the Gross Asset Value and the adjusted tax basis of such asset.

(b)     Any elections or other decisions relating to allocations for tax purposes under this Article IV, including the selection of any allocation method permitted under Treasury Regulations Section 1.704-3, shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.

(c)     The Partners are aware of the income tax consequences of the allocations made by this Article IV and hereby agree to be bound by the provisions of this Article IV in reporting their shares of Partnership income and loss for income tax purposes.

Section 4.11.  **UBTI**. Tax-exempt investors may recognize "unrelated business taxable income" ("*UBTI*") within the meaning of the Code Sections 511 and 514 from an investment in the Partnership. To the fullest extent permitted by law, the General Partner will not be liable for the recognition of any UBTI by a Partner with respect to an investment in the Partnership for any reason, and potential investors hereby consent to some or all of their profits from the Partnership constituting UBTI for any reason.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CHHEDA-TRANLLC-RC-00000161

## ARTICLE V

## RIGHTS AND DUTIES OF THE GENERAL PARTNER – EXPENSES

Section 5.1.    **Management; Investment Limitations**.

(a)    Except as otherwise expressly provided herein or required by law, the General Partner is hereby vested with the full, exclusive and complete right, power and discretion to operate, manage and control the business and affairs of the Partnership and to make all decisions affecting Partnership affairs in the conduct and furtherance of the purpose of the Partnership as described in Section 2.4. Without limiting the generality of the foregoing, all of the Limited Partners hereby specifically agree that the General Partner, at any time, and without further notice to or Consent from any Limited Partner may do the following on behalf and in the name of the Partnership and at the sole expense of the Partnership:

(i)    acquire, invest in, hold, pledge, manage, operate or otherwise deal in or with Investments consistent with the purposes of the Partnership and the Investment Parameters and any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership, whether directly or indirectly, through holding companies, subsidiaries, partnership interests, listed or unlisted securities, joint ventures or otherwise;

(ii)    sell, transfer or otherwise dispose of all or any part of any Investment, on such terms as the General Partner shall determine to be appropriate in its sole discretion;

(iii)    perform, or arrange for the performance of, those management services that are necessary to foster the ultimate realization of the Investments, and delegate and/or contract for such other management and administrative services, as the General Partner may deem appropriate given the fundamental business purpose of the Partnership;

(iv)    prepay in whole or in part, refinance, recast, assume, increase, reduce, modify, extend, foreclose or transfer any debt obligations constituting or affecting any of the Investments, and in connection therewith to execute any extensions, renewals, assumptions or modifications of any documents constituting or affecting any of the Investments;

(v)    incur all expenditures permitted by this Agreement, and, to the extent that funds of the Partnership are available, pay all expenses, debts and obligations of the Partnership;

(vi)    employ and dismiss from employment any and all consultants, asset managers and portfolio managers and other Partnership agents, including attorneys, accountants and other advisors;

(vii)    enter into, execute, amend, supplement, acknowledge and deliver any and all contracts, agreements or other instruments (including agreements to form, own, invest in and/or acquire shares or interests in one or more joint ventures and partnerships)

- 30 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     CHHEDA-TRANLLC-RC-00000162

as the General Partner shall determine to be appropriate in furtherance of the purposes of the Partnership, including entering into agreements to acquire or dispose of Investments which may include such representations, warranties, covenants, indemnities and guarantees as the General Partner deems necessary or advisable;

(viii)  admit an assignee of all or any portion of a Partner's Interest to be a Substituted Limited Partner in the Partnership pursuant to and subject to the terms of Section 9.3, admit Additional Limited Partners under Section 3.6 and execute and deliver all documents in connection therewith, including Subscription Agreements and any Side Letters with one or more Limited Partners and to allow any Limited Partner to make a Several Interest Election;

(ix)  make, or refrain from making, any election under federal, state and local tax laws;

(x)  act as, or designate, the Partnership Representative of the Partnership, as such term is defined in Code Section 6223(a), and exercise any authority permitted a Partnership Representative under the Code;

(xi)  settle or prosecute litigation on behalf of the Partnership;

(xii)  create, in the General Partner's sole discretion, the Parallel Investment Vehicles and Alternative Investment Vehicles described in Section 2.8 and 2.9;

(xiii)  create one or more entities to hold any assets of the Partnership or for any other Partnership purpose, and to hold or distribute, to the fullest extent permitted by law, to the Partners any interest in such entities (subject to the provisions herein on in-kind Distributions); *provided*, that the General Partner may have management rights and financial interests in any such entities so long as such arrangements preserve in all material respects the overall economic relationship and rights of the Partners; and

(xiv)  take any other action reserved to a General Partner under the Delaware Act.

(b)  Without the approval of the Advisory Committee, the Partnership shall not, and the General Partner shall not cause or permit the Partnership to do any of the following:

(i)  measured at the time of acquisition, invest more than 20% of Capital Commitments in a single Investment, or invest in a single Investment if the Fund would own in the aggregate more than 30% ownership interests in the Investment;

(ii)  waive the rights of the Partnership with respect to each such Investment opportunity in order to permit an investment by the General Partner or its Affiliates;

(iii)  waive any conflict of the General Partner or any Affiliate of the General Partner in pursuing any Investment opportunity;

- 31 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER  CHHEDA-TRANLLC-RC-00000163

(iv)    invest in swaps, hedges or other derivative financial instruments, except in connection with the Partnership's financing activities.

(c)    Subject to the provisions of this Section 5.1(c), the General Partner shall have the right, at its option, to cause the Partnership or any Affiliate to (A) borrow money from any Person, (B) provide customary non-recourse carve-out, environmental, payment/performance guarantees, indemnities and covenants in connection with construction loans and (C) provide guarantees in connection with the Investments.

(d)    To the fullest extent permitted by law, third parties dealing with the Partnership may rely conclusively upon any certificate of the General Partner to the effect that it is acting on behalf of the Partnership.

(e)    To the fullest extent permitted by law, the signature of the General Partner shall be sufficient to bind the Partnership in every manner to any agreement or on any document, including, but not limited to, documents drawn or agreements made in connection with the acquisition or Disposition of any Investments or other properties in furtherance of the purposes of the Partnership. To the fullest extent permitted by law, without limiting the generality of the foregoing, third parties need not confirm that the General Partner obtained any necessary approvals from the Advisory Committee or any Limited Partners.

Section 5.2.    **Duties and Obligations of the General Partner**.

(a)    The General Partner shall exercise its powers and duties under this Agreement in accordance with the duty of Good Faith. Each Limited Partner expressly acknowledges that any other duties that may be waived under the Delaware Act are hereby waived. Each Limited Partner expressly acknowledges that the Partnership has been formed to invest in the securities of privately-held companies involved in the construction industry or companies that, in the General Partner's discretion, hold or may develop technology-based solutions relevant to the construction industry, and that such investments are highly speculative in nature, and that the risks of the Partnership's actual results differing materially from the General Partner's expectations are significantly greater than would be the case were the investment objectives of the Partnership of a more conservative nature.

(b)    The General Partner will use commercially reasonable efforts to identify opportunities for equity investments in privately-held companies involved in the construction industry or companies that, in the General Partner's discretion, hold or may develop technology-based solutions relevant to the construction industry consistent with the purposes and objectives set forth in Section 2.4 and the Investment Parameters of the Partnership.

(c)    The General Partner shall take all lawful action which may be necessary or appropriate for the continuation of the Partnership's valid existence and authority to do business as a Partnership under Delaware law and of each other jurisdiction in which such authority to do business is necessary or, in the judgment of the General Partner, advisable to protect the limited liability of the Limited Partners or to enable the Partnership to conduct the business in which it is engaged. The General Partner shall not intentionally violate any law applicable to the Partnership.

- 32 -

(d)     The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, insurance agents, brokers, and other consultants (each, a "*Consultant*" and, collectively, "*Consultants*") selected by the General Partner (who may serve the Partnership or any Affiliate of the General Partner). To the fullest extent permitted by law, the written advice by any Consultant on a matter which the General Partner reasonably believes to be within its professional or expert competence shall be full and complete protection as to any action taken or omitted by the General Partner based on such advice and taken or omitted in Good Faith, and shall not be deemed to be a breach of the General Partner's responsibilities under this Agreement. To the fullest extent permitted by law, the General Partner shall not be responsible for the misconduct, negligence, acts or omissions of any Consultant or of any agent who is not an Affiliate of the General Partner or its Affiliates and shall assume no obligations other than to use due care in the selection of all consultants.

(e)     It is understood and agreed that any officer of the General Partner may act for and in the name of the General Partner under this Agreement. To the fullest extent permitted by law, in dealing with any such officer acting for or on behalf of the Partnership, no Person shall be required to inquire into, and Persons dealing with the Partnership are entitled to rely conclusively on, the right, power and authority of the General Partner to bind the Partnership.

(f)     It shall be the duty and responsibility of the General Partner to use reasonable commercial efforts to manage and control the investments, business and affairs of the Partnership. The General Partner shall devote such time to the investments, business and affairs of the Partnership as it deems necessary, proper or desirable to supervise the investments, business and affairs of the Partnership in an efficient manner. Except as otherwise explicitly provided herein, the General Partner shall not be obligated as the General Partner of the Partnership to provide services directly to any Investments (including services that an Affiliate of the General Partner may be in the business of providing) and the General Partner may employ an agent or agents for such purpose (which, subject to the provisions of this Agreement, may include Affiliates of the General Partner).

(g)     The General Partner has entered into an agreement (as amended from time to time, the "*Management Agreement*") with the Manager, and has arranged for the Manager, pursuant to such Management Agreement, to render significant management and investment assistance and advice, to provide economic and investment analysis, to provide day-to-day managerial and administrative services and to perform such other acts as may be lawfully approved the General Partner, in each case to the Partnership and any Alternative Investment Vehicles and Feeder Funds. Notwithstanding any such appointment or delegation, the management and conduct of the activities of the Partnership will remain the sole responsibility of the General Partner and all final decisions relating to the selection and disposition of the Partnership's investments will be made exclusively by the General Partner in accordance with this Agreement.

Section 5.3.    **Determination of Fair Value**. For all purposes of this Agreement, the General Partner shall annually establish and notify the Limited Partners of the aggregate fair market values of the Investments and net assets of the Partnership as of the end of each Fiscal Year (incorporating the General Partner's Good Faith internal valuation for all Investments) (such value, except as otherwise provided in this Agreement, including Section 5.1, shall be the "*Fair Value*").

- 33 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER         CHHEDA-TRANLLC-RC-00000165

Section 5.4.    **Exclusivity; Other Businesses of the General Partner**.

(a)    Except for the transactions and other arrangements contemplated by this Agreement including, without limitation, investment in privately-held companies involved in the construction industry or companies that, in the General Partner's discretion, hold or may develop technology-based solutions relevant to the construction industry, and asset management services, none of the General Partner, the Manager, the Managing Members nor any of their respective Affiliates may (i) engage in any transaction with the Partnership or (ii) seek to acquire for the Partnership, interests in potential Investments that the General Partner, the Manager, the Managing Members or any of their respective Affiliates manage, control or in which any of them holds an ownership interest unless, in each case, (x) the Advisory Committee has approved such transaction or acquisition, or (y) the terms of such transaction or acquisition are on an arm's-length basis, at competitive market rates; *provided,* that nothing contained herein shall restrict the Partnership's ability to co-invest or joint venture in Investments with any third party or any subsequent fund permitted to be organized by the Managing Members (whether to fully invest the Capital Commitments of the Partnership on a *pro rata* basis per unit of investment with any successor fund or to meet investment restrictions), the General Partner or the Manager by this Section 5.4 or other co-investment activities permitted under this Agreement, or restrict direct or indirect passive investments by family members of any member, officer, director or employee of the General Partner or the Manager or any Affiliate of the General Partner or the Manager or trusts or other entities established by any of the foregoing for estate planning or charitable purposes. For clarity, ES may engage in any transaction with one or more of the Fund's portfolio companies in manners that differ materially from the transactions entered into by the Fund.

(b)    Each Partner acknowledges and agrees that the General Partner, any Affiliated Limited Partner (including ES), the Manager, the Advisory Committee and their respective members, managers, directors, officers, partners, employees and agents may exercise investment responsibility, or otherwise engage, directly or indirectly, in any other business, irrespective of whether any such business is similar to, or identical with, the business of the Partnership, which may include purchasing, selling, holding or otherwise dealing with investments, notwithstanding any provision to the contrary at law or in equity. To the fullest extent permitted by law, neither the Partnership, nor any Limited Partner, solely by reason of being a Limited Partner in the Partnership, will have any right to participate in any manner in any profits or income earned or derived by or accruing to the General Partner, any Affiliated Limited Partner (including ES), the Manager, the Advisory Committee or their respective members, managers, directors, officers, partners, employees, agents, and Affiliates from the conduct of any business or any investment activity other than the business of the Partnership or from any transaction or other investment effected by any such Person for any Person other than that of the Partnership. This paragraph is subject to all other provisions of this Agreement.

(c)    Furthermore, each of the Limited Partners recognizes and understands that the General Partner may select one or more entities associated with the General Partner or associated with certain ES investors and directors (including entities associated with Romulus Capital Management LLC and/or Mr. Neil Chheda) to provide services to the Partnership, including the Manager and an entity to provide outsourced accounting services. The Limited Partners hereby consent and agree that such selection of service providers by the General Partner,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                        CHHEDA-TRANLLC-RC-00000166

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

even if any such entity is an Affiliate of the General Partner, shall not constitute a conflict of interest by, or create any liability for, the General Partner or any partner thereof.

(d)     The Limited Partners hereby agree that the General Partner may offer the right to participate, directly or indirectly, in investment opportunities of the Partnership to one or more Limited Partners or other private investors, groups, partnerships, or corporations, whenever the General Partner, in its discretion, so determines (and the Limited Partners acknowledge that such investment practices involve an inherent conflict of interest and agree that the General Partner shall have no liability attributable to or based upon such conflict of interest in the absence of intentional harm to the Partnership by the General Partner or a member thereof (it being understood that merely causing any subsequent investment vehicle permitted to be formed hereunder to take advantage of an investment opportunity or to exercise any legal or contractual rights available to it shall not be deemed intentional harm to the Partnership)).

(e)     The Limited Partners hereby acknowledge that the General Partner may be prohibited from taking action for the benefit of the Partnership:  (i) due to confidential information acquired or obligations incurred in connection with an outside activity permitted to the General Partner, its Affiliates, equity holders or other related persons; (ii) in consequence of an equity holder, Affiliate or other related person of the General Partner serving as an officer or director of a portfolio company or of an Affiliated Limited Partner (including ES); or (iii) in connection with activities undertaken by an equity holder, Affiliate or other related person of the General Partner prior to the date to or after the launch of the Fund. The Limited Partners further acknowledge that the General Partner may cause the Partnership to decline investment opportunities that are not "qualifying investments" as defined in Rule 203($l$)-1(c)(3) promulgated under the Advisers Act, for the purpose of enabling each of the Manager and the General Partner to remain exempt from registering as an investment adviser under the Advisers Act. No person shall be liable to the Partnership or any Partner for any failure to act for the benefit of the Partnership in consequence of a prohibition or consideration described in the two preceding sentences.

(f)     The Partners recognize that the differing financial, regulatory, income tax and other status and circumstances of the Partners may give rise to conflicts of interest among the Partners with regard to the timing of capital calls, selection of investments, disposition of assets, making of tax elections, or other Partnership matters. Except as otherwise specifically provided in this Agreement, the General Partner, when making decisions or taking action with respect to the Partnership or its business, shall not be required to take into consideration the separate status or circumstances of any Partner or group of Partners.

(g)     Except with the consent of the Advisory Committee, neither the General Partner nor the Managing Members shall call down capital of any other entity with the same operations, objectives and investment focus as those of the Partnership (a "*Subsequent Fund*") prior to the earlier of (i) such time as funds equal to at least seventy five percent (75%) of the Partners' Capital Commitments have been invested, expensed, committed or reserved for follow-on investment in portfolio companies or future expenses, or (ii) the fifth (5th) anniversary of the Initial Closing Date (the earliest of (i) or (ii), the "*Substantial Investment Date*"). For the avoidance of doubt nothing in this Agreement shall prevent any partner of the General Partner from calling down capital with respect to an Opportunity Fund or any successor fund thereto. The General Partner shall provide reasonable detail to the Advisory Committee upon request regarding

- 35 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CHHEDA-TRANLLC-RC-00000167

any amounts deemed to be reserved for the purposes of determining the Substantial Investment Date.

Section 5.5. **Expenses and Reimbursements; Organizational Expenses**.

(a) **Operating Expenses**. Operating Expenses shall be borne by the Partnership. The Partnership shall pay Operating Expenses directly or shall reimburse the General Partner for the payment thereof as the case may be. Operating Expenses shall be paid either from Current Income, from Capital Transaction Proceeds, from Capital Contributions made by the Partners or from Partnership borrowings. The General Partner may cause the Partnership to borrow funds on a short-term basis to pay Operating Expenses if the Partnership does not have available funds, in which case the borrowings shall be repaid from Current Income, Capital Transaction Proceeds or Capital Contributions, as provided above. Operating Expenses shall include: all costs and expenses incurred in holding, monitoring, and disposing of Investments and operating the Fund, including any travel, legal, tax and accounting expenses; brokerage, banking, custodial, administration and brokerage fees, commissions and expenses; all fees, costs and expenses incurred in connection with the formation, organization and establishment of any intermediate investment vehicles; costs of preparing financial statements and reports to the Limited Partners, tax returns and Schedule K-1s; fees, costs and expenses of legal counsel, tax advisors, auditors, accountants, administrators, custodians, consultants and other outside advisors or service providers; expenses of the Investment Committee; costs and expenses related to the Fund's compliance with applicable laws, rules and regulations; expenses of meetings of the Partners; insurance, taxes and other costs of any audit, investigation and administrative or other proceedings; litigation and threatened litigation relating to the business or activities of the Fund; insurance costs; indemnification obligations; liquidation expenses of the Fund; interest expenses and other expenses for borrowed money; expenses of the Advisory Committee; government charges that may be assessed against the Fund; any extraordinary expense of the Fund; and all other expenses properly chargeable to the activities of the Fund. Fees paid may include source fees for Investments identified by wholly owned asset acquisition subsidiaries to the extent permitted by law. If any Operating Expenses incurred are for the account or for the benefit of the Fund and one or more Other TKF Participants (as defined below), the General Partner will allocate such expenses among the Fund and each such Other TKF Participant in such manner as the General Partner considers fair and reasonable (generally anticipated to be in proportion to the size of the investment made by such Other TKF Participants in the Investment or activity to which the expense relates). The Fund may invest with or alongside other funds, investors or groups, including Limited Partners (or their affiliates) or parties affiliated or associated with the General Partner and/or the Manager, at the sole discretion of the General Partner (collectively, the "Other TKF Participants"). All costs and expenses referred to in this Section 5.5(a) are collectively referred to as "*Operating Expenses*." All Operating Expenses are Partnership costs and reimbursable to the General Partner or the Manager, as the case may be, and shall be due and payable promptly following receipt of invoices therefor. For the avoidance of doubt, Operating Expenses shall not include Manager Expenses.

(b) **Organizational Expenses**. The Partnership shall bear all third-party and out-of-pocket expenses (the "*Organizational Expenses*"), incurred in connection with forming and establishing the General Partner, the Partnership, any Parallel Investment Vehicle and any Feeder Fund (each a "*Fund Entity*"), including, but not limited to, (i) fees of attorneys of the Fund, the General Partner, members, partners or shareholders of the General Partner, the Manager,

- 36 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    CHHEDA-TRANLLC-RC-00000168

members, partners or shareholders of the Manager, and each of their Affiliates, including in connection with preparing and negotiating organizational documents, Side Letters and related agreements and preparing resolutions and regulatory filings; (ii) expenses for travel, entertainment and printing; (iii) any associated taxes and fees; (iv) accountants' fees and costs; (v) charges of escrow holders, depositaries and experts and (vi) offering Interests in the Fund, including filing fees, or regulatory compliance expenses.

Section 5.6.    **Management Fee and Expenses**.

(a)    (i) The Partnership shall pay the management fee (the "*Management Fee*") to the Manager, as set forth in this Section 5.6.

(ii)    If, and to the extent that, at any time following the expiration of the Investment Period, the Partnership does not have sufficient funds to make all payments of the Management Fee to the Manager, the General Partner may (but shall not be obligated to) defer the payment of the Management Fee until the Partnership holds sufficient funds to pay the same, at which time the deferred and accrued Management Fee shall be paid to the Manager, prior to any Distributions pursuant to Section 4.2.

(b)    The Management Fee payable by the Partnership with respect to a Partner shall commence accruing on the Effective Date and will be computed on a Partner-by-Partner basis. The Management Fee payable by the Partnership to the Manager, quarterly in advance (or its designee, as applicable) shall be equal to 2% *per annum* of each Partner's Capital Commitments, subject to the provisions of Section 15.6. The Management Fee shall be due and payable by the Partnership with respect to each such Partner quarterly in advance as of the first Business Day following the Initial Closing Date and on the first Business Day of each calendar quarter thereafter ("*Management Fee Due Date*"). If the first Business Day following the Initial Closing Date is not the first day of a calendar quarter, the Management Fee will be prorated based on the number of days from the Initial Closing Date (inclusive) until the first day of the next calendar quarter. The General Partner may cause a Subsidiary of the Partnership to pay a portion of the Management Fee in lieu of the Partnership, in which case any such amounts paid by such Subsidiary shall reduce the Management Fee payable by the Partnership to the Manager by the same amount.

(c)    The General Partner and the Manager and their respective Affiliates will be responsible for all of their respective day-to-day operating expenses and overhead expenses, including, without limitation, office expenses (such as rent, computers, computer software and office supplies), employee compensation and due diligence expenses (collectively, "*GP and Manager Expenses*"). The Partnership shall not pay any GP and Manager Expenses unless such GP and Manager Expenses are waived by the Advisory Committee.

(d)    If the effective date of the Partnership's dissolution is not the last day of a calendar quarter, the Manager shall rebate to the Partnership, and the Partnership shall subsequently rebate to the Limited Partners, a prorated portion of the Management Fees already paid by the Limited Partners for the calendar quarter during which dissolution occurs based on the number of days during such period that the Term was still in effect. Management Fees payable with respect to the period commencing on the Initial Closing Date and ending on the last day of

- 37 -

the calendar quarter in which the Initial Closing Date shall occur shall be computed with respect to the Aggregate Commitments as of the Initial Closing Date on a *pro rata* basis for such period.

        (e)     Certain adjustments to the Management Fee may be made as follows:

        (i)     The General Partner has the right to waive, reduce or make adjustments that will have the effect of waiving or reducing, from time to time, all or part of the Management Fee payable with respect to certain Partners (including employees and other Affiliates of the General Partner) without having the effect of waiving or reducing the Management Fee payable with respect to other Partners.

        (ii)     The General Partner may, in its sole discretion, waive, reduce or delay payment of the Management Fee related to any fiscal quarter.

        (iii)     The Manager may elect to waive its receipt of the Management Fee and convert the Management Fee so waived into a Capital Contribution as of the date the Management Fee would have otherwise been payable (the ***"Converted Management Fee")***. To elect such a conversion, the Manager must provide notice to the General Partner on at least 30 calendar days prior to the relevant Management Fee Due Date. As a result of any such conversion, the Manager shall also become a Limited Partner and shall be subject to all of the provisions of this Agreement applicable to Limited Partners.

        (iv)     The Management Fee payable to the Manager shall be reduced on a dollar-for-dollar basis and shall neither be earned nor payable in an amount equal to the amount of any Placement Fees paid by the Fund. There will be no waiver of the Management Fee payable by any investor that is not permitted to pay Placement Fees and if an investor is not permitted to invest in an entity that pays Placement Fees, a Parallel Investment Vehicle may be formed for such investor and other similarly situated investors so that such investor and the entity in which it invests will not pay Placement Fees.

        (f)     To reflect the reduced time and effort the General Partner or the Manager or their respective members will devote to the Partnership by reason of performing services as a director or consultant to portfolio companies, one hundred percent (100%) of any directors' fees or consulting fees, Break-up Fees or equivalent compensation, whether in cash or in kind, received by the General Partner, a partner of the General Partner (for so long as he is a partner thereof), the Manager, any full-time employee of the Manager or any of their respective officers or directors (for so long as he is an officer or director thereof) from any company in which the Partnership then holds an interest or reasonably expects to hold an interest in the future (other than direct reimbursement of out-of-pocket expenses) (hereinafter, "**Fees Subject to Offset**") shall be offset against and reduce the amount of the management fee payment next due the Manager in each subsequent Fiscal Quarter pursuant to Section 5.6 until the entire amount of Fees Subject to Offset has been offset in full unless waived by the Advisory Committee. Fees Subject to Offset shall not include (i) compensation received by any Person from ES for services provided to ES or (ii) compensation for services rendered as an employee of or in the ordinary course of business of a portfolio company of the Fund.

- 38 -

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

Section 5.7. Removal of the General Partner. The General Partner may be removed as the general partner of the Partnership following the vote of at least a Majority-in-Interest of the Limited Partners with or without the occurrence of a Cause Event. For purposes of this Section 5.7 only, the Allocation Percentage of ES, Arken and any Limited Partner controlled by ES or Arken shall be disregarded for purposes of determining a Majority-in-Interest, and none of ES, Arken and any such Limited Partner controlled by them shall be permitted to vote. Control shall mean directly or indirectly possessing the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting shares, by contract or otherwise. If the General Partner is removed as the general partner of the Partnership, then as of the effective date of such removal (i) the status of the General Partner shall be changed to that of a special Limited Partner Interest having the same rights with respect to its Capital Contributions and Distributions as if the General Partner had not been removed; (ii) the General Partner will continue to receive its Carried Interest in respect of all Investments made through the date of such removal; (iii) in the event of removal upon the occurrence of a Cause Event, both the General Partner and the Affiliated Limited Partners will be relieved of any of their remaining Capital Commitment obligations to the Partnership (both as the General Partner and in their capacities, if applicable, as Limited Partners); (iv) in the event of removal upon the occurrence of a Cause Event, the obligation of the Partnership to pay Management Fees shall terminate and the General Partner shall return to the Partnership such Management Fee amounts received following the date the claim of a Cause Event was made; and (v) in the event of removal upon the occurrence of a Cause Event, the Investment Period shall be terminated automatically unless expressly authorized to continue by a Majority-in-Interest. The removal of the General Partner shall be effected by written notice from the Limited Partners to the General Partner. A Majority in Interest of the Limited Partners may appoint a Successor General Partner to succeed a removed General Partner, which appointment shall become effective upon such removal and the acceptance by such Successor General Partner to become the Successor General Partner of the Partnership and to be bound by all of the terms and provisions of this Agreement. Such Successor General Partner shall continue the business of the Partnership without dissolution.

# ARTICLE VI

## INDEMNIFICATION

Section 6.1. **Indemnification of General Partner and Manager**.

(a) To the fullest extent permitted by law, neither the General Partner, nor the Manager, nor their Affiliates, nor their respective officers, directors, employees, managers, agents, stockholders, members or partners, nor any Person who serves at the specific request of the General Partner on behalf of the Partnership as a partner, member, officer, director, employee, agent or Consultant of any other Person, including for the avoidance of doubt, the Partnership Representative and its designated individual (in each case, an "*Indemnitee*") shall be liable to any Partner or the Partnership (and the Partners and the Partnership waive, and agree not to make, any such claim against an Indemnitee), and each is fully exculpated and held harmless by the Partnership hereby from any liability for actions taken or not taken (or omitted) in connection with the affairs of the Fund except where such action or omission (x) was not taken or omitted in the Good Faith belief, or (y) constitutes (i) fraud, (ii) gross negligence, (iii) willful misconduct, (iv) a material breach of this Agreement, (v) a violation of Federal securities laws or a knowing and

- 39 -

 CHHEDA-TRANLLC-RC-00000171

willful violation of state securities laws, or (vi) in the case of a criminal action or proceeding, such Indemnitee had reasonable cause to believe that his/her/its conduct was illegal.

Independent contractors engaged by the General Partner and/or its Affiliates shall not be or be deemed to be Indemnitees pursuant to this Section 6.1. An Indemnitee may consult with legal counsel, accountants, consultants or other advisors in respect of Partnership affairs and, except in respect of matters in which there is an alleged conflict of interest in respect of such legal counsel, accountants, consultants or other advisors, shall, to the fullest extent permitted by law, be fully protected and justified in any action or inaction which is taken or omitted in Good Faith, in reliance upon and in accordance with the opinion or advice of such counsel, accountants, consultants or other advisors; *provided*, that they shall have been selected and monitored with reasonable care; *provided, further*, that such Indemnitee discloses all information that it reasonably believes to be material to the rendering of such advice to the applicable counsel, accountants, consultants or advisor. No Indemnitee shall, to the fullest extent permitted by law, be liable for any loss due to the mistake, action, inaction, negligence, dishonesty, fraud or bad faith of any broker or other agent (other than brokers or other agents that are Affiliates). Further, no Indemnitee shall, to the fullest extent permitted by law, be liable for loss due to any action or inaction in connection with the affairs of the Partnership, except where such action or omission (x) was not taken or omitted in the Good Faith belief or (y) constitutes (i) fraud, (ii) gross negligence, (iii) willful misconduct, (iv) a material breach of this Agreement, (v) a violation of Federal securities laws or a knowing and willful violation of state securities laws, or (vi) in the case of a criminal action or proceeding, Indemnitee had reasonable cause to believe that his/her/its conduct was illegal.

(b)     No Indemnitee shall be entitled to indemnification pursuant to this Section 6.1 with respect to any action, suit or proceeding that relates solely to a dispute between or among the General Partner, the Manager or their Affiliates or any of their respective members, managers or employees unless either a Limited Partner (which is not an Affiliated Limited Partner) or a third party is also a party to such action, suit or proceeding. If any such action, suit or proceeding relates to a dispute between or among the General Partner and any of its members, managers or employees and either a Limited Partner (which is not an Affiliated Limited Partner) or a third party, then such Indemnitee shall be entitled to indemnification under this Section 6.1 only to the extent such losses, liabilities, damages and expenses are attributable to the involvement of a Limited Partner and/or a third party. The Partnership shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnitee and the Liquidating Trustee (as defined herein) (and their respective heirs and legal and personal representatives) who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the Partnership or any Partners), by reason of any actions or omissions or alleged acts or omissions arising out of such Person's activities either on behalf of the Partnership or in furtherance of the interests of the Partnership or arising out of or in connection with the Partnership or as to the Liquidating Trustee, if such activities were performed in a manner reasonably believed by such Person to be within the scope of the authority conferred by this Agreement or by law or by the Consent of the Partners, against any claims, liabilities, costs and expenses (including legal fees, judgments and amounts paid in settlement (collectively "*Claims*")), as incurred, in connection with their activities on behalf of, or their association with, the Fund, the Partnership or any of its Partners, except where such action or omission (x) was not taken or omitted in the Good Faith belief, or (y) constitutes (i) fraud, (ii) gross negligence, (iii) willful misconduct, (iv) a material

- 40 -

breach of this Agreement, (v) violation of Federal securities laws or a knowing and willful violation of state securities laws, or (vi) in the case of a criminal action or proceeding, such Indemnitee had reasonable cause to believe that his/her/its conduct was illegal, and such conduct was the proximate cause of the Claims. An Indemnitee shall obtain the written consent of the General Partner prior to entering into any compromise or settlement which would result in an obligation of the Partnership to indemnify such Person. The General Partner may have the Partnership purchase, at the Partnership's expense, insurance to insure the Partnership, the General Partner, any other Indemnitee or any Person indemnified pursuant to Sections 6.1(a) or 6.1(b) against liability in connection with the activities of the Partnership. Each Indemnitee shall use commercially reasonable efforts to assist the Partnership to seek reimbursement for indemnified expenses from any insurance company or other third party liable for the applicable losses, all such recoveries shall be immediately paid to the Partnership and shall reduce the obligation of the Partnership hereunder (however, no Indemnitee shall be required to first proceed against any insurance policy before being reimbursed by the Fund).

(c)     If for any reason the indemnification called for by this Section 6.1 is unavailable or insufficient (after taking any insurance recovery into account that is available at the time when amounts are payable by an Indemnitee that are subject to indemnification) to indemnify and hold harmless an Indemnitee in accordance with the terms hereof (other than as a result of a failure to satisfy the conditions to such indemnification as set forth in Section 6.1(b)), then the Partnership shall, to the fullest extent permitted by law, contribute to the amount paid or payable by such Indemnitee (which contribution may equal up to 100% of such amount) as a result of any Claims referred to in Section 6.1(b) such that the Indemnitee would be in the same financial position it would have been in if the indemnification called for by this Section 6.1 were available and sufficient. Any Indemnitee may recover its indemnification payments (including costs) from the Partnership without first proceeding against any applicable insurance (with the Partnership being subrogated to the Indemnitee's rights of indemnification to that extent).

Section 6.2.     **Giveback Obligations**.

(a)     Each Partner (including any former Partner) may, to the fullest extent permitted by law, be required by the General Partner to return to the Partnership Distributions received by such Partner to pay Operating Expenses, to the extent that the Partnership does not have adequate assets to pay Operating Expenses as determined by the General Partner in its sole discretion, including to pay indemnification obligations. Each such Partner shall be required to make such payment, within ten Business Days after the demand therefor is received from the General Partner (the "***Payment Date***"), *pro rata* by all Partners and in the reverse order of priority in which such Distributions were made to the Partner or former Partner (or any of its predecessors in interest) (including any Distributions made to the General Partner in its capacity as such) pursuant to Section 4.2 for the purpose of meeting such Partner's share of the Partnership's indemnity obligations under Section 6.1 or other expenses of the Partnership (the "***Giveback***"); *provided*, that no Partner (other than the General Partner) shall be required to (i) return a distribution pursuant to this Section 6.2 after the second anniversary of the date of termination of the Partnership (as such period shall be extended by the General Partner for claims made prior to such second anniversary as provided in Section 6.2(b)), or (ii) return an amount exceeding the lesser of (x) 20% of the aggregate Distributions made to such Partner or (y) 20 % of such Partner's Capital Commitment. A Partner who fails to satisfy its obligation to repay any portion of its

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     CHHEDA-TRANLLC-RC-00000173

Giveback obligation by the Payment Date shall have breached this Agreement and shall be deemed to be a Defaulting Partner for all purposes of this Agreement, effective upon the receipt of notice from the General Partner (which notice may be given or not given in the sole discretion of the General Partner).

(b)     If prior to the second anniversary of the date of termination of the Partnership, the General Partner determines that there are any proceedings (including arbitration) then pending or any other liability or claim then outstanding that the General Partner is otherwise seeking to settle on behalf of the Partnership, the General Partner shall notify the Partners at such time that such proceeding or settlement discussions may require a Giveback (which notice shall include a brief description of each such proceeding (and of the liabilities asserted in such proceeding) or of such liabilities and claims) and, to the fullest extent permitted by law, the obligation of the Partners to return all or any portion of such Distributions (as specified in such notice) for the purpose of meeting the Partnership's obligations shall survive with respect to each such proceeding, liability and claim set forth in such notice until the date that such proceeding, liability or claim ultimately is resolved and satisfied.

(c)     If any Partner is an agency or instrumentality of a state and if a provision of this Section 6.2 is inconsistent with the constitution or any other law of such state, then such Partner and the General Partner shall enter into alternative arrangements regarding such provision so that the economic benefits of the Partnership to such Partner are not materially more favorable to such Partner than the economic benefits received or to be received by Partners generally (as determined by the General Partner in Good Faith).

(d)     Any Distributions returned pursuant to this Section 6.2 shall be treated as Capital Contributions and shall be required to be recontributed by such Partners, *pro rata*, in reverse order of Distributions to the Partners.

Section 6.3.    **Advancement of Expenses**. Expenses reasonably incurred by an Indemnitee and any Person entitled to indemnification pursuant to this Article VI in defense or settlement of any claim that may be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee, in form and substance reasonably acceptable to the General Partner, to repay such amount to the extent that it shall be determined ultimately that such Indemnitee is not entitled to be indemnified hereunder. Notwithstanding anything to the contrary contained in this Agreement, (a) no expenses will be advanced and no indemnification will be made to a Limited Partner or other purported Indemnitee in connection with any claim made by such Person against the General Partner or the Partnership until the final adjudication of such claim in favor of the Person bringing such claim, and (b) in no event shall the General Partner make an advance payment of any indemnification expenses (i) to the General Partner or any of its Affiliates, if the expenses relate to a claim brought against the General Partner or any of its Affiliates by at least a Majority in Interest of the Limited Partners, or (ii) to a Limited Partner, if the expenses relate to a suit brought by such Limited Partner against the General Partner or any of its Affiliates; *provided*, that upon the final adjudication of such claim in favor of the General Partner, any of its Affiliates or such Limited Partner, indemnification expenses shall be reimbursed to such Persons, as applicable.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        CHHEDA-TRANLLC-RC-00000174

Section 6.4.   **Cure Rights**. If the General Partner breaches any of the terms of this Agreement, the General Partner shall have 45 days after becoming aware of such breach to cure such breach; *provided*, that the time to cure such breach shall be extended to 90 days if the General Partner is using diligent efforts to cure such breach.

# ARTICLE VII

# ADVISORY COMMITTEE

Section 7.1.   **The Advisory Committee**.

(a)   The General Partner will establish a committee of three representatives of Limited Partners (the *"Advisory Committee"*). The General Partner may, in its sole discretion, remove any member of the Advisory and/or designate additional Limited Partners and/or indirect investors to serve on the Advisory Committee. All members of the Advisory Committee shall be appointed by the General Partner, depending on, amongst other factors, the amount of the Capital Commitment of each Limited Partner. The General Partner may appoint representatives of Limited Partners to the Advisory Committee prior to the Final Closing Date (with the General Partner having the right to appoint Advisory Committee members beginning on the Initial Closing Date). The Advisory Committee shall be available to advise the General Partner and the Manager regarding Investments and consult with the General Partner and the Manager as requested by the General Partner concerning the Partnership's activities and operations. The General Partner may, in its discretion, present for resolution by the independent members of the Advisory Committee certain material conflicts of interest, including any purchases and sales of assets between the Partnership, on the one hand, and the General Partner or its Affiliates, on the other hand, and that are not otherwise provided for in this Agreement. The Advisory Committee will also review and approve the designation of "passive investments" and review the General Partner's valuation of Fund assets that are not readily marketable. In addition, the approval of the Advisory Committee will be sought to (i) invest in securities of an issuer that is not an existing portfolio company as of the expiration of the Investment Period, (ii) approve the organization of another fund prior to the Investment Period, or (iii) waive or vary any other requirements of the limited partnership agreement except as explicitly provided otherwise therein. The Advisory Committee may also be asked to resolve issues involving other conflicts of interest that are specified from time to time by the General Partner in its reasonable discretion. Each member of the Advisory Committee shall serve until (w) such member is removed by the General Partner with the consent of a majority of the other members of the Advisory Committee, (x) the Limited Partner that such member represents becomes a Defaulting Partner or transfers all or any portion of its Interest, (y) such member resigns, or (z) such member fails to vote (either in favor or against) in respect of three consecutive matters brought by the General Partner to the Advisory Committee for a vote. Any vacancy on the Advisory Committee shall be filled, if necessary, by a representative of a Limited Partner who is not an Affiliate of the General Partner and who is designated by the General Partner in its sole discretion. No Person who is a partner, member, stockholder, shareholder, director, general partner, manager, officer, employee or Affiliate of the General Partner or the Manager shall be a member of the Advisory Committee, however, the General Partner may designate representatives of the General Partner (or its Affiliates) to be present at all Advisory Committee meetings. Unless otherwise indicated, any matters requiring approval of the Advisory Committee will be considered approved only if a number of Advisory Committee representatives representing

- 43 -

at least a majority of the members of the Advisory Committee vote to approve such matter. Such approval may be given in writing, in person at a meeting or by means of a conference telephone, web-cast, or similar communications equipment by means of which members can hear each other.

(b) In no event shall the Advisory Committee take part in the control or management of the Partnership, nor shall the Advisory Committee have any authority to act for or on behalf of the Partnership. Neither the Advisory Committee nor any member thereof shall have the power to bind the Partnership in any manner and in no event shall the Advisory Committee (or any member thereof) be considered a general partner of the Partnership by agreement, estoppel or otherwise or be deemed to participate in the control of the business of the Partnership as a result of the performance of its duties hereunder or otherwise. Notwithstanding the foregoing, the Advisory Committee is hereby expressly authorized to deliver any consent required of the "client" pursuant to the Advisers Act. To the fullest extent permitted by law, the Advisory Committee shall not owe any duties (fiduciary or otherwise) to any Partner, the Partnership, any Parallel Investment Vehicle, any Investment or any of their respective limited partners or members or owners in respect of the activities of the Advisory Committee. The participation by any Limited Partner whose representative is a member of the Advisory Committee in the activities of the Advisory Committee shall not be construed to constitute participation by such Limited Partner in the control of the business of the Partnership so as to make such Limited Partner a general partner or liable in any manner for the debts and obligations of the Partnership. No Limited Partner who has a representative serving on the Advisory Committee shall be deemed to be an Affiliate of the Partnership or the General Partner solely by reason of such representative's appointment. The actions of the Advisory Committee approving or disapproving any matter submitted to it pursuant to this Section 7.1 shall, to the fullest extent permitted by law, be binding on each of the Partners. Notwithstanding anything to the contrary herein, none of the members of the Advisory Committee are, nor shall any of them be deemed to be, fiduciaries of any of the Partners, the Partnership or any subsidiary of the Partnership (or of any other Fund Entity or any members or partners thereof) under any federal or state law (including Delaware law), and none of the members of the Advisory Committee shall be required to consider the interests of any Partner prior to making his/her decision as a member of the Advisory Committee.

(c) Members of the Advisory Committee shall not receive any fees from the Partnership for fulfilling any Advisory Committee duties but shall be reimbursed by the Partnership for all reasonable travel and out-of-pocket expenses incurred in attending meetings thereof.

(d) In addition to and without limiting the foregoing, to the fullest extent permitted by law, the General Partner is authorized to enter into additional agreements on behalf of the Partnership that provide for the exculpation and indemnification of the members of the Advisory Committee and their Affiliates and that contain additional provisions related to the Advisory Committee and its members, it being understood that such agreements may provide for levels of exculpation and indemnification that are more favorable to such Persons than comparable provisions in this Agreement that benefit the General Partner and its Affiliates.

(e) The General Partner may, in its sole discretion, grant to certain Limited Partners the right to designate a representative to attend and observe meetings of the Advisory Committee without being a member of the Advisory Committee. Such representative shall have

- 44 -

the right to receive notices of meetings and copies of all materials provided to the members of the Advisory Committee but shall not have the right to participate in such meetings or to cast any vote with respect to any matters for which Advisory Committee approval is sought.

# ARTICLE VIII

## TRANSFERABILITY OF GENERAL PARTNER'S INTEREST

Section 8.1. **Assignment of the General Partner's Interest**. Without the prior approval of a Super Majority-in-Interest of the Limited Partners, the General Partner shall not have the right to withdraw from the Partnership and shall not Transfer all or any portion of its Interest as a General Partner in the Partnership or its responsibility for the management of the Partnership, or enter into any agreement as a result of which any other Person shall have an Interest as a General Partner of the Partnership; *provided*, that nothing in this Agreement (a) shall preclude changes in the composition of the partners constituting, or the employees of, the General Partner so long as at least two of the Managing Members control, directly or indirectly, the General Partner, and (b) shall prohibit the Transfer by the General Partner of its Interest in the Partnership to Affiliates of the General Partner that are controlled, directly or indirectly, by at least two of the Managing Members.

Section 8.2. **Transfer of General Partner's Interest**. Whenever all or a portion of the General Partner's Interest as a General Partner in the Partnership is transferred pursuant to this Article VIII, the assignee, purchaser or other transferee shall assume the Capital Account of the General Partner (or the appropriate portion thereof) and all corresponding obligations of the General Partner hereunder. In the event of a Transfer of all of the General Partner's Interest as a General Partner of the Partnership in accordance with this Article VIII, its assignee or transferee shall be admitted as a substitute General Partner with full power and authority to continue the business of the Partnership, and immediately thereafter the transferor General Partner shall cease to be General Partner. The transferor and assignee or transferee General Partner shall cause the execution of any necessary documents or instruments, including, as required by the Delaware Act, an amendment to the Certificate to record the admission of the assignee or transferee as a substitute General Partner of the Partnership without the consent of any other Person. Notwithstanding anything contained herein to the contrary, upon withdrawal or removal of the General Partner of the Partnership, if any Managing Member or Affiliated Limited Partner obligates itself in any way in connection with the Partnership or the General Partner, the Partnership shall obtain a release for such Person from any and all such obligations and each such Person shall, to the fullest extent permitted by law, be fully indemnified by the Partnership with respect to payments and costs with respect thereto pursuant to Sections 6.1 and 6.3 to the extent provided herein.

# ARTICLE IX

## TRANSFERABILITY OF A LIMITED PARTNER'S INTEREST

Section 9.1. **Restrictions on Transfers of Interests**.

(a)     Except as expressly permitted in this Agreement, no Partner shall sell, assign, pledge or otherwise transfer, whether voluntarily or involuntarily, by operation of law, or

- 45 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CHHEDA-TRANLLC-RC-00000177

otherwise, all or any part of its Interests, except with the prior consent of the General Partner, which consent may be granted or withheld in the General Partner's sole discretion. For purposes of this Section 9.1, transferees must not:

(i) have a reputation for litigiousness or discord;

(ii) have used any business strategy that involved extortion, alleged extortion or disruptive activity within a fund designed to obtain economic benefits at the expense of the other participants in such fund;

(iii) lack creditworthiness;

(iv) have violated or allegedly violated the USA PATRIOT Act;

(v) have a reputation that could have a material adverse impact on the Partnership or any of its Limited Partners;

(vi) be another pooled investment fund;

(vii) be a Person that sponsors, acts as an advisor to, is an employee of, or is part of the control group of another pooled investment fund;

(viii) have a business that competes with the Partnership;

(ix) be a lender (or any Affiliate of a lender) to the Partnership;

(x) in the Good Faith belief of the General Partner, use its Interest or any information with respect to the Partnership, any Investment, or such Interest to harm the Partnership, the other Limited Partners or their respective reputations;

(xi) in the Good Faith belief of the General Partner, attempt to obtain an economic benefit at the expense of the other Limited Partners, including the use of strategies of attempting a hostile takeover, appropriating any business opportunities of the Partnership, causing liquidation of the Partnership (or any of its assets) or forcing so-called "greenmail payments" or the like from the Partnership;

(xii) result in the Partnership:

(A) having to register under the Investment Company Act;

(B) having all or any portion of its assets treated as Plan Assets;

(C) being subject to the provisions of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law;

(D) having its General Partner become a fiduciary with respect to any existing or contemplated ERISA Limited Partner or other Limited Partner for purposes of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law;

- 46 -

(E)     being a publicly traded partnership under Code Section 7704;

(F)     having an unaccredited investor as a Limited Partner; or

(xiii)   hold its Interest (or any portion thereof), directly or indirectly, for the benefit of any Person described in clauses (i) through (xii) above.

If a Limited Partner complies with the provisions of subsections (b) through (d) of this Section 9.1, such Limited Partner may, without the consent of the General Partner, Transfer all or a portion of its Interest to a Person that:

(i)     controls, is controlled by, or is under common control with, the Limited Partner;

(ii)    is an investment fund managed by an Affiliate of such Limited Partner;

(iii)   is a trust or a successor trust with the same beneficial ownership; or

(iv)    is an Immediate Family Member of such Limited Partner or a trust for the benefit of one or more Immediate Family Members (it being understood and agreed that notwithstanding such Transfer, the Limited Partner making such a Transfer shall thereafter remain liable for its Unused Capital Commitment, unless released in writing by the General Partner in its sole discretion).

(b)     Notwithstanding any other provisions of this Section 9.1, no Transfer of all or any portion of a Limited Partner's Interest may be made unless in the opinion of counsel, reasonably acceptable, and satisfactory in form and substance, to the General Partner (which opinion may be waived, in whole or in part, at the sole discretion of the General Partner):

(i)     the Transfer would not violate the registration or qualification provisions of the Securities Act, any state or securities "blue sky" or non-U.S. securities laws applicable to the Partnership or the Interest to be Transferred;

(ii)    the Transfer would not cause the Partnership to lose its status as a partnership for federal income tax purposes or cause the Partnership to become subject to the Investment Company Act or to be treated as a publicly traded partnership under Code Section 7704;

(iii)   the Transfer would not require the General Partner or the Manager or any of their Affiliates that is not registered under the Investment Advisers Act of 1940, as amended (*"Advisers Act"*), or the Partnership, to register as an investment adviser under the Advisers Act;

- 47 -

        (iv)     the Transfer would not violate the laws, rules or regulations of any state or any governmental authority applicable to such Transfer; and

        (v)     such additional opinions regarding the Transfer as the General Partner may reasonably require.

Each opinion of counsel must be delivered in writing to the Partnership not less than 10 days prior to the date of the Transfer. The General Partner agrees to cooperate with any Limited Partner making a Transfer by providing promptly such records and other factual information regarding the Partnership as may be reasonably requested with respect to any proposed Transfer. Except as permitted by this Agreement, each Limited Partner hereby severally agrees that it will not Transfer all or any portion of its Interest in the Partnership, and that any purported Transfer in violation of this Agreement shall, to the fullest extent permitted by law, be null and void. Each transferee or assignee of an Interest must complete an "Assignee Questionnaire" in a form deemed appropriate by the General Partner and containing information reasonably acceptable to the General Partner. In order for the General Partner to make the determination with respect to Sections (a)(xii)(B)-(a)(xii)(D), any proposed transferee of an Interest will be required to provide the General Partner with any information that the General Partner deems relevant, including, without limitation, evidence or confirmation relating to whether it is a Benefit Plan Investor or a Controlling Person.

        (c)     Each Limited Partner agrees that it will pay all reasonable expenses, including attorneys' fees and accountants' fees, incurred by the Partnership in connection with a Transfer or requested Transfer of an Interest by such Limited Partner.

        (d)     Any Person who acquires all or any portion of the Interest of a Limited Partner and who is admitted as a Limited Partner shall assume all or a proportionate amount of the Capital Account of such Limited Partner and shall be obligated (i) to pay to the Partnership the appropriate portion of any amounts thereafter becoming due in respect of the Capital Commitment made by its predecessor in interest, and (ii) to return any amounts to the Partnership as required by any provision of this Agreement or applicable law as if it had received all Distributions made to its predecessor in interest. Each Limited Partner agrees that, notwithstanding the Transfer of all or any portion of its Interest, as between the transferring Limited Partner and the Partnership, the transferring Limited Partner will remain liable for its Unused Capital Commitment and to return any Distributions previously made to such Limited Partner if return of any such Distributions is required by any provision of this Agreement; however, a transferring Limited Partner will not in any case have any liability for amounts required to be paid with respect to any Distributions made on its Interest after the time when the purchaser, assignee or transferee of such Interest, or portion thereof, is admitted as a Substituted Limited Partner.

        (e)     Except as may be required by Section 3.2(f) and Section 3.10, no Limited Partner may withdraw from the Partnership without the written consent of the General Partner.

        (f)     If the General Partner consents to a proposed Transfer pursuant to Section 9.1(a), the Limited Partner entering into an agreement to Transfer all or any part of its Interest in the Partnership to a *bona fide* third-party purchaser (the "***Proposed Assignee***") shall give written notice to the General Partner, certifying the name and address of the Proposed

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        CHHEDA-TRANLLC-RC-00000180

Assignee, the terms and conditions of the proposed sale (including the purchase price and the proposed closing date).

(g)     If, under applicable law, a Transfer of an Interest in the Partnership that does not comply with this Agreement is nevertheless legally effective, the transferor and transferee, to the fullest extent permitted by law, shall be jointly and severally liable to the Partnership and the General Partner for, and shall indemnify and hold harmless the Partnership and the General Partner against, any losses, damages or expenses (including attorneys' fees, judgments, fines and amounts paid in settlement and costs of collection) actually and reasonably incurred by them in connection with such Transfer. To the fullest extent permitted under applicable law, each Limited Partner shall indemnify and hold harmless the Partnership, the General Partner and all other Limited Partners who were or are parties, or are threatened to be made parties, to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of or arising from any actual or alleged misrepresentation, misstatement of facts or omission to state facts made (or omitted to be made), noncompliance with any agreement or failure to perform any covenant by such Limited Partner in connection with any Transfer of all or any portion of such Limited Partner's Interest (or any economic interest therein) in the Partnership, against any losses, damages or expenses (including attorneys' fees, judgments, fines and amounts paid in settlement) actually and reasonably incurred by it or them in connection with such action, suit or proceeding and for which it or they have not otherwise been reimbursed.

Section 9.2.    **Assignees.**

(a)     The Partnership shall not recognize for any purpose any purported Transfer of all or any portion of the Interest of a Limited Partner unless the provisions of Section 9.1 shall have been complied with (or waived by the General Partner) and there shall have been filed with the Partnership a dated notice of such Transfer, in form prescribed by the General Partner, executed and acknowledged by both the seller, assignor or transferor and the purchaser, assignee or transferee, and such notice (i) contains the acceptance and assumption by the purchaser, assignee or transferee of all of the terms and provisions of this Agreement, including the provisions of Section 13.1, and its agreement to be bound hereby and thereby, (ii) contains a representation that such Transfer was made in accordance with all applicable laws and regulations and (iii) contains a power of attorney granted by the purchaser, assignee or transferee to the General Partner to execute this Agreement on its behalf.

(b)     Unless and until an assignee of an Interest becomes a Substituted Limited Partner in accordance with this Agreement, such assignee shall not be entitled to participate in any vote or written consent hereunder or under the Delaware Act with respect to such Interest.

(c)     Any Limited Partner who shall Transfer all of its Interest shall cease to be a Limited Partner immediately following the admission of a Substituted Limited Partner in place of such assigning Limited Partner.

(d)     Notwithstanding anything to the contrary contained in this Agreement, both the Partnership and the General Partner shall be entitled to treat the assignor of an Interest as the absolute owner thereof in all respects, and shall incur no liability for Distributions made in Good

- 49 -

     CHHEDA-TRANLLC-RC-00000181

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

Faith to it, until such time as a written assignment that conforms to the requirements of this Article IX has been received by the Partnership and accepted by the General Partner.

(e) A Person who is the assignee of all or any portion of the Interest of a Limited Partner as permitted hereby but does not become a Substituted Limited Partner and who desires to make a further Transfer of such Interest, shall be subject to all of the provisions of this Article IX to the same extent and in the same manner as any Limited Partner desiring to make a Transfer of its Interest.

(f) In the event of the Incapacity of a Limited Partner, such Incapacity shall not, in and of itself, cause the termination of the Partnership, and the Limited Partner's trustee in bankruptcy or other legal representative shall have only the rights of an assignee of the right to receive Partnership Distributions applicable to the Interest in the Partnership of such incapacitated Limited Partner as provided herein. Any Transfer from such trustee in bankruptcy or legal representative shall be subject to the provisions of this Agreement.

Section 9.3. **Substituted Limited Partner**.

(a) Notwithstanding anything to the contrary contained in this Agreement, no Limited Partner shall have the right to substitute a purchaser, assignee, transferee, donee, heir, legatee, distributee or other recipient of all or any portion of such Limited Partner's Interest for it in its capacity as a Limited Partner. Any such purchaser, assignee, transferee, donee, heir, legatee, distributee or other recipient of an Interest (whether pursuant to a voluntary or involuntary Transfer) shall be admitted to the Partnership, effective immediately prior to the Transfer by a Limited Partner of its Interest, as a Substituted Limited Partner only with the consent of the General Partner, which consent shall not be unreasonably withheld. Each Person admitted as a substitute Limited Partner is referred to herein as a "***Substituted Limited Partner***."

(b) Each Substituted Limited Partner, as a condition to its admission as a Limited Partner shall execute and acknowledge such instruments, in form and substance reasonably satisfactory to the General Partner, as the General Partner reasonably deems necessary or desirable to effectuate such admission and to confirm the agreement of the Substituted Limited Partner to be bound by all the terms and provisions of this Agreement with respect to the Interest acquired. All expenses, including attorneys' fees not paid by the assignor Limited Partner that are incurred by the Partnership in connection with the Transfer and admission of the Limited Partner as a Substituted Limited Partner shall be borne by such Substituted Limited Partner. Any such costs not paid by the Substituted Limited Partner shall be treated as a loan and shall be repaid to the Partnership upon demand by the Partnership; *provided, however*, that in the General Partner's sole discretion, any such amount may be repaid by deduction from any Distributions payable to such Limited Partner pursuant to this Agreement (with such deduction treated as an amount distributed to the Limited Partner) as determined by the General Partner in its sole discretion. A Limited Partner who fails to satisfy its obligation to repay any portion of such obligations by the required date shall be in breach of this Agreement and shall be deemed to be a Defaulting Partner for all purposes of this Agreement, effective upon the receipt of notice from the General Partner (which notice may be given or not given in the sole discretion of the General Partner) and as detailed in Section 3.5.

- 50 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    CHHEDA-TRANLLC-RC-00000182

(c)     Prior to an assignee's admission to the Partnership as a Substituted Limited Partner, such assignee shall nevertheless be entitled to all of the rights of an assignee of a Limited Partnership Interest under the Delaware Act (and any successor provision).

Section 9.4.    **Transfers During a Fiscal Year**. In the event of the Transfer of a Limited Partner's Interest at any time other than the end of a Fiscal Year, allocations and Distributions pursuant to Article IV shall be divided between the transferor and the transferee in any reasonable manner as determined by the General Partner and in compliance with Code Section 706. The General Partner may, for the convenience of the Partnership, select that the effective date of any Transfer be the end of any fiscal period determined by the General Partner in the exercise of its sole discretion. For purposes of determining the effective date of a transfer, the General Partner may adopt a mid-month convention (consistently applied) under which transfers made (or deemed made) on or before the 15th day of the current month are deemed made on the last day of the prior month, and transfers made after the 15th day of the current month are deemed made on the last day of the current month.

Section 9.5.    **Elections Under the Internal Revenue Code**. In the event of a Transfer of all or any part of a Limited Partner's Interest by sale or exchange, the General Partner shall, at its option and in its sole discretion (unless required by law or Treasury Regulations), if requested by such Limited Partner or its successor in interest, cause the Partnership to elect, pursuant to Code Section 754 (or corresponding provisions of subsequent law) to adjust the basis of the Partnership's assets as provided by Code Sections 734 and 743. Such Limited Partner and its successor in interest shall pay to the Partnership the increased accounting costs resulting from making such election as reasonably determined by the General Partner (with such amount payable being payable upon demand from the General Partner and the provisions of Section 9.3(b) being applicable with respect to the payment and any default in payment of such amount).

# ARTICLE X

## DISSOLUTION AND LIQUIDATION OF THE PARTNERSHIP

Section 10.1.    **Dissolution**. The Partnership shall be dissolved, and its affairs shall be wound up upon the first to occur of any of the following events:

(a)     the expiration of the Term as set forth in Section 2.6; or

(b)     the termination, liquidation, dissolution or withdrawal by the General Partner (other than in connection with a permitted assignment of interest).

Section 10.2.    **Liquidation**.

(a)     Upon dissolution of the Partnership, the General Partner or, if (i) there is none or (ii) the General Partner fails or refuses to act or (iii) such dissolution occurred pursuant to Section 10.1(b), the General Partner or a Person approved by a Super Majority-in-Interest of the Partners to act as a liquidating trustee (whether the General Partner or such Person, the "***Liquidating Trustee***"), shall wind up the affairs of the Partnership and proceed within a reasonable period of time to sell or otherwise liquidate the assets of the Partnership and, after paying or making due provision by the setting up of reserves for all liabilities to creditors of the

- 51 -

Partnership, to distribute the assets among the Partners in accordance with the provisions for the making of Distributions set forth in this Agreement and the Delaware Act.

(b) Notwithstanding this Section 10.2, if the Liquidating Trustee shall, in Good Faith, determine a sale or other Disposition of part or all of the Investments would cause undue loss to the Partners or otherwise be impractical, the Liquidating Trustee may request consent of a Super Majority-In-Interest of the Limited Partners to either defer liquidation of, and withhold from distribution for a period of up to, but not more than, 24 months from the date of dissolution, or a longer period of time as determined by the Liquidating Trustee with the consent of a Super Majority-In-Interest of the Limited Partners.

(c) The General Partner or the Liquidating Trustee shall make a final allocation of all items of income, gain, loss and expense in accordance with Article IV hereof, and the proceeds from liquidation shall, subject to the Delaware Act be paid in the following manner:

(i) *first*, to pay the creditors of the Partnership, including Partners who are creditors except Partners withdrawn pursuant to Section 3.10(b), to the extent otherwise permitted by law, in satisfaction of the liabilities of the Partnership (whether by payment or the making of reasonable provision for payment thereof), including:

(A) paying the expenses of liquidation (including legal and accounting expenses incurred in connection therewith up to and including the date that distribution of the Partnership's assets to the Partners has been completed);

(B) establishing such reserves as the Liquidating Trustee deems necessary or desirable (including reserves for Management Fees expected to be earned prior to the complete dissolution and liquidation of the Partnership); and

(C) paying, in accordance with the terms agreed among them and otherwise on a *pro rata* basis, debts to Partners, either by the payment thereof or the making of reserves therefor as the Liquidating Trustee deems necessary or desirable; and

(ii) *second*, the balance, if any, shall be distributed to the Partners in accordance with the priorities of Article IV.

(d) In any liquidation, the Partnership may distribute (after payment of the Partnership's obligations) the assets of the Partnership in cash, ratably in-kind, or any combination thereof as the Liquidating Trustee shall determine. Distributions consisting of both cash and property distributed in-kind shall be made, to the extent practicable, in *pro rata* portions of cash and in-kind Distributions as to each Partner receiving such Distributions. To the extent deemed desirable by the Liquidating Trustee, Distributions may be made into a liquidating trust or other appropriate entity, and reserves may be established for contingencies; *provided, however*, that the time during which Distributions may be withheld by such trust or other entity may not extend beyond 24 months from the date of dissolution without the approval of a Super-Majority-in-Interest of the Limited Partners.

(e) When the Liquidating Trustee has complied with the foregoing liquidation provisions, the Liquidating Trustee, on behalf of all Partners, shall, in accordance with the

- 52 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER　　　　CHHEDA-TRANLLC-RC-00000184

Delaware Act, execute, acknowledge and cause to be filed an instrument evidencing the cancellation of the Certificate and the Partnership shall terminate.

(f)     In carrying out the provisions of this Article X, the Liquidating Trustee shall comply with the requirement of Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2) that all liquidating Distributions be made on or before the later of (i) the last day of the Fiscal Year in which the liquidation occurs or (ii) the 90th day after such liquidation occurs.

(g)     No Partner shall have any obligation to restore a negative Capital Account balance at any time. This shall not affect any Partner's obligation to pay any amount pursuant to any other provision of this Agreement.

Section 10.3.  **Clawback Liability**.

(a)     Upon liquidation of the Partnership, the General Partner and, to the extent provided below, the Manager shall be severally required to repay to the Partnership an amount (the "**Clawback Amount**"), if any, by which the aggregated Carried Interest actually received by the General Partner (excluding the portion thereof equal to the General Partner's Carried Interest Tax Liability, which for this purpose shall be determined taking into account, without duplication, any tax benefits) exceed the Carried Interest the General Partner would have received if all other distributions, including distributions of the proceeds of the liquidation of the Partnership, were made at a single time on the date of liquidation (i.e., as though all of the Investments had been a single Investment, all Capital Contributions had been made with regard to that Investment, all Current Income had been derived from that Investment and all distributions of such Current Income had been made on the date of the liquidation of the Partnership); provided that any amount required to be returned pursuant to this Section 10.3(a) by the General Partner shall be net of any amounts returned by the General Partner pursuant to Section 6.2. The Clawback Amount is payable first by the Manager but only up to the amount of Converted Management Fee. Any remainder is payable by the General Partner. For the avoidance of doubt, the Clawback Amount shall not apply to distributions made to the General Partner or the Affiliated Limited Partners in respect of their Capital Contributions.

(b)     Each of the General Partner and the Manager agrees that its operating agreements (or equivalent organizational documents) shall provide that each Person that receives direct or indirect distributions with respect to the Carried Interest or any Converted Management Fee, as applicable (including all Persons that have a direct or indirect ownership interest in the General Partner or the Manager, in a portion of the Carried Interest through the General Partner, or in a portion of the Converted Management Fee through the Manager, as applicable) shall have the several obligation to repay to the General Partner or the Manager, as applicable, its proportionate share of the amount owed by the General Partner or the Manager, as the case may be, pursuant to this Section 10.3 within 30 days after the receipt of notice of a determination that such Clawback Amount payment is due.

- 53 -

# ARTICLE XI

# AMENDMENTS

Section 11.1. **Adoption of Amendments; Limitations Thereon.**

(a)      This Agreement may be amended from time to time by the General Partner with the consent of a Majority in Interest of the Limited Partners, except (i) as required by law, (ii) as provided in Section 2.2 (*Name Change*), Section 2.10 (*Single Partnership Assumption*), Section 3.1 (*Schedule A*), Section 3.2 (*Schedule A*), Section 3.5(i) (*Feeder Fund*), Section 3.5(j) (*Several Interest Election*), Section 3.6(b)(iv) (*Schedule A*), Section 4.7(b) (*Allocations*), Section 8.2 (*Substitute General Partner*), the penultimate sentence of this Section 11.1(b) (*Unilateral Amendments*), Section 14.9(e) (*Safe Harbor Election and Forfeiture Allocations*), Section 15.5 (*Side Letters*) and Section 15.8(i) (*Anti-money laundering*), (iii) that any provision of this Agreement that permits or requires the vote or consent of Limited Partners representing greater than a Majority in Interest of the Limited Partners may only be amended with the consent of the General Partner and of Limited Partners representing the same percentage of the voting Interests of the Limited Partners that is required to approve the vote or consent of Limited Partners permitted or required by the Section of this Agreement to be amended, (iv) any amendment to any economic term or provision in Sections 5.6 (*Management Fee and Expenses*) that is materially adverse to the Limited Partners may only be amended by the General Partner with the approval of the Advisory Committee, and (v) without the consent of any Partner to be adversely affected thereby, this Agreement may not be amended to (x) increase such Limited Partner's Capital Commitment, or (y) disproportionately, vis-à-vis the other Limited Partners, materially and adversely affect such Limited Partner.

(b)      Notwithstanding anything to the contrary contained in Section 11.1(a), in addition to other amendments authorized herein, this Agreement may be amended from time to time by the General Partner without the consent of any other Limited Partner: to (i) amend Schedule A hereto at any time and from time to time to reflect the admission or withdrawal of any Limited Partner, or a change in any Limited Partner's Capital Commitment, pursuant to the terms of this Agreement; (ii) add to the General Partner's duties or surrender any right or power granted to it; (iii) correct errors, cure ambiguities, respond to changes in the law and make changes for the benefit of the Partners; (iv) delete or add any provision requested by any federal or state "blue sky" agency to the extent deemed to be for the benefit or protection of some or all of the Partners; (v) effectuate the admission or withdrawal of Partners in accordance with the terms of this Agreement; (vi) make amendments to this Agreement in order to reflect changes made to the Agreement in response to the comments of Partners admitted at Subsequent Closings if such amendments do not materially adversely affect the rights or obligations of such previously admitted Limited Partner; and (vii) improve, upon the advice of counsel to the Partnership, the Partnership's position in (A) satisfying any Investment Company Act exemptions, (B) qualifying for any applicable exemptions from the definition of "plan assets" under Section 3(42) of ERISA and the Plan Assets Regulation, (C) sustaining any tax positions of the Partnership or those of any of its Partners upon the advice of counsel (including with respect to UBTI), (D) avoiding publicly traded status for the Partnership, (E) to make modifications if a Feeder Fund is a Defaulting Partner as provided in Section 3.5(i), (F) as permitted under Section 14.9 regarding a Safe Harbor Election or (G) preventing the Partners' final Capital Accounts from deviating from the intended priority cash

- 54 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER      CHHEDA-TRANLLC-RC-00000186

Distributions described in this Agreement by amending the allocation provisions of Article IV (collectively, the "*Unilateral Amendments*"). Copies of any such Unilateral Amendments shall be forwarded to all Partners by the General Partner. Notwithstanding the foregoing, no amendment shall be made to provisions regarding ERISA in this Agreement without the written consent of the General Partner and of Limited Partners that are ERISA Partners and that have at least 2/3 of the Aggregate Commitments of all ERISA Partners.

(c)     Upon the adoption of any amendment to this Agreement, the amendment shall be executed by the General Partner on behalf of itself and on behalf of all of the other Partners by the power of attorney granted pursuant to Section 13.1. The General Partner will provide the Partners with notice of any amendments.

(d)     Any request for consent of the Partners in this Section 11.1 shall be made by written notice from the General Partner to each of the Partners at the address listed on such Partner's Schedule A. Each Partner hereby agrees that failure of a Partner to respond within 10 Business Days after notice is received or deemed received under Section 15.1 shall be deemed a consent to the proposed amendment by such Partner.

(e)     Notwithstanding any contrary provision of this Agreement, any provision of this Agreement that has a substantial equivalent in the governing agreement of any Parallel Investment Vehicle may only be amended by the vote or consent of Limited Partners with Capital Commitments and Parallel Investment Vehicle Limited Partners with Parallel Investment Vehicle Commitments which, when taken together, equal more than 50% (or such other specified percentage) of Aggregate Commitments. For the avoidance of doubt, to the extent that any amendment relates only to the Partnership and not any other Parallel Investment Vehicle, such amendment may be made with the consent of a Majority in Interest of the Limited Partners (or other specified percentage) instead of a majority in interest (or other specified percentage) of the Limited Partners and the Parallel Investment Vehicle Limited Partners.

# ARTICLE XII

## CONSENTS, VOTING AND MEETINGS

Section 12.1.   **Method of Giving Consent**. Any vote, consent or approval required by this Agreement ("*Consent*") may be given as follows:

(a)     by a written Consent given by the approving Partner (or member of the Advisory Committee, if formed) at or prior to effecting any act (including inaction) for which the Consent is solicited; *provided*, that such Consent shall not have been nullified by notice to the General Partner by the approving Partner (or member of the Advisory Committee, if formed) at or prior to effecting the act or taking action in furtherance thereof; or

(b)     by the affirmative vote by the approving Partner (or member of the Advisory Committee, if formed) to the doing of the act (including inaction) for which the Consent is solicited at any meeting called and held to consider the doing of such act or thing.

For purposes of this Agreement, a written Consent may be given by electronic mail and shall be effective for all purposes in determining whether the requisite Consent of Partners (or members of

- 55 -

the Advisory Committee) has been obtained with respect to matters for which such vote or approval is sought under this Agreement. Whenever under the terms of this Agreement the Consent of a specified percentage of the Interests of the Partners is required for any action, forbearance, amendment hereof, inaction, consent or otherwise, a Limited Partner with respect to which a Several Interest Election has been accepted by the General Partner may allocate its Interest in the Partnership for the purpose of casting such vote or giving such consent or approval in accordance with the respective directions of the underlying investors of such Limited Partner in accordance with their relative interests in such Limited Partner. If the General Partner reasonably determines that a particular action to be taken under this Agreement that requires Consent of the Limited Partners would not be applicable to one or more of the Parallel Investment Vehicles, including for legal, tax or regulatory reasons, then such action shall only require the Consent of the Limited Partners of the Partnership and the applicable Parallel Investment Vehicles, if any.

Section 12.2. **Meetings**. The General Partner may, but is not required to, cause the Partnership to conduct an informational meeting of the Partners at which representatives of the General Partner will be present to discuss the business of the Partnership (the "*Annual Meeting*"). The General Partner shall not be required to (but may) submit any of the Partnership's potential Investments for discussion at an Annual Meeting and none of the Limited Partners shall play any role in the Partnership's governance or participate in the control of the business of the Partnership. Each Annual Meeting (and any other meeting of Partners or Partner vote) may be held in person, or by secure telephone conference, webcast or other electronic means. Voting at the Annual Meeting or any other vote of the Partners, may be held by such means or by written consent of the Partners.

Section 12.3. **Record Dates**. The General Partner may set in advance a date for determining the Partners entitled to notice of and to vote at any meeting or by written consent. All record dates shall neither be more than 90 days prior to the date of the meeting to which such record date relates nor, in the case of a written consent, be more than 100 days prior to the date of the act (including inaction) or meeting for which consents are being solicited.

Section 12.4. **Submissions to Partner**. The General Partner shall give all of the Partners notice of any proposal or other matter required by any provision of this Agreement or by Delaware law to be submitted for the consideration and approval of the Partners. Such notice shall include any information required by the relevant provisions of this Agreement or by Delaware law.

## ARTICLE XIII

## POWER OF ATTORNEY

Section 13.1. **Power of Attorney**.

(a) Each Limited Partner, by its execution hereof, hereby irrevocably makes, constitutes and appoints each of the General Partner, any Managing Member or general partner of the General Partner, and the Liquidating Trustee, if any (in such capacity as Liquidating Trustee for so long as it acts as such), each acting alone, as its true and lawful agent and attorney-in-fact, with full power of substitution and full power and authority in its name, place and stead, to make, execute, sign, acknowledge, swear to, record and file: (i) this Agreement and any amendment to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CHHEDA-TRANLLC-RC-00000188

this Agreement which has been adopted as herein provided; (ii) the original Certificate and all amendments thereto required or permitted by law and the provisions of this Agreement; (iii) all certificates and other instruments deemed advisable by the General Partner or the Liquidating Trustee to carry out the provisions of this Agreement and applicable law or to permit the Partnership to become or to continue as a limited partnership; (iv) all instruments that the General Partner or the Liquidating Trustee deems appropriate to reflect a change or modification of this Agreement or the Partnership in accordance with this Agreement, including the admission of Substituted Limited Partners pursuant to the provisions of this Agreement; (v) all conveyances and other instruments or papers deemed advisable by the General Partner or the Liquidating Trustee to effect the dissolution and termination of the Partnership (consistent with Article X); (vi) all instruments necessary to effect the purchase of a Defaulting Partner's interest and the compulsory withdrawal of such Defaulting Partner; (vii) all documents and instruments to be executed by a Defaulting Partner under this Agreement (or by law) with respect to the Partnership or the Defaulting Partner's Interest, including those effecting the Defaulting Partner's withdrawal from the Partnership; and (viii) all other instruments or papers which may be required or permitted by law to be filed on behalf of the Partnership which do not subject the Partners to personal liability and are necessary or desirable to carry out the provisions of this Agreement.

(b)     The foregoing power of attorney:

(i)     is coupled with an interest, shall be irrevocable and shall survive and shall not be affected by the subsequent death, disability or Incapacity of any Limited Partner; may be exercised by the General Partner, its Managing Members or general partner or the Liquidating Trustee, as appropriate, either by signing separately as attorney-in-fact for each Limited Partner or by a single signature of the General Partner, its Managing Members or general partner or the Liquidating Trustee, as appropriate, acting as attorney-in-fact for all of them, with or without listing all of the Limited Partners executing the instrument, and

(ii)     shall survive the delivery of an assignment by a Limited Partner of the whole or any portion of its Interest; except that, where the assignee of the whole of such Limited Partner's Interest has been approved by the General Partner for admission to the Partnership as a Substituted Limited Partner, the power of attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling the General Partner, its Managing Members or general partner or the Liquidating Trustee, as appropriate, to execute, swear to, acknowledge and file any instrument necessary or appropriate to effect such substitution.

(c)     Each Limited Partner shall execute and deliver to the General Partner within 15 days after receipt of the General Partner's request therefor such other instruments as the General Partner reasonably deems necessary to carry out the terms of this Agreement. The General Partner shall notify each Limited Partner for which it has exercised a power-of-attorney as soon as practicable thereafter and shall provide each such Limited Partner with a copy of any document for which it has exercised a power-of-attorney as soon as practicable thereafter.

- 57 -

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

## ARTICLE XIV

## RECORDS AND ACCOUNTING; REPORTS; FISCAL AFFAIRS

Section 14.1.  **Records and Accounting**.

(a)     Proper and complete records and books of account of the business of the Partnership including a list of the names, addresses and Interests of all Partners, shall be maintained at the Partnership's principal place of business for a period of five years following the due date of the final tax return of the Partnership.

(b)     The books and records of the Partnership shall be maintained in U.S. dollars, on the accrual basis of accounting for tax purposes, on a GAAP (fair value) basis for reporting purposes, and the cash basis (subject to unpaid bills, projected short-term needs and reserves) for purposes of determining Distributions. The books shall be open to inspection by any Partner (or its authorized representative) at any time during ordinary business hours, upon reasonable notice, for any purpose reasonably related to its interest as a Partner. The financial statements of the Partnership provided to the Partners pursuant to this Article shall reflect the assets of the Partnership at their Fair Value as established pursuant to the terms of this Agreement. The taxable year of the Partnership shall be its Fiscal Year. The books and records that shall be available for inspection by Partners pursuant to this Section 14.1 and shall consist of annual income statements, balance sheets, statements of cash flow, tax returns, checking account ledgers, bank statements, appraisals or valuations of real property owned by the Partnership and copies of Partnership reports previously sent to the Partners (other than the portions thereof identifying other Partners).

(c)     The General Partner shall have the right at any time and for any reason to obtain fair market value appraisals of all or any part of the Partnership's Investments and shall obtain an independent appraisal of each Investment at the expense of the Partnership.

Section 14.2.  **Annual Reports**.

(a)     The General Partner shall use commercially reasonable efforts to cause to be prepared and mailed to each Partner who was a Partner at any time during the Fiscal Year, within 120 days after the end of each Fiscal Year, beginning with the first full Fiscal Year of the Partnership, an annual report containing the following (which reports, or portions thereof, may be internally prepared by the General Partner or prepared by the Partnership's accountants or other third parties at Partnership expense, as determined by the General Partner in its sole discretion):

(i)      a balance sheet of the Partnership;

(ii)     a statement of the net Profits or net Losses (and any other tax items) of the Partnership for such year, including a statement setting forth Management Fees and Operating Expenses incurred for such year;

(iii)    a statement of cash flow of the Partnership;

(iv)    a current valuation of the Partnership's Investments.

- 58 -

    CHHEDA-TRANLLC-RC-00000190

(b)     The annual financial statements are not required to be audited.

Section 14.3. **Tax Information; Tax Returns**. The General Partner will use commercially reasonable efforts to cause to be delivered to each Person who was a Partner at any time during such Fiscal Year, within 120 days after the end of each Fiscal Year, such information, if any, with respect to the Partnership as may be necessary for the preparation of such Partner's income tax returns, including a statement showing each Partner's share of income, gain or loss, expense and credits for such Fiscal Year for income tax purposes, including unrelated business income tax purposes. The General Partner shall use reasonable commercial efforts to prepare or cause to be prepared and to be filed on or before the due date (or any extension thereof elected by the General Partner in its sole discretion) any tax returns required to be filed by the Partnership. Each Partner is responsible for the preparation and filing of its own tax returns. Without limiting the foregoing, the General Partner shall have the right, but not the obligation, to file composite state tax returns for the benefit of Partners that elect to participate in the filing of such returns. The General Partner shall cause the Partnership to pay all taxes payable by the Partnership (it being understood that the expenses of preparing and filing such tax returns, the amounts of such taxes, and costs in connection with any controversy with any governmental taxing authority with respect thereto, are expenses of the Partnership and not of the General Partner); *provided*, that the General Partner shall not be required to cause the Partnership or any of its Affiliates to pay any tax so long as the General Partner or the Partnership or any of its Affiliates is in Good Faith and by appropriate legal proceedings contesting the validity, applicability or amount thereof. The General Partner will use commercially reasonable efforts to provide each Partner with a Schedule K-1 for tax purposes within 120 days after the end of the Fiscal Year of the Fund. If the General Partner is unable to deliver such Schedule K-1 by April 15th of each year, the General Partner will provide the Partners with estimates of taxable income or loss allocated to their investment in the Fund.

Section 14.4.     **Partnership Funds**. The funds of the Partnership which are not invested in Investments may be deposited in the name of the Partnership in one or more bank accounts. Withdrawals therefrom shall be made upon such signature(s) as the General Partner may designate. No funds of the Partnership shall be kept in any account other than a Partnership account; funds shall not be commingled with the funds of any other Person; and the General Partner shall not employ, or permit any other Person to employ, such funds in any manner except for the benefit of the Partnership. Such funds may be held in interest bearing or non-interest-bearing accounts as determined by the General Partner in its sole discretion.

Section 14.5.     **Partnership For Income Tax Purposes; Tax Elections, Determinations & Decisions**. The Partners agree that the Partnership will be treated as a partnership for purposes of federal, state, and local income tax laws and further agree not to take any position or any action or to make or cause to be made any election inconsistent with such treatment. Except as otherwise expressly provided in this Agreement, all tax elections by the Partnership, determinations for tax purposes and any other tax decisions with respect to the Partnership, will be made (or not made) by the General Partner in its reasonable discretion. Each Partner shall upon request supply promptly any information necessary to give proper effect to any election made by the Partnership. The determinations of the General Partner with respect to the Partnership's treatment of any item or its allocation for federal, state or local tax purposes shall be binding upon all of the Limited Partners so long as such determination (a) shall not be inconsistent with any express term hereof and (b) the Partnership's accountants shall not have disagreed therewith. The General Partner shall

- 59 -

make (or refrain from making, as applicable) all appropriate elections and take (or refrain from taking, as applicable) all other appropriate actions to the extent required pursuant to Code Section 7701 (and the Treasury Regulations thereunder) for the Partnership to be classified as a "partnership" for federal income tax purposes.

Section 14.6. **Other Information**. Subject to Section 14.7, with reasonable promptness, the General Partner will deliver such other information available to the General Partner, including financial statements and computations, relating to the Partnership or any Person in which the Partnership then holds Investments as any Partner may from time to time reasonably request.

Section 14.7. **Limited Partner Information**. Upon the reasonable request of the General Partner, each Limited Partner agrees to provide the Partnership with such non-confidential information concerning the Limited Partner and its business so that the Partnership can comply, or determine its compliance, with any laws or regulations applicable to it (including, without limitation, the Investment Company Act and ERISA). Notwithstanding anything in this Article XIV to the contrary, a Limited Partner shall have access to books and records of the Partnership and the right to receive copies of Partnership documents only for a purpose reasonably related to the Limited Partner's Interest as a Limited Partner of the Partnership, and any such access shall be subject to such reasonable standards (including standards governing what information and documents are to be furnished, at what time and location and at whose expense) as may be established from time to time by the General Partner (it being understood that such standards may be established by the General Partner following the receipt of an inspection request). In addition, the General Partner shall have the right to keep confidential from each Limited Partner for such period of time as the General Partner deems reasonable, any information which the General Partner reasonably believes to be in the nature of trade secrets or other information (or confidential information regarding another Limited Partner) the disclosure of which the General Partner in Good Faith believes is not in the best interest of the Partnership or could damage the Partnership or which the Partnership is required to keep confidential by law or by agreement with a Limited Partner or with a third party to keep confidential with respect to Partnership tax items. In addition, in order to protect the privacy of Limited Partners, to the fullest extent permitted by law, the General Partner may in its sole discretion (but is not required to) withhold from any Limited Partner information concerning any other Limited Partner, including such other Limited Partner's name, address, telephone number and other contact information. Each Limited Partner hereby agrees to provide the General Partner with such information as the General Partner may reasonably request from time to time with respect to non-U.S. Citizenship, residency, ownership or control of such Limited Partner so as to permit the General Partner to evaluate and comply with any regulatory and tax requirements applicable to the Partnership or proposed investments of the Partnership.

Section 14.8. **Partnership Representative**.

(a) **Designation**. The General Partner or a Person designated by the General Partner, at Partnership expense, shall act as the "partnership representative" of the Partnership (the "***Partnership Representative***"), as such term is defined in Code Section 6223(a), and in a similar capacity under any corresponding or similar provisions of applicable state and local law, and exercise any authority permitted the "partnership representative" under the Code and applicable state and local law, including settlement or extension of the statute of limitations with respect to

- 60 -

Partnership tax items. To the extent the Partnership Representative is not an individual, the General Partner shall be entitled to appoint, revoke or replace a "designated individual" (as such term is described in Treasury Regulations Section 301.6223-1(b)(3)(ii)) through whom the Partnership Representative will act.

(b) **Tax Proceedings**. In the event the Partnership shall be the subject of an income tax audit, examination or other administrative or judicial proceeding with respect to taxes by any Federal, state or local authority ("**_Tax Proceedings_**"), the Partnership Representative shall be authorized to act for, and its decision shall be final and binding upon, the Partnership and each Partner thereof. All expenses incurred in connection with any such audit, investigation, settlement, review or any other Tax Proceeding shall be borne by the Partnership. The Partnership Representative shall have the right to make on behalf of the Partnership any and all elections and take any and all actions that are available to be made or taken by the Partnership Representative or the Partnership under the Code and the Partners shall take such actions requested by the Partnership Representative consistent with any such elections made and actions taken by the Partnership Representative, including filing amended tax returns and paying any tax due in accordance with Section 6225(c)(2) of the Code, it being understood that no such amended tax return shall be filed in accordance with such section with respect to the Partnership without the advance written consent of the Partnership Representative in its sole discretion. In the event the Partnership incurs any liability for taxes, interest or penalties as a result of an audit of the Partnership or other Tax Proceeding:

(i) the Partnership Representative may cause the Partners (including any former Partner) to whom such liability relates, as determined by the Partnership Representative in its sole Good Faith discretion, to pay, and each such Partner hereby agrees to pay, such amount to the Partnership, and such amount shall not be treated as a Capital Contribution;

(ii) any amount not paid by a Partner (or former Partner) at the time requested by Partnership Representative shall accrue interest at the rate of 8% _per annum_, compounded quarterly, until paid, and such Partner (or former Partner) shall also be liable to the Partnership for any damages resulting from a delay in making such payment beyond the date such payment is requested by Partnership Representative, and for this purpose the fact that the Partnership could have paid this amount with other funds shall not be taken into account in determining such damages;

(iii) without reduction in a Partner's (or former Partner's) obligation under clauses (i) and (ii), any amount paid by the Partnership that is attributable to a Partner (or former Partner), as determined by the Partnership Representative in its reasonable, Good Faith discretion, and that is not paid by such Partner pursuant to clauses (i) and (ii) shall be treated for purposes of this Agreement as a distribution to such Partner (or former Partner); and

(iv) the Partnership may deduct from, and set off against, any distribution or other amount otherwise due or payable to a Partner (or former Partner) by the Partnership pursuant to this Agreement or otherwise, the payment obligations of such Partner (or former Partner) under clauses (i) or (ii) of this Section 14.8(b).

- 61 -

(c)  The provisions of this Section 14.8, including the obligations of each Partner (or former Partner) shall survive the transfer by such Partner of its Interest in the Partnership and the dissolution of the Partnership.

Section 14.9.  **Safe Harbor Election and Forfeiture Allocations.**

(a)  The Partners agree that the General Partner may (but is not required to) make an election, on behalf of itself and of all Partners, to have the "Safe Harbor" of Section 3.03 of IRS Notice 2005-43 (or the corresponding provision in any Revenue Procedure or regulation issued pursuant to the provisions of such notice) (the "*Safe Harbor*") apply irrevocably with respect to all Interests transferred in connection with the performance of services by a Partner in a partner capacity or in anticipation of becoming a Partner (such election, the "*Safe Harbor Election*"), including the General Partner's Carried Interest. The Safe Harbor Election shall be effective as of the date hereof. The Partnership and each Partner agree to comply with all requirements of the Safe Harbor with respect to all Interests in the Partnership transferred in connection with the performance of services by a Partner in a partner capacity or in anticipation of becoming a Partner, whether such Partner was admitted as a Partner or as a transferee of a previous Partner. The General Partner shall cause the Partnership to comply with all record-keeping requirements and other administrative requirements with respect to the Safe Harbor as shall be required by proposed or final regulations relating thereto, to the extent the General Partner so determines in its sole discretion.

(b)  The Partners agree (for all purposes including Rev. Proc. 93-27 and similar provisions of subsequent law or IRS administrative interpretation) that (i) the General Partner's Carried Interest issued hereunder is a "Safe Harbor Partnership Interest" within the meaning of Section 3.02 of IRS Notice 2005-43 (or the corresponding provision in any Revenue Procedure or Treasury Regulation issued pursuant to the provisions of such Notice) and represents a profits interest received for services rendered or to be rendered to or for the benefit of the Partnership by the General Partner, and (ii) the "fair market value" of the Safe Harbor Partnership Interest and the Carried Interest upon receipt by the General Partner, as of the date of issuance on the date hereof is zero, representing the liquidation value of such interest upon receipt on the date hereof (with such valuation being consented to and approved by all Partners).

(c)  Each Partner, by signing this Agreement or by accepting such transfer, hereby agrees (i) to comply with all requirements of the Safe Harbor Election with respect to the Safe Harbor Partnership Interests while the Safe Harbor Election remains effective, and (ii) that to the extent that such profits interest is forfeited after the date hereof and to the extent that allocations of income have been made to the General Partner, with respect thereto and have not been matched with corresponding allocations of loss or deduction with respect thereto, or Distributions with respect thereto that may be retained by the General Partner, the Partnership shall make special forfeiture allocations of gross items of deduction or loss (including, as may be permitted by or under Treasury Regulations to be adopted, notional items of deduction or loss) in accordance with IRS Notice 2005-43 and the Treasury Regulations adopted under Code Sections 704(b) and 83.

(d)  The General Partner shall file or cause the Partnership to file all returns, reports and other documentation as may be required, as determined by the General Partner, to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     CHHEDA-TRANLLC-RC-00000194

perfect and maintain the Safe Harbor Election with respect to transfers of the Safe Harbor Partnership Interests without further vote or action of any other Person.

(e)     The General Partner is hereby authorized, without further vote or action of the Partners or any other Person, to amend this Agreement as necessary to comply with the Safe Harbor requirements, in order to provide for a Safe Harbor Election and the ability to maintain the same, and shall have the authority to execute any such amendment by and on behalf of each Partner pursuant to the power of attorney granted by this Agreement. Any undertaking by the Partners necessary to enable or preserve a Safe Harbor Election may be reflected in such amendments and, to the extent so reflected, shall be binding on each Partner.

(f)     Each Partner agrees to cooperate with the General Partner to perfect and maintain any Safe Harbor Election, and to timely execute and deliver any documentation with respect thereto reasonably requested by the General Partner at the expense of the Partnership.

(g)     No Transfer of any Interest in the Partnership by a Partner shall be effective unless prior to such Transfer, the assignee or intended recipient of such Interest shall have agreed in writing to be bound by the provisions of this Section 14.9, in a form satisfactory to the General Partner.

## ARTICLE XV

## MISCELLANEOUS

Section 15.1.   **Notices**.

(a)     Any notice to any Partner shall be at the mailing address or e-mail address of such Partner set forth in such Partner's <u>Schedule A</u> or such other mailing address or e-mail address of which such Partner shall advise the General Partner in writing; *provided*, that any notice to the Partnership or the General Partner shall be sent to its principal office. The General Partner may at any time change the location of the principal office. Notice of any change shall be given to the Partners on or before the date of any such change.

(b)     Any notice shall be deemed to have been duly given (i) if personally delivered, upon delivery, (ii) if sent by e-mail or telecopy on a Business Day, if there is no electronic notice of failure of delivery, when sent (or, if not sent on a Business Day, on the next Business Day), (iii) if sent by a nationally recognized overnight courier service, on the date of delivery to such service, or (iv) if sent by mail (certified or registered), on the date on which the piece of mail containing such communication is posted. The time to respond to any notice shall run from the date of actual delivery (or attempted delivery if delivery is refused during normal business hours on a Business Day).

Section 15.2.   **Governing Law; Separability of Provisions**.

(a)     All questions concerning the construction, interpretation and validity of this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether in the State of Delaware or any other jurisdiction) that would cause the application of the laws of

- 63 -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                          CHHEDA-TRANLLC-RC-00000195

any jurisdiction other than the State of Delaware. Notwithstanding anything to the contrary contained in this Agreement (including any provision of this Agreement that is modified by the phrase "notwithstanding anything to the contrary contained in this Agreement" or words of similar import and effect), each provision of this Agreement shall be enforceable to the extent (and only to the extent) permitted by non-waivable provisions of the Delaware Act. In furtherance of the foregoing, and to the fullest extent permitted by law, the law of the State of Delaware shall control the interpretation and construction of this Agreement, even if under such jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily or necessarily apply.

(b)     The Partners desire, intend and agree that the provisions of this Agreement should be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if a court of competent jurisdiction shall adjudicate any particular provision of this Agreement to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 15.3.   [RESERVED]

Section 15.4.   **Waiver of Jury Trial; Expedited Arbitration**. Any claim, dispute or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement or any conflict of interest between the General Partner and the Partnership ("***Controversy***") shall be settled by arbitration pursuant to this section. In the event of such a Controversy, the complaining party shall deliver to the other a "***Dispute Notice***," which shall describe the Controversy with particularity. Within 10 days after receipt of any such Dispute Notice, the parties thereto shall meet and confer in person with fully authorized and empowered executives and with counsel regarding the matters set forth in the Dispute Notice and shall attempt in good faith to resolve all issues described therein. Unless otherwise agreed in writing by the negotiating parties, the above-described negotiation shall take place at a mutually acceptable time and place, and end at the close of the first meeting of executives and counsel described above. To the extent the parties either are not able to meet or otherwise are not able to resolve the Controversy within the time stated (unless extended by mutual agreement), such Controversy shall be determined by binding arbitration under and pursuant to JAMS' Streamlined Arbitration Rules (where the amount in controversy, not including estimated attorneys' fees or costs, is less than $250,000) or JAMS' Comprehensive Arbitration Rules And Procedures (where the amount in controversy, not including estimated attorneys' fees or costs, equals or exceeds $250,000). The arbitration shall proceed before one arbitrator, who, to the extent practicable, shall be a retired Article III federal court judge negotiated and agreed on by the parties. If the parties are unable to agree upon such an arbitrator within 30 days after the demand for arbitration is filed, then JAMS shall appoint a sole arbitrator in accordance with its rules ("***Rules***"). Nothing in this Section 15.3

- 64 -

precludes any of the parties from seeking injunctive and/or emergency relief (including, among other things, a temporary restraining order) from a court of competent jurisdiction. The prevailing party in any arbitration shall be reimbursed for its attorneys' fees by the non-prevailing party.

Notwithstanding anything to the contrary contained in such Rules, (i) the arbitrator, in deciding any Controversy, shall base his or her decision on the record and in accordance with this Agreement and applicable law, (ii) in no event shall the arbitrator make any ruling, finding or award that does not conform to the terms and conditions of this Agreement, is not supported by the weight of the evidence, or is contrary to statute, administrative regulations or established judicial precedents, (iii) the arbitration award shall be a factually detailed, reasoned opinion stating the arbitrator's findings of fact and conclusions of law, and (iv) any such arbitration, including the final hearing, shall be held in the State of Delaware, unless the parties mutually agree upon some other location, or unless another location is mandated by law, and (v) pending adjudication and subject to reallocation as provided therein, all costs of the arbitrator (including costs of administration by JAMS, excluding attorney's fees) shall be borne equally by the parties thereto.

Notwithstanding any provision of the Agreement to the contrary, this Section 15.3 shall be construed to the maximum extent possible to comply with the laws of the State of Delaware, including the Uniform Arbitration Act (10 Del. C. § 5701 *et seq.*) (the "***Delaware Arbitration Act***"). If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this Section 15.3, including any JAMS' Streamlined Arbitration Rules or JAMS' Comprehensive Arbitration Rules And Procedures, shall be invalid or unenforceable under the Delaware Arbitration Act, or other applicable law, such invalidity shall not invalidate all of this Section 15.3. In that case, this Section 15.3 shall be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of the Delaware Arbitration Act or other applicable law, and, in the event, such term or provision cannot be so limited, this Section 15.3 shall be construed to omit such invalid or unenforceable provision.

Section 15.5. **Entire Agreement**. Except as the same may be amended in accordance with Section 11.1, this Agreement sets forth the entire understanding of all parties hereto. Notwithstanding anything to the contrary contained in this Agreement, the parties hereto acknowledge that the Partnership or the General Partner, without any further act, approval or vote of any Limited Partner, may enter into side agreements or other writings (collectively, the "***Side Letters***") with individual Limited Partners which have the effect of establishing rights under, or altering or supplementing, the terms of, this Agreement; *provided, however*, that the economic terms set forth in any such Side Letter shall not affect the economic rights of any other Limited Partner under any provision of this Agreement and such economic terms shall be determined solely as between such Limited Partner and the General Partner. The parties hereto agree that any rights established, or any terms of this Agreement altered or supplemented, in any such Side Letter with a Limited Partner shall govern with respect to such Limited Partner (but not any of such Limited Partner's assignees or transferees unless so specified in such Side Letter) notwithstanding any other provision of this Agreement or the Subscription Agreement.

Section 15.6. **Binding Provisions; Third Party Beneficiaries**. Subject to any rights granted to a lender pursuant to Section 5.1(c), Article VIII and Article IX and to the fullest extent permitted by law, the covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, personal or legal representatives, successors

- 65 -

 CHHEDA-TRANLLC-RC-00000197

and assigns of the respective parties hereto; except that, to the fullest extent permitted by law, the provisions herein relating to contribution of capital to the Partnership are for the benefit of the Partners only, and not for the benefit of any third party. Nothing expressed or referred to in this Agreement shall be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except that Indemnitees, the Liquidating Trustee and the persons indemnified pursuant to Article VI are intended third party beneficiaries of the provisions of Article VI with the right to enforce those provisions as provided in this Agreement as if they were Limited Partners who were subject to such provisions (including this Section 15.6).

Section 15.7. **No Waiver**. The failure of any Partner to seek redress for violation, or to insist on strict performance, of any covenant or condition of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

Section 15.8. **Confidentiality**.

(a) All information relating to the General Partner, the Partnership, the Parallel Investment Vehicles, their Subsidiaries, any Investment or the business or operations of such Persons (including processes, plans, data, reports, drawings, documents, business secrets, financial information or information of any other kind) received by any Limited Partner ("*Confidential Information*") shall be received and maintained in confidence by such Limited Partner. Notwithstanding anything contained in this Agreement to the contrary, each Partner's counterpart Schedule A to this Agreement shall be considered a confidential document of the Partnership, and the General Partner and, unless waived by the General Partner in its sole discretion, no Limited Partner shall have the right to receive, copy, or review all or any portion of any other Partner's Schedule A. Limited Partners may be asked to sign separate and additional non-disclosure agreements in connection with their investment in the Partnership.

(b) Confidential Information may be used by Limited Partners only for the purpose of monitoring their investments in the Partnership (the "*Permitted Purpose*"). The Limited Partners agree that they will not use any Confidential Information for any other purpose, including use in conducting or furthering their own business or that of any Affiliates or any competing business.

(c) The obligations of limited use and nondisclosure contained in this Section 15.8 will not: (i) restrict the disclosure of Confidential Information to a Limited Partner's attorneys, tax advisors, accountants or other professional advisors or consultants who have a reason to have access to such Confidential Information in connection with their duties and responsibilities to such Limited Partner relating to the Permitted Purpose (so long as such Persons are under an obligation of confidentiality consistent with the terms of this Section 15.8); (ii) restrict the disclosure of Confidential Information by a Limited Partner to the extent such disclosure is required by any governmental or regulatory authority or court entitled by law to such disclosure, or that is required by law to be disclosed, *provided*, that such Limited Partner promptly notifies the General Partner when such requirement to disclose arises (but only to the extent such notification by such Limited Partner is permitted by law) to enable the General Partner to seek an appropriate protective order and to make known to such governmental or regulatory authority or

- 66 -

court the proprietary nature of the Confidential Information and to make any applicable claim of confidentiality in respect thereof, and *provided, further*, that such party shall only make such disclosure to the extent it is required to do so by law; (iii) restrict the disclosure of Confidential Information by a Limited Partner to the extent permitted with the written consent of the General Partner; or (iv) apply to information that (x) was publicly known or otherwise known to a Limited Partner prior to the time it was disclosed pursuant to this Agreement and was not otherwise subject to any restriction on disclosure by such Limited Partner, (y) subsequently becomes publicly known through no act or omission by a Limited Partner or any Person acting on a Limited Partner's behalf, or (z) otherwise becomes known to a Limited Partner without breach of this Agreement (other than through disclosure by the Partnership or the General Partner) or any other contractual, legal, or fiduciary obligation and is not otherwise subject to any restriction on disclosure by such Limited Partner. Each Limited Partner agrees: (A) to cooperate in any appropriate action that the General Partner may decide to take to prevent or minimize the disclosure of such Confidential Information; (B) that all Confidential Information is and will be the exclusive property of the General Partner and its Affiliates, and upon the request of the General Partner, a Limited Partner shall immediately return, delete or destroy all Confidential Information, including all copies or derivations thereof, held by such Limited Partner (other than Confidential Information that constitutes tax information or other financial information necessary for such Limited Partner's internal and external audit activities); and (C) that the misappropriation or unauthorized disclosure of Confidential Information by a Limited Partner is likely to cause substantial and irreparable damage to the Partnership and/or one or more Affiliates such that damages may not be an adequate remedy for breach of this Section 15.8; accordingly, the Partnership and General Partner and its Affiliates shall be entitled to seek injunctive and other equitable relief, in addition to all other remedies available to them at law or at equity, and, to the fullest extent permitted by law, no proof of special damages shall be necessary for the enforcement of this Section 15.8.

(d)     Notwithstanding any provision contained herein to the contrary, unless otherwise required by applicable law, the General Partner shall not be required to disclose any information relating to any Investments to any Limited Partner who is subject to any law, rule or regulation that would require such Limited Partner to publicly disclose such information upon request of a third party or otherwise.

(e)     Each Limited Partner hereby consents to the disclosure by the General Partner of its identity and its investment in the Partnership or any Parallel Investment Vehicle or co-investment with the Partnership and any Affiliates (and other information concerning such Limited Partner and its Affiliates) (i) in order to demonstrate compliance or to comply with any laws, rules or regulations to which the Partnership, the General Partner, any Affiliate thereof, or any financial institution or any other service provider providing services to any of the foregoing is or becomes subject, (ii) if the contents thereof are relevant to any issue in any action, suit, or proceeding to which the Partnership, the General Partner or any Affiliate thereof is a party or by which it is or may be bound, (iii) to establish the availability under any applicable law of an exemption from registration of Interests in the Partnership, (iv) in response to requests for information by other investors in the Partnership or Partnership lenders or regulatory or law enforcement authorities, (v) if the General Partner believes in its sole discretion that doing so will be beneficial to the Partnership's business or that of another entity sponsored by the General Partner, and its Affiliates (and to its professionals under a duty of confidentiality) or other investment programs sponsored by the General Partner or its Affiliates, and (vi) to prospective

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER            CHHEDA-TRANLLC-RC-00000199

financial sources or to other parties who request such information in connection with conducting business with the Partnership (including brokers, purchasers, sellers or tenants); *provided,* that the General Partner shall not disclose the identity of any Limited Partner and its investment pursuant to Section 15.8(e) upon the prior written notice from the Limited Partner to the General Partner.

(f)     Each Limited Partner hereby consents to the use by the General Partner of the Partnership's performance data in subsequent offerings and in connection with future borrowings.

(g)     The General Partner will have the right to show any investor's Side Letter to (or provide an investor's identity to) any other investor, prospective investor, or lender (and to its professionals under a duty of confidentiality), however, the General Partner will have no obligation to do so except to the extent provided for in an investor's Side Letter.

(h)     Unless approved by the General Partner, to the fullest extent permitted by law, no Limited Partner shall have the right to receive a copy of any other Limited Partner's Schedule A or receive any information about any other Limited Partner who is not an Affiliate of the General Partner.

(i)     Notwithstanding anything to the contrary contained in this Agreement, the General Partner, in its own name and on behalf of the Partnership, shall be authorized without the consent of any Person, including any other Limited Partner, to take such lawful action as it determines in its sole discretion to be necessary or advisable to comply with the Bank Secrecy Act, the USA PATRIOT Act, and any other anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures. The Partnership and the General Partner also reserve the right to refuse to make any Distribution or other payment to a Limited Partner if the General Partner suspects or is advised that such payment might result in a breach or violation of any applicable anti-money laundering, anti-terrorist or other laws or regulations by any Person in any relevant jurisdiction, or if such refusal is considered necessary or appropriate to ensure the compliance by the Partnership, the General Partner, the Manager and their Affiliates with any such laws or regulations in any relevant jurisdiction.

Section 15.9.  **No Right to Partition**. To the fullest extent permitted by law, and except as otherwise expressly provided in this Agreement, the Partners, on behalf of themselves and their shareholders, members, partners, heirs, executors, administrators, personal or legal representatives, successors and assigns, if any, hereby specifically and irrevocably renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for voluntary dissolution or for partition of the Partnership, any Subsidiary or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to any such property may be held.

Section 15.10. [RESERVED]

Section 15.11. **Remedies Cumulative**. The remedies of the General Partner and the Partners under this Agreement are cumulative and shall not exclude any other remedies to which the acting party may lawfully be entitled.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                 CHHEDA-TRANLLC-RC-00000200

Section 15.12. **Counterparts; E-Mail Signatures**. This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument; *provided*, that each such counterpart shall be executed by the General Partner. E- mail counterpart signatures to this Agreement shall be acceptable and binding.

Section 15.13. **Partner Communications**. If any Partner, other than the General Partner or if formed, a member of the Advisory Committee, desires to contact any other Partner, or group of Partners, with respect to any matter related to the Partnership, the Partner seeking to initiate communications may send a written request to the General Partner for a list of Partners and the most recent mailing address of each such Partner. If such information must be provided by non-waivable provisions of applicable law, the General Partner will provide such information to such Partner. The requesting Partner must first provide, with the request, a brief summary of the business purpose for the request and intended use of the information (the "*Proposal*") to the General Partner. Notwithstanding anything to the contrary in this Agreement, but subject to the express requirements of this Section 15.13, pursuant to Section 17-305(f) of the Delaware Act, each Partner hereby waives any right to receive a current list of the names and last known addresses of the other Partners.

Section 15.14. **Force Majeure**. Whenever any act or thing is required of the Partnership, the General Partner or the Manager hereunder to be done within any specified period of time, the Partnership, the General Partner and the Manager shall be entitled to such additional period of time to do such act or thing as shall equal any period of delay resulting from causes beyond the reasonable control of the Partnership, the General Partner, or the Manager, as the case may be, including bank holidays, actions of governmental agencies, acts of God, terrorist acts and financial crises of a nature materially affecting the purchase and sale of securities; *provided*, that this provision shall not have the effect of relieving the Partnership, the General Partner or the Manager from the obligation to perform any such act or thing.

Section 15.15. **UCC Article 8 Election**. Each limited partnership Interest in the Partnership shall constitute a "security" within the meaning of, and be governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 and the Partnership hereby "opts-in" to such provisions for the purpose of the Uniform Commercial Code.

Section 15.16. **Ownership and Use of Name**. The entire right, title and interest to the name "Takeoff," "TKF" or "TKF II" and the goodwill attached thereto are the sole and exclusive property of the Manager, which rights shall survive the liquidation and termination of the Partnership. The Manager and its Affiliates shall have the right to use the name "Takeoff," "TKF" or "TKF II" in other funds that may be sponsored by the Manager or any Affiliate. Upon any removal of the General Partner, the Partnership shall immediately cease using the name "Takeoff," "TKF" or "TKF II" and shall execute and deliver to the Manager an assignment of any and all right, title and interest in and to such name. This Section 15.16 shall not be amended without the consent of the Manager.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     CHHEDA-TRANLLC-RC-00000201

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

Section 15.17. **Legal Counsel and Other Professionals**. Each Partner hereby agrees and acknowledges that:

(a)    The General Partner and its Affiliates have retained Baker & McKenzie LLP in connection with the formation of the General Partner, the Partnership and the Parallel Investment Vehicles (and their Subsidiaries and Affiliates) and expect to retain such firm and other legal counsel (collectively, "*Law Firms*") in connection with the operation of the General Partner, the Partnership, and the Parallel Investment Vehicles (and their Subsidiaries and Affiliates) including making, holding and disposing of Investments. In addition, Baker & McKenzie LLP represents, and the other Law Firms may represent, ES with respect to a variety of other matters. The Law Firms are not representing and will not represent the Limited Partners (or the investors of any Parallel Investment Vehicle) in connection with the formation of the Partnership and the Parallel Investment Vehicles (and their Subsidiaries and Affiliates), the offering of Interests or interests in the Parallel Investment Vehicles, the management and operation of the Partnership and the Parallel Investment Vehicles (and their Subsidiaries) or any dispute which may arise between the Limited Partners on the one hand and the General Partner, the Partnership, any Parallel Investment Vehicle (or their respective Subsidiaries) or any Affiliate of the General Partner, on the other hand.

(b)    To the fullest extent permitted by law, no Law Firm, appraiser, accountant or other professional who at any time provides services to the General Partner, the Partnership, any Parallel Investment Vehicle (or their respective principals and subsidiaries and their Affiliates) or their respective Affiliates shall be disqualified from acting in such capacity because such Person also provides other services to the Partnership, the General Partner, any Parallel Investment Vehicle or any Affiliates or Subsidiaries of any such Persons in connection with the transactions contemplated by this Agreement or any other transactions (whether related or unrelated to this Agreement) at any time, and all conflicts of interest in connection with such Law Firm representations are hereby waived by each Partner.

Section 15.18. **Confidentiality of Investor Identity**. Except as otherwise required by non-waivable provisions of applicable law, unless the General Partner otherwise determines in its sole discretion, no Limited Partner shall be entitled to receive disclosure of the identity of any other Limited Partner or the identity of any investor in a Parallel Investment Vehicle.

Section 15.19. **Authorized Representatives**. The "*Authorized Representatives*" of a Partner that is not a natural person shall be those representatives named by a Limited Partner in such Limited Partner's Subscription Agreement. The written statements and representations of an Authorized Representative for a Limited Partner that is not a natural Person shall be the only authorized statements and representations of such Limited Partner with respect to the matters covered by this Agreement. The written statement or representation of any one Authorized Representative of such Limited Partner shall be sufficient to bind such Limited Partner with respect to all matters pertaining to the Partnership. The term "approved by" or "consented to by" or "consent of" or "satisfactory to" (or words of similar meaning) with respect to a Limited Partner that is not a natural person means a decision or action which has been consented to in writing by the Authorized Representative of such Limited Partner, and with respect to a Limited Partner who is an individual, means a decision or action which has been consented to in writing by such individual. The initial authorized representatives for the General Partner is Mr. William Schlacks.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CHHEDA-TRANLLC-RC-00000202

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

Section 15.20. **Disqualifying Events**. Limited Partner acknowledges that the Partnership may be precluded from relying on SEC Regulation D Rule 506 under the Securities Act, if a Partner having 20% or more of the Partnership's voting securities or any person deemed to be a direct or indirect beneficial owner (as defined for purposes of Rule 13d-3 pursuant to the Securities and Exchange Act of 1934, as amended) of such voting securities (each, a "***Rule 506(d) Covered Person***"), is subject to a disqualifying event, as described in Rule 506(d)(i) through 506(d)(viii) (each, a "***Disqualifying Event***"). Accordingly, if (i) a Rule 506(d) Covered Person is or is reasonably likely to become subject to any Disqualifying Event, such Limited Partner, on behalf of the Rule 506(d) Covered Person, shall promptly notify the General Partner, regardless of the Limited Partner's percentage ownership of the Partnership, (ii) the General Partner notifies the Limited Partner that the Limited Partner's percentage ownership of the Partnership is over or approaching the relevant threshold, the Limited Partner shall promptly provide, or shall cause the applicable Rule 506(d) Covered Person to provide, any information reasonably requested by the General Partner to determine whether a Disqualifying Event may have occurred, and (iii) at any time the Limited Partner holds 20% or more of the Partnership's voting securities, if the General Partner reasonably determines that a Limited Partner or its Rule 506(d) Covered Persons may have experienced a Disqualifying Event such that the Fund may not rely on the safe harbor from registration set forth under Rule 506, the Limited Partner hereby agrees to waive such portion of its voting, consent or similar rights sufficient to reduce the Limited Partner's voting, consent or similar rights to less than 20% of such rights, *provided*, that any such waiver shall not impact such Limited Partner's economic interest in the Partnership.

[SIGNATURE PAGE TO FOLLOW]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CHHEDA-TRANLLC-RC-00000203

IN WITNESS WHEREOF, the parties have executed this Limited Partnership Agreement as of the date first above written.

**GENERAL PARTNER**:

TKF II GP, LLC

By: _William Schlacks_
Name: William Schlacks
Title:　Managing Member


**INITIAL LIMITED PARTNER**:

EQUIPMENTSHARE.COM INC

By: _Trevor Schauenberg_
Name: Trevor Schauenberg
Title:　CFO

[Signature Page to Limited Partnership Agreement]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## SCHEDULE A*

### Limited Partners' and General Partner's (and Affiliated Limited Partners')

### Capital Commitments

| General Partner and Affiliated Limited Partners | Initial Capital Contribution | Percentage of Ownership of TKF at Initial Close | Total Possible Capital Commitment |
|---|---|---|---|
| Arken, LLC | $500,000 | 12.5% | $2,000,000 (with flexibility to reduce or eliminate the remaining $1.5 million) |

| Limited Partners | Initial Capital Contribution | Percentage of Ownership of TKF at Initial Close | Total Possible Capital Commitment |
|---|---|---|---|
| EquipmentShare. com Inc. | $3,000,000 | 75% | $12,000,000 (with flexibility to reduce or eliminate the remaining $9 million) |
| RC Opportunity LLC | $500,000 | 12.5% | $2,000,000 (with flexibility to reduce or eliminate the remaining $1.5 million) |

Date: As of October 28, 2022.

* Separate Schedule A to be prepared for each Partner. Schedule A to be updated by the General Partner without the signature of any Limited Partner being required as provided in Section 11.1.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CHHEDA-TRANLLC-RC-00000205

**EXHIBIT A**
**DEFINITIONS**

"*Additional Limited Partner*" has the meaning set forth in Section 3.6(b)(i).

"*Adjusted Capital Account Deficit*" means, with respect to any Partner, the deficit balance, if any, of the Partner's Capital Account as of the end of the Fiscal Year, after giving effect to the following adjustments: (i) there shall be credited to the Partner's Capital Account any amounts that the Partner is obligated to restore pursuant to the terms of this Agreement or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-l(b)(2)(ii)(*c*), the second sentence of Treasury Regulations Section 1.704-2(g)(1), and the second sentence of Treasury Regulations Section 1.704-2(i)(5); and (ii) there shall be debited to the Partner's Capital Account the items described in Treasury Regulations Sections 1.704-l(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

"*Advisers Act*" has the meaning set forth in Section 9.1(b)(iii).

"*Advisory Committee*" has the meaning set forth in Section 7.1(a).

"*Affiliate*" means, with respect to a Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with,such Person, and with respect to the General Partner, its partners, officers and employees and their Immediate Family Members (including the Managing Members). The term "control" includes the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise. No entity in which the Partnership invests shall be deemed to be an Affiliate of the Partnership, the General Partner, or the Manager, as applicable, solely as a result of the investment or as a result of a Managing Member serving as a director of the entity.

"*Affiliated Limited Partner*" means any Affiliate of the General Partner or the Manager and the so-called "friends and family" investors making a Capital Commitment as referred to in Section 3.1 who acquires an Interest as a Limited Partner and who is designated as an Affiliated Limited Partner by the General Partner upon becoming a Limited Partner. The General Partner may treat any Limited Partner who is managed or financially advised by the same Person as any other Limited Partner as such Limited Partner's Affiliate. For clarity, Arken, LLC is an Affiliated Limited Partner.

"*Aggregate Commitments*" means the sum of the Capital Commitments and Parallel Investment Vehicle Commitments.

"*Aggregator Vehicle*" has the meaning set forth in Section 2.8(b).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

"***Agreement***" means this Limited Partnership Agreement of the Partnership (including the schedules and exhibits attached hereto) as originally executed and as amended, modified, supplemented or restated from time to time, in accordance with its terms, as the context requires.

"***Allocation Percentage***" means, with respect to each Partner as of any point in time, a fraction, the numerator of which is such Partner's Capital Commitment and the denominator of which is the aggregate Capital Commitments of all Partners, expressed as a percentage, as the same may be adjusted from time to time pursuant to the terms of this Agreement.

"***Allocation Provisions***" has the meaning set forth in Section 4.7(b).

"***Alternative Investment Vehicle***" has the meaning set forth in Section 2.8(a).

"***Annual Meeting***" has the meaning set forth in Section 12.2.

"***Authorized Representatives***" has the meaning set forth in Section 15.19.

"***Benefit Plan Investor***" means:

(a) an "employee benefit plan" within the meaning of Section 3(3) of ERISA that is subject to Title I of ERISA;

(b) a "plan" within the meaning of Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code; or

(c) any Person whose underlying assets are deemed to be "plan assets" by reason of an investment in the Person by an employee benefit plan or plan described in (a) or (b) under the Plan Assets Regulation or otherwise for purposes of Title I of ERISA or Section 4975 of the Code.

"***Break-up Fees***" means any fees received by the General Partner, the Manager, or any of their respective Affiliates, in connection with a potential Investment that is not ultimately made or a Disposition of an Investment that is not actually consummated.

"***Broken Deal Expenses***" means the costs of unconsummated investments (including, without limitation, all costs and expenses incurred in developing, investigating, negotiating, structuring or terminating any proposed Investment in which the Partnership does not actually invest and any liquidated damages, reverse termination fees or other similar payments incurred in connection with unconsummated investments).

"***Business Day***" means any day other than a Saturday, Sunday, or other day on which banks are authorized or required by law to be closed in New York, New York.

"***Capital Account***" means the separate account, maintained by the Partnership under Section 4.6, for each Partner in accordance with the principles and requirements set forth in Code Section 704(b) and the Treasury Regulations (with no double counting of items taken into account in the definition of Profits or Losses).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CHHEDA-TRANLLC-RC-00000207

"*Capital Commitment*" of a Partner means the amount set forth under the heading "Capital Commitment" opposite the name of such Partner on such Partner's Schedule A, as applicable, as each may be amended from time to time by the General Partner in accordance with this Agreement.

"*Capital Contributions*" of a Partner means, as of any date of determination, the total amount of all capital contributions such Partner has made to the capital of the Partnership pursuant to the terms of this Agreement as of that date, without regard to any repayment thereof

"*Capital Transaction Proceeds*" means all cash, securities and other property received by the Partnership in respect of any Investment or portion thereof (excluding non-cash proceeds, except to the extent that such portion or such proceeds are distributed to the Partners in kind), net of any indebtedness payment and any expenses or taxes borne by the Partnership in connection with such Investment (or proceeds with respect to thereto), but not including Current Income.

"*Carried Interest*" means the amounts distributed to the General Partner under Section 4.2(b).

"*Carried Interest Tax Distribution*" has the meaning set forth in Section 4.4.

"*Carried Interest Tax Liability*" has the meaning set forth in Section 4.4.

"*Cause Event*" shall be deemed to have occurred if (A) any of the Managing Members is convicted of committing fraud, embezzlement or a similar felony involving misappropriation of funds; (B) any of the Managing Members, the General Partner, or the Manager, is the subject of a determination by a court or arbitrator of competent jurisdiction (or the entry of an order of such a court upon settlement of any litigation which stipulates) that he/it has acted in a manner constituting fraud or willful misconduct in the discharge of a duty under this Agreement that has a material adverse effect on the Partnership, or (C) any of the Managing Members, the General Partner, or the Manager is the subject of a determination by a court or arbitrator of competent jurisdiction (or the entry of an order of such a court upon settlement of any litigation which stipulates) that he/it has breached this Agreement in a manner that has a material adverse effect on the Partnership.

"*Certificate*" means the Certificate of Limited Partnership of the Partnership filed with the Office of the Secretary of State of the State of Delaware pursuant to Section 2.5, as the same may be amended from time to time in accordance with the terms and conditions of this Agreement.

"*Claims*" has the meaning set forth in Section 6.1(b).

"*Clawback Amount*" has the meaning set forth in Section 10.3(a).

"*Closing*" means each event of consummation of the admission of Limited Partners to the Partnership on any Closing Date.

"*Closing Date*" means each date as of which the General Partner accepts Subscription Agreements from any prospective Limited Partners, as determined by the General Partner in its sole discretion.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended from time to time, or any successor federal income tax code.

"*Confidential Information*" has the meaning set forth in Section 15.8(a).

"*Consent*" has the meaning set forth in Section 12.1.

"*Controlling Person*" means:

(a)     a Person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the Partnership's assets;

(b)     a Person (other than a Benefit Plan Investor) that provides investment advice for a fee (direct or indirect) with respect to the Partnership's assets; or

(c)     any "affiliate" (other than a Benefit Plan Investor) within the meaning of paragraph (f)(3) of the Plan Assets Regulation of such a Person described in clause (a) or (b).

"*Converted Management Fee*" has the meaning set forth in Section 5.6(e)(iii).

"*Current Income*" means, with respect to an Investment for any period, interest, dividend, management fee, and similar income from Investments held by the Partnership.

"*Default Date*" has the meaning set forth in Section 3.5(b).

"*Default Loan*" has the meaning set forth in Section 3.5(b).

"*Default Notice*" has the meaning set forth in Section 3.5(b).

"*Default Portion*" has the meaning set forth in Section 3.5(i).

"*Defaulted Interest*" has the meaning set forth in Section 3.5(c).

"*Defaulting Investor*" has the meaning set forth in Section 3.5(i).

"*Defaulting Partner*" has the meaning set forth in Section 3.5(b).

"*Delaware Act*" has the meaning set forth in Section 2.1.

"*Delaware Arbitration Act*" has the meaning set forth in Section 15.3.

"*Disposition of an Interest*" means, with respect to any Interest or any portion thereof, a sale, assignment, transfer, pledge, hypothecation, conveyance, gift, exchange or other disposition of such Interest, whether such disposition be voluntary, involuntary or by operation of law. A Disposition of an Interest shall not include a merger or consolidation of a Person or a conversion

of a Person into another type of Person, so long as the Persons holding a majority of the voting power of such Person immediately prior to such merger, consolidation or conversion continue to hold a majority of the voting power of such Person thereafter. A Disposition of an Interest shall include the following: (a) in the case of an asset owned by a Person, a Distribution of such asset in connection with the dissolution, liquidation, winding up or termination of such Person (unless, in the case of dissolution, such Person's business is continued without the commencement of liquidation or winding up); and (b) a disposition in connection with, or in lieu of, a foreclosure of an encumbrance. With respect to any Interest, "Dispose," "Disposed" and "Disposing" have correlative meanings.

"*Disposition of an Investment*" or "*Disposition*" with respect to an Investment means the sale, exchange, or other disposition by the Partnership of all or any portion of such Investment for cash or property, and shall include the receipt by the Partnership of a liquidating dividend or other like Distribution in cash on such Investment and shall also include the Distribution in-kind of all or any portion of that Investment.

"*Distributable Cash Flow*" has the meaning set forth in Section 4.1(b).

"*Distributions*" means and refers to amounts from time to time distributed to the Partners pursuant to Article IV and Article X.

"*Drawdown Amount*" has the meaning set forth in Section 3.3(a).

"*Drawdown Date*" has the meaning set forth in Section 3.3(a).

"*Drawdown Notice*" has the meaning set forth in Section 3.3(a).

"*Due Date*" means the date on which the Capital Contributions are due to the Partnership.

"*Economic Capital Account*" means, with respect to any Partner, such Partner's Capital Account as of the date of determination, after crediting to such Capital Account any amounts that the Partner is deemed obligated to restore under Treasury Regulations Section 1.704-2.

"*Effective Date*" has the meaning set forth in Section 2.1.

"*ERISA*" means the U.S. Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Limited Partner*" means:

(a)     a Limited Partner that is or is deemed to be a Benefit Plan Investor and has notified the General Partner in writing of the same; or

(b)     any Person to the extent that the General Partner has otherwise agreed in writing shall be treated as an ERISA Limited Partner.

"*ES*" means EquipmentShare.com Inc., a Delaware corporation.

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

"**Estimated Value Capital Account**" means, with respect to any Partner, the amount such Partner would receive in a hypothetical liquidation of the Partnership following a hypothetical sale of all of the assets of the Partnership at prices equal to their most recent Fair Values as determined in accordance with Section 5.3, and the Distribution of the proceeds thereof to the Partners pursuant to this Agreement (after the hypothetical payment of all actual Partnership Indebtedness, and any other liabilities related to the Partnership's assets, limited, in the case of non-recourse liabilities, to the collateral securing or otherwise available to satisfy such liabilities). The calculation of any Estimated Value Capital Account (including any valuation of the assets of the Partnership) shall be determined by the General Partner in its sole discretion.

"**Fair Value**" means the value of Partnership assets and Investments determined as provided in Section 5.3.

"**Feeder Fund**" means an entity formed by any Affiliate of the General Partner, or by any third party approved by the General Partner in its discretion, for the purpose of aggregating investor subscriptions that are intended for investment in the Partnership through such entity; unlike a Parallel Investment Vehicle that would invest side-by-side with the Partnership in an Aggregator Vehicle or an Investment.

"**Final Closing**" has the meaning set forth in Section 3.6(b)(i).

"**Final Closing Date**" means the date upon which the Final Closing occurs, which shall occur no later than eighteen (18) months following the Initial Closing Date.

"**First Limited Partners**" means each of EquipmentShare.com Inc., Arken LLC, and RC Opportunity LLC.

"**Fiscal Quarter**" means the calendar quarter or, in the case of the first and last fiscal quarters, the portion thereof commencing on the Initial Closing Date or ending on the date on which the winding up of the Partnership is completed, as the case may be.

"**Fiscal Year**" means the calendar year or, in the case of the first and the last fiscal years, the portion thereof commencing on the Initial Closing Date or ending on the date on which the winding up of the Partnership is completed, as the case may be.

"**Fund**" means and refers to the business and assets of the Partnership, any Parallel Investment Vehicles and any Feeder Funds, and any of their Subsidiaries, taken as a whole.

"**Fund Agreement**" means this Agreement and the limited partnership agreement or limited liability company agreement of each other Parallel Investment Vehicle.

"**Fund Entity**" has the meaning set forth in Section 5.5(b).

"**General Partner**" means TKF II GP LLC, a Delaware limited liability company, in its capacity as general partner of the Partnership and/or any other Person which becomes a Successor General Partner as provided herein in such Person's capacity as a general partner of the Partnership.

"*Giveback*" has the meaning set forth in Section 6.2(a).

"*Good Faith*" means a Person having acted in a manner such Person believes to be in, or not opposed to, the best interests of the Fund.

"*GP and Manager Expenses*" has the meaning set forth in Section 5.6(c).

"*Gross Asset Value*" means, with respect to any Investment or other asset of the Partnership, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed (or deemed contributed) by a Partner to the Partnership shall be the fair market value of such asset at the time of such contribution, as determined by the General Partner in Good Faith.

(b)     The Gross Asset Value of any Partnership asset distributed (or deemed distributed) to a Partner shall be the fair market value of such asset on the date of Distribution as determined by the General Partner in Good Faith.

(c)     The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective fair market values, as determined by the General Partner in Good Faith using such reasonable method of valuation as it may adopt, which shall not require an appraisal, as of the times listed below (provided, however, that notwithstanding anything contained herein to the contrary, the Partners acknowledge and agree that the General Partner will not, unless required to do so by the Code or the Treasury Regulations promulgated thereunder or the General Partner determines to do so in its sole discretion, adjust the Gross Asset Values of Partnership assets upon the admission of any Additional Limited Partners to the Partnership on or before the Final Closing Date):

(i)     immediately prior to the acquisition of an additional Interest in the Partnership by a new or existing Partner in exchange for more than a *de minimis* amount of Capital Contributions, if it is determined by the General Partner in Good Faith that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(ii)     immediately prior to the Distribution by the Partnership to a Partner of more than a *de minimis* amount of the Partnership property as consideration for an Interest if it is determined by the General Partner in Good Faith that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(iii)     immediately prior to the liquidation of the Partnership within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

(iv)     immediately prior to such other times as the General Partner shall determine (in Good Faith, after consulting with Partnership counsel) to be necessary or advisable in order to comply with Treasury Regulations Section 1.704-1(b) and 1.704-2, including upon the transfer or vesting of a compensatory interest in the Partnership as provided in the Treasury Regulations;

(d)     The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or

Code Section 743(b), however, only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*); *provided*, *however*, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) to the extent that the General Partner determines that an adjustment pursuant to subparagraph (b) or (c) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

(e) If the Gross Asset Value of a Partnership asset has been determined or adjusted pursuant to subparagraph (a), (c) or (d), such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"*Immediate Family Members*" of any Person, means the spouse, children (natural or adopted), brothers, sisters and parents of such Person.

"*Incapacity*" means, as to any Person, (i) the adjudication of incompetence or insanity, (ii) the filing of a voluntary petition in bankruptcy, the entry of an order of relief in any bankruptcy or insolvency proceeding or the entry of an order that such Person is a bankrupt or insolvent, (iii) any involuntary proceeding seeking liquidation, reorganization or other relief against such Person under any bankruptcy, insolvency or other similar law now or hereafter in effect that has not been dismissed 120 days after the commencement thereof, and (iv) the death, dissolution or termination (other than by merger or consolidation), as the case may be, of such Person.

"*Indebtedness*" means, with respect to any Person, (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property, goods or services, including reimbursement, and all other obligations contingent or otherwise of such Person with respect to repurchase agreements, surety bonds, letters of credit and bankers acceptances, whether or not matured, and hedges and other derivative contracts and financial instruments, (ii) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments and (iii) all indebtedness of others guaranteed by such Person (in each case, without duplication of any amount included pursuant to any other clause hereof). Notwithstanding anything to the contrary contained herein, neither any Investment by the Partnership nor any interest that is junior to the Partnership's interest in any Person, in each case, that would constitute Indebtedness pursuant to the preceding sentence, shall be considered Indebtedness for any purpose herein.

"*Indemnitee*" has the meaning set forth in Section 6.1(a).

"*Initial Closing*" means the first Closing at which a Limited Partner or Parallel Investment Vehicle Limited Partner (other than the Initial Limited Partner and the initial limited partner of any Parallel Investment Vehicle) was admitted and makes a Capital Contribution to the Fund.

"*Initial Closing Date*" means the date on which the Initial Closing was held.

"*Initial Limited Partner*" has the meaning set forth in the introduction to this Agreement.

"*Interest*" means the entire partnership interest owned by a Partner in the Partnership at any particular time, including such Partner's share of the profits and losses of the Partnership and the right to receive distributions of the Partnership's assets.

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

"*Investment*" means any debt or equity investment by the Partnership subject to the Investment Parameters whether directly or indirectly through one or more Persons.

"*Investment Committee*" has the meaning set forth in Section 7.1.

"*Investment Company Act*" means the Investment Company Act of 1940, as amended.

"*Investment Parameters*" means investments primarily in privately-held companies involved in the construction industry or companies that, in the General Partner's discretion, hold or may develop technology-based solutions relevant to the construction industry. The Fund will not invest in securities of any issuer that is not an existing portfolio company at the expiration of the Investment Period without the approval of the Advisory Committee.

"*Investment Period*" means the period commencing on the Initial Closing Date and ending on the earlier of (i) four (4) years after the Initial Closing Date and (ii) the date on which at least 70% of the aggregate amount of the Partners' Capital Commitments have been allocated; *provided*, that the General Partner may terminate the Investment Period early pursuant to the following occurrences:

(i) if the General Partner determines in its reasonable discretion that (a) after consulting with counsel, changes in applicable law have materially adversely affected the ability of the Partnership to achieve its investment objective, or (b) there are insufficient business opportunities consistent with the investment objectives of the Fund;

(ii) the day on which all Unused Capital Commitments have been drawn down, invested, committed or reserved; and

(iii) the date of any early termination of the Investment Period.

"*Law Firms*" has the meaning set forth in Section 15.17(a).

"*Limited Exclusion Right*" has the meaning set forth in Section 3.9(a).

"*Limited Partner*" means the Person(s) executing this Agreement or a counterpart signature page hereto as of the Initial Closing Date, and any other Person which becomes an Additional Limited Partner or a Substituted Limited Partner as provided herein, in such Person's capacity as a limited partner of the Partnership.

"*Liquidating Trustee*" has the meaning set forth in Section 10.2(a).

"*Majority in Interest*" means, as of any date of determination, Partners who are entitled to vote and who hold more than 50% of the Allocation Percentages held by Partners who are entitled to vote. In computing Majority in Interest, the Allocation Percentage held by the General Partner, the Manager, any Affiliated Limited Partners and any Defaulting Partners shall not be entitled to vote.

"*Management Fee*" has the meaning set forth in Section 5.6(a).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     CHHEDA-TRANLLC-RC-00000214

DocuSign Envelope ID: 63851314-F0B9-4C28-A521-44F675D6BDCC

"*Management Fee Due Date*" has the meaning set forth in Section 5.6(b).

"*Management Agreement*" has the meaning set forth in Section 5.2(g).

"*Manager*" means Takeoff Capital LLC, a Delaware limited liability company, or any other entity (which may or may not be an Affiliate of the General Partner, Romulus Capital Management LLC or Mr. Neil Chheda) chosen by the General Partner from time to time to be the Manager.

"*Managing Members*" means, individually or collectively, as the context may require, (i) Mr. William Schlacks and Mr. Jabbok Schlacks, and (ii) any other Person designated as a Managing Member by the General Partner.

"*Non-Default Portion*" has the meaning set forth in Section 3.5(i).

"*Operating Expenses*" has the meaning set forth in Section 5.5(a).

"*Opportunity Fund*" means any entity formed by the General Partner or an Affiliate thereof (including any related parallel funds, alternate investment vehicles and similarly related investment vehicles, as well as all successor funds thereto) to make: growth and late stage investments in companies; investments in portfolio companies of the Partnership or other funds managed by the General Partner of amounts that exceed such funds' capacity or desire to invest; "special situation," "opportunity" and other investments involving higher valuations, different risk-return profiles, smaller available ownership percentage amounts, fewer or non-standard investor rights and reduced opportunities to serve on boards of directors than those sought by the Partnership; or investments that do not operate in the sectors of the technology industry in which the Partnership invests.

"*Organizational Expenses*" has the meaning set forth in Section 5.5(b).

"*Parallel Investment Vehicle*" has the meaning set forth in Section 2.9(a).

"*Parallel Investment Vehicle Commitment*" means, with respect to each Parallel Investment Vehicle Partner, the amount of its capital commitment reflected in the books and records of such Parallel Investment Vehicle at any time.

"*Parallel Investment Vehicle Limited Partner*" means any Person that is listed as a limited partner, member or other equity holder of a Parallel Investment Vehicle in the books and records of such Parallel Investment Vehicle.

"*Parallel Investment Vehicle Partner*" means the general partner, managing member or other acting manager, applicable, of a Parallel Investment Vehicle or any Parallel Investment Vehicle Limited Partner.

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning given to it in Treasury Regulations Section 1.704-2(i)(3).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partners*" means the General Partner and the Limited Partners.

"*Partnership*" has the meaning set forth in the introduction to this Agreement.

"*Partnership Minimum Gain*" has the meaning given to it in Treasury Regulations Sections 1.704-2(d) and 1.704-2(g).

"*Partnership Representative*" has the meaning set forth in Section 14.8(a).

"*Payment Date*" has the meaning set forth in Section 6.2(a).

"*Permitted Purpose*" has the meaning set forth in Section 15.8(b).

"*Person*" means any individual, company, corporation, partnership, limited liability company, unincorporated organization or association, trust (including the trustees thereof in their capacity as such) or other entity.

"*Placement Fees*" if any, means (whether incurred before, on, or after the date hereof) all placement agent fees of any placement agent relating to the sale of Interests in the Fund, any Parallel Investment Vehicle or any Feeder Fund.

"*Plan Assets*" means "plan assets" within the meaning of the Plan Assets Regulation for purposes of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law.

"*Plan Assets Regulation*" means the U.S. Department of Labor "plan asset" regulation at 29 C.F.R. § 2510.3-101, as amended by Section 3(42) of ERISA, *et seq.*, as amended.

"*Prime Rate*" means the annual rate of interest published in the Wall Street Journal from time to time as the "Prime Rate" or a comparable source selected by the General Partner in its reasonable discretion.

"*Private Placement Memorandum*" means that certain Confidential Private Placement Memorandum of the Fund pursuant to which Interests are being offered (as amended or supplemented from time to time).

"*Profits*" or "*Losses*" means, for each Fiscal Year or other period, except as provided herein, the net profit or net loss of the Partnership for "book" or Capital Account purposes pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv). Without limiting the generality of the preceding sentence, "Profits" or "Losses" means the taxable income or loss of the Partnership, or particular items thereof, determined in accordance with the accounting method used by the Partnership for United States federal income tax purposes (which shall be the accrual method unless otherwise required by law), with the following adjustments: (a) all items of income, gain, loss or deduction allocated other than pursuant to Section 4.7 shall not be taken into account in computing such taxable income or loss (however, the amount of such items available for allocation shall be determined by applying rules analogous to the rules set out in clauses (b) through (e) below); (b)

any income of the Partnership that is exempt from United States federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss; (c) if the Gross Asset Value of any asset differs from its adjusted tax basis for United States federal income tax purposes, then any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Gross Asset Value; (d) upon an adjustment to the Gross Asset Value of any asset (other than an adjustment in respect of depreciation, amortization or other cost recovery deductions) pursuant to the definition of Gross Asset Value, the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss; and (e) if the Gross Asset Value of any asset differs from its adjusted tax basis for United States federal income tax purposes, then the amount of the depreciation, amortization or cost recovery deduction with respect to such asset for purposes of determining Profits or Losses shall be an amount that bears the same ratio to such Gross Asset Value as the United States federal income tax depreciation, amortization or other cost recovery deduction bears to such adjusted tax basis; *provided*, that if the United States federal income tax depreciation, amortization or other cost recovery deduction is zero, then the General Partner may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Profits or Losses.

"*Prohibited Limited Partner*" means any Person who is (i) a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization," or "blocked person" within the definitions set forth in the Foreign Assets Control Regulations of the United States Treasury Department, (ii) acting on behalf of, or a Person owned or controlled by, any government against whom the United States maintains economic sanctions or embargoes under the Regulations of the United States Treasury Department, including, but not limited to, the "Government of Sudan," the "Government of Iran," and the "Government of Libya," (iii) within the scope of Executive Order 13224 — Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001 or (iv) subject to additional restrictions imposed by the following statutes (or regulations and executive orders issued thereunder): the Trading with the Enemy Act, the National Emergencies Act, the Antiterrorism and Effective Death Penalty Act of 1996, the International Emergency Economic Powers Act, the United Nations Participation Act, the International Security and Development Cooperation Act, the Nuclear Proliferation Prevention Act of 1994, the Foreign Narcotics Kingpin Designation Act, the Iran and Libya Sanctions Act of 1996, the Cuban Democracy Act, the Cuban Liberty and Democratic Solidarity Act, and the Foreign Operations, Export Financing, and Related Programs Appropriations Act, or any other law of similar import, as each such act or law has been or may be amended, supplemented, adjusted, modified, or reviewed from time to time.

"*Proposal*" has the meaning set forth in Section 15.13.

"*Proposed Assignee*" has the meaning set forth in Section 9.1(f).

"*Rule 506(d) Covered Person*" has the meaning set forth in Section 15.20.

"*Safe Harbor*" has the meaning set forth in Section 14.9(a).

"*Safe Harbor Election*" has the meaning set forth in Section 14.9(a).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CHHEDA-TRANLLC-RC-00000217

"*Securities Act*" means the United States Securities Act of 1933, as amended.

"*Several Interest Election*" means a written election made by a Limited Partner, and accepted by the General Partner in its reasonable discretion, pursuant to which the General Partner shall treat the Interest held by such Limited Partner as if it were held by more than one Limited Partner as expressly provided herein.

"*Side Letters*" has the meaning set forth in Section 15.5.

"*Similar Law*" means a U.S. federal, state, local, non-U.S. or other law or regulation that is substantially similar to the Plan Assets Regulation or otherwise provides that the Partnership's assets could be deemed to include "plan assets" under such a law or regulation and/or thereby subject the Partnership to a U.S. federal, state, local, non-U.S. or other law or regulation that is substantially similar to the fiduciary responsibility and prohibited transaction provisions of Title I of ERISA or Section 4975 of the Code.

"*Single Partnership Assumption*" has the meaning set forth in Section 2.10.

"*Subscription Agreement*" means the Subscription Agreement among the General Partner, the Limited Partner and the Partnership pursuant to which such Limited Partner has subscribed for and purchased Interests in the Partnership, including the investor questionnaire attached to such Subscription Agreement as completed by such Limited Partner prior to the Partnership's acceptance of the Limited Partner's subscription.

"*Subsequent Closing*" has the meaning set forth in Section 3.6(b)(i).

"*Subsequent Closing Partner*" means an Additional Limited Partner admitted at a Subsequent Closing or an existing Partner that is increasing its Capital Commitment at a Subsequent Closing.

"*Subsequent Fund*" has the meaning set forth in Section 5.4(g).

"*Substantial Investment Date*" has the meaning set forth in Section 5.4(g).

"*Subsidiary*" has the meaning set forth in Section 2.4.

"*Substituted Limited Partner*" means any Person admitted to the Partnership as a substitute limited partner pursuant to the provisions of Section 9.3.

"*Successor General Partner*" means any Person that is admitted as a general partner of the Partnership in accordance with all of the term and conditions of this Agreement to succeed TKF II GP LLC or its successors.

"*Super Majority-in-Interest*" means, as of any date of determination, Partners who are entitled to vote and who hold more than 66-2/3% of the Allocation Percentage held by Partners who are entitled to vote. In computing Super Majority-in-Interest, the Allocation Percentages held by the General Partner, the Manager, or any Affiliated Limited Partners and the Allocation Percentages held by any Defaulting Partners shall not be entitled to vote.

"*Target Balance*" means, with respect to any Partner as of the close of any period for which allocations are made under Article IV, the amount such Partner would receive (or be required to contribute) in a hypothetical liquidation of the Partnership as of the close of such period, assuming for purposes of such hypothetical liquidation:

(a)     a sale of all of the assets of the Partnership at prices equal to their then Gross Asset Values (taking into account only those revaluations of Gross Asset Values actually made by the General Partner prior to such hypothetical sale);

(b)     the distribution of the net proceeds thereof to the Partners pursuant to Section 4.2 (after the payment of all actual Partnership Indebtedness, and any other liabilities related to the Partnership's operations and assets, limited, in the case of nonrecourse liabilities, to the collateral securing or otherwise available to satisfy such liabilities); and

(c)     the contribution by all Partners of any Unused Capital Commitments as needed to satisfy any credit facility secured by the Capital Commitments described in this Agreement and the contribution by the General Partner of amounts needed to satisfy any remaining Partnership liabilities for which the General Partner would be liable.

"*Target Amount*" has the meaning set forth in Section 4.7(e).

"*Tax Distribution Amount*" has the meaning set forth in Section 4.4.

"*Term*" has the meaning set forth in Section 2.6.

"*Transfer*" means any sale, exchange, transfer (including any mortgage, hypothecation or pledge), assignment or other disposition.

"*UBTI*" has the meaning set forth in Section 4.11.

"*Unreturned Capital*" means, with respect to each Partner, as of the date of determination, an amount equal to the excess of such Partner's Capital Contributions made by such Partner over the amount previously distributed to such Partner pursuant to Section 4.2(b) or deemed distributed to such Partner hereunder.

"*Unused Capital Commitments*" means, with respect to any Partner and as of any date of determination, the amount of such Partner's Capital Commitment *minus* the amount of all Capital Contributions made by that Partner as of such date *plus* the amount of Capital Contributions that are returned to the Partners.

"*Withdrawal Date*" has the meaning set forth in Section 3.10(a).

"*Withholding Payment*" has the meaning set forth in Section 4.5.